UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **MICHELE TOURANGEAU,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**NAPPI DISTRIBUTORS,** )<br>)<br>Defendant. ) | **Case No.** _____ |

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Michele Tourangeau, by and through undersigned counsel, hereby complains against Defendant Nappi Distributors as follows:

**INTRODUCTION**

1. This case arises under the Federal Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, as amended by the Equal Pay Act of 1963 (the "EPA"); Title VII of the Civil Rights Act of 1964 ("Title VII"), including the Pregnancy Discrimination Act, 42 U.S.C. § 2000e and 2000e(k) ("Title VII" and the "PDA"); the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq.*; the Maine Timely and Full Payment of Wages Law ("TFPWL"), 26 M.R.S. § 664 *et seq.*; and the common law.

2. This case challenges Defendant's: (1) multiple unequal pay practices based on gender, which violate the EPA; (2) retaliation against Plaintiff for opposing pay practices made unlawful by the EPA; (3) discrimination on the basis of pregnancy, child birth, child rearing, and maternity leave, as well as negative stereotypes related thereto, in violation of the PDA; (4) sex-based discrimination and quid pro quo sexual harassment in violation of the Title VII; (5)

violation of the MHRA; and (6) violation of the Maine TFPWL as well as equitable claims of quantum meruit and unjust enrichment.

## THE PARTIES

3. Plaintiff Michele Tourangeau ("Plaintiff" or "Tourangeau") is an individual residing in the Town of Ogunquit, County of York, and State of Maine.

4. Defendant Nappi Distributors ("Defendant" or "Nappi") is a duly organized Maine Corporation with a principal place of business in the Town of Gorham, County of Cumberland, and State of Maine.

5. Nappi employed Tourangeau at all times relevant to this Complaint.

6. Nappi has had more than 50 employees on its payroll in each of 20 or more calendar weeks during the current and/or preceding calendar year.

7. At all times herein relevant, Nappi was engaged in interstate commerce with an annual sales volume of more than $500,000.00 per year.

## JURISDICTION AND VENUE

8. Prior to filing this Complaint, Tourangeau filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the EEOC. Tourangeau received a notice of right to sue letter from the MHRC pursuant to 5 M.R.S. §§ 4612(6) and 4622(1)(C) on or about October 17, 2019.

9. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in Cumberland and York Counties, Maine.

10. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS

11. Nappi hired Tourangeau in 2014 as a wine sales representative with a start date in January of 2015.

12. Tourangeau was the first female sales representative at Nappi.

13. Nappi's former wine sales director, Paul Carr ("Carr") hired Tourangeau. Carr retired in June 2017. All of Tourangeau's communications about her compensation package were with Carr.

14. At the time of hire, Nappi agreed to pay Tourangeau $22,491.00 annually as a base salary with an additional 2% commission. All other wine sales representatives already working for Nappi were hired at 3% commission.

15. Carr explained to Tourangeau that he designed this compensation for her as opposed to the 3% straight commission that other representatives received because of the nature of her accounts, many of which were seasonal businesses. He told Tourangeau the base salary would account for the 1% difference in her commission, but provide more economic stability through the slower winter months.

16. Matt Watson became the wine sales director after Carr retired.

17. At present, Tourangeau reports directly to Ian Brown, Nappi's fine wine manager.

18. Tourangeau is one of three full-time female sales representatives within the wine sales division at Nappi—the other two were hired sometime after Tourangeau. There is one female sales representative within the beer sales division.

19. In the summer of 2015, Tourangeau had two accounts in Kennebunkport owned by the same proprietor. These establishments had a manager named Bill. In the course of Tourangeau performing her duties as a Nappi sales representative for these businesses, Bill made sexual advances toward her. Tourangeau believed Bill was trying to solicit her to have a

threesome with him and his girlfriend at the time. Tourangeau first reported the behavior to her supervisor, Ian Brown ("Brown"), stating that Bill's behavior made her uncomfortable.

