UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MICHELE TOURANGEAU,<br><br>      Plaintiff,<br><br>      vs.<br><br>NAPPI DISTRIBUTORS,<br><br>      Defendant. | Civil No. 20-00012-JAW |

## DEFENDANT'S SUR-REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

With the Court's leave, Defendant Nappi Distributor hereby supplements its reply to Plaintiff Michele Tourangeau's opposition to Nappi's summary judgment motion as follows:

### I. Plaintiff's temporal proximity argument in support of her Equal Pay Act retaliation claim has no merit.

As stated in Nappi's February 7, 2022, reply memorandum in support of its motion for summary of judgment ("reply"), Ms. Tourangeau's claims for retaliation under the Equal Pay Act ("EPA") for events that occurred prior to January 10, 2017, are time-barred. In her opposition, Ms. Tourangeau asserts that her "protected activity" was complaints about unequal pay, and that she then suffered adverse consequences in terms of pay, sales accounts, incentives, and hostile treatment.[1] She relies on a temporal proximity in an effort to demonstrate causation. However, the competent, material facts do not support this theory. Ms. Tourangeau vaguely alludes to "ongoing complaints" but does not specify to which action she views as the "protected activity." Further, any "complaints" that occurred after January 10, 2017, do not amount to a prima facie case of retaliation, as discussed in Nappi's reply.

In order to satisfy the protected activity prong of the retaliation analysis, Ms. Tourangeau ostensibly points to an article that she sent to management regarding gender disparity in pay in the alcohol beverage industry, which she alleges was sent when the topic of

---

[1] As Nappi notes in its reply, Ms. Tourangeau did not plead a hostile work environment claim.

changing compensation for sales representatives came up.  Notably, Ms. Tourangeau sent this report on November 27, 2018, *after* Nappi had decided to reduce the compensation of sales representatives. Defendant's Response to Plaintiff's Statement of Additional Material Facts (hereinafter "DRPSAMF") ¶¶ 184-185. In fact, Ms. Tourangeau testified that she sent the report *after* her manager told her that there was going to be some sort of adjustment to her salary. DRPSAMF ¶¶ 188-189. Therefore, there is no temporal connection between the alleged protected activity and the alleged adverse action, since the decision to reduce Ms. Tourangeau's compensation came first.

Nor does the sending of the report constitute a protected activity. As discussed more in-depth in Nappi's summary judgment motion, the United States Court of Appeals for the First Circuit has clarified that "[t]o engage in protected activity, 'the employee must step outside his or her role of representing the company and . . . file . . . an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.'" *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004) (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)); *see also Morales v. Challenger Caribbean Corp.*, 8 F. Supp. 2d 126, 130 n.9 (D.P.R. 1998) (noting that "[t]he Equal Pay Act is an amendment to the FLSA"). Here, simply sending a report to a supervisor, after a decision about compensation had already been made, does not constitute stepping outside employment and filing an action adverse to the employer. Moreover, Ms. Tourangeau herself testified that she has no information to suggest that the change in her compensation structure was in retaliation for something. Defendant's Statement of Material Facts (hereinafter "DSMF") ¶ 97 (Tourangeau Dep. at 219/19 to 220/11; Doc. 74, #1877-1878).[2]

---

[2] Although Ms. Tourangeau's response to this statement of fact is a denial, her testimony speaks for itself. Moreover, Mr. Watson clearly testified that Ms. Tourangeau sent him an email with the report "as a result" of him telling her that there was going to be a salary reduction. Watson Dep. at 26/11-20; Doc. 65-11, 1135. Notably, Ms. Tourangeau cites testimony before and after this clear response to support her denial but fails to bring this response to the Court's attention.