20. Tourangeau declined Bill's sexual advances.

21. A few months later, Carr informed Tourangeau that Bill complained about her performance as a sales representative and therefore the accounts were being taken away from her. Tourangeau was shocked because she had always provided great service to this customer. Tourangeau informed Carr that she believed Bill had only complained about her because she turned down his sexual advances. Tourangeau also informed Carr that she had complained to Brown about this incident. Carr did not provide any substantive response to Tourangeau's concerns, and instead continued to remove her from accounts without providing any supplemental accounts or sources of earning potential.

22. In 2016, Tourangeau became pregnant with her first child. She planned a maternity leave from April to June of 2016. Before going out on leave, Tourangeau prepared all of her seasonal accounts for the upcoming season, because the businesses would open when she was out on leave. Tourangeau spent hours preparing wine lists and menus for these accounts and established sales revenue for the upcoming season.

23. Tourangeau had a conversation with Mike Hale ("Hale"), wine sales manager, regarding how she would be compensated during her maternity leave. Hale assured Tourangeau she would receive incentives for her efforts undertaken in preparation for leave. However, this did not occur. Instead, Tourangeau received only a fraction of what she should have earned.

24. Because of this disparity in pay, Tourangeau had a telephone conversation with Nappi's director of human resources, Christine Fox ("Fox"). Tourangeau explained that Hale had promised she would be compensated for her work in realizing sales revenue in advance of

maternity leave. Fox accused Tourangeau of lying about the conversation and refused to discuss her compensation any further.

25. Tourangeau then followed up with Afton Hawkins ("Hawkins"), a female wine sales assistant, because Hawkins was aware of the conversation between Hale and Tourangeau. Hawkins told Tourangeau she had been instructed not to discuss the issue. Hawkins ended up receiving a portion of the compensation Tourangeau believed she had earned.

26. Hawkins was one of four wine sales assistants—the other three were male. Hawkins applied and interviewed for sales positions with the company but was never promoted. The three other male wine sales assistants were promoted. She left Nappi at the beginning of 2019 to work for a competitor as a wine sales representative.

27. A female beer sales assistant, Shayle Wormel ("Wormel"), had a conversation about compensation with male sales assistants. Wormel learned that the males earned more than she did working in the same position.

28. Wormel believed the sales assistant position was designed to provide support for sales representatives when they are busy, sick, on vacation, on a leave of absence, or otherwise in need of assistance. Wormel never received additional compensation for assisting sales representatives and was unaware of any other scenario where a sales assistant received such additional compensation.

29. Dan Toolan ("Toolan") worked with a sales manager named Frank Maurino ("Maurino"). While Tourangeau was out on maternity leave, Maurino was angry that he had to arrange coverage for her sales route. Maurino said to Toolan something like: "we should not hire women because you have to cover their maternity leave."

30. On December 14, 2017, following a morning sales meeting at Nappi, the director of human resources (Fox) called Tourangeau into her office as she was walking by. Fox berated Tourangeau for the allegedly messy condition of her company vehicle and damage to the side of the vehicle.

31. Tourangeau apologized profusely for the condition of her company car, but Fox continued to berate her, stating: "I don't think you're sorry at all." Fox would not let Tourangeau leave. Tourangeau became so upset she began to cry. Fox stared at Tourangeau intensely and angrily, then accused her of being passive aggressive. Fox then continued to harass and intimidate Tourangeau and then said Tourangeau should have her medications checked because there was probably something wrong with her hormones after she gave birth to her daughter.

32. By contrast, a male employee has been involved in numerous accidents in his company vehicle and was once seen driving while intoxicated. Upon information and belief, this male employee has not been berated or intimidated by Fox despite his mishandling of a company vehicle.

33. After the above incident, Tourangeau left Fox's office and scheduled a meeting with her direct supervisor, Brown, as well as a management employee named Joline Masters ("Masters") to discuss what had taken place.

34. They met the following day, Tourangeau explained to Brown and Masters what had transpired in Fox's office. Tourangeau said the behavior was inappropriate and she was shocked the director of human resources would conduct herself in a harassing, intimidating manner toward an employee.