Ms. Tourangeau filed her complaint with the Maine Human Rights Commission on April 8, 2019. DRPSAMF ¶ 221. This is inarguably the type of conduct that the *Claudio-Gotay* court intended when it described the analysis to determine what amounts to protected activity. However, Ms. Tourangeau has not introduced admissible evidence of any adverse employment action that is temporally related to that protected activity. Indeed, Ms. Tourangeau makes no attempt in her opposition to indicate which factual allegation is meant to satisfy this prong of the analysis. Accordingly, Nappi is entitled to judgment as a matter of law on Ms. Tourangeau's EPA retaliation claim.

## II. **Plaintiff has presented no evidence to support her contention that she was subjected to rudeness and ostracism in retaliation for a protected activity.**

In her opposition, Ms. Tourangeau cites *Noviello v. City of Bos.*, 398 F.3d 76, 92 (1st Cir. 2005), for the proposition that "rudeness and ostracism," when taken with other retaliatory action, can amount the adverse actions. She points to a variety of perceived adverse actions, which taken either cumulatively or individually, would allegedly dissuade a reasonable worker from making or supporting a charge of discrimination. However, Ms. Tourangeau has presented no facts in the summary judgment record to support an indication of rudeness, ostracism, or other adverse action would dissuade a reasonable worker from making or supporting a charge of discrimination.

The cited portion of *Noviello* states that "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." *Id.* The First Circuit then goes on to state that, "if protected activity leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness), a reasonable person would not be deterred from such activity." *Id.* The court further stated that employees "can expect to encounter such tribulations even if [they] eschew[] any involvement in protected activity." *Id.* The First Circuit has pointed out that "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 23 (1st Cir.

2002). Retaliatory harassment claims present a unique challenge, as the "very act of filing a charge against a coworker will invariably cause tension and result in a less agreeable workplace." *Noviello*, 398 F.3d 76, 93 (1st Cir. 2005). Predictably, the "target of the complaint likely will have coworker-friends who come to his defense, while other coworkers will seek to steer clear of trouble by avoiding both the complainant and the target. Although admittedly a source of unpleasantness in the workplace, such behavior should not be seen as contributing to a retaliatory hostile work environment." *Id.*

In this matter, Ms. Tourangeau has not established that she was subjected to rudeness or ostracism, and certainly not to acts or omissions that rise beyond the type of unpleasantness described by the *Noviello* court. The summary judgment record, taken in the light most favorable to her, only contains the type of commonplace indignities that are typical in the workplace. In her opposition, Ms. Tourangeau places emphasis on Ms. Fox "glaring" at her and points that this created a hostile work environment. A perceived "glare" would fall into the commonplace indignities of the workplace that the First Circuit described as conduct that would not rise to the level of a hostile work environment. Moreover, even if a glare could rise to the level of conduct that is "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive," *see Noviello*, 398 F.3d 76, 92 (1st Cir. 2005), the record does not support the contention that Ms. Fox glared at Ms. Tourangeau. Ms. Tourangeau specifically refrained from assigning the word "glare" to any of Ms. Fox's conduct at her deposition, and categorized interactions with Ms. Fox as "pretty good," and "civil." DRPSAMF ¶ 144.

Ms. Tourangeau also claims that she was ostracized because she was excluded from a work dinner in 2019. However, the record indicates that this was not a structured, pre-planned work event, but rather an informal event that was organized at the last-minute. DRPSAMF ¶ 235. Again, even if this was an intentional exclusion, this is the type of alleged social avoidance by uninvolved co-workers hypothesized by the *Noviello* court. Aside from the one instance of a last-minute dinner, Ms. Tourangeau was unable to point to any other events she was "excluded" from. DSMF ¶ 107.

### III. Nappi is entitled to summary judgment on Plaintiff's Maine's Timely and Full Payment of Wages Claim, as Plaintiff was compensated for all work performed.

Ms. Tourangeau has alleged that Nappi violated Maine's Timely and Full Payment of Wages ("MTFPW") statute. She points to three separate periods which she claims demonstrate violations. As discussed in Nappi's reply, Ms. Tourangeau's claim for work allegedly performed during a 2015 vacation is barred because it was not alleged in her Complaint or interrogatory responses, it is time-barred, and it is reliant on hearsay.