35. During the meeting, Brown and Master discussed reasons why Fox might not like Tourangeau. Brown indicated that Fox might be holding a grudge against Tourangeau for complaining about her pay for sales revenue earned during maternity leave.

36. Tourangeau requested that Brown and Masters document the conversation in the event of any issues moving forward. She also requested not to have any more one on one meetings with Fox in the future.

37. On Friday, December 7, 2018, Tourangeau met with Watson and Brown for what she thought would be a conversation about year-end performance and possible route changes.

38. During this meeting, Watson informed Tourangeau that she would no longer receive her base salary of $22,491.00 per year. Instead, Nappi was changing Tourangeau's compensation to be straight commission because the company no longer wanted to provide any base salary for outside sales representatives. At first, Tourangeau was accepting of the change with the understanding that she would receive the 3% commission that her colleagues received.

39. However, Watson told Tourangeau she was not eligible for the 3% commission, but would keep the 2% commission rate without the base pay. Watson told Tourangeau that the seven male sales representatives hired on or before January 2015 were given the 3% rate because they were "grandfathered" into that rate, but she would not be.

40. Tourangeau asked Watson if this decision was based on her performance. Watson assured Tourangeau the decision was not based on her performance. Tourangeau also expressed concerns that Nappi was trying to force her to quit, which Watson denied.

41. Tourangeau followed up with Watson on Thursday, December 20, 2018 about the changes to her compensation. During this conversation, they agreed to set up a meeting with Fox.

42. Tourangeau met with Watson and Fox on January 22, 2019. Tourangeau began the conversation by stating that she was happy working for Nappi and she was hopeful they would be able to come to an agreement as to her compensation. Fox and Watson both told Tourangeau she was a valuable member of the sales team, confirming that the decision regarding her compensation was not based on performance.

43. Tourangeau asked Fox why Nappi had changed her compensation structure. Fox claimed that Carr, the manager who hired Tourangeau, was not authorized to provide her with a base salary plus 2% commission. Fox indicated that Nappi was moving toward a 2% commission for sales representatives.

44. Tourangeau asked Fox why she was not "grandfathered" in to a 3% commission rate like the seven male sales representatives working at the time she was hired. Fox did not specifically answer the question.

45. Fox reiterated that Nappi would not pay Tourangeau a 3% commission, but offered to taper Tourangeau's salary for a period of five years. Fox indicated that changes in business happen all the time and Nappi was fully within its rights to make changes to Tourangeau's pay.

46. The following day, Watson sent Tourangeau an email asking her to call him. They spoke on the phone and he confided that he also believed the action to be unfair. He asked Tourangeau not to make any rash decision about leaving the company and to give him a bit of time to work on a different plan.

47. Tourangeau followed up with Watson on January 28, 2019, asking how long it would be until a final decision was made. Watson did not have a specific timeline in mind.

48. Tourangeau spoke with Watson on February 13, 2019. He informed Tourangeau that he had a three-hour meeting with Fox in which he tried to "plead" Tourangeau's "case" to either receive the full base salary with 2% commission, or receive the 3% commission. Watson said the best he could do was convince Fox to agree to an $11,000 base salary with 2% commission.

49. To date, Tourangeau has not been provided a specific reason for why she was not eligible for the 3% commission rate like her male colleagues.

50. Justin Park ("Park") is a wine sales representative for National Distributors. Nappi originally offered the job that Tourangeau ended up taking to Park. Park decided to remain employed with National Distributors instead, but his understanding was that Nappi would have offered him a 3% commission back in 2015.

51. Meanwhile, Nappi eliminated the base salary for a male wine sales representative named Dan Toolan ("Toolan"). Toolan had been earning a $6,500.00 base salary plus 2% commission. However, after Nappi took away his base pay, Toolan was told that Nappi would provide him with additional accounts to compensate for the loss of his salary.