Ms. Tourangeau next argues that Nappi violated the MTFPW statute because she was not paid during maternity leave. This argument fails for two reasons. First, Ms. Tourangeau was paid during this period. It is undisputed that Ms. Tourangeau received short-term disability pay while she was out on maternity leave. DSAMF ¶ 28. Additionally, Ms. Tourangeau has been paid incentives on all sales she has earned according to Nappi's policies. DSMF ¶ 124.[3]

Second, the record does not support Ms. Tourangeau's contention that she worked throughout her maternity leave. The summary judgment record is devoid of references to work aside from an occasional email or meeting. Ms. Tourangeau's assertion that she was expected to work while on leave is contradicted by the record, which unambiguously states that she was not expected to work while on leave. DRPSAMF ¶ 110. In fact, Nappi's human resources director was unaware that Ms. Tourangeau was working, or thought she was expected to work, while on leave. DRSAMF ¶ 132. Although one member of management indicated that he saw the occasional email from Ms. Tourangeau while she was on leave, it was not intensive or regular, and he was unaware that Ms. Tourangeau met with the sales assistant covering her route while she was on leave. DRSAMF ¶¶ 150-151. Ms. Tourangeau testified that she contacted the sales assistant covering her sales route a couple times per week. DRSAMF ¶ 131. The sales assistant testified that she spent most of this time period covering for Ms. Tourangeau. DRSAMF ¶ 129. Thus, the record indicates that although Ms. Tourangeau sent an occasional email to the sales

---

[3] Although Ms. Tourangeau denies this statement of fact, her denial is not supported by any competent, material record evidence that actually refutes or calls into question the accuracy of the stated fact.

assistant and management, the majority of the work on her route was performed by the covering sales assistant.

Finally, Ms. Tourangeau claims that Nappi violated the MTFPW statute when she was on short-term disability leave for a medical procedure in May 2019. Ms. Tourangeau has alleged that she continued to work during that leave. However, there is no support in the record for that contention. The only record citation properly before the Court is an email Ms. Tourangeau sent inquiring about the status of commissions generated by her account *during* her leave. PSAMF ¶ 245. The email does not indicate that Ms. Tourangeau was working during her recovery. *Id*. Moreover, Ms. Tourangeau was compensated while on leave, as she received short term disability pay. DSMF ¶¶ 118-20.[4] In short, Ms. Tourangeau does not generate a genuine issue of material fact in support of her MTFPW statute claims and Nappi is therefore entitled to summary judgment.

### IV. **Plaintiff has not presented a genuine dispute as to any material fact.**

In her opposition memorandum, Ms. Tourangeau made a variety of factual statements, arguing that disputed facts make summary judgment impossible. Due to page constraints, Nappi was unable to respond to many allegations in its Reply, and it now uses the opportunity in this Sur-Reply to respond to certain allegations in turn.

First, Ms. Tourangeau claims that she has fewer and less desirable accounts than her similarly situated male peers. She claims that Nappi distributes its sales accounts in a discriminatory fashion. However, the undisputed record demonstrates that to contrary is true. Ms. Tourangeau's route has become more profitable during the course of her employment at

---

[4] Although Ms. Tourangeau qualifies or denies the factual assertions in paragraphs 119 and 120, her responses are largely argument – a flaw that pervades her supposed denials and qualifications generally. The Court should disregard all such conclusory and argumentative responses to Nappi's factual statements. *See Richardson v. Mabus*, 203 F. Supp. 3d 86, 99 n.8 (D. Me. 2016) (A party "may not introduce legal arguments as if they constitute statements of fact, as the Court can 'afford no evidentiary weight to "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."'") (citations omitted).  Moreover, with regard to paragraphs 119 and 120, she does not present any facts that actually contest or call into question the facts set forth in those paragraphs.