52. One of the accounts Nappi promised to give to Toolan was Market Basket, which after the store opened would be a far more lucrative account than any of Tourangeau's. Watson also told Toolan that he would work with him to become a supplier sales representative, because Watson had connections at that higher level of the industry. This would have guaranteed higher compensation for Toolan. Watson made no such promises to Tourangeau.

53. In December of 2013, Nappi hired Helena Donovan ("Donovan") to be the wine purchasing manager. Donovan's predecessor was a male named John Houle. Donovan had a conversation with Houle when she started working for Nappi. Houle told Donovan she would not

be paid as high a salary as he was, because Houle was "grandfathered" into a higher salary. Donovan believed the disparity in their salaries was due to gender.

54. Two months into Donovan's employment, Nappi changed her job title to wine purchaser. This change meant Donovan was no longer eligible for a company vehicle or manager bonuses. Donovan's job duties did not change, but with the change in title some of her employee benefits were eliminated.

55. Nappi has a pattern of unequal pay practices and discriminatory treatment of women. Nappi has engaged in unequal pay practices that disproportionately affect female employees and perpetuate previous discriminatory hiring practices.

56. Tourangeau's 2% commission in 2018 amounted to $35,694.00. Of the women working in the wine sales division, Tourangeau had the highest commission and highest earnings overall.

57. By contrast, the seven highest paid sales employees were all men, compensated at a 3% commission rate.

58. Five of those seven male employees had commissions in 2018 that nearly doubled Tourangeau's, due to not only on disparate commission rates but account assignments as well.

59. Nappi's stated reasons for removing Tourangeau's base salary and/or failing to compensate her at a commission of 3% amount to pretext.

60. After Tourangeau filed a charge of discrimination with the Maine Human Rights Commission on April 2, 2019 alleging gender discrimination, Nappi retaliated against her by withholding earned commission.

61. Tourangeau scheduled short term disability leave for a minor medical procedure on May 9, 2019.

62. On May 15, 2019, Tourangeau asked her direct supervisor (Watson) about how her earned commission would be handled when she was out on leave, given that the work required to generate such commissions had already been performed.

63. Much of the work as a wine sales representative is front loaded. Tourangeau spends numerous hours on each account at the beginning of the busy season by getting Nappi products in the door of different venues. She conducts wine tastings, meetings, and promotes features for customers' drink menus in time for the busy season. Even if Tourangeau is out of work for an entire week, the work that generated the sale for which the commission is based has already been performed.

64. During Tourangeau's short term disability as well as maternity leave, she continued to place orders and communicate with clients and assistants about servicing various accounts.

65. After Tourangeau inquired about commissions earned during her short-term disability leave for work already performed, Nappi stated they do not redistribute the commission from the sales; instead, Nappi retained the commission.

66. However, when Tourangeau was out on maternity leave Nappi retained her commission and provided a portion of Tourangeau's incentive dollars to Hawkins.

67. Since Tourangeau filed her charge of discrimination, Nappi has retaliated by excluding her from work-related dinners.

68. Nappi has further retaliated against Tourangeau since she filed her charge of discrimination by excluding her from an incentive-based compensation opportunity.

69. Nappi's discriminatory and retaliatory actions set forth above amounted to a willful violation of Tourangeau's state and federally protected rights.

## COUNT I – VIOLATION OF THE FEDERAL EQUAL PAY ACT
### (29 U.S.C. § 206 *et seq.*)

70. Plaintiff repeats the allegations set forth in Paragraphs 1 through 69 of her Complaint as if fully set forth herein.

71. Defendant discriminated against Tourangeau in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(d), as amended by the Equal Pay Act of 1963, by subjecting her to unequal pay on the basis of sex.

72. Nappi violated the Equal Pay Act by compensating Tourangeau less for a job requiring substantially equal skill, effort, and responsibility, which was performed under similar working conditions.

73. Nappi's unequal pay on the basis of sex affected not only Tourangeau's salary but her employee benefits, earning potential, sales incentives, and bonuses as well.

74. Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the Equal Pay Act. Further, Defendant knew of or showed reckless disregard for the fact that its conduct violated the Equal Pay Act.

75. As a result of Defendant's conduct alleged herein and/or Defendant's willful, knowing and intentional discrimination, Tourangeau suffered and will continue to suffer harm, including but not limited to, lost wages, lost benefits, and other financial loss.

76. Tourangeau should be awarded all legal and equitable remedies, including underpaid wages and liquidated damages for Nappi's willful violation of the Equal Pay Act, along with reasonable attorneys' fees under 29 U.S.C. § 216, et seq.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages,

punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT II – RETALIATION IN VIOLATION OF THE EPA
### (29 U.S.C. § 215)

77. Plaintiff repeats the allegations set forth in Paragraphs 1 through 76 of her Complaint as if fully set forth herein.

78. Tourangeau engaged in protected activity under the EPA by making several specific complaints of pay practices that violate the EPA.

79. Nappi took adverse action against Tourangeau as a direct and proximate result of her complaints about EPA violations.

80. A temporal and causal connection exists between Tourangeau's complaints of unequal pay and multiple instances of adverse action set forth above.

81. As a result of Defendant's willful, knowing and intentional retaliation, Tourangeau suffered and will continue to suffer economic harm.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT III – VIOLATION OF THE PREGNANCY DISCRIMINATION ACT
### (42 U.S.C. § 2000e(k))

82. Plaintiff repeats the allegations set forth in Paragraphs 1 through 81 of her Complaint as if fully set forth herein.

83. Nappi discriminated against Tourangeau on the basis of her pregnancy, childbirth, and/or maternity leave.

84. As a woman affected by pregnancy and childbirth, Nappi did not treat Tourangeau in the same manner as other employees not so affected, who had the same ability to work as Tourangeau.

85. Direct evidence of animus against Tourangeau on the basis of her pregnancy, childbirth, and maternity leave exists in this case.

86. To this day, Nappi is engaged in an ongoing violation of the Pregnancy Discrimination Act by continuing to treat Tourangeau less favorably than similarly situated employees who did not become pregnant or take maternity leave.

87. Nappi continues to discriminate against Tourangeau on the basis of both her past pregnancy and the potential for a future pregnancy.

88. Nappi continues to discriminate against Tourangeau on the basis of negative stereotypes about childrearing and motherhood related to her past pregnancy.

89. As a result of Defendant's willful, knowing and intentional pregnancy discrimination, Tourangeau has suffered and will continue to suffer economic harm and compensatory damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT IV – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
### (42 U.S.C. § 2000e *et seq.*)

90. Plaintiff repeats the allegations contained in Paragraphs 1 through 89 of her Complaint as if fully set forth herein.

91. Tourangeau is female and a member of a protected class.

92. For all the reasons set forth above, Nappi has engaged in discrimination against Plaintiff on the basis of sex.

93. Nappi has also engaged in sex stereotyping and subjected Plaintiff to unequal working conditions on the basis of sex.

94. As a result of Nappi's sex-based discrimination, Plaintiff has suffered compensatory damages and economic loss.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT V – QUID PRO QUO SEXUAL HARASSMENT IN VIOLATION OF TITLE VII
**(42 .S.C. § 2000e *et seq*.)**

95. Plaintiff repeats the allegations contained in Paragraphs 1 through 94 of her Complaint as if fully set forth herein.

96. A customer of Nappi's subjected Plaintiff to unwelcomed sexual advances, which she rejected.

97. Because Tourangeau rejected the customer's sexual advances, Nappi took adverse action against her that impacted her earning potential with the company.

98. Nappi's decision to remove the customer account in question was made on the basis of sex and Plaintiff's failure to submit to unwelcome sexual advances.

99. Tourangeau's refusal to submit to this customer's sexual advances affected a tangible aspect of her employment because when she rejected the advances, Nappi took away the account, failed to replace it with another, and thus decreased her earning potential.