Nappi. Seven accounts have been added to her route since 2018. DSMF ¶ 98. One of those new accounts was one of the largest accounts in York County. DSMF ¶ 99. Two of the new accounts added an approximately 30% commissions increase and additional incentive opportunities. DSMF ¶ 100. Ms. Tourangeau admits that her account, as it is currently constituted, has better sales potential than when she first started working at Nappi. DSMF ¶ 101.

Second, Ms. Tourangeau's contention surrounding incentive pay for an account called "Mike's" is unfounded. As indicated in Nappi's reply, Ms. Tourangeau did not plead this factual allegation in her Complaint or in her interrogatory responses, and accordingly, it should not be considered. Notwithstanding Ms. Tourangeau's insufficient pleadings, the record clearly demonstrates that she was abusing an incentives program and her conduct not only meant Nappi was not earning money from the products she placed, but it also prompted complaints from a supplier. The record shows that Ms. Tourangeau became ineligible for the incentive program at Mike's because the supplier complained to Nappi that the placed product would be returned or never ordered again, but they were expected to pay the incentive regardless. DRSAMF ¶ 233. The supplier further complained that on several of Ms. Tourangeau's accounts, placements were not made for long-term growth. *Id.* Nappi's management made the goal of incentives clear to sales staff at meetings — to promote brands and to initiate business, and to grow long-term brand building through reordering. DRSAMF ¶¶ 228, 233. Mr. Brown testified that the egregious nature of the Ms. Tourangeau's incentive-driven sales to an account for which Nappi did not end up making money was unique to his sales experience. DRSAMF ¶ 226. Accordingly, Nappi had a legitimate business reason for denying Ms. Tourangeau's eligibility for that one account, due to the unique circumstances surrounding her abuse of the program.

Third, Ms. Tourangeau points to alleged statements made by a former sales manager, Frank Maiorino, regarding his alleged opinion about hiring women for sales positions. These statements are inadmissible hearsay, as Ms. Tourangeau attempts to introduce them via the testimony of a non-speaker. Therefore, the Court cannot consider these statements on summary judgment. *Garside v. Osco Drug*, Inc., 895 F.2d 46, 50 (1st Cir. 1990); Local Rule 56(e).

Accordingly, there is no factual evidence in the summary judgment record to support this claim.

Fourth, Ms. Tourangeau erroneously claims that a representative of Nappi testified that "a sales representative that takes a leave of absence still receives incentive pay." To support this, she cites to a paragraph of deposition testimony in which a former member of Nappi management, Paul Carr, was asked what would happen with compensation in general if an employee "needed to take a couple of weeks off. . .?" DRSAMF ¶ 101. Mr. Carr was not asked about how or if an employee would receive incentives if they took an extended leave of ten or more weeks. He was simply asked about compensation for an employee who took "a few" weeks off. *Id*. There is nothing in the record to suggest that Ms. Tourangeau's compensation while on leave was contrary to Nappi policy, or different than her similarly situated male peers.

Fifth, Ms. Tourangeau alleges that she was specifically promised that she would receive her incentive pay while on maternity leave, and further claims that although she did work while on maternity leave, she was not paid. First and foremost, as discussed *supra,* Ms. Tourangeau *was paid* during maternity leave. She received short-term disability benefits and 43 percent of the incentives that were earned during her leave based on products sold and delivered pre-dating her leave period. DSMF ¶ 60. Moreover, the record simply does not support the contention that she was promised incentives while on maternity leave. Michael Hale, the Wine Manager at the time, testified that he told Ms. Tourangeau that if she took phone calls from clients, and if those clients worked with the sales assistant assigned to the route, he would *try* to get her placement incentives. DRSAMF ¶¶ 109, 114. Mr. Hale specifically testified that, "in every other case I'd ever been through, anybody who was out never, ever was entitled to incentives." DRSAMF ¶ 110. Mr. Hale's testimony simply cannot be construed to support the notion that he "promised" Ms. Tourangeau he would get her incentive pay. Further, Ms. Tourangeau's contention that she was not paid during leave is simply incorrect, as it is undisputed that she received both short-term disability pay and a portion of the incentives earned while a sales assistant covered her route.