100. Nappi knew of this customer's quid pro quo sexual harassment of Plaintiff but failed to take any action to correct it.

101. Based on the foregoing, Nappi can be held liable for its customer's quid pro quo sexual harassment of Plaintiff.

102. As a result of Nappi's discriminatory actions, Tourangeau has suffered and is entitled to damages, including but not limited to: lost wages and employee benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT VI -- VIOLATION OF THE MAINE HUMAN RIGHTS ACT
(5 M.R.S. § 4571 *et seq.*)

103. Plaintiff repeats the allegations contained in Paragraphs 1 through 102 of her Complaint as if fully set forth herein.

104. For all of the reasons set forth in Counts I through V above, unlawful discrimination and retaliation against Plaintiff have taken place in violation of the Maine Human Rights Act.

105. As a result of Nappi's discriminatory actions, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

### COUNT VII: VIOLATION OF THE MAINE TIMELY AND FULL PAYMENT OF WAGES LAW ("TFPWL")
### (26 M.R.S. § 621-A et seq.)

106.    Plaintiff repeats the allegations contained in Paragraphs 1 through 105 of her Complaint as if fully set forth herein.

107.    Defendant failed to pay Tourangeau commissions and incentives earned and owed for work she performed within the time provided for under Maine's Timely and Full Payment of Wages Law ("TFPWL").

108.    Under the penalty provisions of the TFPWL, Tourangeau is entitled to an amount equal to twice the amount of her unpaid commission and incentives, plus reasonable attorney's fees, interest, and costs of suit.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

### COUNT VIII: QUANTUM MERUIT

109.    Plaintiff repeats the allegations contained in Paragraphs 1 through 108 of her Complaint as if fully set forth herein.

110.    Tourangeau rendered services to Defendant in furtherance of Defendant's business interests at the request and/or with the knowledge of Defendant.

111. The circumstances surrounding Tourangeau's rendering of services to Defendant made it reasonable for Tourangeau to believe, and in fact Tourangeau did believe, that she would receive payment from Defendant for those services pursuant to the commission structured pay.

112. Under the circumstances described above, a promise to pay must be inferred.

113. All of the various services rendered by Tourangeau occurred under circumstances consistent with contractual relations.

114. Under Maine law, damages owed to Tourangeau for quantum meruit have the same status as unpaid wages, entitling Tourangeau to payment of twice that amount for liquidated damages.

## COUNT IX: UNJUST ENRICHMENT

115. Plaintiff repeats the allegations contained in Paragraphs 1 through 114 of her Complaint as if fully set forth herein.

116. Tourangeau conferred a benefit on Defendant by performing services in furtherance of Defendant's business interests.

117. Tourangeau rendered the aforementioned services with the appreciation or knowledge of Defendant of the benefit(s) conferred.

118. Under the circumstances described above, acceptance or retention of the benefit(s) conferred to Defendant, without payment to Tourangeau for the value of services rendered, would be inequitable.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court (1) enter judgment of favor of the Plaintiff and (2) award damages sufficiently large to compensate for damages she has suffered as a result of Defendants conduct including, but not limited to, damages for general and non-economic damages, economic damages, prejudgment and post

judgment interest, lost wages, punitive damages, costs of this suit, including reasonable attorney fees and costs, and such further relief the Court may deem proper.

Dated:  January 10, 2020			/s/ Laura H. White
						_____
						Laura H. White, Bar No. 4025
						*Attorney for Plaintiff*
						WHITE & QUINLAN, LLC
						62 Portland Rd., Suite 21
						Kennebunk, ME 04043
						(207) 502-7484
						*lwhite@whiteandquinlan.com*

						/s/ Danielle M. Quinlan
						_____
						Danielle M. Quinlan, Bar No. 5480
						*Attorney for Plaintiff*
						WHITE & QUINLAN, LLC
						62 Portland Rd., Suite 21
						Kennebunk, ME 04043
						(207) 502-7484
						*dquinlan@whiteandquinlan.com*