Sixth, Ms. Tourangeau alleges that Nappi took adverse action against her in removing an

Page 8 of 10

account for rejecting a customer's sexual advances. As discussed in Defendant's summary judgment motion, this claim is time barred. Regardless, for reasons discussed in Nappi's summary judgment motion, the comment itself did not amount to a "sexual advance," and even assuming *arguendo,* that it did, Ms. Tourangeau has introduced no evidence to establish that she was removed from the account because she rejected an advance. The account was reassigned a few months after the conversation because Ms. Tourangeau was not coordinating with the client to discuss product orders. DSMF ¶ 56.[5]

Seventh, Ms. Tourangeau alleges that there is a "strong inference of sex-based discrimination" due to a conversation that she had with Ms. Fox regarding the state of her work vehicle. This conversation has been taken out of context and distorted. The discussion occurred on December 14, 2017, after Ms. Tourangeau was asked to report to Human Resources to discuss internal and external damage to her vehicle that Ms. Tourangeau had not reported for a full year, violating company policy. DRSAMF ¶ 172. Further, Ms. Tourangeau was asked about a food mess in her car, which she claimed was a spilled smoothie that she let sit in the company car uncleaned for six months. *Id.* Ms. Tourangeau then testified that she began crying in order to leave, and that Ms. Fox did not threaten her or physically prevent her from leaving. *Id.* Ms. Tourangeau further stated that she confided in Ms. Fox that she gets sensitive when she is frustrated, and the two had bonded over the difficulties of balancing work with the raising of young children. *Id.* Ms. Tourangeau described the conversation as the two women "being nice and dialoguing." *Id.* Ms. Fox, in discussing these issues with Ms. Tourangeau, confided that she had a hormonal imbalance when her child was young, and found it helpful to discuss the issue with her PCP. *Id.* Essentially, this conversation, which occurred 20 months after Ms. Tourangeau's daughter was born, was about undisputed external and internal damage that Ms. Tourangeau had done to her company car, which went unreported for a year. During the

---

[5] Although Ms. Tourangeau denies this statement of fact, she does not cite any record evidence to establish that Mr. Carr did not testify as indicated or that Mr. Carr's stated basis for moving the account – that Ms. Tourangeau was not coordinating with the account to discuss product orders – was unfounded. Therefore, her denial lacks merit.

meeting, Ms. Tourangeau started crying in an attempt to leave the meeting, at which point Ms. Fox empathized with Ms. Tourangeau and attempted to support her. Ms. Tourangeau herself categorized the conversation as positive. There is nothing in the admissible record to suggest that this conversation constitutes sex-based discrimination.

For the reasons set forth in its Motion and supporting memoranda of law, Nappi is entitled to summary judgment on all claims in this matter.

Dated at Portland, Maine this 12th day of August, 2022.

> Attorneys for Defendant
> MONAGHAN LEAHY, LLP
> 95 Exchange Street, P.O. Box 7046
> Portland, ME 04112-7046
> (207) 774-3906
> jwall@monaghanleahy.com

BY: /s/ John J. Wall, III
John J. Wall, III

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2022, I electronically filed **Defendant's Sur-Reply Memorandum of Law in Support of Motion for Summary Judgment** using the CM/ECF system, which will provide notice to me and all other counsel of record.

Dated at Portland, Maine this 12th day of August, 2022.

> Attorneys for Defendant
> MONAGHAN LEAHY, LLP
> 95 Exchange Street, P.O. Box 7046
> Portland, ME 04112-7046
> (207) 774-3906
> jwall@monaghanleahy.com

BY: /s/ John J. Wall, III
John J. Wall, III