UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHELE TOURANGEAU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:20-cv-00012-JAW |
| NAPPI DISTRIBUTORS, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED[1] ORDER ON MOTION FOR SUMMARY JUDGMENT**

An employer-defendant brings a motion for summary judgment against an employee-plaintiff's claims pursuant to Federal Rule of Civil Procedure 56. The employee alleges that the employer violated the Equal Pay Act and the Maine Human Rights Act by discriminating against her on the basis of sex and violated Title VII of the Civil Rights Act by discriminating against her on the basis of sex and pregnancy. The employee additionally alleges that the employer violated the Maine Timely and Full Payment of Wages Act by failing to pay her owed commissions and incentives for her work. The employee further alleges retaliation under Title VII and the Maine Human Rights Act and brings claims of quantum meruit and unjust enrichment, alleging that while on leave she provided services at her workplace for which she did not receive owed compensation. The Court grants in part and denies in part the

---

[1]    The Order on Motion for Summary Judgment dated 11/29/2022 (ECF No. 106) inadvertently referred to the motion at issue as a motion to dismiss. This Amended Order correctly identifies the motion and relevant rule.

motion because genuine issues of material fact preclude summary judgment as to most of the employee's claims.

## I.   PROCEDURAL HISTORY

On January 10, 2020, Michele Tourangeau filed a complaint against her former employer Nappi Distributors (Nappi), alleging unequal pay practices and related retaliation, sex and pregnancy discrimination, and sexual harassment. *Pl.'s Compl. and Demand for Jury Trial* (ECF No. 1) (*Compl.*). The Complaint expressly asserted claims under the Federal Fair Labor Standards Act, as amended by the Equal Pay Act (EPA), Title VII of the Civil Rights Act of 1964 (Title VII), including the Pregnancy Discrimination Act (PDA), the Maine Human Rights Act (MHRA), the Maine Timely and Full Payment of Wages Law (TFPWL), and common law. *Id.* ¶ 1.

On March 13, 2020, Nappi filed its answer and affirmative defenses. *Answer, Affirmative Defenses and Jury Trial Demand (Def. Nappi Distributors)* (ECF No. 7) (*Answer*). In its answer, Nappi asserted nineteen affirmative defenses but did not assert as affirmative defenses the statutory damages caps under Title VII or the MHRA. *Id.* at 14-16. Both Title VII and the MHRA provide for statutory caps depending on the number of employees employed by the employer. *See* 42 U.S.C. § 1981a(b)(3); 5 M.R.S. § 4613(2)(B)(8).[2]

---

[2]   On March 16, 2020, the Magistrate Judge issued a scheduling order and imposed various deadlines, including a June 1, 2020, deadline for amendment of the pleadings and joinder of parties. *Scheduling Order with Incorporated Rule 26(f) Order* at 2 (ECF No. 8). The Magistrate Judge granted the parties' motions to amend the scheduling order to extend the discovery deadline multiple times for a final deadline of September 2, 2021; however, the parties did not move for an extension to the June 1, 2020, deadline for amendment of the pleadings. *See Am. Order* (ECF No. 11); *Order* (ECF No. 14); *Order* (ECF No. 20); *Order* (ECF No. 32); *Order* (ECF No. 51). On March 21, 2022, after the deadline to amend pleadings had expired, Nappi filed a motion for leave to amend its answer to plead

On December 6, 2021, Nappi filed its motion for summary judgment and statement of material facts. *Def.'s Mot. for Summ. J.* (ECF No. 76) (*Def.'s Mot.*); *Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 77) (DSMF). On January 10, 2022, Ms. Tourangeau filed her opposition, *Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 86) (*Pl.'s Opp'n*). That same day, Ms. Tourangeau filed her opposing statement of additional material facts, *Pl.'s Opposing and Additional Statement of Material Facts in Opp'n to Summ. J.* at 1-64 (ECF No. 85) (PRDSMF), and her own statement of additional material facts. *Pl.'s Additional Statement of Material Facts* at 64-110 (ECF No. 85) (PSAMF). On February 7, 2022, Nappi replied, *Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 89) (*Def.'s Reply*), and filed a response and objections to Ms. Tourangeau's additional statements of material fact. *Consolidated Statements of Material Facts Including Def.'s Reply Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J.* at 1-49 (ECF No. 90) (DRPSAMF).

In its February 7, 2022 reply, Nappi objected to Ms. Tourangeau's response as longer than the twenty-page limitation in District of Maine Local Rule 7(d) and urged the Court to strike her response to the extent it exceeded twenty pages. *Def.'s Reply* at 1. On July 14, 2022, the Court issued an order on Nappi's objection, allowing

---

statutory damage caps as a twentieth affirmative defense. *Def. Nappi Distributors' Mot. for Leave to Amend Answer* (ECF No. 92). On April 11, 2022, Ms. Tourangeau responded in opposition to Nappi's request. *Pl.'s Opp'n to Def.'s Mot. for Leave to Amend Answer* (ECF No. 96). On April 25, 2022, Nappi replied. *Def.'s Reply Mem. of Law in Supp. of its Mot. for Leave to Amend Answer* (ECF No. 100). On June 14, 2022, the Court granted Nappi's motion to amend. *Order on Mot. to Amend* (ECF No. 101). On June 16, 2022, Nappi filed its amended answer. *Am. Answer, Aff. Defenses and Jury Trial Demand (Def. Nappi Distributors)* (ECF No. 102).

Nappi, if it chose to do so, to file a sur-reply. *Order on Pl.'s Opp'n* (ECF No. 103). On July 21, 2022, Nappi filed its request to submit a sur-reply and asked for three weeks to complete it. *Notice of Intent to File Suppl. Reply in Supp. of Mot. for Summ. J.* (ECF No. 104). The Court allowed Nappi its requested three weeks and on August 12, 2022, Nappi filed its sur-reply. *Def.'s Sur-Reply Mem. of Law in Supp. of its Mot. for Summ. J.* (ECF No. 105) (*Def.'s Sur-Reply*).

## II.   THE FACTS

### A.   Nappi Background and Pay Structure

Nappi is a beer and wine distributor based in Gorham, Maine. DSMF ¶ 1; PRDSMF ¶ 1. Nappi sells wine to essentially two types of accounts—businesses that sell wine to their customers for consumption at the business (on-premise accounts) and businesses that sell wine to their customers for consumption elsewhere (off-premise accounts). DSMF ¶ 2; PRDSMF ¶ 2. Accounts are organized into sales routes that are roughly—but not entirely—geographic.[3] DSMF ¶ 3; PRDSMF ¶ 3. Wine sales routes vary in terms of the percentage of on-premise and off-premise accounts. DSMF ¶ 4; PRDSMF ¶ 4.

Wine sales routes that have more on-premise accounts—particularly routes in summer vacation areas—tend to be more seasonal in terms of distribution and

---

[3]     Ms. Tourangeau denies Nappi's ¶ 3, contending that "[t]he sales representatives' routes look like gerrymandered districts with accounts in long trails or sporadic accounts throughout the state with the exception of a few sales representatives such as [Ms.] Tourangeau." PRDSMF ¶ 3.

Matt Watson testified that "when [he] was hired" one of his "primary tasks [was] to try to clean up geographies." *Jt. R. Materials for Def.'s Mot. for Summ. J.* (*Jt. R.*), Attach. 11, *Dep. of Matt Watson* at 42:11-13 (*Watson Dep.*). When asked if "some of these routes look a little like gerrymandering," he responded: "Yeah . . . the geographies are certainly not as tight as they should be." *Id.* at 42:20-43:1. The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 3 to reflect the record.

4

volume.  DSMF ¶ 5; PRDSMF ¶ 5.  Wine sales routes in seasonal vacation areas experience much greater sales during the summer than the winter, when many on-premise accounts are closed for the season and there are fewer tourists.  DSMF ¶ 6; PRDSMF ¶ 6.  Nappi sells more wine in the routes in the southern part of Maine than in the northern routes due to demographics and extent of its portfolio available outside Cumberland and York counties.  DSMF ¶ 7; PRDSMF ¶ 7.

Nappi currently has thirteen wine sales routes.  DSMF ¶ 8; PRDSMF ¶ 8. Eleven wine sales routes are in the southern part of Maine and two are in the northern part of the state.  DSMF ¶ 9; PRDSMF ¶ 9.  Nappi assigns a wine sales representative to each wine sales route.  DSMF ¶ 10; PRDSMF ¶ 10.  Currently, Nappi employs eight male and five female wine sales representatives.  DSMF ¶ 11; PRDSMF ¶11.

Nappi compensates its wine sales representatives through a combination of three methods, plus benefits: commissions, incentives, and possibly base salaries, if necessary.  DSMF ¶ 12; PRDSMF ¶ 12.  The majority of compensation for some wine sales representatives is paid on a commission of the percentage of gross dollars of products sold.[4]  DSMF ¶ 13; PRDSMF ¶ 13.  In addition, wine sales representatives typically have available to them a regular cadence of varying incentive programs for

---

[4]     Although Ms. Tourangeau admits Nappi's ¶ 13 "is true for some sales representatives," she denies it as it applies to her because "the majority of her compensation comes from salary and incentives.  For example, in 2017, Ms. Tourangeau's total compensation was $84,011.  Her commission for that year was $33,868.  The majority of her income came from her salary ($22,145) and incentives ($27,998)."  PRDSMF ¶ 13.  The compensation spreadsheet cited by Ms. Tourangeau, *see* ECF No. 65, Attach. 7, supports her contention that not all sales representatives base their earnings primarily on commissions.  The Court accepts Ms. Tourangeau's denial and alters DSMF ¶ 13 to clarify that it applies to "some" sales representatives.

specific product or portfolio distribution, display, and volume.[5]  DSMF ¶ 14; PRDSMF ¶ 14.

The cost of incentive payments is shared between the suppliers and importers at a 60/40 split with Nappi, which compensates the wine sales representatives selling the pertinent products once incentive program requirements have been met.  DSMF ¶ 15; PRDSMF ¶ 15.  Pursuant to Nappi's longstanding unwritten company policy, commissions and incentive compensation are paid when sales are fully finalized— which occurs when product is delivered by delivery or sales personnel and payment is received and reconciled.[6]  DSMF ¶ 16; PRDSMF ¶ 16.  Nappi strictly follows state laws which prohibit alcohol sales on a credit basis.  DSMF ¶ 17; PRDSMF ¶ 17.  "Final

---

[5]     Ms. Tourangeau denies Nappi's ¶ 14 because she "was excluded from incentives at her Mike's account."  PRDSMF ¶ 14.  She cites Mr. Toolan's deposition testimony that "[s]ome accounts are great for incentives. Some you have no leeway because they could be a chain store or authorization is determined so you have no wiggle room.  So, yeah, I mean, taking an account that can create incentives is obviously retaliation."  *Jt. R.*, Attach. 3, *Dep. of Daniel Toolan* at 63:4-9 (*Toolan Dep.*).
    Although Ms. Tourangeau's denial goes beyond the scope of Nappi's fact, viewing the record in the light most favorable to the nonmovant, the Court adjusts DSMF ¶ 14 to specify that sales representatives "typically" have incentive opportunities.
[6]     Ms. Tourangeau denies "that the commissions and incentives are earned at this time."  PRDSMF ¶ 16.  She says "commissions and incentives are earned at the time the work is performed - - they are paid when the sale is final."  *Id.*  Nappi Human Resources Director Christine Fox testified:

> No.  Sales -- commissions are not paid until sales are made and finalized, which at Nappi it's always been delivery date.  So if the order was put in with an extended delivery date, the commissions are not paid until that payroll period for which the delivery -- the receipt of the product.  That's actually federal law . . . because a sale isn't a sale until we get payment.  That's -- that's how it is.  There could be a lot of hypothetical promises.  We're not allowed by federal law to extend product on credit.

*Jt. R.*, Attach. 7, *Dep. of Christine Fox* at 144:17-145:8 (*Fox Dep.*).  Frank Nappi, Jr. testified that sales representatives "earn their commission by percentage of wine that they sell."  *Jt. R.*, Attach. 8, *Dep. of Frank Nappi, Jr.* at 34:23-35:1 (*Nappi Dep.*).
    The Court admits Nappi's ¶ 16 but alters it to clarify the distinction between earned and paid commissions and incentives, specifically that commissions and incentives are paid when the sale is made final.

sales" also allows Nappi to accurately record and calculate commissions due for its weekly payroll process. DSMF ¶ 18; PRDSMF ¶ 18.

Nappi compensates some wine sales representatives in part through salaries. DSMF ¶ 19; PRDSMF ¶ 19. Generally, Nappi does not pay base salaries to wine sales representatives, as their total annual compensation structure (commission and incentives) should be sufficient to compensate for the skills, experience, and responsibilities required of the position.[7] DSMF ¶ 20; PRDSMF ¶ 20. However, Nappi has used base salaries for some employees, especially but not limited to, those assigned to routes with sales opportunities that may not support a commission - and incentives - only structure, routes with significant seasonality, and northern routes, where only a portion of Nappi's product portfolio is available to sell.[8] DSMF ¶ 21; PRDSMF ¶ 21.

Since the onset of COVID-19 and its effect on primarily on-premise wine sales, Nappi has supplemented the incomes of several of its wine sales representatives with salaries to help the representatives weather the financial strain caused by reduced

---

[7]    Ms. Tourangeau denies DSMF ¶ 20 because "Nappi had a practice of providing a base salary to sales representatives." PRDSMF ¶ 20. She cites Mr. Toolan's testimony that in 2016, he spoke with Mr. Nappi to negotiate his compensation because he was not happy with his offer of 2% commission, so he "was given $125 salary per week" in addition to the 2% commission on a route that was "very Portland retail, South Portland retail, [and] Cape Elizabeth." *Toolan Dep.* at 18:1-25; *Nappi Dep.* at 20:23-23:13. Elmer Alcott confirmed that in 2014 Nappi had a practice of providing a salary to "salesmen that had like small routes or had seasonal routes" and that he could not "recall any policy or mandate to eliminate those salary plus commission packages." *Jt. R.*, Attach. 9, *Dep. of Elmer Alcott* at 9:3-10:21 (*Alcott Dep.*).
    The Court rejects Ms. Tourangeau's denial as beyond the scope of DSMF ¶ 20; Ms. Tourangeau's concern is addressed in DSMF ¶ 21.
[8]    Ms. Tourangeau denies Nappi's DSMF ¶ 21 for the same reasons explained in the previous footnote. The Court accepts Ms. Tourangeau's denial as a qualification and alters DSMF ¶ 21 to reflect the record, indicating that some sales representatives with southern routes received base salaries.

7

sales and account closures.[9]  DSMF ¶ 49; PRDSMF ¶ 49.  However, the supplemental salary payments that began in 2020 because of the effects of COVID-19 are not and were not intended to be permanent, and they either already have been or will be phased out as wine sales return to more typical levels.  DSMF ¶ 50; PRDSMF ¶ 50.

### B.  Michele Tourangeau's Hiring at Nappi and Nappi's Shift to 2% Commission

Michele Tourangeau began working for Nappi as a sales representative for the Wine Department in 2015.  PSAMF ¶ 2; DRPSAMF ¶ 2.  When Nappi hired Ms. Tourangeau, she had over twenty years of professional experience in the industry, although she had no specific experience as a wine sales representative and had never run a wine sales route.[10]  DSMF ¶ 31; PRDSMF ¶ 31.  Frank Nappi, Sr. owned and ran Nappi until he died a year or two ago.  PSAMF ¶ 60; DRPSAMF ¶ 60.  Mr. Nappi, Sr. told former Nappi Wine Sales Director Paul Carr he was totally responsible for hiring in the Wine Department.[11]  PSAMF ¶ 61; DRPSAMF ¶ 61.  Mr. Nappi, Sr.

---

[9]      Ms. Tourangeau admits in part and denies in part DSMF ¶ 49, saying "salaries were [not necessarily] provided to those with reduced sales.  Employee I received a salary and vacation grant despite [it being] his highest earning year since 2015."  PRDSMF ¶ 49.  The Court rejects Ms. Tourangeau's qualification as beyond the scope of the fact and admits DSMF ¶ 49.

[10]      Ms. Tourangeau denies DSMF ¶ 31, saying she "had worked in the professional industry for over 20 years and ran her own promotional company for the alcohol industry which included alcohol sales and getting customers to purchase the products she was promoting."  PRDSMF ¶ 31.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 31 to reflect the record.

[11]      Nappi qualifies Ms. Tourangeau's PSAMF ¶ 61, saying that Mr. "Carr testified that he was responsible for hiring [only] the sales representatives in the Wine Department."  DRPSAMF ¶ 61.  Mr. Carr's testimony reads:

> Q. Were you at all involved in hiring the sales representatives for the wine department when you became the wine sales manager and then the director?
> A. Yes, I was totally responsible for hiring.  [Mr. Nappi] Sr., when I was hired, told me to run it like my company, that I didn't have to answer to anybody like him.

*Jt. R.*, Attach. 5, *Dep. of Paul Carr* at 18:24 19:4 (*Carr Dep.*).  The Court rejects Nappi's qualification and admits PSAMF ¶ 61.

instructed Mr. Carr to run the Wine Department like it was his business.  PSAMF ¶
62; DRPSAMF ¶ 62.  Nappi President Frank Nappi, Jr. testified from 2000 to 2015,
he had no role in determining the compensation of sales representatives—he only
made suggestions.  PSAMF ¶ 261; DRPSAMF ¶ 261.  From 2015 to the present, Mr.
Nappi, Jr. has not directly controlled compensation in the wine department.  PSAMF
¶ 262; DRPSAMF ¶ 262.

At the time Mr. Carr extended a job offer to Ms. Tourangeau in October of 2014,
Nappi was in the process of attempting to reduce the pay scale of some of its wine
sales representatives to better align with the rest of the organization and industry,
particularly in response to the addition of resources implemented to support sales
representatives.[12]  DSMF ¶ 22; PRDSMF ¶ 22.  Nappi elected to do so by moving
towards 2% commissions for new hires instead of 3%, which was the rate Nappi
previously used to compensate its wines sales representatives.[13]  DSMF ¶ 23;

---

[12]     Ms. Tourangeau denies Nappi's ¶ 22 because "Nappi Distributors did not take any action to
reduce the pay scale of its wine sales representatives that were identified as having 'inflated'
compensation, reasoning that they earned it by building their routes."  PRDSMF ¶ 22.  She cites Ms.
Fox's testimony that Nappi did not reduce the pay scale of Terry O'Brien, John Lambert and John
Keaney because "they grew those routes themselves . . . those routes are indicative of tenure more
than anything."  *Fox Dep.* at 22:12-21.  The Court accepts Ms. Tourangeau's denial as a qualification
and slightly alters the stated fact to conform to the cited testimony.

[13]     Ms. Tourangeau denies Nappi's ¶ 23 because "Justin Park received an offer of 3% commission
just prior to Ms. Tourangeau's job offer."  PRDSMF ¶ 23.  The record reflects that Mr. Carr "made [Mr.
Park] an offer and it was 3% . . . and [Mr. Carr] went to [Mr. Nappi], Jr., . . . told him about that and
he got furious and said, you're not to hire anyone at 3% anymore, it will be 2%."  *Carr Dep.* at 21:1-11.
Ms. Tourangeau also denies DSMF ¶ 23 because "Duane Preble was offered 2.5% commission when he
began his southern route in 2016."  PRDSMF ¶ 22.  When asked whether Nappi has "sales
representatives that were earning 2.5%," Mr. Watson responded "Yeah.  I believe [Mr.] Preble was at
2.5%."  *Watson Dep.* at 49:7- 13.

        The Court accept Ms. Tourangeau's denial as a qualification and slightly alters Nappi's DSMF
¶ 23 to reflect that this was not a strict hiring policy enforced in 2016.

PRDSMF ¶ 23.  Nappi's decision to start using a 2% commission rate for new wine sales representatives was based on multiple reasons, including:

- the 3% commission structure did not factor in the additional overhead that Nappi had absorbed over the years;
- the 3% wine commission rate, combined with the size of many of Nappi's sales routes, had inflated the desired total annual compensation range for some wine sales representatives, particularly as compared to other positions within Nappi and as compared to the industry as a whole; and
- Nappi's previous wine sales' management team made inadequate periodic route changes over the years to level out sales routes' volumes, to ensure quality external customer service to its accounts, and to coordinate its internal operations teams for product selection and delivery schedules.

DSMF ¶ 22(2); PRDSMF ¶ 22(2).[14, 15]  In short, Nappi wanted to bring the payroll cost down in the wine department because of its concern that the payroll was eating into the company's profits.[16]  DSMF ¶ 23(2); PRDSMF ¶ 23(2).

---

[14]    Defendant's Statement of Material Facts and Plaintiff's Response to Defendant's Statement of Material Facts each repeat ¶¶ 22 and 23, before returning to the correct numbering.  The Court addresses these material facts as ¶¶ 22(2) and 23(2) of the DSMF and PRDSMF.

[15]    Ms. Tourangeau denies that the 3% commission rate was from the 1970's.  She cites Mr. Hale's testimony that in 1996, he was "hired as a sales representative" and compensated with "commission and incentives . . . [at] 3.5%."  *Jt. R.*, Attach. 12, *Dep. of Mike Hale* at 11:13-17 (*Hale Dep.*).  The Court accepts Ms. Tourangeau's denial as a qualification and strikes the portion of DSMF ¶ 22(2) indicating that a specific 3% commission policy was set in the 1970s.

Ms. Tourangeau also denies that her compensation was inflated, citing that "Mr. Nappi testified that Ms. Tourangeau's compensation was not what he considered inflated."  PRDSMF ¶ 22(2).  Mr. Nappi testified that he thinks "the ones that were making a substantial amount of money would probably be the top five or six" on the chart showing wine sales representatives' earnings for 2017, indicating that he did not consider all the wine sales representatives' compensation to be inflated.  *Nappi Dep.* at 29:8-18.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly modifies DSMF ¶ 22(2) to reflect the cited record.

Ms. Tourangeau further denies that "Nappi's current wine sales management team has made adequate changes to routes to level out sales volumes."  PRDSMF ¶ 22(2).  She cites Ms. Fox's testimony that "we still have a long ways to go with that rerouting process to make them truly more aligned geographically.  So what you said earlier, that they're aligned geographically, no, they're not."  *Fox Dep.* at 138:3-7.  The Court rejects Ms. Tourangeau's denial as beyond the scope of DSMF ¶ 22(2).

[16]    Ms. Tourangeau denies that Nappi was attempting to bring down the payroll costs because "Nappi did not change the commission of the sales representatives identified as having 'inflated' income because they were 'grandfathered.'"  PRDSMF ¶ 23(2).  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits Nappi's DSMF ¶ 23(2).

Mr. Nappi, Jr. elected not to change the tenured sales representatives' commission rates because many of them had significant years of experience within the industry and he felt they had developed their Nappi sales routes over many years.[17] DSMF ¶ 24; PRDSMF ¶ 24.  Mr. Nappi, Jr. made the decision to adjust compensation downward, which in turn led to a shift towards a 2% rate when sales routes opened up through the normal attrition process.[18] DSMF ¶ 25; PRDSMF ¶ 25. Mr. Nappi, Jr. also believed that some of the unbalanced sales volumes would resolve when the overdue re-routing process was initiated with continuing re-routing occurring as opportunities arose due to personnel attrition, account openings/closures, etc.[19] DSMF ¶ 26; PRDSMF ¶ 26.

---

[17]   Ms. Tourangeau denies that the tenured sales representatives "earn their large income because they developed their sales routes." PRDSMF ¶ 24. Ms. Fox's testimony states that "prior to Matt Watson, you know, a lot of times [rerouting of accounts] just wasn't being managed by the management team, it was just sales reps, you know, kind of a free-for-all grabbing new accounts. And there just wasn't a defined process . . .." *Fox Dep.* at 88:14-23. The Court accepts Ms. Tourangeau's denial as a qualification and modifies DSMF ¶ 24 to reflect that Mr. Nappi, Jr. made this decision based on his belief that the tenured sales representatives had "developed their Nappi sales routes over many years."

[18]   Ms. Tourangeau denies Nappi's ¶ 25 that "[Mr.] Nappi Jr. made the decision to make the change to the 2% commission rate." PRDSMF ¶ 25. Ms. Fox's testimony states that Mr. Nappi Jr. "had given a directive to the wine division that the compensation was overinflated and needed to be - - needed to be adjusted. He didn't tell them how to do it. He just told them, you know, look at different options and make it happen. That's -- that's how Frank is. He doesn't give a directive on how to do it." *Fox Dep.* at 85:19-86:2. Ms. Fox's affidavit, however, states that she was "informed by [Mr.] Carr and [Mr.] Nappi, Jr. that Nappi had elected to maintain the more tenured wine sales representatives' 3% commission rate and adjust to 2% through attrition . . .." Additional Attachments Filed by Nappi (ECF No. 75), Attach. 5, *Affidavit of Christine Fox* at ¶ 15 (*Fox Aff.*).  Based on the record, it is unclear whether Frank Nappi, Jr. made the decision to drop the commission to 2% or whether he merely decided that compensation was too high and left it to others to make the implementing decision, including dropping the commission rates to 2% through attrition.  In accordance with its obligation to view contested matters in the light most favorable to the nonmovant, the Court admits DSMF ¶ 25 and alters it slightly to reflect the cited record.

[19]   Ms. Tourangeau denies DSMF ¶ 26 for the same reasons discussed in footnote 10. The Court rejects the denial and includes DSMF ¶ 26.

Mr. Nappi had a goal of getting the salespeople's compensation within a certain range.  PSAMF ¶ 277; DRPSAMF ¶ 277.  Mr. Nappi could not provide a general appropriate compensation range for a sales representative and believes compensation has to do with skill as well.[20]  PSAMF ¶ 278; DRPSAMF ¶ 278.  Mr. Nappi, Jr. does not know the year he decided to eliminate the 3% commission.[21]  PSAMF ¶ 263; DRPSAMF ¶ 263.  Mr. Nappi, Jr. believes he told Mr. Carr to bring down the compensation to 2% commission with a weekly salary so somebody didn't starve in the winter because of the seasonality of the business.  PSAMF ¶ 264; DRPSAMF ¶ 264.  Although not a strictly enforced policy, prior to considering Ms. Tourangeau's resume, Mr. Nappi, Jr. expressed to Mr. Carr that new wine sales representatives moving forward would be compensated with 2% commissions.[22]  DSMF ¶ 27; PRDSMF ¶ 27.

---

[20]     Nappi qualifies PSAMF ¶ 278, saying "Mr. Nappi testified that he could not provide an approximate compensation range without more information."  DRPSAMF ¶ 278.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 278 to reflect the record.

[21]     Nappi qualifies PSAMF ¶ 263, saying "Mr. Nappi testified that he made that decision sometime between 2014 through 2016."  DRPSAMF ¶ 263.  Mr. Nappi testified:

> Q. The question is, is there something that you could look at that would help refresh your recollection of when you made the decision to eliminate the 3% commission for wine sales representatives?
> A. I don't think so, not to give you an exact date.
> Q. How about a year?
> A. It was more a conversation that I had with [Mr.] Carr . . ..
> Q. Okay.  And when do you think that conversation happened?
> A. An exact date of year, I couldn't tell you. It would --
> Q. Even a range of years.
> A. I'm going to say in the -- probably between 2014 to '16 as a guess.

*Nappi Dep.* at 18:24-19:18.  The Court finds the record supports the statement of fact, rejects Nappi's qualification, and admits PSAMF ¶ 263.

[22]     Ms. Tourangeau denies DSMF ¶ 27 for the same reasons discussed in footnote 11.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters Nappi's DSMF ¶ 27 to reflect that although expressed to Mr. Carr, this was not a strictly enforced hiring policy, as demonstrated by Mr. Preble's 2.5% commission.

Prior to receiving the job offer, Ms. Tourangeau met with Mr. Carr, Rockey Devinney, and Mike Hale—on-premise and off-premise managers of the wine department.  PSAMF ¶ 4; DRPSAMF ¶ 4.  The three mentioned that she may be taking over Ian Brown's route and that it resulted in compensation of about $85,000 annually.[23]   PSAMF ¶ 5; DRPSAMF ¶ 5.   All conversations regarding Ms. Tourangeau's compensation were between Ms. Tourangeau and Mr. Carr.  PSAMF ¶ 6; DRPSAMF ¶ 6.  Mr. Carr's pre-employment communications with Ms. Tourangeau document that in combination with her base salary, her commission rate would be 2%.[24]  DSMF ¶ 32; PRDSMF ¶ 32.  Mr. Carr's pre-employment communications with Ms. Tourangeau include a base salary—which was eventually set at $432.52 per week or just under $22,500 annually—with initial minimum total compensation with salary, commissions, and incentives, estimated at approximately $65,000 per year with the ability to make more based upon her incentives and work ethic.[25, 26]  DSMF

---

[23]     Nappi qualifies PSAMF ¶ 5, saying "Ms. Tourangeau testified that there was no discussion about her compensation at the meeting."  Ms. Tourangeau, in response to the question "[w]as there any discussion at that meeting about compensation, what was anticipated, that type of thing?" testified: "[y]es and no.  I mean not compensation for me in particular, but there was discussion about . . . [ Mr. Brown's] route, it's about an $85,000 route, so there's that."  When asked whether that "mean[t] what the approximate compensation would be [for her]," Ms. Tourangeau responded: "Yes. Yes."  Additional Attachments Filed by Nappi, *Deposition of Michele Tourangeau* at 36:18-37:16 (ECF No. 74) (*Tourangeau Dep.*).  The Court accepts Nappi's qualification and adjusts PSAMF ¶ 5 to reflect the cited record.

[24]     Ms. Tourangeau denies DSMF ¶ 32, saying "[d]uring Ms. Tourangeau's conversations with Mr. Carr about her compensation, he explained to her that she was being paid in a combination of salary and 2% commission as opposed [to] the 3% commission other sales representatives received because of the seasonal nature of her route."  PRDSMF ¶ 32.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 32 to reflect the record.

[25]     Ms. Tourangeau denies DSMF ¶ 30, saying "Mr. Carr told Ms. Tourangeau that she was guaranteed to make $65,000 annually with the possibility of making $75,000 to $80,000 if she did well on her incentives."  PRDSMF ¶ 30.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 30 to reflect the record.

[26]     Ms. Tourangeau denies DSMF ¶ 33, saying "Mr. Carr told Ms. Tourangeau that she was guaranteed to make $65,000 annually with the possibility of making $75,000 to $80,000 if she did well

¶¶ 30, 33; PRDSMF ¶¶ 30, 33; PSAMF ¶¶ 7-8; DRPSAMF ¶¶ 7-8.  Ms. Tourangeau was the first sales representative paid only a 2% commission.[27]  PSAMF ¶ 12; DRPSAMF ¶ 12.

When Christine Fox began working for Nappi as the Director of Human Resources, Mr. Carr had to seek approval of compensation offers.  PSAMF ¶ 63; DRPSAMF ¶ 63.  Mr. Carr believes Mr. Nappi, Jr. approved of the base plus commission plus incentive compensation package because Mr. Nappi, Jr. instructed him to offer this compensation package.[28]  PSAMF ¶ 64; DRPSAMF ¶ 64.  Mr. Carr was never told that he was not authorized to offer the compensation package he offered to Ms. Tourangeau.[29, 30]  PSAMF ¶ 67; DRPSAMF ¶ 67.  Chief Financial Officer Michele Apt calculated Ms. Tourangeau's base salary.  PSAMF ¶ 68;

---

[27] Nappi qualifies PSAMF ¶ 12 as unsupported by the cited record.  DRPSAMF ¶ 12.  Mr. Carr testified: "[Ms. Tourangeau] was the first [sales representative] hired at 2% . . . [and the] first female salesperson."  *Carr Dep.* at 27:7-9.  The Court slightly modifies PSAMF ¶ 12 to conform to the cited record.

on her incentives."  PRDSMF ¶ 33.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 33 to reflect the record.

[28] Nappi qualifies Ms. Tourangeau's PSAMF ¶ 64, saying "Mr. Carr testified that Frank Jr. instructed him to offer base plus commission plus incentives."  DRPSAMF ¶ 64.  The Court accepts Nappi's qualification and adds to PSAMF ¶ 64 to reflect the cited record.

[29] PSAMF ¶ 66 states that "Ms. Fox would calculate the base pay."  PSAMF ¶ 66.  Nappi denies this statement, saying that "Mr. Carr testified that that [CFO Michele] Apt calculated Ms. Tourangeau's base pay."  DRPSAMF ¶ 66.  In the record cited by Ms. Tourangeau, Mr. Carr says Ms. Fox "could look into how much base pay it would take and stuff like that" when Mr. Carr offered compensation packages.  *Carr Dep.* at 29:8-13.  Later in Mr. Carr's deposition, when he was asked "[s]o the CFO [Ms. Apt] is the one who calculated what the base salary should be?"  Mr. Carr responded "Yes."  The Court accepts Nappi's denial and strikes PSAMF ¶ 66.

[30] Nappi objects to Ms. Tourangeau's PSAMF ¶ 67, saying "[t]he second cited testimony was in response to a two-part question, and it is unclear to which question Mr. Carr answered affirmatively.  DRPSAMF ¶ 67.  When asked "[a]nd I just want to confirm here again that you were never told that you were not authorized to offer a base salary of $22,491, 2% sales, and you estimated she would earn approximately $5,000 in incentives, is that correct?", Mr. Carr responded "Yes."  *Carr Dep.* at 34:8-13.  Viewing the record in the light most favorable to Ms. Tourangeau, the Court finds that Mr. Carr responded affirmatively to the entire posed question and therefore rejects Nappi's qualification and admits PSAMF ¶ 67.

DRPSAMF ¶ 68.  Like other sales representatives, Ms. Tourangeau was also eligible to earn incentive-based pay.  PSAMF ¶ 13; DRPSAMF ¶ 13.

During Ms. Tourangeau's conversations with Mr. Carr about her compensation, he explained to her that because of the seasonal nature of her route she was being paid in a combination of salary and a 2% commission, as opposed to the 3% commission other sales representatives received.  PSAMF ¶ 24; DRPSAMF ¶ 24.  During this conversation, Mr. Carr never indicated that Ms. Tourangeau's salary would be temporary.  PSAMF ¶ 25; DRPSAMF ¶ 25.  He explained that this compensation package with salary was meant to offset the slow season so that Ms. Tourangeau "didn't starve."  PSAMF ¶ 26; DRPSAMF ¶ 26.  The offer including a salary plus 2% commission to offset the slow months made sense to Ms. Tourangeau, so she didn't further question the commission rate.  PSAMF ¶ 27; DRPSAMF ¶ 27.  Mr. Carr specifically said that in lieu of a 3% commission she would receive a 2% commission in addition to her salary.  PSAMF ¶ 28; DRPSAMF ¶ 28.  Although Mr. Nappi, Jr. generally felt that a base salary would be necessary in combination with 2% commission, he did not think the base salary amount Mr. Carr extended to Ms. Tourangeau was necessary given the potential for commissions and incentives in the route assigned to her.[31]  DSMF ¶ 34; PRDSMF ¶ 34.

---

[31]     Ms. Tourangeau denies DSMF ¶ 34, saying "Mr. Nappi believes he told [Mr.] Carr to bring down the compensation to 2% commission with a weekly salary so somebody didn't starve in the winter because of the seasonality of the business."  PRDSMF ¶ 34.  Mr. Nappi testified:

> It was more conversation that I had with [Mr.] Carr, that we need to bring that compensation down to 2% and then we can have, I don't know, a weekly salary. . . plus a 2% to give a weekly paycheck so somebody didn't starve in the winter if the -- you know, the seasonality of this business.

Prior to offering this southern route to Ms. Tourangeau, Mr. Carr offered the same position and route to Justin Park.[32]  PSAMF ¶ 29; DRPSAMF ¶ 29.  Mr. Park was offered the same position and route with his compensation set at 3% commission.[33]  PSAMF ¶ 30; DRPSAMF ¶ 30.  Ms. Fox told the Maine Human Rights Commission that Mr. Park was offered the same position at 2% commission and again testified to the fact during her deposition, even though Mr. Carr, who made the offer, admits that he offered the position to Mr. Park at the 3% rate.[34]  PSAMF ¶ 31; DRPSAMF ¶ 31.

Each sales representative hired before Ms. Tourangeau received compensation of 3% commission.[35]  PSAMF ¶ 32; DRPSAMF ¶ 32.  Mr. Brown was unaware of any policy prohibiting deviation from a flat 2% commission.[36]  PSAMF ¶ 33; DRPSAMF ¶ 33.  Mr. Nappi, Jr. told Ms. Fox that before Mr. Brown's position became vacant, either Mr. Nappi, Jr. and/or Elmer Alcott and Mr. Carr had given a directive to the

---

*Nappi Dep.* at 19:5-11.  The Court accepts Ms. Tourangeau's denial as a qualification and adds to DSMF ¶ 34 to reflect the record.

[32]  Nappi qualifies PSAMF ¶ 29, saying that "Mr. Carr testified that he offered Mr. Park 3%, without approval from [Mr.] Nappi, Jr. [and Ms.] Fox testified that [Mr.] Brown told her that [Mr.] Park was offered 2%."  DRPSAMF ¶ 29.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits Ms. Tourangeau's PSAMF ¶ 29.

[33]  Nappi objects for the same reason as the previous footnote.  Mr. Carr testified: "And I made [Mr. Park] an offer and it was 3%, and I guaranteed he would be making $65,000."  *Carr Dep.* at 21:4-6.  The Court finds that PSAMF ¶ 30 reflects the record and rejects Nappi's objection,.

[34]  Nappi denies PSAMF ¶ 31, saying "[t]he assertion that Ms. Fox's statement is inaccurate is an argument and not a statement of fact."  DRPSAMF ¶ 31.  The Court accepts Nappi's denial as a qualification and modifies PSAMF ¶ 31 to objectively reflect the cited record.

[35]  Nappi qualifies PSAMF ¶ 32, adding that the "wine sales representatives hired before Ms. Tourangeau received 3% commission, no base pay, and incentives."  DRPSAMF ¶ 32.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 32.

[36]  Nappi qualifies PSAMF ¶ 33, saying that "[t]he cited deposition testimony does not indicate a date."  DRPSAMF ¶ 33.  When asked "[a]s of that point had you heard that there was a new policy which prohibited any deviation from a flat 2% commission?"  Mr. Brown responded: "I had not."  *Jt. R.*, Attach. 10, *Dep. of Ian Brown* 17:10-13 (*Brown Dep.*).  The Court accepts Nappi's qualification and alters PSAMF ¶ 33 to reflect the cited record.

16

wine division that compensation was overinflated and needed to be adjusted.[37] PSAMF ¶ 34; DRPSAMF ¶ 34. After hiring Ms. Tourangeau, Mr. Carr continued to hire sales representatives with base salaries, commission, and incentives. PSAMF ¶ 65; DRPSAMF ¶ 65.

The alleged 2014 decision to change the compensation of wine sales representatives from 3% to 2% is not memorialized, documented, or reduced to writing anywhere (no email, no policy, no text message, no handwritten note, no meeting minutes).[38] PSAMF ¶ 207; DRPSAMF ¶ 207. Although aware of discussions to reduce commission, then-CFO Mr. Alcott was unaware of any policy in 2014 which limited commissions to 2% or prohibited salaries to sales representatives.[39] PSAMF

---

[37]    Nappi qualifies PSAMF ¶ 34, saying "[Mr.] Nappi, Jr. and [Mr.] Alcott made the decision to compensate newly hired wine sales representatives at 2%." DRPSAMF ¶ 33. The Court accepts Nappi's qualification and alters PSAMF ¶ 34 to reflect the uncertainty of the cited record as to whether "it was [Mr. Nappi, Jr.] or if it was [Mr. Alcott] and [Mr.] Carr" that gave direction in response to an "overall [inflated] compensation structure," saying that "the logical thing would be to reduce the commission rate . . .." *Fox Dep.* at 87:9-15.

[38]    Nappi qualifies PSAMF ¶ 207, saying "[w]hile Nappi could locate no email, written policy, text message, note, or meeting minute discussing the decision to change compensation from 3% to 2%, the decision is well-documented with hires made since 2014." DRPSAMF ¶ 207. The Court interprets "documented" to mean in writing, rejects Nappi's qualification, and admits PSAMF ¶ 207.

[39]    Nappi qualifies PSAMF ¶ 208, saying "Mr. Alcott testified that before he retired in 2014, management had been discussing eliminating 3% commission." DRPSAMF ¶ 208. Mr. Alcott testified:

> Q. Had you heard by the time you retired in 2014 of a plan to eliminate the 3% commission?
> A. We had been talking about it. I do the financial statements. I review the financial statements and we were talking about the fact that wine sellers were getting out of hand, getting too high.
> . . .
> Q. And by the time that you left in 2014 was there a policy in place to eliminate the 3% commission?
> A. I don't think so, no.
> Q. And how about salaries, had you had any conversations with anybody about eliminating the salaries for all sales representatives?
> A. No.

*Alcott Dep.* at 9:3-24. The Court accepts Nappi's qualification and adds to PSAMF ¶ 208 to conform to the record.

¶ 208; DRPSAMF ¶ 208.  Mr. Alcott confirmed that Nappi sometimes offered a salary to salesmen with small or seasonal routes.[40]  PSAMF ¶ 209; DRPSAMF ¶ 209.

Ms. Fox testified that Mr. Nappi believed the overall compensation of the wine sales representatives was inflated.  PSAMF ¶ 210; DRPSAMF ¶ 210.  Ms. Fox also testified that Mr. Nappi and Mr. Alcott explained that one way to reduce the inflated compensation was through rerouting that needed to occur on an ongoing basis to level the load.[41]  PSAMF ¶ 211; DRPSAMF ¶ 211.  Ms. Fox doesn't believe any of the sales representatives are earning too much money because they have been in their place for a number of years and have built their routes.[42]  PSAMF ¶ 212; DRPSAMF ¶ 212.

Ms. Fox testified that the intent behind the 2% commission rate was to bring the compensation to a level consistent with the industry and reflect the effort,

---

[40]    Nappi qualifies PSAMF ¶ 209, saying "Mr. Alcott testified that policy was typically used for beer sales representatives."  DRPSAMF ¶ 209.  Mr. Alcott testified:

> Q. So you're unaware of a policy to not offer some sort of combination of commission and salary to sales representatives?
> A. Yeah, we did that for like salesmen that had like small routes or had seasonal routes that couldn't -- you know, we didn't think they could make that minimum salary.  So we did do some of that salary with commission, more for beers than wine that I remember.

*Alcott Dep.* at 9:25-10:7.  The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 209 to reflect the record.

[41]    Nappi qualifies PSAMF ¶ 211, saying "Ms. Fox testified that Mr. Nappi and Mr. Alcott told her that rerouting should have been occurring on an ongoing basis, but it had not been occurring prior to [Mr.] Watson's tenure as manager."  DRPSAMF ¶ 211.  Having reviewed the cited record, the Court accepts Nappi's qualification in part and adds "Mr. Alcott" to PSAMF ¶ 211 to conform to the record.

[42]    Nappi denies Ms. Tourangeau's PSAMF ¶ 212 as unsupported by the cited record.  DRPSAMF ¶ 212.  When asked "which sales representatives do you have the opinion are earning too much money?" Ms. Fox testified "None of them -- you know, a lot of these sales reps have been in their place for a number of years, they built those routes, you know."  *Fox Dep.* at 19:21-20:1.  The Court rejects Nappi's denial and admits PSAMF ¶ 212.

knowledge, educational background, and work experience required of the position.[43] PSAMF ¶ 216; DRPSAMF ¶ 216. Ms. Fox does not believe Ms. Tourangeau is lacking in work experience, education, effort, or knowledge. PSAMF ¶ 217; DRPSAMF ¶ 217. Ms. Fox testified that sales representatives Terry O'Brien, John Lambert, and John Keaney deserve the compensation they receive because they grew their routes themselves. PSAMF ¶ 218; DRPSAMF ¶ 218. Since Ms. Tourangeau's employment in 2015, Nappi has hired or promoted ten wine sales representatives, including six males and four females.[44] DSMF ¶ 29; PRDSMF ¶ 29.

Ms. Tourangeau reported directly to Mr. Brown from 2015 until a few months prior to August 26, 2021. PSAMF ¶ 169; DRPSAMF ¶ 169. Mr. Brown testified that Ms. Tourangeau is "a very effective salesperson. I think she is aggressive. I think she's developed strong relationships with her accounts. I think she's very organized. I think she does a great job." PSAMF ¶ 170; DRPSAMF ¶ 170. Mr. Nappi believes Ms. Tourangeau was inexperienced and underperforming when she started but is no longer deficient in her performance. PSAMF ¶ 279; DRPSAMF ¶ 279. Mr. Nappi observed that there was out-of-code product and underrepresentation at The Anchorage Inn in York. PSAMF ¶ 280; DRPSAMF ¶ 280. Mr. Nappi assumed it was

---

[43]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 216, saying "Ms. Fox testified that the intent behind the 2% commission rate was to make the overall compensation rate consistent within the industry." DRPSAMF ¶ 216. The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 216 to reflect the record.

[44]   DSMF ¶ 28 states: "Since Ms. Tourangeau's employment in 2015, all new hires for wine sales representative positions who are paid by commission are compensated at a commission rate of 2% regardless of their gender or years of experience." Ms. Tourangeau denies DSMF ¶ 28, saying "[Mr.] Preble was offered 2.5% commission after Ms. Tourangeau when he began his southern route in 2016." PRDSMF ¶ 28. The Court accepts Ms. Tourangeau's denial, finds that the record does not support the fact, and omits DSMF ¶ 28.

Ms. Tourangeau's deficiency, even though Mr. Brown had recently been working the account—he did not know who the salesperson was at the time.[45]  PSAMF ¶ 281; DRPSAMF ¶ 281.

The commissions Nappi has paid to Ms. Tourangeau are governed by the same Nappi policies that Nappi states it applies to all wine salespersons, regardless of their sex.[46]  DSMF ¶ 123; PRDSMF ¶ 123.   The incentives Nappi has paid to Ms. Tourangeau are governed by the same Nappi policies that Nappi states it applies to all other wine salespersons, regardless of their sex.[47]  DSMF ¶ 125; PRDSMF ¶ 125. Ms. Tourangeau has been paid incentives on all sales she has earned while not on leave, according to Nappi's policies.[48]  DSMF ¶ 124; PRDSMF ¶ 124.

## C.    Female Employment at Nappi and within the Industry

Jim Bourque is Nappi's former Vice President of Human Resources.  PSAMF ¶ 35; DRPSAMF ¶ 35.  Mr. Bourque worked at Nappi until 2015.  PSAMF ¶ 36; DRPSAMF ¶ 36.  Mr. Bourque interacted minimally with Ms. Tourangeau at the

---

[45]     Nappi qualifies PSAMF ¶ 279 as unsupported by the record citation.  DRPSAMF ¶ 279.  The Court reviews the record and notes that when asked: "[d]id you assume it was a deficiency on [Ms. Tourangeau's] part as opposed to [Mr. Brown's]?", Mr. Nappi responded: "[a]t that point in time, yes, and at that point in time I did not know who the salesperson was." *Nappi Dep.* at 28:24-29:2.  The Court rejects Nappi's qualification and admits PSAMF ¶ 279.

[46]     Ms. Tourangeau denies DSMF ¶ 123, saying "Mr. Carr testified, if a sales representative needed to take a leave of absence they would still receive their pay." PRDSMF ¶ 123.  Having reviewed the record, the Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 123 to reflect the record.

[47]     Ms. Tourangeau denies DSMF ¶ 125 for the same reasons explained in the previous footnote.  PRDSMF ¶ 125.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 125 to reflect the record.

[48]     Ms. Tourangeau denies DSMF ¶ 124, saying she "was not paid for all incentives earned for work performed throughout her unpaid [leaves and vacation]." PRDSMF ¶ 124.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 124 to reflect the record regarding this disputed fact.

weekly sales meetings.[49]  PSAMF ¶ 37; DRPSAMF ¶ 37.  Mr. Bourque believes a

female was not hired into the sales representative position prior to 2014 because the

role was typically male dominated and there may have been few female applicants.[50]

PSAMF ¶ 38; DRPSAMF ¶ 38.  Often Nappi did not get external applicants because

the sales positions were filled by informal recruiting.[51]  PSAMF ¶ 39; DRPSAMF ¶

39.  Nappi did not regularly post available sales representative positions.[52]  PSAMF

¶ 40; DRPSAMF ¶ 40.  Sales representative positions were mostly filled by word of

mouth and networking through the "grapevine."  PSAMF ¶ 41; DRPSAMF ¶ 41.

---

[49]     Nappi qualifies PSAMF ¶ 37, saying Mr. Bourque "met Ms. Tourangeau but did not interact with her often."  DRPSAMF ¶ 37.  When asked "[h]ow often did you interact with [Ms. Tourangeau] while you were at Nappi Distributors?," Mr. Bourque responded: "[n]ot that much.  I used to attend the -- they had a sales meeting on I think Thursday morning at 7:00, and I used to attend those.  And I think that's where I saw her the most."  *Jt. R.*, Attach. 6, *Dep. of Jim Bourque* at 22:6-11 (*Bourque Dep.*).  The Court accepts Nappi's qualification and alters PSAMF ¶ 37 to reflect the record.

[50]     Nappi objects to PSAMF ¶ 38 because it is "misleading as it does not reflect the witness's entire statement."  DRPSAMF ¶ 38.  When asked why it "took until 2015 for a female sales representative to be hired at Nappi," Mr. Bourque responds: "[y]ou know, it's -- it's typically -- it's typically been male dominated, and I don't know if we got many -- a lot of times we never got many applicants."  *Bourque Dep.* at 16:18-22.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 38 to reflect the record.

[51]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 39 as unsupported by the record.  DRPSAMF ¶ 39.  Mr. Bourque's deposition reads:

> Q. And do you know if Nappi Distributors would publicly post available sales representative positions?
> A. Oh, boy, I'm not quite -- jeepers creepers, they didn't -- not very often.  Mostly warehouse and drivers were quite frequent.  Sales, we didn't get too much.  A lot of the sales folks were -- I don't know, there's like -- there's grapevine within the industry, and a lot of times people hear there's an opening at Nappi and all of a sudden it just comes in.  Very informal on the sales side.  But they may have.  Since I've gone, I've -- boy, most of the time a lot of it was just almost word of mouth, I guess you'd say.  For some reason on the sales end it worked that way.

*Bourque Dep.* at 17:19-18:7.  The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 39 to reflect Mr. Bourque's testimony.

[52]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 40, saying that the cited record indicates that Nappi "may have posted sales positions."  The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 40 to reflect the cited record.

Nappi oftentimes hired from within.[53]  PSAMF ¶ 42; DRPSAMF ¶ 42.  Historically, the sales representatives at Nappi helped other "guys" they knew get sales representative jobs at Nappi.[54]  PSAMF ¶ 52; DRPSAMF ¶ 52.

Ms. Tourangeau learned of the opening with Nappi from Pam Gallagher, who worked for a wine supplier doing business in New England.  PSAMF ¶ 9; DRPSAMF ¶ 9.  Ms. Gallagher told Ms. Tourangeau that Mr. Carr said: "they really needed to start hiring women."[55]  PSAMF ¶ 10; DRPSAMF ¶ 10.  Ms. Tourangeau was the first female sales representative for Nappi.  PSAMF ¶ 11; DRPSAMF ¶ 11.

---

[53]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 42, saying it "does not accurately reflect the cited testimony."  DRPSAMF ¶ 42.  Mr. Carr's testimony states that Nappi "tried first to hire people within the company that [it] thought had promise, and if there was no one I that -- in the company at the time that had any wine experience, [it] would look outside to competitors."  *Carr Dep.* at 27:19-22.  Mr. Alcott's testimony states that "[m]ost of the people came from, you know, knowledge of other employees, [Mr.] Carr, [Mr.] Hale.  Most of our employees came from either suppliers or other distributors."  *Alcott Dep.* at 14:12-15.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 42 to reflect the cited record.

[54]     Nappi objects to PSAMF ¶ 52, saying it is unclear whether Mr. Bourque used the term "guys" in a gendered sense when he testified that "the sales guys network with each other."  DRPSAMF ¶ 52.  The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 52 to reflect the cited record.

[55]     Nappi objects to PSAMF ¶ 11 on the grounds that "assertions in the paragraph offer out of court statements for the truth of the matter asserted."  DRPSMF ¶ 11.

    Federal Rule of Civil Procedure 56(c)(4) requires that declarations used to support a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  *See Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998) ("Evidence that would be inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment"); FED. R. EVID. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter").  A declaration used to support a motion for summary judgment must be factually specific and explain the basis for the declarant's knowledge, and the Court may disregard inadmissible portions, keeping in mind that "personal knowledge is the touchstone."  *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)).

    The Court is aware of the distinction between fact and opinion and will enforce the distinction.  *See Livick v. The Gillette Co.*, 524 F.3d 24, 28 (1st Cir. 2008) ("requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise" (quoting *Perez*, 247 F.3d 303, 316 (1st Cir. 2001)) (internal quotations omitted).  The Court admits PSMF ¶ 11, which presents Ms. Tourangeau's personal knowledge as to what Ms. Gallagher said to her, over Nappi's objection.  The Court accepts Ms. Gallagher's statement not for the truth but to explain why Ms. Tourangeau applied for a sales position at Nappi.

Most of the sales representatives working at Nappi were men.[56]  PSAMF ¶ 43; DRPSAMF ¶ 43.  Most of the sales representatives working for competitors were men.[57]  PSAMF ¶ 44; DRPSAMF ¶ 44.  Another reason Mr. Bourque believes there previously was not a female sales representative at Nappi is the physical component of the position.[58]  PSAMF ¶ 45; DRPSAMF ¶ 45.  Mr. Bourque explained that the physical component consisted of the sales representative getting a call from a customer at 4:30 p.m. Friday afternoon with a missed delivery and could involve needing to deliver a barrel which weighs more than he does.  PSAMF ¶ 46; DRPSAMF ¶ 46.  Mr. Bourque testified about a gender disparity in hiring.[59]  PSAMF ¶ 47; DRPSAMF ¶ 47.

---

[56]     Nappi qualifies PSAMF ¶ 43, saying that the "cited testimony refers only to sales representatives."  DRPSAMF ¶ 43.  The Court accepts Nappi's qualification and changes "employees" to "sales representatives" to reflect the cited record.

[57]     Nappi denies PSAMF ¶ 44 as unsupported by the record.  DRPSAMF ¶ 44.  Mr. Bourque's testimony states that "it didn't seem to be that prevalent throughout the industry [to have female sales representatives], not just us but most of the ones in the state," indicating that there were few women sales representatives working for competitors.  *Bourque Dep.* at 17:15-18.  The Court therefore rejects Nappi's denial and adopts PSAMF ¶ 44 but adopts "sales representatives" rather than "employees."

[58]     Nappi denies Ms. Tourangeau's PSAMF ¶ 45 because Mr. Bourque "specifically testified that the physical component of the job does not preclude women."  DRPSAMF ¶ 45.  When asked why it "took until 2015 for a female sales representative to be hired at Nappi," Mr. Bourque responded that "[p]art of it is there is -- there can be a large physical component, which doesn't necessarily preclude women.  But, for instance, you'd always get a call late on a Friday afternoon like usually 4:30, a missed delivery or something, and it could involve delivering a barrel, which, you know, weighs more than I do, for crying out loud.  So that's just one little side effect."  *Bourque Dep.* at 17:4-11.  The Court rejects Nappi's denial and admits PSAMF ¶ 45, noting that although Mr. Bourque testified that the physical component of the job "doesn't necessarily preclude women," his testimony taken demonstrates that he considered this one reason why there are few women in the industry, as stated by Ms. Tourangeau's fact.

[59]     Nappi denies PSAMF ¶ 47 as unsupported by the record because "Mr. Bourque testified that he does not believe there was a 'feeling to deny women.'"  DRPSAMF ¶ 47.  Mr. Bourque's testimony states that "it's typically been male dominated . . . it started to change over the years . . . [b]ut not so much -- jeepers creepers, not so much in this business . . . [t]here was no -- I don't believe there was -- I don't think there was a, you know, a feeling to deny women, but there just didn't -- it didn't seem to be prevalent throughout the industry, not just us but most of the ones in the state."  *Bourque Dep.* at 16:20-17:18.  The Court takes Nappi's denial as a qualification and reformulates PSAMF ¶ 47 to reflect the record, stating that Mr. Bourque "testified about . . . a gender disparity in hiring" rather than "agrees that there was gender discrimination."

Nappi account manager Joline Masters agrees that there is gender discrimination for sales representatives in the industry.[60]  PSAMF ¶ 48; DRPSAMF ¶ 48.  Ms. Masters may have experienced gender discrimination herself.[61]  PSAMF ¶ 49; DRPSAMF ¶ 49.  While working for another distributor, Ms. Masters was told they did not think she could do the sales position, specifically that they did not think she could handle the sales position.[62]  PSAMF ¶ 50; DRPSAMF ¶ 50.  Ms. Masters also experienced managers of her accounts who propositioned her sexually.  PSAMF ¶ 51; DRPSAMF ¶ 51.

Mandi Ford was a merchandiser for Nappi.  PSAMF ¶ 53; DRPSAMF ¶ 53.  She applied for a sales representative position, but she did not get the job.[63]  PSAMF ¶ 53; DRPSAMF ¶ 53.  Nappi Sales Manager Mr. Frank Maiorino stated: "we have a

---

[60]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 48 because Ms. Masters "then testified she was uncertain if her experience was due to her personality or her gender."  DRPSAMF ¶ 48.  Ms. Masters' testimony reads:

> Q. Do you have an understanding that there tends to be gender discrimination within the industry?
> A. Yeah.  I mean I've experienced it myself in prior distributorships.
> Q. Can you share with me those instances of discrimination that you've experienced while working in the industry?
> A. Just as far as when I worked for Central Distributors, I basically was told that I didn't think I could do a sales job.  They didn't feel I could handle it.
> Q. Because you were a woman?
> A. The rejection, the rejection.  And I don't know if it was because I was a woman or just my personality at the time.  I don't know if it was either/or.

*Jt. R.*, Attach. 13, *Dep. of Joline Masters* at 18:25-19:15 (*Masters Dep.*).  The Court rejects Nappi's qualification and admits PSAMF ¶ 48, as the record reflects Ms. Masters' agreement that gender discrimination exists in the field, even if she was uncertain whether she was rejected due to her gender.

[61]     Nappi objects to PSAMF ¶ 49 for the same reason it objects to PSAMF ¶ 48.  The Court accepts Nappi's qualification and modifies PSAMF ¶ 49 to reflect Ms. Masters' cited testimony.

[62]     Nappi objects to PSAMF ¶ 50 as "inadmissible hearsay."  DRPSAMF ¶ 50.  The Court rejects Nappi's hearsay objection for the reasons explained in footnote 54.

[63]     Nappi objects to Ms. Tourangeau's PSAMF ¶ 53, saying "[t]here were no open positions for which Ms. Ford applied."  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 53.

hard time trusting women in the sales representative position" while Ms. Ford interviewed for a sales position.  PSAMF ¶ 118; DRPSAMF ¶ 118.  Mr. Maiorino said the position was not meant for women and he would not want or approve of his daughters working in the sales representative position.  PSAMF ¶ 119; DRPSAMF ¶ 119.  Mr. Maiorino had previously sent out sexually explicit text messages in a group chat that was mostly Nappi employees.[64]  PSAMF ¶ 120; DRPSAMF ¶ 120.  Mr. Brown heard Mr. Maiorino make sexist comments.[65]  PSAMF ¶ 59; DRPSAMF ¶ 59.

Vice President Elmer Alcott was aware of Mr. Maiorino's sexually explicit work communications.  PSAMF ¶ 121; DRPSAMF ¶ 121.  Mr. Alcott and other employees and members of management received sexually explicit work emails from Mr. Maiorino.  PSAMF ¶ 122; DRPSAMF ¶ 122.  One email Mr. Alcott and other Nappi employees and managers received from Mr. Maiorino joked about how men had it easier than women and one specific reference was to how men have it easier because they do the same work for more pay.  PSAMF ¶ 123; DRPSAMF ¶ 123.  Mr. Alcott agreed that emails like those contained in Alcott Deposition, Ex. 1 were distributed in the workplace.  PSAMF ¶ 124; DRPSAMF ¶ 124.  Mr. Alcott testified that Nappi had antidiscrimination classes at Nappi, but he testified that at these classes he

---

[64]    PSAMF ¶ 120 reads "Mr. Maiorino had always been repulsive with his comments and would send out sexually explicit text messages in a group chat that was mostly Nappi employees."  Nappi objects to PSAMF ¶ 120 because the "assertion in this paragraph is argument, and not a statement of fact.  DRPSAMF ¶ 120.  The Court accepts Nappi's qualification and removes "had always been repulsive with his comments" from PSAMF ¶ 120.

[65]    Nappi objects to PSAMF ¶ 59 as "inadmissible hearsay."  DRPSAMF ¶ 59.  The Court rejects Nappi's hearsay objection for the reasons explained in footnote 54.  Ms. Tourangeau is obviously not offering Mr. Maiorino's sexist comments for their truth.

learned that "if you're a white man and under fifty you have no rights at all."[66] PSAMF ¶ 125; DRPSAMF ¶ 125.

Mike Hale was an off-premise wine sales manager with Nappi for more than twenty years. PSAMF ¶ 108; DRPSAMF ¶ 108. Mr. Hale previously worked for Nappi as a sales representative in the wine department and earned 3.5% commission. PSAMF ¶ 105; DRPSAMF ¶ 105. Mr. Hale was hired by Melanie Larocca, who held the Wine Director position prior to Mr. Carr. PSAMF ¶ 106; DRPSAMF ¶ 106; PSAMF ¶ 55; DRPSAMF ¶ 55. Mr. Hale understood that Melanie Larocca filed a lawsuit related to her employment with Nappi. PSAMF ¶ 107; DRPSAMF ¶ 107. Mr. Carr described Ms. Larocca as "fluff" and "incompetent."[67] PSAMF ¶ 56; DRPSAMF ¶ 56[68].

Afton Hawkins was a merchandiser and sales assistant for Nappi. PSAMF ¶ 75; DRPSAMF ¶ 75. Ms. Hawkins was interested in becoming a sales representative.[69] PSAMF ¶ 76; DRPSAMF ¶ 76. She applied for a few sales

---

[66]    The Court has quoted Mr. Alcott's testimony on this point to clarify that these words are his opinion as set forth in his deposition testimony. *Jt. R.*, Attach. 9, *Dep. of Elmer Alcott*, 33:14-17 (ECF No. 65) (*Alcott Dep.*).

[67]    Nappi objects to Ms. Tourangeau's PSAMF ¶ 56, specifying that these words were said when describing Ms. Larocca's termination. The Court rejects Nappi's objection as beyond the scope of the fact and admits PSAMF ¶ 56.

[68]    Nappi objects to PSAMF ¶ 57 as "inadmissible hearsay." DRPSAMF ¶ 57. Paragraph 57 reads that "Mr. Carr heard that Ms. Larocca believed she was terminated because of gender discrimination." PSAMF ¶ 57. The Court agrees that Mr. Carr's testimony that he "[thinks] she put that out" is inadmissible hearsay and the Court has not considered it.

[69]    Nappi qualifies PSAMF ¶ 76, saying Mr. "Hale's testimony does not discuss Hawkins' interest" in becoming a sales representative. DRPSAMF ¶ 76. When asked whether Ms. Hawkins "ever s[ought] out a sales representative position" while he was the manager, Mr. Hale testified "[Ms. Hawkins] was -- she was in line. She was absolutely in line, and she was -- she was capable, absolutely." *Hale Dep.* at 28:15-18. Ms. Hawkins' cited testimony says that she "applied for a . . . [wine] sales position," indicating that she was interested in said position. *Jt. R.*, Attach. 2, *Dep. of Afton Hawkins* at 10:18-20 (*Hawkins Dep.*). The Court rejects Nappi's qualification and admits PSAMF ¶ 76.

representative positions, but Mr. Carr did not believe she had the experience on fine wine or the wine knowledge needed for the route for which she applied.[70]  PSAMF ¶ 77; DRPSAMF ¶ 77.  Matt Watson did not hire Ms. Hawkins for a position because she lived too far away.[71]  PSAMF ¶ 78; DRPSAMF ¶ 78.  At the time, Ms. Hawkins lived forty minutes from the route to which she applied.  PSAMF ¶ 79; DRPSAMF ¶ 79.  Previously, Mr. Carr had offered Ms. Hawkins a position that was two hours and thirty minutes away from her house.  PSAMF ¶ 80; DRPSAMF ¶ 80.

Mr. Watson did not hire Ms. Hawkins because she does not interview well.[72] PSAMF ¶ 81; DRPSAMF ¶ 81.  Mr. Hale does not agree with the assertion that Ms. Hawkins does not interview well.  PSAMF ¶ 82; DRPSAMF ¶ 82.  Mr. Hale believes Ms. Hawkins was absolutely "in line" for the position and capable.  PSAMF ¶ 83; DRPSAMF ¶ 83.  Ms. Hawkins believes she did not get the sales representative

---

[70]    Nappi qualifies PSAMF ¶ 77, saying that Mr. Carr "later offered her two different routes . . . both of which she declined."  DRPSAMF ¶ 77.  The Court accepts Nappi's qualification as supported by the record and alters PSAMF ¶ 77 to reflect the cited record.

[71]    Nappi qualifies PSAMF ¶ 78, saying that "[t]he cited testimony indicates Hawkins's belief as to why she was not hired."  DRPSAMF ¶ 77.  Ms. Hawkins' testimony reads:

> Q. [D]o you remember who you submitted your application to for that [wine sales position]?
> A. [Mr.] Watson.
> Q. Do you remember who advised you that you were not going to receive a position?
> A. [Mr.] Watson.
> Q. And do you remember what he told you?
> A. I didn't live close enough.

*Hawkins Dep.* at 12:14-21.  The Court rejects Nappi's qualification and admits PSAMF ¶ 78.

[72]    Nappi qualifies PSAMF ¶ 81, saying that "[t]he assertion that Mr. Watson's motive is 'alleged' is an argument and not a statement of fact."  DRPSAMF ¶ 81.  The Court accepts Nappi's qualification and strikes the word "alleged" from the fact.

position because she is female and because Nappi did not find her to be attractive enough. [73, 74]  PSAMF ¶ 84-85; DRPSAMF ¶ 84-85.

Michael Huff, a manager at Nappi, indicated to Ms. Hawkins that part of the reason she did not get the position was because she was female.[75]  PSAMF ¶ 86; DRPSAMF ¶ 86.  Mr. Huff communicated to Ms. Hawkins that based on his conversation with management it was his impression that she did not get the position because she was a woman.[76]  PSAMF ¶ 87; DRPSAMF ¶ 87.  Mr. Brown did not think Ms. Hawkins should get the sales representative position because she "lacked a

---

[73]    Nappi qualifies PSAMF ¶ 84, saying "Ms. Hawkins admits that her belief is an assumption." DRPSAMF ¶ 84.  The Court finds that the fact reflects only Ms. Hawkins' assumption in the form of her belief, and thereby denies Nappi's qualification and admits PSAMF ¶ 84.

[74]    Nappi qualifies PSAMF ¶ 85 for the same reason as PSAMF ¶ 84.  The Court rejects Nappi's qualification for the reasons in the previous footnote.

[75]    Nappi denies PSAMF ¶ 86 as "inadmissible hearsay" and unsupported by the record. DRPSAMF ¶ 86.  Ms. Hawkins' testimony reads:

> Q. What exactly did Mr. Huff tell you?
> A. It was a big and roundabout way of being like it's like he told me -- I really don't want to get into it, honestly.  I'm sorry.  But he did imply that, you know, I was a female, that would be part of the reason why I didn't get it.
> Q. . . .  Is there something he said to indicate to you that the reason you didn't get the position was because you were female?
> A. And because of what I looked like.
> Q. What exactly did he say that lead [sic] you to believe that you didn't get the position because of your looks and the fact that you were female?
> A. I wasn't the right fit for the position.
> Q. So he indicated that you weren't the right fit.  Did he ever say it's because you're female or because of the way you look?
> A. Not per se, but somebody that had way less experience than me and was "attractive" got the position over me.

*Hawkins Dep.* at 36:22-37:20.  The Court accepts Nappi's denial as a qualification and slightly modifies PSAMF ¶ 86, changing "told" to "indicated," to reflect the cited record.

[76]    Nappi objects to PSAMF ¶ 87 as "inadmissible hearsay."  DRPSAMF ¶ 87.  The Court rejects Nappi's hearsay objection because the statement is not hearsay under Federal Rule of Evidence 801(d)(2)(D).

certain polish, that she was not as wine knowledgeable as [he] had hoped."[77]  PSAMF ¶ 88; DRPSAMF ¶ 88.

Mr. Watson testified that Ms. Hawkins came ill-prepared for the interview and did not have a cover letter.  PSAMF ¶ 90; DRPSAMF ¶ 90.[78, 79]  Mr. Watson also testified that in the interview, Ms. Hawkins "threw the other guy that was going for the role under the bus saying that he wasn't qualified, she's more qualified."[80]  PSAMF ¶ 91; DRPSAMF ¶ 91.  Mr. Watson testified that Ms. Hawkins came across as someone who "just thought it was her turn because she had been a sales assistant."  PSAMF ¶ 92; DRPSAMF ¶ 92.  Mr. Watson said the decision to hire Karl Parrott over Ms. Hawkins was about his superior enthusiasm and aspirations within the industry.  PSAMF ¶ 93; DRPSAMF ¶ 93.  Mr. Parrot is no longer working in the industry, but

---

[77]     Nappi objects to PSAMF ¶ 88, saying that Mr. Brown "clarified the 'polish' criticism to indicate that Ms. Hawkins lacked the "ability to speak about our portfolio, her charisma, her ability to engage with customers."  DRPSAMF ¶ 88.  Mr. Brown's testimony states that Mr. Brown "felt as though [Ms. Tourangeau] still lacked a certain polish, that she was not as wine knowledgeable as I had hoped."  *Brown Dep.* at 19:5-8.  The Court accepts Nappi's qualification and adds to PSAMF ¶ 88 to more accurately reflect the cited record.

[78]     PSAMF ¶ 89 states that "[a] male applicant with less experience that was more attractive than Ms. Hawkins got the sales representative position she applied for."  Nappi denies PSAMF ¶ 89, saying "[t]he cited testimony is in regard to a summer beer associate position, not the wine sales position discussed in paragraph 88."  DRPSAMF ¶ 89.  Ms. Tourangeau's cited testimony, *Hawkins Dep.* at 35:21-37:20, is in response to Ms. Hawkins being asked "[w]hat assumptions did you make when you were not hired for the summer beer associate position?"  *Hawkins Dep.* at 35:21-21.  The Court accepts Nappi's denial and omits PSAMF ¶ 89.

[79]     Nappi qualifies PSAMF ¶ 90, saying that "Mr. Watson stated: 'She came ill-prepared.  I don't believe she had a cover letter.  She came ill-prepared.  Her -- when asked about her -- her accomplishments and such, she didn't have very good feedback on that.'"  DRPSAMF ¶ 90 (citing *Watson Dep.* at 52:23-53:1).  The Court finds that the fact reflects the cited testimony, rejects Nappi's qualification, and admits PSAMF ¶ 90.

[80]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 91, saying "Mr. Watson further indicated that Ms. Hawkins's conduct was unusual in an interview, as '[g]enerally in interviews people will talk about their own attributes and not drag the other person.'"  DRPSAMF ¶ 91 (citing *Watson Dep.* at 53:5-7).  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 91.

Ms. Hawkins continues to work as a sales representative for a competitor company.[81]

PSAMF ¶ 94; DRPSAMF ¶ 94.  Ms. Hawkins left her employment with Nappi because

she did not see opportunity for growth within the company as a woman or in

general.[82]  PSAMF ¶ 96; DRPSAMF ¶ 96.

One sales representative sent a picture of his genitals to a client and another

repeatedly made females at his accounts feel uncomfortable because of inappropriate

conversations he was having with them.[83]  PSAMF ¶ 292; DRPSAMF ¶ 292.  Mr.

Nappi, Jr. testified that it is not company policy nor company philosophy to

discriminate against women, talk disparagingly about women, or to share messages

that disparage women.  PSAMF ¶ 258; DRPSAMF ¶ 258.  Mr. Nappi testified if he

heard of any discrimination there would be penalties.  PSAMF ¶ 259; DRPSAMF ¶

259.  If Mr. Nappi, Jr. saw sexually explicit emails in the workplace there would be

discipline of at least a verbal or written warning and potentially termination.  PSAMF

¶ 260; DRPSAMF ¶ 260.

---

[81]    PSAMF ¶ 95 states that "[a]t the time Ms. Hawkins applied for the position there were only
two females that worked at Nappi Distributors."  Nappi denies PSAMF ¶ 95 as unsupported by the
cited record.  DRPSAMF ¶ 95.  Ms. Tourangeau's cite the Hawkins Deposition at 35:21-23, but the
citation does not support the Plaintiff's fact and the Court sustains the objection.  *See* D. ME. LOC. R.
56(f).  The Court omits PSAMF ¶ 95.

[82]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 96, saying "Ms. Hawkins also testified that she
left because she did not see much opportunity for growth in general."  DRPSAMF ¶ 96.  The cited
record states that in response to the question: "Did you leave Nappi . . . because you didn't see much
opportunity for growth within the company as a woman?," Ms. Hawkins responded: "Yes. Growth in
general, yes." *Hawkins Dep.* at 55:17-20.  The Court accepts Nappi's qualification and modifies PSAMF
¶ 96 to reflect the cited record.

[83]    Nappi qualifies PSAMF ¶ 292, saying "the record citation does not fully support the factual
assertions. The cited record material simply refers to two employees who were terminated—one for
sending a 'dick pic' to a client and one for making inappropriate comments on two occasions to a
client."  DRPSAMF ¶ 292.  The Court rejects Nappi's qualification and admits PSAMF ¶ 292.

### D.    Michele Tourangeau's Route

Ms. Tourangeau's route consisted of accounts located in Kennebunkport, Wells, York, Kittery, and Eliot.[84]  PSAMF ¶ 14; DRPSAMF ¶ 14.  Her route was seasonal in nature, being more lucrative and busier in the summer months and slowing down in the early winter months.[85]  PSAMF ¶ 16; DRPSAMF ¶ 16.  Prior to Ms. Tourangeau having her route, Mr. Brown had been assigned the route.  Before Mr. Brown, Mr. Carr himself had been assigned the route.  PSAMF ¶ 17; DRPSAMF ¶ 17.  Mr. Carr believes he had 150 accounts in total.  PSAMF ¶ 18; DRPSAMF ¶ 18.  Mr. Carr believes Mr. Brown also had around but just under 150 accounts.[86]  PSAMF ¶ 19; DRPSAMF ¶ 19.  Ms. Tourangeau currently has seventy on-premise accounts and thirty-eight off-premise accounts, totaling 108 accounts.  PSAMF ¶ 20; DRPSAMF ¶ 20.  Some of these accounts are no longer operational and therefore no longer producing any sales.[87]  PSAMF ¶ 21; DRPSAMF ¶ 21.  Some of these accounts are

---

[84]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 14, saying that Ms. Tourangeau's route additionally "consisted of accounts in Berwick and possibly Ogunquit."  DRPSAMF ¶ 14.  The cited record says: "You will be covering accounts in Kennebunkport, Wells, Kittery, and Eliot. If you determine that the salesman in Ogunquit isn't doing particularly well in some accounts there, I might give them to you to see if you can turn those around."  *Carr Dep.* at *Ex.* 1:003.  The Court rejects Nappi's qualification as unsupported by the cited record and admits PSAMF ¶ 14.

[85]    Nappi qualifies PSAMF ¶ 16, saying that the "cited testimony is in the past tense."  DRPSAMF ¶ 16.  The Court rejects Nappi's qualification, noting that PSAMF ¶ 16 is written using the past tense and because it was true in the past does not mean it is untrue.

[86]    Nappi qualifies PSAMF ¶ 19, saying the "statement does not accurately reflect Mr. Carr's entire testimony on the subject."  DRPSAMF ¶ 19.  Mr. Carr's testimony states: Mr. Brown "took over my route, so he probably had the same number [150] that I had . . . [but] somewhere along 2002 or whatever . . . I think that some of them went to that salesperson [Steve Cohen] for the Ogunquit area and that person for York. . .. So [Mr. Brown] probably had less accounts than I did because of Steve Cohen having some down there."  *Carr Dep.* at 38:22-39:11.  The Court accepts Nappi's qualification and alters PSAMF ¶ 19 to more accurately reflect Mr. Carr's testimony.

[87]    Nappi qualifies the scope of PSAMF ¶ 21.  Ms. Tourangeau testified that Mr. Watson "gave [her] a list of new accounts that, you know, didn't amount to anything, it was a bakery -- two bakeries that, you know, don't buy very much.  There were four buildings that are vacant with no business in them currently."  *Tourangeau Dep.* at 166:20-24.  The Court rejects Nappi's qualifications,  finds that PSAMF ¶ 21 appropriately reflects that some accounts do not produce sales, and admits PSAMF ¶ 21.

very small accounts such as bakeries and coffee shops that do not result in high wine sales.[88]  PSAMF ¶ 22; DRPSAMF ¶ 22.  Human Resources Director Ms. Fox agrees that Ms. Tourangeau's route is "significantly smaller" in the sales that it generates than the routes of the "highest-paid male sales representatives" and that Ms. Tourangeau's "is a considerably smaller route than what her colleagues are or some of them."[89]  PSAMF ¶ 23; DRPSAMF ¶ 23.

Since Mr. Watson started as Director of Wine Sales at Nappi, approximately seven accounts have been added to the wine sales route assigned to Ms. Tourangeau.[90]  DSMF ¶ 98; PRDSMF ¶ 98.  Among the accounts added to the wine sales route assigned to Ms. Tourangeau during Mr. Watson's tenure were Hannaford Supermarket in York, Maine, which is one of the largest accounts in terms of wine sales volume in York County, and Village Food in Ogunquit.[91]  DSMF ¶ 99; PRDSMF ¶ 99.  According to Mr. Watson, these two accounts had the potential to add approximately 30% increase in commissions plus additional incentive opportunities to Ms. Tourangeau's assigned sales route, although Ms. Tourangeau's commissions

---

[88]     Nappi objects to the inclusion of this fact on the same grounds as PSAMF ¶ 21.  The Court overrules Nappi's objection and includes PSAMF ¶ 22 for the same reasons discussed in the previous footnote.

[89]     Nappi objects to PSAMF ¶ 23 as "misleading in that it does not place the testimony in context." DRPSAMF ¶ 23.  The Court accepts Nappi's qualification and adds to PSAMF ¶ 23 to reflect the cited record.

[90]     Ms. Tourangeau qualifies DSMF ¶ 98, saying "Ms. Tourangeau received new accounts but two of them were bakeries and four were buildings that were vacant with no businesses in them.  She got a couple of accounts that didn't amount to anything."  PRDSMF ¶ 98.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 98.

[91]     Ms. Tourangeau qualifies DSMF ¶ 99, saying "Ms. Tourangeau also lost the following accounts: Tides Beach Club; 1652 LLC; Earth at Hidden Pond; Stonewall Cooking School; Fishermen's Dock; Hidden Pond; For the Love of Food and Drink; Burrito Betty's; Castaways At Compass Point; Kenzies Restaurant and Pub; Navy Exchange; Badger's Convenience."  PRDSMF ¶ 99.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 99.  The proper place to insert this new information into the record would have been the Plaintiff's Statements of Additional Fact.

and incentives did not rise with the addition of these accounts.[92]   DSMF ¶ 100; PRDSMF ¶ 100.  Ms. Tourangeau thinks she has essentially the same number of profitable accounts currently as she had when she started at Nappi.[93]   DSMF ¶ 101; PRDSMF ¶ 101.  Ms. Tourangeau acknowledges that as her sales route is currently constituted, it has greater sales potential than when she started at Nappi.[94]   DSMF ¶ 102; PRDSMF ¶ 102.

Much of the work as a wine sales representative is front loaded.  PSAMF ¶ 236; DRPSAMF ¶ 236.  Ms. Tourangeau spends numerous hours on each account at the beginning of the busy season getting Nappi products in the door of different venues.  PSAMF ¶ 237; DRPSAMF ¶ 237.  Ms. Tourangeau conducts wine tastings, meetings, and promotes features for customers' drink menus in time for the busy season.  PSAMF ¶ 238; DRPSAMF ¶ 238.  Even if Ms. Tourangeau is out of work for an entire week, the work that generated the sale for which the commission is based has already been performed.  PSAMF ¶ 239; DRPSAMF ¶ 239.

---

[92]   Ms. Tourangeau denies DSMF ¶ 100, saying Ms. Tourangeau's commissions did not increase by 30%.  PRDSMF ¶ 100.  The Court accepts Ms. Tourangeau's denial as a qualification and adds to DSMF ¶ 100 to reflect the record.

[93]   Ms. Tourangeau qualifies DSMF ¶ 101, saying "Ms. Tourangeau received new accounts but two of them were bakeries and four were buildings that were vacant with no businesses in them. She got a couple of accounts that didn't amount to anything. Ms. Tourangeau also lost the following accounts: Tides Beach Club; 1652 LLC; Earth at Hidden Pond; Stonewall Cooking School; Fishermen's Dock; Hidden Pond; For the Love of Food and Drink; Burrito Betty's; Castaways At Compass Point; Kenzies Restaurant and Pub; Navy Exchange; Badger's Convenience." PRDSMF ¶ 101.  The Court finds Ms. Tourangeau's qualification largely beyond the scope of the fact, but modifies DSMF ¶ 101 to clarify that Ms. Tourangeau is focusing on profitable accounts and otherwise admits DSMF ¶ 101.

[94]   Ms. Tourangeau qualifies DSMF ¶ 102, saying "Ms. Tourangeau's route has the potential to create more sales by performing more work, but because of the salary elimination she will earn less money while doing more work." PRDSMF ¶ 102.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 102.

Wine sales representative Mr. Toolan agrees that as a sales representative for Nappi a lot of the work that goes into a sale is front-loaded, meaning that to generate sales and repeat sales, repeat orders, a salesperson has to do a lot of work such as meeting with customers, creating menus, doing wine tastings, that sort of thing and that once you put in that work, not that the sales generate themselves, but the work becomes less onerous and the sales representative is more likely to generate sales based on the work that has always been performed.  PSAMF ¶ 240; DRPSAMF ¶ 240. Mr. Nappi, Jr. agrees there is a lot of base work that needs to be done to generate sales.  PSAMF ¶ 241; DRPSAMF ¶ 241.

### E.   Michele Tourangeau's 2015 Vacation

In December of 2015, Ms. Tourangeau went on vacation to Florida, but she was not yet eligible for paid vacation.  PSAMF ¶ 70; DRPSAMF ¶ 70.  During this time, Mr. Brown agreed to cover Ms. Tourangeau's route.[95]  PSAMF ¶ 70; DRPSAMF ¶ 70. However, Mr. Brown's wife went into labor so he called Ms. Tourangeau and told her she would have to do what she could from Florida.[96]  PSAMF ¶ 71; DRPSAMF ¶ 71. Ms. Tourangeau worked during her unpaid vacation.  PSAMF ¶ 72; DRPSAMF ¶ 72. When Ms. Tourangeau returned to work, she discussed with Mr. Carr that because of the circumstances she had worked during her vacation without pay.  PSAMF ¶ 73; DRPSAMF ¶ 73.  Mr. Carr told Ms. Tourangeau that it was messed up that she would

---

[95]     Nappi objects to PSAMF ¶ 70 as "inadmissible hearsay."  DRPSAMF ¶ 70.  The Court rejects Nappi's hearsay objection for the reasons explained in footnote 54.

[96]     Nappi objects to PSAMF ¶ 71 as "inadmissible hearsay."  DRPSAMF ¶ 71.  The Court rejects Nappi's hearsay objection for the reasons explained in footnotes 54 and 75.

have to work without pay but did not do anything to rectify the situation.[97]  PSAMF ¶ 74; DRPSAMF ¶ 74.

### F.     Ms. Tourangeau's Complaint Regarding Sexual Harassment from Account Manager Bill Barksdale

According to Ms. Tourangeau's allegations, in the summer of 2015 she had a discussion with Bill Barksdale, the manager of two of her off-premise accounts. DSMF ¶ 51; PRDSMF ¶ 51.  The discussion with Mr. Barksdale occurred on the account's business premises during the business workday, although he did once call her through Facebook messenger in the middle of the night.[98]  DSMF ¶ 52; PRDSMF ¶ 52.  According to Ms. Tourangeau's allegations, Mr. Barksdale stated to her, "I would really like for you to come out with my girlfriend Joyce [Hulm] and I and have drinks."[99]  DSMF ¶ 53; PRDSMF ¶ 53.   During the alleged conversation, Mr. Barksdale did not explicitly mention sex or sexual activity.[100]  DSMF ¶ 54; PRDSMF ¶ 54.  During the alleged conversation, Mr. Barksdale did not explicitly suggest that his establishment's business with Nappi was conditioned on her having a drink with

---

[97]      Nappi objects to PSAMF ¶ 74 as "inadmissible hearsay."  DRPSAMF ¶ 74.  The Court rejects Nappi's hearsay objection for the reasons explained in footnotes 54 and 75.

[98]      Ms. Tourangeau denies DSMF ¶ 52, saying "Mr. Barksdale also attempted to call Ms. Tourangeau through Facebook in the middle of the night."  PRDSMF ¶ 52.  The Court accepts Ms. Tourangeau's denial as a qualification and adds to DSMF ¶ 52 to reflect the record.

[99]      Ms. Tourangeau denies DSMF ¶ 53, saying "Ms. Tourangeau testified he made a sexual advance toward her."  PRDSMF ¶ 53.   The Court has added Ms. Tourangeau's interpretation of the events leading up to and including Mr. Barksdale's invitation.

[100]     Ms. Tourangeau denies DSMF ¶ 54 for the same reason as the previous footnote.  Ms. Tourangeau testified that "[i]t was just the way he said it and the way he was looking at me when he said it . . . [he was] a little bit flirty . . . [a]nd just giggle[d] in certain ways, kind of get close to me and rub up against my arm."  *Tourangeau Dep.* at 79:6-17.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 54 to reflect the record and adds Ms. Tourangeau's reaction to complete the record.

him and his girlfriend.[101]  DSMF ¶ 55; PRDSMF ¶ 55.  Nevertheless, Ms. Tourangeau testified that she interpreted his invitation as a sexual advance because of the way Mr. Barksdale said it, the way he looked at her, and his flirtatious manner in the period leading up to the invitation.  DSMF ¶ 53; PRDSMF ¶ 53.  Furthermore, shortly after Ms. Tourangeau declined Mr. Barksdale's invitation, the account complained about Ms. Tourangeau and Nappi removed her from the account.   DSMF ¶ 55; PRDSMF ¶ 55.

Ms. Tourangeau complained to Mr. Brown that the manager of two of her accounts, Mr. Barksdale, was 'demanding sex' and propositioning her for a threesome with his girlfriend, Joyce Hulm.  PSAMF ¶ 159; DRPSAMF ¶ 159.[102]  Mr. Carr knew Ms. Tourangeau had complained of sexual harassment.  PSAMF ¶ 160; DRPSAMF ¶ 160.   Despite admitting that he had no reason to distrust Ms. Tourangeau, Mr. Carr 'dismissed' the complaint on its face because he knew the other people involved on a personal and professional level and trusted them.[103]   PSAMF ¶ 162; DRPSAMF ¶

---

[101]    Ms. Tourangeau qualifies DSMF ¶ 55, denying "that her account was not conditioned on having a drink with him and his girlfriend."  PRDSMF ¶ 55.  The Court accepts Ms. Tourangeau's qualification and slightly alters DSMF ¶ 55 to reflect the record.

[102]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 159, saying "[t]he cited record material does not establish to which 'complaint and demand' Mr. Carr is referring, nor does it establish when Mr. Carr learned of it."   DRPSAMF ¶ 159.   Having reviewed the cited record, the Court accepts Nappi's qualification and alters PSAMF ¶ 159 to conform to the record.

[103]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 162 as unsupported by the record because "Mr. Carr testified that he knew the account holders on a professional level . . . [and] Mr. Carr described instances where she was using one of her accounts in an unprofessional manner and another instance where she was not serving a client properly . . . ."  DRPSAMF ¶ 162.  Mr. Carr testified as follows:

> Q. Would you agree with me arguendo that if what [Ms. Tourangeau] was reporting was true, that they were trying to solicit her for a threesome and that she turned them down and that she was then kicked out of the account because she turned them down, that it would be unfair to not compensate her with an additional account?
> . . .

162. Mr. Carr admits that if he did not have a personal relationship with Mr. Barksdale and Ms. Hulm, he would have investigated Ms. Tourangeau's report rather than dismissing it on its face.[104]  PSAMF ¶ 163; DRPSAMF ¶ 163.

After dismissing the sexual harassment complaint without investigation, Nappi removed Ms. Tourangeau from the two accounts managed by Mr. Barksdale

---

A. But this is totally absurd. I know the two other people involved in the conversation and in the situation, and there's no way they'd be looking for a threesome or to be soliciting sex with [Ms. Tourangeau].

. . .

But no, I'm not prejudice against [Ms. Tourangeau] as far as this.  I just know the two other parties in this complaint, and there's no way that this would have happened.  I also know the owner of the account, and the owner of the account never suggested anything like this to me either.

. . .

Q. Okay. And has [Ms. Tourangeau] ever done anything to make you think she's untrustworthy or a liar?

A. You know, it's hard to answer that . . . I have an instance of another account . . . and he claimed the bar manager complained that she never came to him with new items and didn't call on the days that he was there.  And then he gave the list away to another company, even though the list was Nappi Distributors . . . But as far as the other thing, the thing that always bothered me in my head was she was using her B and B as a source of -- you know, a source of income for incentives. I didn't like that. But no, I have no reason to distrust her, you know. And I just talked to her about the thing, about using her B and B, that she couldn't use it anymore.  And after that, I didn't have a problem with it.

*Carr Dep.* at 70:25-72:15, 73:13-74:7.  The Court rejects Nappi's qualification, since Mr. Carr expressly testified that he had "no reason to distrust [Ms. Tourangeau]."

[104]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 163 as misleading.  DRPSAMF ¶ 163.  Mr. Carr testified:

Q. And I just want to take your knowledge of who it was that she complained of out of the question.

. . .

A. I think that other than this situation here if somebody -- if she complained that some other account was, you know, sexually harassing her or something like that, I would look into it and then I would do a judgment call on it.  I wouldn't necessarily kick her out of the account. But then again, if the account is saying they won't deal with her, then I'm stuck of losing the business.

*Carr Dep.* at 72:2-9.  The Court rejects Nappi's qualification and admits PSAMF ¶ 163.

and took away her compensation.[105]   PSAMF ¶ 164; DRPSAMF ¶ 164.  Mr. Carr admits that if the allegations were true, Ms. Tourangeau should have been adequately compensated in some way for removal from such accounts.[106]  PSAMF ¶ 165; DRPSAMF ¶ 165.  Mr. Brown denies receiving a complaint from Ms. Tourangeau about sexual harassment at one of her accounts.   PSAMF ¶ 161; DRPSAMF ¶ 161. Mr. Brown recalls instead that the owner requested a more experienced wine salesperson.[107]  PSAMF ¶ 166; DRPSAMF ¶ 166.  The account went to Terry O'Brien. PSAMF ¶ 167; DRPSAMF ¶ 167.   Mr. Carr, the Nappi Wine Sales Director at the time, testified that he moved the account from the Plaintiff's route because the account manager complained that the Plaintiff was not coordinating with him to discuss product orders.[108]   DSMF ¶ 56; PRDSMF ¶ 56.

---

[105]    Nappi denies Ms. Tourangeau's PSAMF ¶ 164 as "argument, and not a statement of fact." DRPSAMF ¶ 164.  The Court accepts Nappi's denial as a qualification and slightly modifies PSAMF ¶ 164 to reflect the cited record.

[106]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 165 as unsupported by the record.  Mr. Carr testified:

> If I didn't know the specifics as I do in this case, I would agree that she should have been compensated for it. We would have placed somebody else in there, and we would have arranged for something, maybe if the person who is getting that account, that we -- that he gives up something to her that would be compensation. But no, not in this specific case.

*Carr Dep.* at 73:4-11.  The Court rejects Nappi's qualification and admits PSAMF ¶ 165.

[107]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 166 as unsupported by the record because "Mr. Brown testified that the owner requested someone with 'much more wine knowledge and much more wine experience' [and t]he cited record material does not support the assertion that the decision had nothing to do with performance."  DRPSAMF ¶ 166.  The Court accepts Nappi's qualification and strikes "but that it had nothing to do with [Ms. Tourangeau]'s performance" from the fact.

[108]    Ms. Tourangeau denies DSMF ¶ 56, saying "[s]oon after Ms. Tourangeau declined the sexual advance, the account complained of Ms. Tourangeau and had her removed from the account.  At the time, Mr. Carr and Mr. Brown were aware of Ms. Tourangeau's complaint of Mr. Barksdale's sexual advance."  PRDSMF ¶ 56.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 56.

### G.     Michele Tourangeau's Maternity Leave

In April of 2016, Ms. Tourangeau took an unpaid leave of absence for the birth of her child and elected to use wage replacement benefits under Nappi's short-term disability plan.[109]   DSMF ¶ 57; PRDSMF ¶ 57; PSAMF ¶ 130; DRPSAMF ¶ 130. Under the terms of Nappi's short-term disability leave plan, Ms. Tourangeau received non-payroll disability leave wage replacement benefits in lieu of her regular compensation.[110]   DSMF ¶ 58; PRDSMF ¶ 58.   While receiving short-term disability leave benefits, Ms. Tourangeau was not entitled to receive any commissions or incentives based on sales that were completed and products delivered during her leave period.[111]   DSMF ¶ 59; PRDSMF ¶ 59.   Salespersons taking a leave of absence may not necessarily receive any commissions or incentives based on sales that were completed and products shipped during his or her leave period.[112]   DSMF ¶ 61; PRDSMF ¶ 61.

---

[109]    Ms. Tourangeau denies DSMF ¶ 57, saying "Ms. Tourangeau went out on leave April 11, 2016, and returned June 20, 2016, for a 10-week maternity leave." PRDSMF ¶ 57. The Court notes that the parties cite conflicting affidavits, one indicating a ten-week leave and the other a fifteen-week. The Court removes any mention of the duration of the leave and otherwise admits DSMF ¶ 57.

[110]    Ms. Tourangeau denies DSMF ¶ 58, saying she "should not have been expected to apply for [short term disability] given it was not truly a maternity leave as she worked throughout the entirety of the leave at the direction of Mr. Hale." PRDSMF ¶ 58. The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 58.

[111]    Ms. Tourangeau denies DSMF ¶ 59, saying "Ms. Tourangeau is entitled to her salary, commission and incentives for the time period because she worked throughout the entire time." PRDSMF ¶ 59. The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 59.

[112]    Ms. Tourangeau denies DSMF ¶ 61, saying "Mr. Carr admits that an employee needing time off would still be compensated." PRDSMF ¶ 61. When asked: "And how about a leave of absence policy? If an employee needed to take a couple of weeks off, how -- how would that work?", Mr. Carr testified: "I'd say they'd still be getting their pay." *Carr Dep.* at 49:5-9. The Court accepts Ms. Tourangeau's denial as a qualification and modifies DSMF ¶ 61 to conform to the record.

Nappi decided to hire sales assistants to cover the routes of sales representatives who were on vacation or out sick. PSAMF ¶ 97; DRPSAMF ¶ 97. Sales assistants also supported sales representatives during the busy season. PSAMF ¶ 98; DRPSAMF ¶ 98. While Ms. Tourangeau was out on maternity leave, Ms. Hawkins was the sales assistant assigned to cover her route. PSAMF ¶ 115; DRPSAMF ¶ 115. Ms. Hawkins testified that she was covering for a sales representative on vacation once or twice a month for the four years she worked as a sales assistant. PSAMF ¶ 99; DRPSAMF ¶ 99.

Mr. Carr was unaware of any maternity leave policy at Nappi while he was working there.[113] PSAMF ¶ 100; DRPSAMF ¶ 100. This was the first maternity leave Mr. Hale knew of at Nappi.[114] PSAMF ¶ 135; DRPSAMF ¶ 135. If a sales representative needed to take a short leave of absence, they would still receive their pay.[115] PSAMF ¶ 101; DRPSAMF ¶ 101. While Ms. Tourangeau was out on

---

[113]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 100, saying "Mr. Carr testified that he did not remember any maternity leave policy." DRPSAMF ¶ 100. When asked: "[d]id Nappi . . . have a maternity or paternity leave policy while you were employed there," Mr. Carr responded: [n]ot that I specifically remember." *Carr Dep.* at 49:2-4. The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 100 to reflect the cited record.

[114]   Nappi denies Ms. Tourangeau's PSAMF ¶ 135 as unsubstantiated by the cited record. The Plaintiff erred in her Hale Deposition at 43:14-44:19 citation, but the Court notes that Ms. Tourangeau's PageID #1170 has properly pointed the Court to the relevant deposition citation at 47:10-13. It appears Ms. Tourangeau switched the appropriate citations in PSAMF ¶ 133 and PSAMF ¶ 135, and the Court corrects this error. Mr. Hale's testimony reads:

> Q. Okay. Was this the first maternity leave that you had ever had to deal with as a manager of the wine sales department?
> A. Yeah. It's the first maternity leave, yes.

*Hale Dep.* at 47:10-13. The Court rejects Nappi's denial and admits PSAMF ¶ 135.

[115]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 101 as misleading. DRPSAMF ¶ 101. In response to the question: did Nappi have "a leave of absence policy? If an employee needed to take a couple of weeks off, how -- how would that work? Would the employee be compensated?", Mr. Carr responded: "I'd say they would still be getting their pay . . .." *Carr Dep.* at 49:5-9. The Court accepts Nappi's

40

maternity leave, Mr. Maiorino was angry about having to arrange for coverage for her route and said to Mr. Toolan something to the effect of "we should not hire women because you have to cover their maternity leave."[116] PSAMF ¶ 116; DRPSAMF ¶ 116. Mr. Brown is not surprised that Mr. Maiorino made the statement.  PSAMF ¶ 117; DRPSAMF ¶ 117.

Mr. Carr does not know whether Ms. Tourangeau had done anything to prepare her accounts prior to going out on maternity leave.[117]  PSAMF ¶ 102; DRPSAMF ¶ 102.  Mr. Carr does not know what Ms. Tourangeau had done to place Nappi product in accounts prior to going out on maternity leave because he did not micromanage.[118]  PSAMF ¶ 103; DRPSAMF ¶ 103.  Mr. Carr did not check to see if Ms. Tourangeau was performing work to get items into specific accounts, such as the Jackson Family Estates account, while she was out on maternity leave.[119]  PSAMF ¶ 104; DRPSAMF ¶ 104.

---

qualification and alters PSAMF ¶ 101, changing "leave of absence" to "short leave of absence" to reflect the cited record.

[116]     Nappi objects to PSAMF ¶¶ 116, 118, 119, and 123 as "inadmissible hearsay."  DRPSAMF ¶¶ 116, 118, 119, 123.  The Court rejects Nappi's hearsay objections for the reasons explained in footnotes 54 and 75 because they are admissions under Federal Rule of Evidence 801(d)(2)(D) noting that these statements may be presented either to show something other than the truth of the matter or as an admission of a party opponent, so the Court admits them at the summary judgment stage.

[117]     Nappi qualifies PSAMF ¶ 102, saying "Mr. Carr testified that he did not recall doing anything to see whether or not [Ms. Tourangeau] had done anything in preparation for her maternity leave.  However, Mr. Carr also testified that if Ms. Tourangeau had gone to restaurants and set up accounts to prepare for her leave, he would have seen it."  DRPSAMF ¶ 102.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 102.

[118]     Nappi qualifies PSAMF ¶ 103 for the same reasons as it qualifies ¶ 102, and the Court rejects Nappi's qualification for the reason explained in the previous footnote.

[119]     Nappi denies Ms. Tourangeau's PSAMF ¶ 104 as unsupported by the record, saying "[t]he cited testimony is in response to whether Mr. Carr looked into what work had gone into getting an item in an account."  DRPSAMF ¶ 104.  Mr. Carr's testimony reads:

> A.  Okay.  So looking at this, for instance, I'm looking down at Jackson Family Estates where the incentive period was February to May.  Okay.  A lot of her accounts wouldn't

Mr. Hale, Wine Manager, instructed Ms. Tourangeau she could receive incentives if she worked while out on maternity leave.[120]  PSAMF ¶ 109; DRPSAMF ¶ 109.  Although Mr. Hale did not expect Ms. Tourangeau to continue to work during her maternity leave, he hoped that she was concerned enough about her route to be available to consult with Ms. Hawkins, who took over the route temporarily.[121]

---

be open in February until May, so I would think that the placements were made by [Ms. Hawkins.]
Q. So -- and what I want to do get to, were you just looking at the date when the order was placed or were you looking at something else?
A. I was looking at the month that was covered by the incentives.
Q. So in making that determination, you were looking at the date the order was placed and whether it was [Ms. Hawkins] who placed the order or whether it was [Ms. Tourangeau] who placed the order?
A. Exactly.
Q. Okay.  Did you do anything to look at what work had gone into getting the item in the account?
A. No.  I didn't -- you know, I didn't micromanage the thing.

*Carr Dep.* at 55:18-56:11.  The Court accepts Nappi's denial as a qualification and modifies PSAMF ¶ 104 to reflect the record.

[120]    Nappi denies Ms. Tourangeau's PSAMF ¶ 109 as unsupported by the record.  DRPSAMF ¶ 109.  Mr. Hale testified that he told Ms. Tourangeau "as long as you stay attached on the phone with your customers in person, taking phone calls from them, they're working with [Ms. Hawkins] on a daily basis, that I would try to get her the placement incentives on that route while she was out." *Hale Dep.* at 32:24-33:3.  The Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 109 to reflect the cited record.

[121]    PSAMF ¶ 110 states that "Mr. Hale expected [Ms. Tourangeau] to work during her maternity leave."  Nappi denies Ms. Tourangeau's PSAMF ¶ 110 because "[t]he cited testimony does not support the statement." DRPSAMF ¶ 110.  Mr. Hale testified as follows:

Q. All right. [Mr. Hale], was it your expectation that [Ms. Tourangeau] work during her maternity leave?
A. No. I mean, [Ms. Tourangeau] -- if [Ms. Tourangeau] wanted to stay attached to make incentive dollars, I made an arrangement that worked out -- would have worked out best for everybody if that was the arrangement.  Am asking somebody to work during their maternity, that is not what I'm doing, but I'm giving her an opportunity to actually accrue some incentives, where in every other case I'd ever been through, anybody who was out never, ever was entitled to incentives. I tried to help, but that was not how it worked out.
Q. . . . Was it your expectation that based on your arrangement with [Ms. Tourangeau], that she work during her maternity leave?
A. I hoped that [Ms. Tourangeau] was as concerned about her route as I was and as concerned about [Ms. Hawkins] covering her route as I was, and wanting and willing to be there for [Ms. Hawkins] . . .

PSAMF ¶ 110; DRPSAMF ¶ 110. Mr. Hale testified that Ms. Tourangeau had, by far, the most seasonal route and that because he wanted that route taken care of as best as possible, he made an agreement with Ms. Tourangeau that "as long as [she] stay[ed] attached on the phone with [her] customers in person, taking phone calls from them, [even though] they're working with [Ms. Hawkins] on a daily basis . . . [he] would try to get her the placement incentives on that route while she was out . . . [He] had made an agreement with her that is what [he] would do if she did her part." PSAMF ¶ 111; DRPSAMF ¶ 111. Mr. Hale understood that Ms. Tourangeau was, in theory, going to remain the salesperson on that route and that Ms. Hawkins would be the hands that put it together. PSAMF ¶ 112; DRPSAMF ¶ 112. Ms. Hawkins understood that her role during the maternity leave was to be the point person, but that she and the accounts would still have access to Ms. Tourangeau. PSAMF ¶ 113; DRPSAMF ¶ 113.

Ms. Hawkins went to Ms. Tourangeau's house five or six times during her maternity leave for work purposes.[122] PSAMF ¶ 126; DRPSAMF ¶ 126. While

---

*Hale Dep.* at 45:20-46:15. Although the cited record does not entirely support the assertion that Mr. Hale expected her to work during her maternity leave, the record confirms that Mr. Hale hoped that Ms. Tourangeau would be available to consult with her substitute during her absence. The Court amended ¶ 110 to reflect this situation.

[122]   Nappi denies Ms. Tourangeau's PSAMF ¶ 126 as unsupported by the cited record. Ms. Hawkins testified as follows:

> Q. Did you ever go to [Ms.] Tourangeau's house while she was out on maternity leave to discuss work things that come up?
> A. Yes.
> Q. On how many occasions do you think you went to her house while she was on maternity leave?
> A. A handful of times, probably like five or six.

covering for Ms. Tourangeau, Ms. Hawkins did not have to create menus for any customers because Ms. Tourangeau had already done so before she went out on leave. PSAMF ¶ 128; DRPSAMF ¶ 128. Ms. Tourangeau remained in constant contact with Ms. Hawkins during her maternity leave between phone calls and meetings at Ms. Tourangeau's home. PSAMF ¶ 131; DRPSAMF ¶ 131. Ms. Tourangeau was regularly advising and supporting Ms. Hawkins to carry out the orders.[123] PSAMF ¶ 131; DRPSAMF ¶ 131. While covering Ms. Tourangeau's route, Ms. Hawkins had occasional days that ended early, so managers would also ask her to help out on other routes.[124] PSAMF ¶ 129; DRPSAMF ¶ 129.

---

      Q. Was the purpose of those meetings specifically work or was it personal. Can you explain it for me.
      A. Work mostly, yes. I did bring her a candle when she had [her baby] . . . I guess that's personal.

*Hawkins Dep.* at 48:17-49:5. The Court rejects Nappi's denial and admits PSAMF ¶ 126.
[123]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 131, saying that "Ms. Tourangeau testified she contacted [Ms.] Hawkins a couple of times per week." Ms. Tourangeau testified as follows:

      Q. I think you indicate in your complaint that you were in constant contact with [Ms. Hawkins] while you were on maternity leave?
      A. That is correct.
      . . .
      Q. Thank you. So when you say constant contact, can we just put a little bit -- like a number on that? Did you have daily contact with her, every other day? How frequently is constant?
      A. I was thinking that when you said -- definitely not daily, definitely weekly. Couple times a week.

*Tourangeau Dep.* at 105:16-106:24. The Court accepts Nappi's qualification and admits PSAMF ¶ 131, changing "constant" contact to "regular" contact to reflect the clarification in the cited record.
[124]    Nappi denies Ms. Tourangeau's PSAMF ¶ 129, saying that "Ms. Hawkins testified that, 'most of the time [she] was covering for [Ms. Tourangeau.'" DRPSAMF ¶ 129. Ms. Hawkins testified as follows:

      Q. And how much of your day was spent working on [Ms. Tourangeau's] accounts while she was out on maternity leave?

Mr. Hale later informed Ms. Fox of his arrangement with Ms. Tourangeau to continue work while on leave.[125]  PSAMF ¶ 132; DRPSAMF ¶ 132.  Mr. Hale also believes he shared with Mr. Brown and Mr. Carr the arrangement he made with Ms. Tourangeau because they were also in management in the wine department.[126]

---

A. I was assigned to [Ms. Tourangeau], so I didn't have any other obligations.  Every so often, like if I had a short day, some of my other managers would ask me to help out here and there, but most of the time I was covering for [Ms. Tourangeau].

*Hawkins Dep.* at 25:11-17.  The Court accepts Nappi's denial as a qualification and adds "occasional" to PSAMF ¶ 129.

[125]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 132, saying that the cited testimony indicates that "after Ms. Tourangeau returned from maternity leave . . . [Mr. Hale] then informed Ms. Fox of the conflict."  DRPSAMF ¶ 132.  Mr. Hale testified:

Q. And as you sit here today, what can you recall about that conversation?
A. Which conversation?
Q. The conversation you just described for me where you and Christine discussed who should receive what for the time that [Ms. Tourangeau] was out?
A. After [Ms. Tourangeau] came in and threatened me, I obviously went right in to [Ms. Fox], and it was full disclosure on, you know, [Ms. Hawkins] running the route and the arrangement that I had had with [Ms. Tourangeau] and that [Ms. Tourangeau] had not upheld any of her end of the bargain whatsoever.   And that [Ms. Hawkins] -- I was making an argument that [Ms. Hawkins] was covering that route for a whole -- for longer than she was supposed to, busting her butt, working a lot of hours, and that she -- I'm guessing that I would have made the argument that [Ms. Hawkins] deserved to get that money.

*Hale Dep.* at 40:16-41:7.  The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 132 to reflect the cited record.

[126]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 133 as unsupported by the cited record.  DRPSAMF ¶ 133.  The Plaintiff erred in her Hale Deposition at 47:10-13 citation, but the Court notes that Ms. Tourangeau's PageID #1169 properly pointed the Court to the relevant deposition citation at 43:14-44:19.  Mr. Hale testified as follows:

Q. Did you have a conversation with [Mr.] Carr about [Ms. Tourangeau] receiving the incentives during her maternity leave?
A. Probably.
. . .
Q. And how about [Mr.] Brown, do you think you had a conversation with [Mr.] Brown about [Ms. Tourangeau's] incentive pay during her maternity leave?
A. Did I even have one?  I don't know.  Was I clear about that or do you want to try to put words in my mouth?
Q. I'm trying to find out what you remember, and you said it probably happened.

45

PSAMF ¶ 133; DRPSAMF ¶ 133.  Ms. Tourangeau indicated that she would share with management a spreadsheet outlining pertinent information regarding her accounts prior to going out on maternity leave, and there is no suggestion that she did not send the spreadsheet.[127]  PSAMF ¶ 134; DRPSAMF ¶ 134.

Ms. Tourangeau worked before, during, and after her maternity leave under the belief that she would be entitled to her commission, salary and incentives.[128]  PSAMF ¶ 140; DRPSAMF ¶ 140.  The total of the incentives for the time period was for $3,999.90.[129]  PSAMF ¶ 136; DRPSAMF ¶ 136.  Ms. Tourangeau did not receive

---

> A. Well, I'm guessing, because [Mr. Carr] was also in the wine department, as was [Mr. Brown], that those conversations did probably happen.  Do I remember them, no, I don't.

*Hale Dep.* at 43:14-44:19.  The Court rejects Nappi's qualification and admits the fact.

[127]  Nappi denies Ms. Tourangeau's PSAMF ¶ 134 as unsupported by the cited record.  DRPSAMF ¶ 134.  Ms. Tourangeau's email introduced into evidence reads: "Monday morning, I will be sending a few spreadsheets to [Ms. Hawkins, Mr. Brown, and Mr. Watson] that will outline all pertinent info about each of my accounts, including the new wine spring/summer list items."  *Hale Dep.* at 67:5-8.  Even though the cited record does not substantiate that this spreadsheet was ever sent, looking at the record in the light most favorable to Ms. Tourangeau, the Court rejects in part Nappi's denial as a qualification and alters PSAMF ¶ 134 to reflect the cited record.

[128]  PSAMF ¶ 140 states that "Ms. Tourangeau worked before, during, and after her maternity leave so she should be entitled to her commission, salary and incentives."  Nappi denies Ms. Tourangeau's PSAMF ¶ 140 as "an argument, and not a statement of fact."  DRPSAMF ¶ 140.  The Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 140 to state a fact, as reflected by the cited record.

[129]  Nappi denies Ms. Tourangeau's PSAMF ¶ 136, saying that "[t]he cited testimony is merely Ms. Tourangeau's counsel's question."  DRPSAMF ¶ 136.  Mr. Hale's testimony reads as follows:

> Q. Okay. I am going to share my screen with you.  Can you see this document which I've marked as Hale Exhibit 1?
> A. Yeah, I can see it but I'm -- you want to read it to me or are you going to make me suffer and --
> Q. I can read it to you.  Anything you need, just let me know.  I'm happy to do that for you. . .. It looks like incentives paid in June of 2016, and it looks like a chart with the different accounts, the period for which the accounts had orders placed, the brands and the incentive programs that were in place during those -- that period of time, and it looks like a total incentive of $3,999.90.  And it says at the bottom, at 43% equals $1,719.96 through payroll June 10th, 2016.  Do you recall seeing this chart?
> A. It does look familiar to me.
> Q. Did you prepare this chart?

all the incentives as promised—she received 43% of the incentives earned for sales during her maternity leave.[130]   PSAMF ¶ 137; DRPSAMF ¶ 137.   Nappi pro-rated and paid Ms. Tourangeau 43% of the incentives earned based on products sold and delivered pre-dating her leave period for which the incentive programs were based upon in 2016.[131]   DSMF ¶ 60; PRDSMF ¶ 60.

Ms. Hawkins believes she received approximately $3,000.00 for incentives during Ms. Tourangeau's maternity leave.[132]   PSAMF ¶ 138; DRPSAMF ¶ 138.   On

---

A. I would not have prepared that, no.
Q. Okay. So who would have prepared that chart?
A. I guess it was probably the wine administrator.
Q. And was that your wife, Valerie?
A. . . . Yes.

The Court rejects Nappi's denial, noting that although Mr. Hale did not prepare the chart, he does not deny the accuracy of the chart prepared by the wine administrator, and admits PSAMF ¶ 136.

[130]   Nappi denies Ms. Tourangeau's PSAMF ¶ 137 as unsupported by the cited record.   DRPSAMF ¶ 137. Mr. Hale's testimony reads:

A. After [Ms. Tourangeau] came in and threatened me, I obviously went right in to [Ms. Fox], and it was full disclosure on, you know, [Ms. Hawkins] running the route and the arrangement that I had had with [Ms. Tourangeau] and that [Ms. Tourangeau] had not upheld any of her end of the bargain whatsoever.   And that [Ms. Hawkins] -- I was making an argument that [Ms. Hawkins] was covering that route for a whole -- for longer than she was supposed to, busting her butt, working a lot of hours, and that she -- I'm guessing that I would have made the argument that [Ms. Hawkins] deserved to get that money.
Q. So I'm looking at this email where you sent [Ms. Tourangeau] the chart that shows she's going to get 43% of the incentives, and that's on June 13th, 2016.   I'm assuming [Ms. Tourangeau] had not yet come into the office and threatened to go to [Ms. Fox] about this issue?   Is this accurate?   I didn't hear you.
A.   I don't know.

The Court rejects Nappi's denial for the same reasons as in the previous footnote and admits PSAMF ¶ 137.

[131]   Ms. Tourangeau denies DSMF ¶ 60, saying "Ms. Tourangeau is entitled to her salary, commission and incentives for the time period because she worked throughout the entire time." PRDSMF ¶ 60.   The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 60.

[132]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 138, saying that "Ms. Hawkins testified it was approximately $3,000.00."   DRPSAMF ¶ 138.   Ms. Hawkins testified: "I remember the [incentives] check that I got.   It was like $3,000.00."   *Hawkins Dep.* at 28:11-12.   The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 138 to reflect the record.

June 13, 2016, when Ms. Tourangeau learned of not receiving the incentives, she told Mr. Hale she was going to speak with Ms. Fox in Human Resources.  PSAMF ¶ 139; DRPSAMF ¶ 139.  Mr. Brown told Mr. Hale he believed Ms. Hawkins should receive a portion of the incentives because of the length of the leave and the amount of effort put in.[133]  PSAMF ¶ 148; DRPSAMF ¶ 148.  Mr. Hale did not communicate to Mr. Brown that he had told Ms. Tourangeau he expected her to work during her maternity leave.[134]  PSAMF ¶ 149; DRPSAMF ¶ 149.

Mr. Brown knew that Ms. Tourangeau was working during her maternity leave, but he was not aware of the extent.[135]  PSAMF ¶ 150; DRPSAMF ¶ 150.  Mr. Brown was not aware of Ms. Tourangeau meeting with Ms. Hawkins during her maternity leave.  PSAMF ¶ 151; DRPSAMF ¶ 151.  Prior to Ms. Tourangeau's maternity leave, Ms. Hawkins had never received incentive pay for covering a sales representative's route.  PSAMF ¶ 152; DRPSAMF ¶ 152.  After Ms. Tourangeau's maternity leave, Ms. Hawkins never received incentive pay for covering a sales representative's route.  PSAMF ¶ 153; DRPSAMF ¶ 153.

Mr. Toolan understood that Ms. Tourangeau was not paid on the incentives in

---

[133]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 148, saying that "Mr. Brown testified that he believed the incentive pay should be split."  DRPSAMF ¶ 148.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 148.

[134]   Nappi denies Ms. Tourangeau's PSAMF ¶ 149, saying "[t]he record citation only states that Mr. Hale did not communicate to Mr. Brown that he expected Ms. Tourangeau to work while she was on maternity leave."  DRPSAMF ¶ 149.  Having reviewed the cited record, the Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 149 to reflect the record.

[135]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 150, saying that "Mr. Brown testified he saw some emails from Ms. Tourangeau while she was on leave, but it was nothing intensive or on a regular basis."  DRPSAMF ¶ 150.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 150.

her accounts and that prior to going out on leave, she had set up her incentive products to be placed in her accounts to be offered by-the-glass on the menus and that those cases add up over time.[136]   PSAMF ¶ 154; DRPSAMF ¶ 154.   When Ms. Tourangeau returned from her maternity leave, she spoke to Mr. Brown about what had occurred with her incentives and suggested she may speak to Mr. Nappi, Jr. about it.   PSAMF ¶ 155; DRPSAMF ¶ 155.   Mr. Brown told her to let it go because Mr. Nappi, Jr. wasn't going to budge on it.[137]   PSAMF ¶ 155; DRPSAMF ¶ 155.   When Ms. Tourangeau first returned from maternity leave, she avoided Mr. Hale, but after a while she spoke to him about her incentive pay during maternity leave, and he told

---

[136]     Nappi objects to Ms. Tourangeau's PSAMF ¶ 154 as "inadmissible hearsay" and unsupported by the record.  DRPSAMF ¶ 154.  Mr. Toolan testified:

> Q. She also alleges that she was discriminated against by Nappi Distributors based upon pregnancy.  Do you have any information about that allegation?
> A. Yeah, I know that -- I don't know if this exactly what she is talking about, but I know when she was on maternity leave, she was promised incentives while she was on maternity leave for what she -- as she had told me that when you have on premise accounts, when you set up a by-the-glass, those incremental cases or overall cases build up, and then you get paid on those.  So even though she was on maternity leave she had set up all her incentives already.

*Toolan Dep.* at 60:15-61:7.  The Court finds the statement to be supported by the record and rejects Nappi's hearsay objection for the reasons explained in footnotes 54 and 75.

[137]     Nappi objects to Ms. Tourangeau's PSAMF ¶ 155 as unsupported by the record and because "[t]he assertion . . . that Mr. Brown 'discouraged' her from speaking with Mr. Nappi is argument, not a statement of fact."  DRPSAMF ¶ 155.  Ms. Tourangeau testified:

> I know I spoke with [Mr.] Brown.  I remember that conversation.  I had not initially talked with Ian about any of this because [Mr.] Hale was the supervisor in charge of the incentive payouts and of the sales assistant, so that was -- that's why [Mr. Brown] wasn't involved in those conversations, but I did, when I got back, let him know what had transpired, and told him, you know: I think I should talk to [Mr. Nappi], Jr. about this.  You know, [Mr. Brown] said: You can if you want to, but you're not going to -- it's not worth it.  You're not going to -- he's not going to budge on it.  You can if you want to.  So I just let it go.  I just let it go.

*Tourangeau Dep.* at 122:14-123:1.   The Court accepts Nappi's qualification as to the word "discouraged" and strikes "discouraged" from PSAMF ¶ 155. The Court rejects Nappi's qualification that the statement is unsupported by the record and admits PSAMF ¶ 155.

her "nothing I could do."[138]  PSAMF ¶ 156; DRPSAMF ¶ 156.  During her maternity leave, Ms. Tourangeau lost an account, Ruby's Wood Grill, to a male beer sales representative.  PSAMF ¶ 157; DRPSAMF ¶ 157.[139]  Ms. Tourangeau learned of losing the account on January 10, 2017.  PSAMF ¶ 158; DRPSAMF ¶ 158.[140]

Ms. Fox believes she had a couple of conversations with Ms. Tourangeau about the maternity leave incentives.[141]  PSAMF ¶ 141; DRPSAMF ¶ 141.  Ms. Fox told Ms.

---

[138]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 156, saying "Ms. Tourangeau testified that at some point after she returned from maternity leave (she could not recall when) . . . Mr. Hale made the comment 'nothing [he] could do.'"  DRPSAMF ¶ 156.  The Court reviewed the cited testimony, accepts Nappi's qualification, and slightly alters PSAMF ¶ 156 to reflect the record.

[139]    Nappi objects to Ms. Tourangeau's PSAMF ¶ 157 as unsupported by the record.  DRPSAMF ¶ 157.  Mr. Carr testified:

> Q. Is this the email that we're looking at from you on January 10, 2017, is that from you?
> A. Yes.
> Q. And you recall sending [Ms. Tourangeau] this email?
> A. Yes.
> Q. Can you explain to me what happened here and what you're discussing?
> A. I think this is -- okay.  So this is 2017, six months before I left.  This was an account which was Ruby's Wood Grill, which we always were the major supplier for, and then they complained to us that they never saw [Ms.] Tourangeau and that the beer person took over the ordering and stuff.  My thing was, if you don't call on an account, then don't come back to me afterwards and complain that, you know, why aren't you doing it.  I look at this as, okay, it was not -- oh, she put on a list of accounts, so she never took this account.  It's on Route 1 in York.  That's primarily a beer account, not too much wine, but the person that owns it was a personal friend of mine.  And he basically said he never sees her and, you know, he doesn't know who she is.

*Carr Dep.* at 63:9-64:1.  According to Mr. Carr's deposition testimony, Ruby's Wood Grill complained to him that they never saw Ms. Tourangeau, which establishes that Ruby's was at one time Ms. Tourangeau's account.  However, while she was on maternity leave, Ruby's turned to the male beer distributor, who took over the account.  Viewing this testimony in the light most favorable to Ms. Tourangeau, the Court accepts Plaintiff's ¶ 157 as supported by the record.

[140]    Nappi objects to Ms. Tourangeau's PSAMF ¶ 158 as "inadmissible hearsay" and as unsupported by the record.  DRPSAMF ¶ 158.  The Court overrules the hearsay objection for the reasons explained in footnotes 54 and 75 because they are admissions under Federal Rule of Evidence 801(d)(2)(D).  During his deposition, Mr. Carr testified about this issue by referring to a memorandum dated January 10, 2017.  *Carr Dep.* 65:10-21.  Accordingly, the Court rejects Nappi's contention that ¶ 158 is not supported by the record.

[141]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 141, saying "Ms. Fox testified that she may have had a couple of conversations about Ms. Tourangeau's complaint that she felt she was entitled to revenue generated by her assigned route while she was on leave."  DRPSAMF ¶ 141.  The Court notes

Tourangeau that she was absolutely wrong and that no one ever told her she would receive incentive pay during her leave.   PSAMF ¶ 142; DRPSAMF ¶ 142.   Ms. Tourangeau testified that this was her first real interaction with Ms. Fox and it left her with a bad feeling—Ms. Fox called her back after hours and told her she was wrong, making her feel like a liar.[142]   PSAMF ¶ 143; DRPSAMF ¶ 143.   After this interaction, Ms. Tourangeau felt uneasy with Ms. Fox.[143]   PSAMF ¶ 144; DRPSAMF ¶ 144.

Ms. Tourangeau testified that later, during a wine tasting, Ms. Fox abruptly grabbed a bottle of wine away from Ms. Tourangeau, said she needed to give it to him, and walked it back to another man visiting—it felt abrupt and weird and made Ms. Tourangeau believe that Ms. Fox did not like her since her maternity leave.   PSAMF

---

that Nappi's cited testimony reflects the record, accepts Nappi's qualification, and slightly alters PSAMF ¶ 141 to conform to the record.

[142]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 143, saying "[t]he assertion in this paragraph about Ms. Fox 'essentially' calling [Ms. Tourangeau] a liar is argument, and not a statement of fact." DRPSAMF ¶ 143.   The Court accepts Nappi's qualification and modifies PSAMF ¶ 143 to state a fact, as reflected by the cited record.

[143]   PSAMF ¶ 144 states: "After this negative interaction Ms. Tourangeau testified that she observed Ms. Fox glaring at her from across the room and Ms. Tourangeau has always felt uneasy with her."   Nappi objects to PSAMF ¶ 144 as unsupported by the record and to the inclusion of "negative" as "an argument, and not a statement of fact."   DRPSAMF ¶ 144.   Ms. Tourangeau testified:

> Q. That's okay. That's okay. Since that time, has your relationship with Ms. Fox improved at all?
> A. No, not really because -- so then I come back to work and I would see her from time to time and always very pleasant, says hi to me. You know, generally compliments my clothes, and, you know, which I appreciate, asks how my daughter is, and just a couple of times that I recall, I just got a weird feeling. I would see her just looking at me from across the room sometimes with this -- I don't want to say glare, but just with a not -- like she was looking at me thinking something. I just -- I don't know. I always felt a little uneasy with her, but for the most -- you know, our interactions were fine and professional until when she had -- and I forget, I don't know exactly when, but she had called me into her office to talk about my vehicle. Is this the time for me to talk about this?

The Court accepts Nappi's qualifications and strikes both "negative" and "Ms. Tourangeau testified that she observed Ms. Fox glaring at her from across the room" from PSAMF ¶ 144.

¶ 145; DRPSAMF ¶ 145.  Mr. Hale perceived Ms. Tourangeau stating she would go to Ms. Fox after she learned that she would not receive the incentives she was promised as "a threat."  PSAMF ¶ 146; DRPSAMF ¶ 146.  Mr. Hale consulted with Mr. Brown about the payment of incentives to Ms. Tourangeau for her maternity leave.  PSAMF ¶ 147; DRPSAMF ¶ 147.

### H.   Michele Tourangeau's 2017 Meeting with Human Resources Director Christine Fox

On December 14, 2017, Ms. Fox met with Ms. Tourangeau to discuss the condition of her vehicle and to fill out an accident report.[144, 145] PSAMF ¶ 171; DRPSAMF ¶ 171; DSMF ¶ 62; PRDSMF ¶ 62.  Ms. Tourangeau does not dispute that she damaged her car, did not report the damage, had food on the floor of her vehicle, or that a smoothie had spilled on the side of the car.  DSMF ¶ 63-64; PRDSMF ¶ 63-64.

Ms. Tourangeau apologized for the condition of her company car, and Ms. Fox stated: "I don't think you're sorry at all."  PSAMF ¶ 172; DRPSAMF ¶ 172.  Ms. Tourangeau testified that Ms. Fox kept raising new topics that prevented Ms. Tourangeau from leaving the meeting.  PSAMF ¶ 172; DRPSAMF ¶ 172.  Ms. Tourangeau became upset and began to cry.  PSAMF ¶¶ 172, 174; DRPSAMF ¶¶ 172, 174; DSMF ¶ 66; PRDSMF ¶ 66.  Ms. Tourangeau testified that Ms. Fox stared at

---

[144]    Nappi admits the substance of PSAMF ¶ 171 but objects to the inclusion of December 14, 2017, as the date of the meeting between Ms. Fox and Ms. Tourangeau because the cited record "does not establish the date of that meeting."  DRPSAMF ¶ 171.  This objection is frivolous.  Nappi asserted that December 14, 2017 was the date of the meeting in ¶ 62 and in response Ms. Tourangeau admitted the date.  DSMF ¶ 62; PRDSMF ¶ 62.  The date is already a matter of record.

[145]    Ms. Tourangeau admits the substance of DSMF ¶ 62 but qualifies the fact by describing the meeting in more detail.  PRDSMF ¶ 62.  The Court rejects Ms. Tourangeau's qualification as beyond the scope of the fact and admits DSMF ¶ 62.

her intensely, accused her of being passive aggressive, and stated that she should see a doctor and have her medications checked because there was probably something wrong with her hormones after she gave birth to her daughter.[146, 147]   PSAMF ¶ 172; DRPSAMF ¶ 172; DSMF ¶ 67; PRDSMF ¶ 67.   Ms. Fox knew that Ms. Tourangeau sought counseling right after she gave birth.[148]   PSAMF ¶ 173; DRPSAMF ¶ 173.

Ms. Fox testified that she encouraged Ms. Tourangeau to contact her primary care provider to help treat her uncontrollable emotions that resulted in crying for no reason.[149]   PSAMF ¶ 175; DRPSAMF ¶ 175.   Ms. Tourangeau also alleges that in response to Ms. Tourangeau's display of emotions during their December 14, 2017, meeting, Ms. Fox talked to Ms. Tourangeau about the challenges Ms. Fox had faced balancing work with a young child and how she had felt overwhelmed at times.   DSMF ¶ 68; PRDSMF ¶ 68.   Although Ms. Tourangeau felt threatened, Ms. Fox did not

---

[146]   Nappi qualifies PSAMF ¶ 172 as "not supported by a record reference" and "argument, rather than statements of fact."   DRPSAMF ¶ 172.   Having reviewed the nearly ten pages of cited record in addition to the cited exhibit, the Court accepts Nappi's qualifications and alters Ms. Tourangeau's PSAMF ¶ 172 to express a fact and to conform to the record.

[147]   Ms. Tourangeau qualifies DSMF ¶ 67, explaining the context of the meeting in detail. PRDSMF ¶ 67.   The Court does not find Ms. Tourangeau's description to conflict with the statement and therefore rejects Ms. Tourangeau's qualification and admits DSMF ¶ 67.

[148]   Ms. Tourangeau's ¶ 173 states that Ms. Fox "knew that Ms. Tourangeau sought counseling for postpartum depression."   PSAMF ¶ 173.   Nappi qualifies PSAMF ¶ 173, saying that "Ms. Fox testified that 'she . . . knew that [Ms. Tourangeau] had sought counseling right after she had [her child].'" DRPSAMF ¶ 173.   Even though depression right after having a child and postpartum depression seem interchangeable, the Court has substituted "right after she had her child" for postpartum depression to be consistent with the cited record.

[149]   Nappi qualifies PSAMF ¶ 175 as unsupported by the record.   DRPSAMF ¶ 175.   Ms. Fox testified:

> I then asked [Ms. Tourangeau] if she had talked to the doctor. And then I then said to her, you know, talk to your PCP, because it had helped me. I, too, had had some uncontrollable emotions years before, and I said my PCP had determined for me it was a hormonal imbalance and I was taking OTC medications or supplements that were helpful.

The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 175 to reflect the cited record.

explicitly threaten her during their December 14, 2017, meeting.[150]   DSMF ¶ 65; PRDSMF ¶ 65.  Ms. Tourangeau indicated that later when discussing the challenges of balancing work and family with Ms. Fox "we were just kind of like being nice and dialoguing."[151]  DSMF ¶ 69; PRDSMF ¶ 69.

Ms. Tourangeau does not know whether the discussion she had with Ms. Fox on December 14, 2017, had anything to do with Ms. Tourangeau's maternity leave, although much of the conversation centered around children and maternity.[152]  DSMF ¶ 70; PRDSMF ¶ 70.  In contrast to the way Ms. Fox treated Ms. Tourangeau, Mr. Watson has had multiple issues with his company vehicle.[153]  PSAMF ¶ 176; DRPSAMF ¶ 176.

Ms. Tourangeau at her request met with Mr. Brown and Ms. Masters regarding this negative interaction she had with Ms. Fox.  PSAMF ¶ 177; DRPSAMF ¶ 177.  Ms. Tourangeau and Mr. Brown recall Ms. Masters being present at this meeting, though Ms. Masters testified that she does not recall such a meeting.  PSAMF ¶ 178; DRPSAMF ¶ 178.  Mr. Brown took notes at this meeting but did not

---

[150]     Ms. Tourangeau denies DSMF ¶ 65, explaining the context of the meeting and why Ms. Tourangeau felt threatened.  PRDSMF ¶ 65.  Having reviewed the record, the Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 65 to reflect the record.

[151]     Ms. Tourangeau qualifies DSMF ¶ 69, saying "Ms. Tourangeau testified that this was a sudden change from the tone of the conversation."  PRDSMF ¶ 69.  The Court rejects Ms. Tourangeau's qualification as beyond the scope of the fact and admits DSMF ¶ 69.

[152]     Ms. Tourangeau denies DSMF ¶ 70, saying "[d]uring this conversation Ms. Fox specifically referenced Ms. Tourangeau's hormones after giving birth to her child," along with other postpartum conditions.  PRDSMF ¶ 70.  The Court accepts Ms. Tourangeau's denial as a qualification and adds to PRDSMF ¶ 70 to reflect the record.

[153]     Nappi qualifies PSAMF ¶ 176 as "inadmissible hearsay" and unsupported by the record.  The Court rejects Nappi's hearsay objection for the reasons explained in footnotes 54 and 75, accepts Nappi's qualification regarding the record, and strikes "but has not been disciplined in any way for it" from the fact.

keep them, despite Ms. Tourangeau requesting that he make a note for her file.[154] PSAMF ¶ 179; DRPSAMF ¶ 179.  Mr. Brown told Ms. Tourangeau "I'm sorry that happened" and asked her if she thought Ms. Fox had it out for her because of what transpired on the maternity leave, which lead Ms. Tourangeau to believe that he thought Ms. Fox treated her poorly because of her maternity leave issues.[155]  PSAMF ¶ 180; DRPSAMF ¶ 180.

---

[154]    Nappi qualifies PSAMF ¶ 179, saying "Ms. Tourangeau did not request that [Mr. Brown] make a note to her file."  DRPSAMF ¶ 179.  Ms. Tourangeau testified:

> I let them both know that I had met with Christine the day before and I summarized the conversation to them and I said that, you know, I had been -- I had many positions in my career and I have worked with many human resource professionals, and I was just shocked at the way she had treated me.  And I just wanted them to be aware of it and make a note of it because, you know, I believe, my words were, you know, if she -- this could become a real problem for the company if that's how she treats people, or I said, you know, they as managers should be aware of how she behaved.  So I told them.  [Mr. Brown] took notes during the meeting.  I don't think [Ms. Masters] did.  [Mr. Brown] did most -- well, I did most of the talking, but [Mr. Brown] engaged more with me, [Ms. Masters] more listened and was there.  [Mr. Brown] asked me if he could or did I want him to bring it to [Mr. Nappi, Jr.].  I said: No.  I just wanted to make you aware.  I wanted you to have documentation in case, you know, something comes up in the future.

*Tourangeau Dep.* at 159:5-24.  The Court rejects Nappi's qualification and admits PSAMF ¶ 179.

[155]    Nappi objects to PSAMF ¶ 180 as "inadmissible hearsay" and qualifies PSAMF ¶ 180 as unsupported by the record.  Ms. Tourangeau testified:

> Q. During your meeting with Mr. Brown and Ms. Masters, did they say anything about Ms. Fox or what she did or why she did it or anything like that?
> A. Oh, yes, actually. [Mr. Brown], as he was taking notes, and he seemed by the look on his face, you know, he was taking in what I was saying, and I think at one point he did apologize.  I mean, just because -- like "I'm sorry that happened."  And he did ask me if I thought maybe she had it out for me or was picking on me, I don't remember the exact words, but because of what transpired on my maternity leave.  I said, you know: Who knows.  I don't know.
> Q. So, I see. He wasn't suggesting that she was doing it because of what happened --
> A. Well, he --
> Q. He was just asking -- I'm sorry, just let me finish my question.  He was asking whether you thought that might be a possibility?
> A. He did.  He thought of it and asked if I thought it was and it seemed that he thought it was.
> Q. Did he say that's what he thought it was?
> A. No.

After this meeting, Mr. Brown and Ms. Masters spoke to Mr. Nappi, Jr. about Ms. Tourangeau's complaint of retaliation with respect to Ms. Fox.[156]  PSAMF ¶ 181; DRPSAMF ¶ 181.  Ms. Fox then met with and spoke to Mr. Nappi, Jr. and reiterated her account of the meeting with Ms. Tourangeau.  PSAMF ¶ 182; DRPSAMF ¶ 182. Within a week of speaking with Mr. Nappi, Jr., Ms. Fox spoke directly to Mr. Brown about the meeting she had with Ms. Tourangeau, which Ms. Tourangeau later complained of to Ms. Masters and Mr. Brown.[157]  PSAMF ¶ 183; DRPSAMF ¶ 183.

Since Ms. Fox began working for Nappi in September of 2015, she has provided one set of sexual harassment training sessions of twenty-to-thirty minutes to the employees of the company.[158]  PSAMF ¶ 168; DRPSAMF ¶ 168.  Ms. Fox was part of

---

*Tourangeau Dep.* at 161:23-162:19.  The Court rejects Nappi's qualification and admits PSAMF ¶ 180.

[156]   Nappi qualifies PSAMF ¶ 181, saying "[t]he assertion in the paragraph regarding 'complaint of retaliation' is not supported by the cited record reference.'"  DRPSAMF ¶ 181.  Ms. Fox testified:

> Q. Okay. To your knowledge was there any conversation between [Mr.] Brown or [Ms.] Masters and [Mr. Nappi, Jr.] regarding any of the conduct involving you?
> A. From the one meeting, yes.
> Q. There was a meeting between them?
> A. No.  From the meeting that [Ms. Tourangeau], the December 14th, 2017, I think, meeting, there was that one meeting that she said that my conduct was retaliatory.
> Q. And what I'm asking is did [Mr. Brown] or [Ms. Masters] reach out to [Mr. Nappi, Jr.] about what [Ms. Tourangeau] had confided in them about?
> A. Yes.
> Q. Okay. And did [Mr. Nappi, Jr.] then talk to you about it?
> A. He did.

*Fox Dep.* at 66:5-17.  The Court rejects Nappi's qualification and admits PSAMF ¶ 181.

[157]   Nappi qualifies PSAMF ¶ 183, saying "Ms. Fox did not complain about the meeting." DRPSAMF ¶ 183.  The Court reads PSAMF ¶ 183 and the record to indicate that Ms. Tourangeau, not Ms. Fox, is the complaining party.  The Court clarifies this ambiguity in PSAMF ¶ 183 and admits the fact.

[158]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 168 as unsupported by the record.  Ms. Fox testified:

the decision to begin paying hourly employees half their hourly rate for hours 40-48. PSAMF ¶ 257; DRPSAMF ¶ 257.

Mary Johnson, an employee at Nappi who recently quit her job, had an exit interview with Ms. Fox where she expressed being very unhappy at Nappi in part because of Ms. Fox.[159]  PSAMF ¶ 255; DRPSAMF ¶ 255.  Ms. Johnson told Ms. Fox she felt afraid to go into Ms. Fox's office and that she felt unsupported by her.[160] PSAMF ¶ 256; DRPSAMF ¶ 256.

### I.    Nappi Sales Account Rerouting

Nappi hired Mr. Watson to take over as Director of Wine Sales in August of 2018.  DSMF ¶ 71; PRDSMF ¶ 71.  One of Mr. Watson's earliest tasks at Nappi was to complete a long-overdue review and reorganization of the sales routes in Nappi's wine division.  DSMF ¶ 72; PRDSMF ¶ 72.  The re-routing or re-assignment of sales accounts is a standard process done on a regular basis throughout the beverage

---

Q. How about trainings on sexual harassment, do you or do you have someone come into Nappi Distributors and provide company-wide training on these -- on sexual harassment?
A. We -- I don't know before my -- I've done it once when I first arrived here but have not -- I don't know what Jim Bourque did prior to that.
Q. Okay. And so how long was your training?
A. Probably 20 to 30 minutes.
Q. And how many employees attended?
A. There were multiple group meetings. I -- you know, I'd have to go through all of them to --
Q. How many groups do you think you had, how many training sessions?
A. Maybe seven, eight.
Q. And did these all occur within one day, one week, how did that happen?
A. Probably over 30 days.

*Fox Dep.* at 50:13-51:5.  The Court accepts Nappi's qualification and slightly modifies PSAMF ¶ 168 to reflect the record.
[159]    Nappi objects to PSAMF ¶ 255 as "inadmissible hearsay."  DRPSAMF ¶ 255.  The Court rejects Nappi's hearsay objection and admits PSAMF ¶ 255 for the reasons explained in footnote 54.
[160]    Nappi objects to PSAMF ¶ 256 as "inadmissible hearsay."  DRPSAMF ¶ 256.  The Court rejects Nappi's hearsay objection and admits PSAMF ¶ 256 for the reasons explained in footnote 54.

distribution industry to improve efficiencies and build sales capacity, but it had not been completed by Nappi's wine division for many years.[161, 162]   DSMF ¶ 36, 73; PRDSMF ¶ 36, 73.

In October and November of 2018, Mr. Watson mentioned at several of his weekly held group sales meetings that rerouting would be forthcoming.[163]   DSMF ¶ 74; PRDSMF ¶ 74.   At several of the group meetings of Nappi's wine sales representatives in the fall of 2018, Mr. Watson informed all wine sales representatives that the planned rerouting was intended to geographically streamline routes and would possibly impact compensation for some wine sales representatives.[164]   DSMF ¶ 75; PRDSMF ¶ 75.   Mr. Watson, along with other members of Nappi's management team, conducted the review and began the process

[161]    Ms. Tourangeau admits "that [rerouting] had not been completed by Nappi's wine division for many years," but denies "that the fact implies Nappi has conducted rerouting or reassignment." PRDSMF ¶ 36.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 36.

[162]    Ms. Tourangeau denies DSMF ¶ 73, saying "[m]uch of the testimony supports the fact that for years Nappi did not go through re-routing and re-assignment and has not as of today."   PRDSMF ¶ 73.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 73.

[163]    Ms. Tourangeau denies DSMF ¶ 74, saying "Mr. Watson testified that he first discussed route changes with Ms. Tourangeau at the December 7, 2018, meeting."   PRDSMF ¶ 74.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 74.

[164]    Ms. Tourangeau denies DSMF ¶ 75, saying "Mr. Watson testified that he notified sales representatives about rerouting at the December 2018 meetings."   PRDSMF ¶ 75.  Mr. Watson testified:

> Actually, the re -- there was communication that there would be rerouting, and then no that -- on those December meetings when we talk about performance, that wasn't exclusive to [Ms. Tourangeau]. We had those meetings with all sales reps, and that's when we went through their changes, what they were receiving, what they were giving up.

*Watson Dep.* at 44:15-21.  The Court rejects Ms. Tourangeau's denial and admits DSMF ¶ 75.

of reorganizng sales routes in Nappi's wine division from October to December of 2018.[165]  DSMF ¶ 76; PRDSMF ¶ 76.

At a November 2018 meeting, Mr. Watson informed the wine sales representatives that individual conversations would occur once the rerouting analysis was completed in December 2018, with implementation of changes effective in early January, 2019.  DSMF ¶ 77; PRDSMF ¶ 77.  Mr. Maiorino likely played a part in redistributing accounts for the wine department.[166]  PSAMF ¶ 58; DRPSAMF ¶ 58.

With respect to the geographic alignment of the sales representatives' accounts, Ms. Fox testified: "We still have a long ways to go with that rerouting process to make them truly more aligned geographically.  So what you said earlier, that they're aligned geographically, no, they're not."  PSAMF ¶ 213; DRPSAMF ¶ 213.  Ms. Fox testified that Ms. Tourangeau's overall compensation was inflated and out of proportion to the whole organization.[167]  PSAMF ¶ 214; DRPSAMF ¶ 214.  The sales representatives' routes are not as tight as they should be and many had accounts in

---

[165]    Ms. Tourangeau denies DSMF ¶ 76, saying that a full reorganization was not completed, and Ms. Fox testified that "we still have a long ways to go with that rerouting process to make them truly more aligned geographically."  PRDSMF ¶ 76.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 76 to reflect the record.

[166]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 58, saying that the "testimony indicates that 'folks like [Mr.] Maiorino' would have been involved," not that Mr. Maiorino himself was involved.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 58 to reflect the cited record.

[167]    Nappi qualifies PSAMF ¶ 214, saying "Ms. Fox testified that several sales representatives' compensation was overinflated."  DRPSAMF ¶ 214.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 214.

long trails or sporadic accounts throughout the state, except for a few sales representatives such as Ms. Tourangeau.[168]  PSAMF ¶ 215; DRPSAMF ¶ 215.

Mr. Watson and his team completed the rerouting work by December 2018, and the changes indicated by that process were implemented in January of 2019.[169]  DSMF ¶ 80; PRDSMF ¶ 80.  Mr. Watson and the wine sales representatives' managers met individually with the wine sales representatives on December 7 and 10, 2018 to discuss route performance and changes.  DSMF ¶ 82; PRDSMF ¶ 82.  The rerouting changes and analysis resulted in reduced sales commission compensation of approximately $1,200-$3,000 annually for several male wine sales representatives who receive only commission and incentives.[170]  DSMF ¶ 83; PRDSMF ¶ 83.  Nappi did not make compensation adjustments to offset the reductions in the sales commission compensation for several male wine sales representatives who received only commission and incentives caused by the rerouting changes.[171]  DSMF ¶ 84; PRDSMF ¶ 84.

As far as Nappi believes, none of the decisions Nappi made related to the rerouting work in 2018 was based on the sex of the salespersons assigned to the

---

[168]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 215 as unsupported by the cited record because "the witness did not adopt the questioner's argumentative assertion about 'gerrymandering,' nor did he refer to the other factual predicates in the question."  DRPSAMF ¶ 215.  The Court accepts Nappi's qualification and removes the plaintiff's reference to gerrymandering from PSAMF ¶ 215.

[169]   Ms. Tourangeau objects to DSMF ¶ 80, denying "that there was any significant rerouting in 2018 [because c]ommission remained steady or increased for inflated sales representatives from 2018, 2019, and 2020."  PRDSMF ¶ 80.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 80.

[170]   Ms. Tourangeau denies DSMF ¶ 83, saying "[c]ommission remained steady or increased for inflated sales representatives from 2018, 2019, and 2020."  PRDSMF ¶ 83.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 83.

[171]   Ms. Tourangeau denies DSMF ¶ 84, saying "Mr. Toolan learned that he was going to lose his salary, but was offered additional accounts including Market Basket to offset this loss."  PRDSMF ¶ 84.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 84.

routes—they were primarily made to geographically streamline routes and improve Nappi's wine sales services and productivity, with consideration to sales representatives' strengths.[172]  DSMF ¶ 81; PRDSMF ¶ 81.

In 2016, Mr. Carr had attempted to reduce the number of accounts salesman Terry O'Brien had, but his wife called Vice President Nick Nappi and complained, so Nick Nappi spoke to Frank Nappi Jr., who instructed Mr. Carr to discontinue any reorganization of Mr. O'Brien's accounts.  PSAMF ¶ 54; DRPSAMF ¶ 54.  Terry O'Brien had at one time 200 accounts.[173]  PSAMF ¶ 69; DRPSAMF ¶ 69.

The rerouting process and analysis also resulted in negative base salary adjustments for the only two southern Maine wine sales representatives receiving a base salary amount—Ms. Tourangeau and a male sales representative, Dan Toolan. DSMF ¶ 85; PRDSMF ¶ 85.

## J.    Dan Toolan's Hiring, Compensation, and Salary Reduction

In February of 2015, Mr. Toolan received an offer for a sales assistant position before it was posted internally or externally.[174]  PSAMF ¶ 268; DRPSAMF ¶ 268.  Mr.

---

[172]    Ms. Tourangeau denies DSMF ¶ 81, providing a thorough description of why Ms. Tourangeau feels her route was negatively impacted because she is a woman.  The Court rejects Ms. Tourangeau's denial as largely beyond the scope of the fact, but slightly alters DSMF ¶ 81 to clarify that this statement reflects Nappi's belief about the reorganization process.  PRDSMF ¶ 81.

[173]    Nappi denies Ms. Tourangeau's PSAMF ¶ 69, saying that "Mr. Carr's testimony is in the past tense."  DRPSAMF ¶ 69.  Mr. Carr's testimony states that "some people worked one day of the weekend because they had so many accounts, sort of like Terry O'Brien who had -- at one point he had 200 accounts, which he couldn't possibly service them in person."  *Carr Dep.* at 31:3-6.  The Court accepts Nappi's denial as a qualification and changes PSAMF ¶ 69 to the past tense.

[174]    Nappi denies PSAMF ¶ 268 as unsupported by the record citation.  DRPSAMF ¶ 268.  The Court notes that Ms. Tourangeau has mistakenly provided two different citations, one to the deposition page and another to the ID#, which do not correspond to one another.  Looking at both citations in context, however, the Court finds that the statement is supported by the record.  The Court thereby rejects Nappi's denial and admits PSAMF ¶ 268.  Mr. Toolan explained that he knew Terry O'Brien from Mr. Toolan's job, that he expressed some interest in working for Nappi and Mr. O'Brien showed

Toolan did not begin working as a wine sales representative until May 2016.[175] PSAMF ¶ 269; DRPSAMF ¶ 269. Mr. Toolan applied for Paul Levecque's route which ultimately went to Duane Preble, but during the interview for that position he was told he would get Bob Cormier's route when it became available a few months later.[176] PSAMF ¶ 270; DRPSAMF ¶ 270. Mr. Toolan and Mr. Preble were offered the same position on the same day, but Mr. Preble was provided 2.5% commission and Mr. Toolan was offered 2% commission. PSAMF ¶ 271; DRPSAMF ¶ 271. Mr. Toolan used this fact to negotiate his pay with Mr. Nappi, Jr.[177] PSAMF ¶ 271; DRPSAMF ¶ 271. Prior to speaking with Mr. Nappi, Jr. about his compensation, Mr. Toolan spoke with Ms. Fox and Chris Black, CFO of Nappi's beer division. PSAMF ¶ 272; DRPSAMF ¶ 272. Neither member of management brought up or seemed aware of any policy prohibiting salary or a deviation from 2% commission. PSAMF ¶ 272; DRPSAMF ¶ 272.

Mr. Toolan spoke with Mr. Nappi, Jr. to negotiate his compensation because he was not happy with his offer of 2% commission. Therefore, Mr. Nappi, Jr. offered him a salary in addition to the 2% commission and officially approved the base salary

---

some interest in hiring him, that he applied for and was hired for a position at Nappi in August 2014, and that he started working there in January 2015. *Toolan Dep.* 11:23-12:19. From his testimony, viewing it in the light most favorable to Ms. Tourangeau, there is support for the fact that Nappi hired Mr. Toolan before the job was posted internally or externally.

[175]   Nappi denies PSAMF ¶ 269 as unsupported by the record citation. The Court accepts Nappi's denial as a qualification, removes "this position did not work out" from the fact to reflect the cited record, and otherwise admits PSAMF ¶ 269.

[176]   Nappi objects to PSAMF ¶ 270 as "inadmissible hearsay." DRPSAMF ¶ 270. The Court rejects Nappi's hearsay objection and admits PSAMF ¶ 270 for the reasons explained in footnote 54.

[177]   Nappi qualifies PSAMF ¶ 271 as unsupported by the record citation. DRPSAMF ¶ 271. The Court rejects Nappi's qualification considers the record citation in context, rejects Nappi's denial, and admits PSAMF ¶ 271.

in May 2016.[178]   PSAMF ¶ 273; DRPSAMF ¶ 273.   Mr. Toolan also negotiated to

initially receive 3% commission for sales at BJs because he was sharing that account

with Dan Kane and it was not fair that he would be doing the same work for less

pay.[179]   PSAMF ¶ 274; DRPSAMF ¶ 274.   Mr. Toolan testified: "Mr. Nappi, Jr. said

he was unwilling to pay me 3% or 2.5% at the time reasoning that he was not sure I

could perform at the level I said I could and he wanted to see me perform before

increasing my commission rate.   PSAMF ¶ 275; DRPSAMF ¶ 275.   I believed based

on these conversations that I would eventually be eligible for a higher commission

rate."   PSAMF ¶ 275; DRPSAMF ¶ 275.   Never was it stated or implied that there

was a new policy regarding 2% commission for the position, and Mr. Toolan left the

meeting believing he had the opportunity to earn a higher commission rate.[180]

PSAMF ¶ 275; DRPSAMF ¶ 275.   Mr. Toolan has a large route in one of the most

desirable areas.   PSAMF ¶ 223; DRPSAMF ¶ 223.   In the past two years Mr. Toolan

has gained accounts, including Market Basket, Old Port Wine Merchants, 43 North

---

[178]   Nappi qualifies PSAMF ¶ 273, saying "Mr. Toolan's receipt of salary plus 2% commission was intended to be temporary."   DRPSAMF ¶ 273.   The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 273.

[179]   Nappi denies PSAMF ¶ 274, saying "Mr. Toolan was earning 1.5% commission at BJ's." DRPSAMF ¶ 274.   The Court accepts Nappi's denial, adds "initially" to the fact to reflect the record, and admits PSAMF ¶ 273.

[180]   Nappi qualifies PSAMF ¶ 275, saying "[t]he record citation does not support the factual assertion that Mr. Toolan left the meeting believing he had the opportunity to earn a higher commission rate."   DRPSAMF ¶ 275.   Mr. Toolan testified:

> Q. Would it be fair for me to understand that none of your conversations with [Mr.] Nappi, Jr. did you discuss what the policy of Nappi's was going to be concerning compensation of wine sales associates; is that fair?
> A. That's fair.   To clarify, I mean, based on the fact that I left that office thinking I was going to have an opportunity to get a higher commission rate.

*Toolan Dep.* at 43:20-44:4.   The Court rejects Nappi's qualification and admits PSAMF ¶ 275.

Bistro, Old Port Sea Grille, and the rest of the BJs account.  PSAMF ¶ 276; DRPSAMF ¶ 276.

Mr. Watson notified Mr. Toolan on December 7, 2018, that his full base salary was to be eliminated, offered him additional accounts, and later communicated to him the elimination would be done incrementally effective July 1, 2019 and December 31, 2019.[181]  DSMF ¶ 86; PRDSMF ¶ 86.  In January of 2019, Mr. Brown and Mr. Watson met with Mr. Toolan to inform him that his salary would also be eliminated, but that he had the potential to gain the Market Basket and Old Port Sea Grille accounts.[182,] [183]  PSAMF ¶ 205; DRPSAMF ¶ 205.  Mr. Toolan opted to have the salary eliminated

---

[181]   Ms. Tourangeau qualifies DSMF ¶ 86, saying "Mr. Toolan learned that he was going to lose his salary, but was offered additional accounts including Market Basket to offset this loss."  PRDSMF ¶ 86.  Mr. Toolan testified:

> In January of 2019, all employees had a private meeting with Mr. Watson and their direct supervisor.  I met with Mr. Brown and Mr. Watson . . . Mr. Watson suddenly said "to make it easier I am going to rip the band off quickly so it does not hurt as much."  At this point I was notified I was losing my salary compensation.  However, I was also told that to make up for the lost salary I would be receiving a half portion of the new Market Basket account which would be approximately $14,000 total commission at 2%.  I was also told that I would take over the account for Old Port Sea Grill to help alleviate the loss of salary.  I was further reassured that new accounts would be prioritized to my route, again, to compensate for the loss of salary.

*Jt. R.*, Attach. 15, *Aff. of Daniel Toolan* ¶ 25 (*Toolan Aff.*).  The Court accepts Ms. Tourangeau's qualification and adds to DSMF ¶ 86 to reflect the record.

[182]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 205, saying "[t]he cited testimony indicates that they discussed the potential of gaining a portion of the Market Basket account and Old Port Sea Grille."  DRPSAMF ¶ 205.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 205 to reflect the record.

[183]   PSAMF ¶ 206 states "Ms. Tourangeau was not offered any additional accounts to make up for the proposed sudden loss of her income."  Nappi denies Ms. Tourangeau's PSAMF ¶ 206 as "not supported by competent record evidence."  DRPSAMF ¶ 206.  Because Ms. Tourangeau cites only her own complaint to support PSAMF ¶ 206, the Court accepts Nappi's denial and omits the fact.  *See Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007) ("A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial.  Allegations made in a plaintiff's complaint, standing alone, are not enough to oppose a properly supported motion for summary judgment").  The Court notes that Ms. Tourangeau's Complaint is not a verified complaint.

entirely by the end of July of 2019, and he has not received a salary since then.  DSMF ¶ 87; PRDSMF ¶ 87.

### K.   The SevenFifty Report and Michele Tourangeau's 2018 Salary Reduction

Nappi offered Ms. Tourangeau a base salary amount in 2015 and began reducing or eliminating her base salary level in 2018 as Nappi began to implement route changes for the entire wine sales division.[184]  DSMF ¶ 35; PRDSMF ¶ 35.  In September of 2018, Mr. Watson learned from Ms. Fox that Nappi wanted to reduce the compensation of sales representatives.  PSAMF ¶ 184; DRPSAMF ¶ 184.  Ms. Fox, along with Mr. Nappi, Jr., Mr. Carr, and Mr. Brown, made the decision to eliminate Ms. Tourangeau's salary.[185]  PSAMF ¶ 219; DRPSAMF ¶ 219.  Mr. Nappi, Jr. believes compensation decisions should be left primarily to the department head, not to Ms. Fox.[186]  PSAMF ¶ 220; DRPSAMF ¶ 220.

---

[184]    Ms. Tourangeau denies DSMF ¶ 35 for the same reason explained in footnote 29.  The Court accepts Ms. Tourangeau's denial as a qualification and slightly alters DSMF ¶ 35 to reflect the record.
[185]    Nappi denies Ms. Tourangeau's PSAMF ¶ 219 as unsupported by the cited record.  Ms. Fox testified:

> Q. Okay. Who was involved in the decision to eliminate [Ms. Tourangeau]'s base salary?
> A. Myself, [Mr.] Brown, [Mr.] Watson. Maybe not [Mr. Watson]. I actually think -- we actually were aware of the need to eliminate it before [Mr. Watson] joined, so myself -- [Mr.] Carr was, because that was -- that was something we were asking him, to get the rerouting done, which then it would have been an opportunity to look at how things were aligned. So it would have been [Mr. Nappi, Jr., Mr. Carr], myself. I think that was it.
> Q. So [Mr. Nappi, Jr.] --
> A. [Mr. Brown] had some different routes. So [Mr. Nappi, Jr.], [Mr.] Carr and [Mr.] Brown and myself.

*Fox Dep.* at 121:22-122:9.  The Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 219 to reflect the cited record.
[186]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 220, saying "Mr. Nappi testified that the department head would make decisions about compensation rates but may discuss any decision with

In early November of 2018, Mr. Watson had a discussion with Ms. Tourangeau during which he advised her that the changes from the rerouting work were being done.  DSMF ¶ 78; PRDSMF ¶ 78.  During that same discussion, Mr. Watson mentioned to Ms. Tourangeau the possibility of a salary adjustment.  DSMF ¶ 79; PRDSMF ¶ 79.

On November 27, 2018, Ms. Tourangeau emailed Mr. Watson a report from SevenFifty, an online marketplace and communications platform for the beverage alcohol industry.  PSAMF ¶ 185; DRPSAMF ¶ 185.  The report described the gender and ethnic discrimination in the alcohol industry, detailing the pay disparity between men and women in all industries and highlighting how it is more pervasive in the alcohol beverage industry.[187]  PSAMF ¶ 185; DRPSAMF ¶ 185.  Prior to Ms. Tourangeau sending this email to Mr. Watson, the decision had not been made to eliminate Ms. Tourangeau's salary.[188]  PSAMF ¶ 186; DRPSAMF ¶ 186.  Mr. Watson

---

[Ms.] Fox."  DRPSAMF ¶ 220.  Having reviewed the cited record, the Court accepts Nappi's qualification and slightly alters PSAMF ¶ 220 to reflect the record.

[187]   Nappi qualifies PSAMF ¶ 185, saying Mr. Watson "testified that the report acknowledges that there's a disparity across all industries and 'it was maybe a little higher in the beverage alcohol industry.'"  DRPSAMF ¶ 185.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 185.

[188]   Nappi denies Ms. Tourangeau's PSAMF ¶ 186 as unsupported by the record.  DRPSAMF ¶ 186.  Mr. Watson testified:

> A. The impetus [to Ms. Tourangeau sending the SevenFifty report] was that it was around the time we were discussing a salary adjustment.  In other words, she didn't just send that randomly to me.  She sent it to me because we were -- we were having the discussion around the salary reduction.
> Q. But the decision had not yet been made to completely eliminate her salary as you knew it?
> A. Not at that -- I don't believe at that point in time, because you remember I started in August, and that was three months later.  I was still waiting for the understanding, not route structure salaries, ways of working internally.  So I knew that there was going to be a reduction, but I don't know as I communicated exactly what that looked

testified that Ms. Tourangeau sent him this report because there had been a discussion about the possibility of her salary being reduced.[189]   PSAMF ¶ 187; DRPSAMF ¶ 187.  Ms. Tourangeau wanted to send the report about the pay disparity between women and men in the beverage industry prior to any final decision being made about her compensation.[190]   PSAMF ¶ 188; DRPSAMF ¶ 188.  Mr. Watson explained at the time of this email he had not made a final decision on eliminating her salary because he was only three months into his position and still learning how things worked internally.  PSAMF ¶ 189; DRPSAMF ¶ 189.  The decision came later in December.[191]   PSAMF ¶ 189; DRPSAMF ¶ 189.

Mr. Brown recalls Ms. Tourangeau sending him a report from SevenFifty that dealt with the pay disparity among women in the beverage industry.  PSAMF ¶ 200; DRPSAMF ¶ 200.  Mr. Brown did not discuss with other members of management the report on gender discrimination and pay disparity in the beverage industry sent

---

like at that point.  I don't think that was done until, I don't know, maybe later -- maybe in December.

*Watson Dep.* at 27:2-17.  The Court rejects Nappi's denial and admits PSAMF ¶ 186.

[189]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 187, saying "Mr. Watson did not use the word 'possibility,' he said, '[s]he sent it to me because we were -- we were having the discussion around the salary reduction.'"  DRPSAMF ¶ 187.  The Court rejects Nappi's qualification and admits PSAMF ¶ 187.

[190]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 188, saying that "the record citation does not support the assertion that Ms. Tourangeau sent that report prior to a decision being made to reduce her salary."  DRPSAMF ¶ 188.  The Court accepts Nappi's qualification and changes "any decision" to "any final decision" to reflect the record.

[191]   Nappi qualifies Ms. Tourangeau's PSAMF ¶ 189 for the same reasons as the previous footnote. The Court likewise accepts Nappi's qualification and changes "any decision" to "any final decision" to reflect the record.

by Ms. Tourangeau or how the decision to eliminate her salary may perpetuate or appear to be gender discrimination.[192]  PSAMF ¶ 201; DRPSAMF ¶ 201.

Mr. Watson forwarded Ms. Tourangeau's email about pay disparity and gender discrimination to Ms. Fox and provided "[w]hen you get in I'll give you the impetus of this."  PSAMF ¶ 190; DRPSAMF ¶ 190.  Mr. Brown and Mr. Watson had a meeting with Ms. Tourangeau on December 7, 2018, regarding her performance review and potential changes to her base compensation.  PSAMF ¶ 191; DRPSAMF ¶ 191.  Mr. Brown learned shortly before the meeting that there may be changes to Ms. Tourangeau's pay.  PSAMF ¶ 192; DRPSAMF ¶ 192.  Mr. Watson did not know a salary elimination would be proposed at the meeting on December 7, 2018.[193]  PSAMF ¶ 193; DRPSAMF ¶ 193.

Between December 7, 2018 and January 22, 2019, through a series of meetings, Mr. Watson notified Ms. Tourangeau that Nappi would begin to eliminate her salary,

---

[192]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 201, saying that "Mr. Brown did not testify to whether he discussed how an elimination of Ms. Tourangeau's pay may 'perpetuate' gender discrimination."  DRPSAMF ¶ 201

> Q. Okay. Do you recall ever seeing a SevenFifty report around that time that dealt with the -- the pay disparity among women in the beverage industry?
> A. Vaguely, but yes, I do.
> Q. And how did you come to see that report?
> A. I think [Ms. Tourangeau] sent that to me or I was copied on it.
> Q. Did you have any conversations with management about that report?
> A. No, not specifically.
> Q. Did you engage with -- did you engage in any conversation with other members of management regarding the appearance of gender discrimination with regards to the decision to eliminate [Ms.] Tourangeau's salary?
> A. Never.

*Brown Dep.* at 30:14-31:2.  The Court rejects Nappi's qualification and admits PSAMF ¶ 201.

[193]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 193, saying "Mr. Watson testified that he knew there would be a reduction, but he did not know about a salary elimination."  DRPSAMF ¶ 193.  The Court accepts Nappi's qualification and modifies "salary change" to "salary elimination" to reflect the record.

likely through a schedule of gradual reductions.[194]  DSMF ¶ 88; PRDSMF ¶ 88.  On

December 20, 2018, Ms. Tourangeau and Mr. Watson had a follow up conversation in

which they agreed to meet together with Ms. Fox on January 22, 2019.[195]  PSAMF ¶

202; DRPSAMF ¶ 202.  During this meeting Mr. Watson recalls discussing those with

3% commission being grandfathered at that rate.[196]  PSAMF ¶ 203; DRPSAMF ¶ 203.

Mr. Watson believed the initial schedule of the reduction was too aggressive given

the seasonal nature of the route.[197]  PSAMF ¶ 204; DRPSAMF ¶ 204.

     Mr. Brown was not aware of any policy prohibiting salary to sales

representatives prior to the December 7, 2018, meeting.  PSAMF ¶ 194; DRPSAMF

¶ 194.  Mr. Watson believed Mr. Preble had a compensation package of 2.5%

---

[194]    Ms. Tourangeau qualifies DSMF ¶ 88, saying "Mr. Watson believed that an abrupt end to her salary was unfair and he proposed to Ms. Fox to gradually eliminate the salary which was agreed to January 22, 2019." PRDSMF ¶ 88.  The Court accepts Ms. Tourangeau's denial as a qualification insofar far as it concerns the date of the meeting, and slightly alters DSMF ¶ 88 to reflect the record.

[195]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 202, saying that "[t]he record citation does not confirm that their conversation occurred on December 20, 2018." DRPSAMF ¶ 202.  Mr. Watson testified:

    Q. And in it -- this is [Ms.] Tourangeau's complaint that she filed in this case, and she provides that she followed up with [Mr.] Watson on Thursday, December 20th, 2018, about the changes to her compensation.  During this conversation they agreed to set up a meeting with [Ms.] Fox.  Do you remember this meeting?
    A. Yeah.  I don't know if it was a live meeting or if we talked on the phone, but I think that's what led to the December 27th meeting between the three of us.

*Watson Dep.* at 50:5-14.  The Court rejects Nappi's qualification and admits PSAMF ¶ 202.

[196]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 203 as unsupported by the record.  Having reviewed the cited record, the Court accepts Nappi's qualification and strikes "3% wasn't going to happen for Tourangeau she would be straight 2% commission" from the fact.

[197]    Nappi qualifies Ms. Tourangeau's PSAMF ¶ 204, saying that "Mr. Watson testified that although he felt the initial proposed salary reduction was too aggressive, he told Ms. Tourangeau on several occasions that he agreed with the reduction, and that he spoke with management and compromised to lessen the reduction, which he found to be a good compromise." DRPSAMF ¶ 204.  Having reviewed the cited record, the Court accepts Nappi's qualification and changes "schedule" to "initial schedule" to conform to the record.

commission plus incentives.[198]  PSAMF ¶ 195; DRPSAMF ¶ 195.  Mr. Preble's route was in Falmouth, Scarborough, and Yarmouth.  PSAMF ¶ 196; DRPSAMF ¶ 196.

Nappi eventually elected to incrementally eliminate Ms. Tourangeau's base salary to reduce the financial impact, by beginning the reductions during her route's high-volume months.  DSMF ¶ 89; PRDSMF ¶ 89.  This was to allow Ms. Tourangeau ample planning time to budget accordingly and to realize sales growth with commission and incentives of the new accounts that were and continue to be assigned to her.  DSMF ¶ 90; PRDSMF ¶ 90.  Mr. Watson communicated to Ms. Tourangeau the start date of the gradual reductions would be June 30, 2019, with complete elimination by June 27, 2021.  DSMF ¶ 91; PRDSMF ¶ 91.  After Mr. Watson had further discussions with Ms. Tourangeau and Ms. Fox, Nappi decided to allow a compromise base salary reduction of 50% over a three-year period, with annual incremental reductions rather than complete elimination.  DSMF ¶ 92; PRDSMF ¶ 92.  In February of 2019, Ms. Fox and Mr. Watson communicated to Ms. Tourangeau this compromise, including Nappi's plan to continue to monitor all sales routes' overall compensation through market and route changes and readjust accordingly. DSMF ¶ 93; PRDSMF ¶ 93.

Under this compromise plan, the initial salary reduction of $62.50/week went into effect on June 30, 2019.  DSMF ¶ 94; PRDSMF ¶ 94.  During the pendency of this litigation, Nappi has refrained from the additional reductions that had been

---

[198]     Nappi qualifies Ms. Tourangeau's PSAMF ¶ 195, saying "Mr. Watson believed that Mr. Preble was at 2.5% but he did not know."  DRPSAMF ¶ 195.  The Court accepts Nappi's qualification and alters PSAMF ¶ 195 to reflect the record.

scheduled to occur on June 28, 2020, and June 27, 2021.  DSMF ¶ 95; PRDSMF ¶ 95.

Nappi continues to monitor Ms. Tourangeau's annual total compensation and adjust

its compensation plan for her accordingly, if necessary, to ensure it is consistent with

how the other southern sales routes are compensated.  DSMF ¶ 96; PRDSMF ¶ 96.   In

Nappi's view, Ms. Tourangeau has no information to suggest that the change in her

compensation structure was in retaliation for something. [199]  DSMF ¶ 97; PRDSMF

¶ 97.

The compensation figures in 2015 for wine sales representatives covering

Nappi's southern routes in 2015 ranged from just over $58,000 to just over $130,000.

DSMF ¶ 37; PRDSMF ¶ 37.  Ms. Tourangeau received compensation, including

salary, commission, and incentives, totaling $72,145 in 2015.[200]   DSMF ¶ 38;

PRDSMF ¶ 38.  The compensation figures in 2016 for wine sales representatives

covering Nappi's southern routes ranged from just over $60,000 to just under

$128,000.  DSMF ¶ 39; PRDSMF ¶ 39.  Ms. Tourangeau received compensation

totaling $62,063 in 2016 (which included a leave of absence for which Ms. Tourangeau

elected non-payroll wage replacement benefits under Nappi's short-term disability

---

[199]    Ms. Tourangeau denies DSMF ¶ 97, listing numerous encounters of possible retaliation.
PRDSMF ¶ 97.  The Court finds that this is a factual issue to be determined by the jury.  The Court
accepts Ms. Tourangeau's denial as a qualification and alters DSMF ¶ 97 to reflect that this is Nappi's
view.

[200]    Ms. Tourangeau qualifies DSMF ¶ 38, saying Ms. Tourangeau had "the lowest commission and
the lowest salary for 2015.  The only place where Ms. Tourangeau begins to compare to her colleagues
is with incentives."  PRDSMF ¶ 38.  Although the Court finds Ms. Tourangeau's qualification to be
largely beyond the scope of the fact, the Court slightly alters DSMF ¶ 38 to reflect the record's meaning
of "compensation" and admits the fact.

plan).  DSMF ¶ 40; PRDSMF ¶ 40.[201]  The compensation figures in 2017 for wine sales representatives covering Nappi's southern routes ranged from $34,444 to $135,605.[202]  DSMF ¶ 41; PRDSMF ¶ 41.  Ms. Tourangeau received compensation totaling $84,011 in 2017.[203] DSMF ¶ 42; PRDSMF ¶ 42.  The compensation figures in 2018 for wine sales representatives covering Nappi's southern routes ranged from just under $52,000 to just under $138,700.  DSMF ¶ 43; PRDSMF ¶ 43.  Ms. Tourangeau received compensation totaling $90,335 in 2018.[204]  DSMF ¶ 44; PRDSMF ¶ 44.  The compensation figures in 2019 for wine sales representatives covering Nappi's southern routes ranged from $38,721 to $135,605.[205]  DSMF ¶ 45; PRDSMF ¶ 45.  Ms. Tourangeau received compensation totaling $83,448 in 2019 (which included a three-week unpaid leave of absence).[206]  DSMF ¶ 46; PRDSMF ¶ 46.  The compensation figures in 2020 for wine sales representatives covering Nappi's

---

[201]  Ms. Tourangeau denies DSMF ¶ 40, saying "Ms. Tourangeau had a 10-week maternity leave as provided for under [short-term disability leave]."  PRDSMF ¶ 40.  The Court notes that the cited record shows that while Ms. Tourangeau testified to a ten-week maternity leave, Ms. Fox testified to a fifteen-week maternity leave.  The Court removes any mention of the length of the maternity leave and otherwise admits DSMF ¶ 40.

[202]  Ms. Tourangeau admits that "the southern routes range as stated," but qualifies that "the salary for sales representatives total ranges from $34,444 to $135,605."  PRDSMF ¶ 41.  The Court accepts Ms. Tourangeau's qualification and alters DSMF ¶ 41 to reflect the record.

[203]  Ms. Tourangeau qualifies DSMF ¶ 42, saying "[o]f the southern route representatives, Ms. Tourangeau had the lowest commission and the second lowest salary for 2017.  The only other female is earning at the lowest end of the spectrum with $34,444.  The only place where Ms. Tourangeau begins to compare to her southern route colleagues is through her performance with incentives.  However, 60% of that income comes from suppliers."  PRDSMF ¶ 42.  The Court rejects Ms. Tourangeau's qualification as beyond the scope of the fact and admits DSMF ¶ 42.

[204]  Ms. Tourangeau qualifies DSMF ¶ 44 for the same reason as the previous footnote, and the Court rejects Ms. Tourangeau's qualification and admits DSMF ¶ 44 for the same reason as the previous footnote.

[205]  Ms. Tourangeau denies DSMF ¶ 45, saying "[t]he compensation ranges from $38,721 to $133,992."  PRDSMF ¶ 45.  The Court accept Ms. Tourangeau's denial as a qualification and alters DSMF ¶ 45 to reflect the record.

[206]  Ms. Tourangeau qualifies DSMF ¶ 46 for the same reasons as in footnotes 199 and 200, and the Court rejects Ms. Tourangeau's qualification and admits DSMF ¶ 46 for the same reason explained in footnote 199.

southern routes ranged from just under $46,700 to just over $163,000.[207]  DSMF ¶ 47; PRDSMF ¶ 47.  Ms. Tourangeau received compensation totaling $84,255 in 2020.[208]  DSMF ¶ 48; PRDSMF ¶ 48.

From the time Ms. Tourangeau started working at Nappi until July 1, 2019—when Nappi implemented the first incremental reduction of Ms. Tourangeau's salary—Nappi paid Ms. Tourangeau a weekly base salary of $432.52.[209]  DSMF ¶ 126; PRDSMF ¶ 126.  After Nappi implemented the first incremental reduction of Ms. Tourangeau's salary effective July 1, 2019, Nappi has paid Ms. Tourangeau a weekly base salary of $370.02.  DSMF ¶ 127; PRDSMF ¶ 127.

Mr. Nappi, Jr. reviewed Exhibit 2, Tourangeau 000206-000211, showing anonymized yearly pay rates for Nappi employees.  After reviewing this document, he testified that employees I, J, K A, H and possibly R were earning a substantial amount of money and "doing very well for themselves."[210]  PSAMF ¶ 282; DRPSAMF ¶ 282.  Mr. Nappi also testified that looking at this chart, he guessed employees D,

---

[207]   Ms. Tourangeau objects to PRDSMF ¶ 47, saying "[t]he chart fails to identify which representatives have a southern route so the evidence cited does not support the fact asserted." PRDSMF ¶ 47.  The Court notes the fact is otherwise supported by the cited record, rejects Ms. Tourangeau's objection, and admits DSMF ¶ 47.

[208]   Ms. Tourangeau qualifies DSMF ¶ 48, saying this "is the lowest amount Ms. Tourangeau (employee Q) has earned in commission and incentives since she began working for Nappi in 2015, which is the result of incentive exclusion and having non-profitable accounts on her route due to the rerouting process.  By comparison, Employee I had his highest amount in commission and incentives since 2015 and was also provided a salary and vacation grant."  PRDSMF ¶ 48.  The Court rejects Ms. Tourangeau's qualification as beyond the scope of the fact and admits DSMF ¶ 48.

[209]   Ms. Tourangeau admits "that [her] weekly salary was $432.52 [but denies] that Nappi paid [her] all of her salary for work performed."  PRDSMF ¶ 126.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 126.

[210]   Nappi qualifies PSAMF ¶ 282, saying "Mr. Nappi identified those salespersons as the top five earners and indicated that 'they were doing very well for themselves.'"  DRPSAMF ¶ 282.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 282 to conform to the record.

M, L, F, B, and S must be sales assistants because they earn so little.[211]  PSAMF ¶ 283; DRPSAMF ¶ 283.  On this chart, Ms. Tourangeau earns the least amount of commission only second to the only other female sales representative, Employee "J." PSAMF ¶ 284; DRPSAMF ¶ 284.  All other sales representatives are male and earned significantly more money in commission than Ms. Tourangeau and Employee "J" in 2017.  PSAMF ¶ 285; DRPSAMF ¶ 285.

Ms. Tourangeau's income begins to reach the level of some of her colleagues' income when commission and salary are considered together, moving her from 11/12 of commission-only earnings to 8/12 of commission and salary earnings.[212]  PSAMF ¶ 286; DRPSAMF ¶ 286.  Ms. Tourangeau's income is 6/12 when comparing total compensation including commission, salary and incentives.[213]   PSAMF ¶ 287; DRPSAMF ¶ 287.  Mr. Nappi testified sales representatives earn their commission by a percentage of wine they sell.  PSAMF ¶ 288; DRPSAMF ¶ 288.  The accounts held by female sales representatives result in less commission and incentives than routes worked by men.[214]  PSAMF ¶ 293; DRPSAMF ¶ 293.

Mr. Nappi, Jr. did not make the decision to eliminate Ms. Tourangeau's salary, and no one consulted with him about doing so.  PSAMF ¶ 265; DRPSAMF ¶ 265.  Mr.

---

[211]    Nappi qualifies PSAMF ¶ 283, saying "Mr. Nappi 'guessed' that those employees were sales assistants because they were completely salaried and did not receive commission."  DRPSAMF ¶ 283. The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 283 to reflect the record.
[212]    Nappi qualifies PSAMF ¶ 286 as "argument and not a statement of fact."  DRPSAMF ¶ 286. The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 286 to be a statement of fact.
[213]    Nappi qualifies PSAMF ¶ 287 as "argument and not a statement of fact."  DRPSAMF ¶ 287. The Court rejects Nappi's qualification and admits PSAMF ¶ 287.
[214]    Nappi denies PSAMF ¶ 293 as "argument, and not a statement of fact."  DRPSAMF ¶ 293. The Court accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 293 to be a statement of fact.

Nappi, Jr. did not know Ms. Tourangeau's salary was being eliminated prior to this lawsuit.  PSAMF ¶ 266; DRPSAMF ¶ 266.

When asked what information Mr. Toolan had about pay disparity at Nappi, he stated that it was obvious that all of the top earners for sales in the wine department are male and that he considered Ms. Tourangeau to be part of the three-percenter group but that she was the only individual to have compensation taken away.[215]  PSAMF ¶ 267; DRPSAMF ¶ 267.

### L.    Michele Tourangeau's Short-Term Disability Leave

In May of 2019, Ms. Tourangeau needed to take a leave of absence for urethral ring surgery to resolve issues with incontinence after her pregnancy and birth.[216] PSAMF ¶ 244; DRPSAMF ¶ 244; DSMF ¶ 118; PRDSMF ¶ 118.  Ms. Tourangeau requested wage replacement benefits for her leave of absence under Nappi's short-term disability plan.[217]   DSMF ¶ 119; PRDSMF ¶ 119.   On May 15, 2019, Ms. Tourangeau wrote to her Director, Mr. Watson, and Human Resources Director, Ms. Fox stating:

> Wanted to check in to let you guys know that I'm alive and well after my surgery. Healing as expected, I think. I'm going to the doctor for a follow up appointment tomorrow and am hoping/expecting to be cleared to be back at work on Monday. I've been in pretty constant contact with Bill Monahan and all seems to be going well. I have a form that Becky gave me that needs to be completed before I can return and I'll take care of that tomorrow.

---

[215]     Nappi objects to PSAMF ¶ 267 as "inadmissible hearsay."  DRPSAMF ¶ 267.  The Court rejects Nappi's hearsay objection and admits PSAMF ¶ 267 for the reasons explained in footnote 54.

[216]     Nappi qualifies PSAMF ¶ 244 as a conclusory allegation, saying "[t]here is no foundation for the Plaintiff to opine as to the reason for her medical procedure."  DRPSAMF ¶ 244.  The Court accepts Nappi's qualification and changes "that occurred as a result of" to "after," to be a statement of fact.

[217]     Ms. Tourangeau qualifies DSMF ¶ 119, saying "Ms. Tourangeau had no other option given she only has 2-weeks' vacation."  PRDSMF ¶ 119.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 119.

> Am wondering what's going to happen with commissions generated since I've been out. For example, the Colony in Kennebunkport got their opening order today. It's a huge order (in my works anyway) that I've been cultivating and working on the past few months and I entered it Monday and Tuesday of this week for delivery today. Wondering if I'll still be paid the commission from it/others. I've copied Christine Fox since I believe this is more her wheelhouse. If somebody could please get back to me on the process/policy of how commissions are handled while on short term leave I'd appreciate it. [218]

PSAMF ¶ 245; DRPSAMF ¶ 245.   Ms. Tourangeau continued to place orders while she was out on leave.[219]   PSAMF ¶ 246; DRPSAMF ¶ 246.   Ms. Tourangeau let management know she was continuing to work through her leave.[220]   PSAMF ¶ 247; DRPSAMF ¶ 247.   Nappi management understood that some sales representatives continued working and stayed on top of their business while they were out and admitted Nappi was not going to tell them not to work on leave.[221]   PSAMF ¶ 248; DRPSAMF ¶ 248.

While receiving wage replacement benefits under Nappi's disability leave plan, Ms. Tourangeau was not entitled to receive any commissions or incentives based on sales delivered during her leave period.[222]   DSMF ¶ 120; PRDSMF ¶ 120.

---

[218]   Nappi qualifies PSAMF ¶ 245 as "not an exact copy of the email." DRPSAMF ¶ 245. The Court has verified the accuracy of the email in the record as that included in the fact and admits PSAMF ¶ 245.

[219]   Nappi denies PSAMF ¶ 246 as unsupported by the cited record. DRPSAMF ¶ 246. The Court considers the record citation in context, including the referred to exhibit, rejects Nappi's denial, and admits PSAMF ¶ 246.

[220]   Nappi denies PSAMF ¶ 247 for the same reason as PSAMF ¶ 246. The Court rejects Nappi's denial for the same reason as the previous footnote.

[221]   Nappi qualifies PSAMF ¶ 248, saying "Mr. Watson said that 'we don't tell people they can't work on their vacation.'" DRPSAMF ¶ 248. The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 248 to reflect the cited record.

[222]   Ms. Tourangeau denies DSMF ¶ 120, saying "Ms. Tourangeau worked throughout her leave and is entitled to be compensated her full salary, commission and incentive for performing that work."

Salespersons taking short-term disability leave under Nappi's plan typically do not receive and have not received any commissions or incentives based on sales that were completed and products delivered during his or her leave period.[223]  DSMF ¶ 121; PRDSMF ¶ 121.  Ms. Tourangeau has been paid commissions on all sales she has earned prior to taking her leave, consistent with Nappi's policies, but Ms. Tourangeau contends she worked during her leave and her commission payments for the period did not include work she did while on leave.[224]  DSMF ¶ 122; PRDSMF ¶ 122.  Nappi refused to pay Ms. Tourangeau full commission and incentives for sales during her leaves because, although the work Ms. Tourangeau performed to make the sale was completed while she was not on leave, the sale was not considered complete until delivered to the account, which occurred while she was out.[225]  PSAMF ¶ 249; DRPSAMF ¶ 249.

Ms. Fox testified that Nappi's policy provides that "commissions are not paid until sales are made and finalized, which at Nappi it's always been delivery date.  So if the order was put in with an extended delivery date, the commissions are not paid until that payroll period for which the delivery—the receipt of the product."[226]

---

PRDSMF ¶ 120.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 120.

[223]   Ms. Tourangeau denies DSMF ¶ 121 for the same reasons explained in the previous footnote. PRDSMF ¶ 121.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 121.

[224]   Ms. Tourangeau denies DSMF ¶ 122 for the same reasons explained in footnote 218.  PRDSMF ¶ 122.  The Court accepts Ms. Tourangeau's denial as a qualification and adds to DSMF ¶ 122 to reflect the record.

[225]   Nappi qualifies PSAMF ¶ 249 as an unsupported factual assertion.  DRPSAMF ¶ 247.  The Court finds that the cited record, *Tourangeau Dep.*, Attach. 8, *RE: Commission Pay*, supports the fact and thereby admits PSAMF ¶ 249.

[226]   Nappi qualifies PSAMF ¶ 252, saying "Ms. Fox clarified that the policy is compliant with federal law."  DRPSAMF ¶ 252.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 252.

PSAMF ¶ 252; DRPSAMF ¶ 252. Ms. Fox testified that Nappi's policy is not to pay sales representatives for work performed at a prior date if the sale was delivered while that sales representative is out.[227] PSAMF ¶ 253; DRPSAMF ¶ 253.

Mr. Toolan understood why Ms. Tourangeau would expect to be paid for the sale on her leave in May of 2019, stating: "if that was my account, and I'm assuming being seasonal if you worked April and May to secure the list, get as many wines by the glass and bottles on the wine list, and then send it in, you did all the work on it, you just weren't working the day it got delivered, yeah, I understand what she is saying." PSAMF ¶ 254; DRPSAMF ¶ 254.

### M. Michele Tourangeau's Formal Complaints

On March 28, 2019, Nappi received a letter from Bergen & Parkinson, LLC, stating that they were acting as Ms. Tourangeau's legal counsel, along with an Equal Employment Opportunity Commission (EEOC) and Maine Human Rights Commission (MHRC) Complaint that Bergen & Parkinson indicated they intended to file on Ms. Tourangeau's behalf. DSMF ¶ 103; PRDSMF ¶ 103. In Bergen & Parkinson's March 28, 2019, letter and proposed Complaint, they alleged that Nappi's actions with regard to Ms. Tourangeau's compensation were discriminatory and retaliatory. DSMF ¶ 104; PRDSMF ¶ 104. Prior to receipt of this letter, Nappi was not aware that Ms. Tourangeau was formally asserting that she believed Nappi's actions were discriminatory or that she believed Nappi's actions violated Maine

---

[227]   Nappi qualifies PSAMF ¶ 253, saying the cited record "does not refer to sales representatives being out on leave -- it refers to how Nappi pays commissions based on sales that are made and finalized, including payment by the customer." DRPSAMF ¶ 253. The Court accepts Nappi's qualification and removes "on leave" from PSAMF ¶ 253.

law.[228]   DSMF ¶ 105; PRDSMF ¶ 105.   On April 8, 2019, Ms. Tourangeau filed a complaint with the MHRC, alleging gender discrimination.[229]   PSAMF ¶ 221; DRPSAMF ¶ 221; DSMF ¶ 106; PRDSMF ¶ 106.

Ms. Fox prepared the response to Ms. Tourangeau's complaint with the MHRC, date stamped as received by the Commission on May 29, 2019.   PSAMF ¶ 222; DRPSAMF ¶ 222.   Ms. Fox testified that in preparing her response to the MHRC, she interviewed Mr. Alcott, Mr. Bourque, Mr. Frank Nappi, Jr., Mr. Nick Nappi, Mr. Watson, Mr. Carr, Mr. Hale, Mr. Brown, Valarie Ellis, and Ms. Apt, and she did not maintain any systematic notes of the interviews despite agreeing that the golden rule of human resources is to maintain documentation of investigations.[230]   PSAMF ¶ 224; DRPSAMF ¶ 224.

As of July 29, 2019, Ms. Fox understood that Ms. Tourangeau believed and alleged Nappi's refusal to pay full commission and incentives for sales during her leave was retaliatory and discriminatory as well as an illegal pay practice.   PSAMF ¶ 250; DRPSAMF ¶ 250.   Ms. Fox testified she had the illegal pay practice complaint reviewed by the Maine Department of Labor between July 29, 2019, and August 15,

---

[228]   Ms. Tourangeau denies DSMF ¶ 105, saying "Ms. Tourangeau had specifically sent an email to management which was forwarded to the Director of Human Resources indicating she believed a reduction of her compensation would result in pay disparity and gender discrimination. On November 27, 2018, Ms. Tourangeau emailed [Mr.] Watson a SevenFifty report which described the gender and ethnic discrimination in the alcohol industry."   PRDSMF ¶ 105.   The Court accepts Ms. Tourangeau's denial as a qualification and slightly modifies DSMF ¶ 105 to reflect the record.

[229]   The Court notes that Ms. Tourangeau's complaint alleges that Ms. Tourangeau "filed a charge of discrimination with the Maine Human Rights Commission on April 2, 2019."   *Compl.* ¶ 60.   The Court is not certain of the correct date, but uses April 8, 2019 as the date of filing for purposes of this Order.

[230]   Nappi admits that Ms. Fox held these interviews but qualifies Ms. Tourangeau's PSAMF ¶ 224, saying that "she testified that she probably did take and maintain notes of some of the persons with whom she spoke."   DRPSAMF ¶ 224.   The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 224 to conform to the record.

2019, but she reports there was no documentation made of their opinion.[231]  PSAMF ¶ 251; DRPSAMF ¶ 251.

### N.    Incentive Opportunity at the Mike's Fish Market Account

Ms. Tourangeau alleges in her Complaint that Nappi excluded her from an incentive-based compensation opportunity in early 2020.  DSMF ¶ 115; PRDSMF ¶ 115.  After Ms. Tourangeau filed a complaint with the MHRC, Mr. Watson told her she was no longer eligible for incentives at her Mike's Fish Market (Mike's) account.[232]  PSAMF ¶ 225; DRPSAMF ¶ 225.

---

[231]    Nappi qualifies PSAMF ¶ 251 as argumentative and unsupported by the record citation. DRPSAMF ¶ 251.  Ms. Fox testified:

> Q. And I think I saw in your response to the Maine Human Rights Commission that you had said that you spoke with somebody at the Maine Department of Labor and had inquired about this policy to not pay out commissions and incentives during a leave and that they had told you that was proper.  Who at the Maine Department of Labor did you speak with?
> A. I don't remember the name off the top of my head.
> Q. Did they send you any documentation?
> A. No, they didn't.
> Q. What information did you provide them to describe to them the scenario?
> A. I don't recall I sent anything. I think what I explained to them was the situation that [Ms. Tourangeau] was out on a paid disability leave through the short-term disability plan and described -- they did ask how we paid commissions and the response was, you know, as long as you're consistent, you get -- the employer gets to elect how the commission is paid or when it's paid, when it's earned.  They cautioned us about deviating from that.

*Fox Dep.* at 15:25-16:18.  The Court accepts Nappi's qualification and alters PSAMF ¶ 251 to conform to the record.

[232]    Nappi qualifies PSAMF ¶ 225, saying "the record citation does not indicate when [Ms.] Tourangeau was told she was not eligible for incentives at Mike's Fish Market."  DRPSAMF ¶ 225. Having reviewed the record, the Court notes that Ms. Tourangeau testified that at some point "since April 2, 2019," she was deprived of the opportunity to earn incentives at her Mike's account. *Tourangeau Dep.* at 236:10-239:13.  The Court rejects Nappi's qualification and admits PSAMF ¶ 225.

Mr. Brown is not aware of any other sales representative being ineligible for incentives at an account.[233]  PSAMF ¶ 226; DRPSAMF ¶ 226.  The customer did not complain about the products Ms. Tourangeau was placing in the store.[234]  PSAMF ¶ 227; DRPSAMF ¶ 227.  Mr. Brown agrees, stating "that is absolutely right" that under the incentive program, the goal of the supplier is to have their product for sale in accounts because that is a sale opportunity, but that "they're only contingent on long-term brand building, and that means reordering the product."[235]  PSAMF ¶ 228; DRPSAMF ¶ 228.  Mr. Brown also admits that there are circumstances where a few products are placed in an account and not reordered—it happens and that is an item or two that just did not succeed.[236]  PSAMF ¶ 229; DRPSAMF ¶ 229.  Mr. Brown also admits that he sent out one email to sales representatives regarding specific incentives in which he encouraged them to "be creative" and encouraged them to even purchase the wine for themselves, stating "you could each buy the wine and still walk away with a good chunk of change, so be creative."[237]  PSAMF ¶ 230; DRPSAMF ¶

---

[233]     Nappi qualifies PSAMF ¶ 226, saying "Mr. Brown testified that another salesperson did have a similar issue on a smaller scale with an account and that the issue was addressed with that salesperson." DRPSAMF ¶ 226.  The record indicates that the similar issue with this other salesperson was dealt with in a manner that did not make the salesperson ineligible for incentives.  *Brown Dep.* at 34:14-24.  The Court rejects Nappi's qualification and admits PSAMF ¶ 226.

[234]     Nappi qualifies PSAMF ¶ 227 as inadmissible hearsay.  The Court rejects Nappi's hearsay objection for the reasons explained in footnote 54.

[235]     Nappi qualifies PSAMF ¶ 228 as "misleading because it fails to place the cited testimony in context."  DRPSAMF ¶ 228.  Having reviewed the record, the Court accepts Nappi's qualification and adds to PSAMF ¶ 228 to reflect the record.

[236]     Nappi qualifies PSAMF ¶ 229 as "misleading because it fails to place the cited testimony in context . . . Mr. Brown further testified that when that situation happens with hundreds of items, it's unique."  DRPSAMF ¶ 229.  The Court accepts Nappi's qualification and modifies PSAMF ¶ 229 to reflect the record.

[237]     Nappi qualifies PSAMF ¶ 230, saying "the cited testimony was to a single email" in a "unique circumstance."  DRPSAMF ¶ 230.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 230 to reflect the record.

230.  Mr. Watson doesn't know of any formal rules on incentives.[238]  PSAMF ¶ 231; DRPSAMF ¶ 231.  Ms. Masters cannot think of a legitimate reason why Ms. Tourangeau would be excluded from incentives at Mike's.[239]  PSAMF ¶ 232; DRPSAMF ¶ 232.

Mr. Watson testified that Ms. Tourangeau became ineligible for incentives at Mike's in part because she had "hundreds of returns."[240]  PSAMF ¶ 233; DRPSAMF ¶ 233.  Mr. Toolan testified that he has never been excluded from incentives at an account but that "as salespeople, incentives are one of the ways we make financial compensation.  Some accounts are great for incentives.  Some you have no leeway because they could be a chain store or authorization is determined, so you have no wiggle room.  So, yeah, I mean, taking away an account that can create incentives is obviously retaliation."[241]  PSAMF ¶ 234; DRPSAMF ¶ 234.

---

[238]    Nappi qualifies PSAMF ¶ 231, saying "Mr. Watson testified that he did not know of any formal rules in a printout but he makes the goal of the incentives clear at meetings."  DRPSAMF ¶ 231.  The Court accepts in part Nappi's qualification and slightly modifies PSAMF ¶ 231.

[239]    Nappi qualifies PSAMF ¶ 232, saying Ms. Masters also testified that "every incentive is different, and suppliers have certain qualifications they require."  DRPSAMF ¶ 232.  The Court rejects Nappi's qualification as beyond the scope of the fact and admits PSAMF ¶ 232.

[240]    Nappi qualifies PSAMF ¶ 233, saying the supplier "further complained that on several of Ms. Tourangeau's accounts, the placements were not made for the right items or long-term growth."  DRPSAMF ¶ 233.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 233 to reflect the record.

[241]    Nappi qualifies PSAMF ¶ 234 as "misleading in that it is taken out of context."  DRPSAMF ¶ 234.  Mr. Toolan testified:

Q. [Ms. Tourangeau] has alleged in the case that Nappi Distributors has retaliated against her.  Do you have any information about that allegation?
A. I don't know the specifics.
Q. Do you have any understanding what she might be referring to by that?
A. I do know the only one I can think of is she had asked me at some point, if I have ever had -- I don't know the exact wording she used, an account stricken from gaining incentive dollars.  I believe it was like Mike's Clam Shack or something like that.  And then, I mentioned like, no, that has never happened to me.
. . .

Ms. Tourangeau testified that the opportunity to which she was referring in her Complaint was abandoned by Mr. Watson before any benefits were conferred to any wine sales representatives.[242, 243]  DSMF ¶ 116; PRDSMF ¶ 116.

### O.    The Work Dinner at Chaval

After Ms. Tourangeau filed a complaint with the MHRC, Mr. Brown organized a work dinner at Chaval with himself, the representative from Miles Madeira, and a handful of Nappi salespeople, excluding Ms. Tourangeau.[244]   PSAMF ¶ 235; DRPSAMF ¶ 235.

---

Q. Anything else you can think of in terms of retaliatory conduct by Nappi's against [Ms. Tourangeau]?
A. Nothing that I have visually seen.
Q. Did she indicate why she believed the incentives issue pertaining to Mike's Clam Shack was retaliation by Nappi?
A. I don't know if she -- I mean, we, as salespeople, like my route, incentives are one of the ways we make financial compensation.  Some accounts are great for incentives. Some you have no leeway because they could be a chain store or authorization is determined so you have no wiggle room.  So, yeah, I mean, taking an account that can create incentives is obviously retaliation.
Q. Did she indicate what she thought it was retaliation for?
A. She never specifically said to me, no.

*Toolan Dep.* at 61:23-63:12.  The Court rejects Nappi's qualification and admits PSAMF ¶ 234.

[242]    Ms. Tourangeau denies DSMF ¶ 116, explaining how Ms. Tourangeau was excluded from this potential opportunity.  PRDSMF ¶ 116.  The Court rejects Ms. Tourangeau's denial as beyond the scope of the fact and admits DSMF ¶ 116.

[243]    DSMF ¶ 117 states: "As a result, Ms. Tourangeau was not excluded from the incentive-based compensation opportunity—as alleged in her Complaint—because no wine sales representatives benefitted from the opportunity."  Ms. Tourangeau denies DSMF ¶ 117 for the same reasons as the previous footnote.  PRDSMF ¶ 117.  The Court omits DSMF ¶ 117, finding that the fact that other wine sales representatives did not actually receive profits from this incentive opportunity does not mean that Ms. Tourangeau could not have been excluded from the possibility to make those profits not realized here.

[244]    Nappi qualifies PSAMF ¶ 235, saying "[t]he record testimony does not indicate when this dinner occurred [and Mr. Brown] testified that it was a last-minute, informal dinner, and he does not recall everyone who was there."  DRPSAMF ¶ 235.  The Court notes that Ms. Tourangeau testified that the timing of the dinner "was very interesting, suspicious to me . . . it was after all of this really started coming to fruition, this lawsuit and such, and then there was a dinner I wasn't aware of . . . I saw it on social media who was there and that it had happened."  *Tourangeau Dep.* at 262:17-263:3. The Court rejects Nappi's qualification and admits PSAMF ¶ 235.

Although Ms. Tourangeau alleges she was excluded from work-related dinners, she is only aware of one dinner that she refers to as "suspicious."[245]  DSMF ¶ 107; PRDSMF ¶ 107.  Ms. Tourangeau does not know if all male on-premise wine salespeople at Nappi received invitations to the dinner, but she knows that no female on-premise wine salespeople at Nappi received invitations to the dinner.[246, 247]  DSMF ¶ 108; PRDSMF ¶ 108.  Ms. Tourangeau does not know, based on her own personal knowledge, whether the dinner was organized by an importer or by someone at Nappi, but she knows that Mr. Brown invited some male sales representatives to the dinner.[248]  DSMF ¶ 111; PRDSMF ¶ 111.  Although the dinner was business-related, Ms. Tourangeau does not know whether any business was explicitly conducted at the dinner or whether there were any specific business-related discussions.[249]  DSMF ¶ 112; PRDSMF ¶ 112.  Ms. Tourangeau is not aware of any specific consequences to

---

[245]    Ms. Tourangeau qualifies DSMF ¶ 107, saying "[a]fter filing a complaint with the Maine Human Rights Commission, Mr. Brown organized a work dinner at Chaval with himself, the representative from Miles Madeira, and a handful of Nappi salespeople." PRDSMF ¶ 107. The Court does not see a conflict between the statement of fact and Ms. Tourangeau's objection and therefore admits DSMF ¶ 107.

[246]    Ms. Tourangeau qualifies DSMF ¶ 108, saying "Ms. Tourangeau does know that she and Julia were not invited, so at the time of this dinner that was all of the on-premise female sales representatives." PRDSMF ¶ 108. Having reviewed the record, the Court accepts Ms. Tourangeau's qualification and adds to DSMF ¶ 108 to reflect the record.

[247]    DSMF ¶¶ 109-10 duplicate DSMF ¶ 108 and the Court therefore omits DSMF ¶¶ 109-10.

[248]    Ms. Tourangeau denies DSMF ¶ 111, saying "Mr. Brown testified that he organized the dinner." PRDSMF ¶ 111. When asked whether he personally invited people to the supplier dinner, Mr. Brown testified: "It wasn't a formal supplier dinner. I did. It was very casual, last -- last-minute type of get-together." *Brown Dep.* at 49:5-8. The Court accepts Ms. Tourangeau's denial as a qualification and adds to DSMF ¶ 111 to reflect the record.

[249]    Ms. Tourangeau denies DSMF ¶ 112, saying "[i]t was business related and a missed opportunity with the supplier representative Sheilah McGovern. The dinner was organized by the manager of fine wine with the representative from the supplier, Miles Madeira, and a small group from the fine wine team including John Keaney and Terry O'Brien." PRDSMF ¶ 112. The Court accepts Ms. Tourangeau's denial as a qualification and slightly modifies DSMF ¶ 112 to reflect the record.

her or her job due to not attending the dinner.[250]  DSMF ¶ 113; PRDSMF ¶ 113.  Ms. Tourangeau did not raise a concern with anyone at Nappi about not being invited to the dinner.  DSMF ¶ 114; PRDSMF ¶ 114.

### P.    Judicial Settlement Conference

The parties participated in a Judicial Settlement Conference (JSC) on December 4, 2020.  PSAMF ¶ 289; DRPSAMF ¶ 289.  After the JSC, Ms. Fox emailed Ms. Tourangeau telling her she needed to take time off for such matters.  PSAMF ¶ 289; DRPSAMF ¶ 289.  Ms. Tourangeau explained that she continued to work through the lengthy breaks and in addition had a wine dinner scheduled for an account later that same evening that would have her working from 5:00 p.m. to midnight.  PSAMF ¶ 289; DRPSAMF ¶ 289.  Ms. Fox instructed her that any time she needed more than three hours off she had to use her PTO despite knowing that the time off does not mean the work will not happen, it will just happen earlier or later.[251]  PSAMF ¶ 289; DRPSAMF ¶ 289.  On December 9, 2020, Ms. Tourangeau responded to Ms. Fox's email:

> Hi Christine-I appreciate this message and that you took the time to explain in detail.  I understand what you're asking but do have a few clarification questions.
>
> Regarding work schedules expectations, it would be helpful to get even more clarification.  I was not aware of the less than 3 hour or more than 3-hour work policy.  Is this something new or something that was communicated previously?  I think most of the sales force operates under the understanding that we are in a different category due to the nature

---

[250]    Ms. Tourangeau denies DSMF ¶ 113 for the same reason explained in the previous footnote. The Court accepts Ms. Tourangeau's denial as a qualification and slightly modifies DSMF ¶ 113 to reflect the record.

[251]    Nappi qualifies PSAMF ¶ 289 as "immaterial factual assertions that were not plead and are not before the Court."  DRPSAMF ¶ 289.  The Court finds that the cited deposition and affidavit testimony support the fact and admits PSAMF ¶ 289.

of our positions and the 24/7 on call expectation.  For example, we don't get holidays or floating holidays off, we work nights and weekends when necessary to get work done and execute events, etc.  As long as we get our work and jobs done, we can work ahead, we can work early morning hours or evening hours, especially during covid, rather than the standard 8am-5pm workday.  We can work from home offices completing proposals, researching product, placing orders, etc.  If this isn't accurate, I think it would be very helpful to let the entire sales force know so we're all on the same page.  If it is accurate then maybe it would be helpful to schedule a time to discuss further.  It is important to me to have a clear understanding of expectations so I can ensure I'm in compliance.

PSAMF ¶ 290; DRPSAMF ¶ 290.  Ms. Fox never responded.[252]  PSAMF ¶ 290; DRPSAMF ¶ 290.

Mr. Watson also emailed Ms. Tourangeau asking her to correct payroll by using personal time for the JSC.  PSAMF ¶ 291; DRPSAMF ¶ 291.  Ms. Tourangeau explained she was able to work during the breaks, began her day earlier, and had a wine dinner that evening.  PSAMF ¶ 291; DRPSAMF ¶ 291.  She also told Mr. Watson he could look at her emails for the day to see the work she was performing.[253]  PSAMF ¶ 291; DRPSAMF ¶ 291.

## III.   THE PARTIES' POSITIONS

### A.   Nappi's Motion for Summary Judgment

Nappi argues that the Court should grant summary judgment in favor of Nappi on all of Ms. Tourangeau's claims.  Nappi contends that all claims are unsupported by the record and furthermore that four of Ms. Tourangeau's discrimination claims

---

[252]   Nappi qualifies PSAMF ¶ 290 as "immaterial factual assertions that were not plead and are not before the Court."  DRPSAMF ¶ 290.  The Court finds that the cited affidavit testimony supports the fact and admits PSAMF ¶ 290.
[253]   Nappi objects to PSAMF ¶ 291 for the same reasons as PSAMF ¶ 290 and the Court admits PSAMF ¶ 291 for the reason explained in the previous footnote.

are largely time barred and thus must be dismissed to the extent that the statute of limitations requires.

### 1.   Equal Pay Act Claims

As a preliminary matter, Nappi argues that Ms. Tourangeau's claims under the Equal Pay Act (EPA) are time barred to the extent that they are based on alleged non-willful violations that occurred before January 10, 2018 and alleged willful violations that occurred before January 10, 2017 because "[m]ost claims under the EPA are subject to a two-year statute of limitations . . . [while] claims for willful violations of the EPA are subject to a three-year limitation period." *Def.'s Mot.* at 3. Nappi contends that a two-year statute of limitations period applies here because Ms. Tourangeau "has not alleged any facts to demonstrate a knowing violation or a violation resulting from reckless disregard," as is required to establish a willful violation. *Id.* at 4.

Nappi further contends that to the extent the EPA claims are not barred, "[b]ased on the record evidence, [Ms. Tourangeau] cannot meet the admittedly lenient standard for establishing a *prima facie* case" of pay discrimination because "both in terms of commission rate and in terms of total numbers, [Ms. Tourangeau] has been compensated at least as well—if not better—than some of her male counterparts." *Id.* at 4-5. Nappi submits that "even if the Court assumes that [Ms. Tourangeau] can present a *prima facie* case, any distinctions in compensation structures between [Ms. Tourangeau] and some of her male counterparts are based on factors other than sex." *Id.* at 5. In particular, Nappi points out "[w]hile it is true that wine sales representatives hired before 2014 received three percent commissions, that

87

commission rate was set many years ago . . . [and in] 2013 and 2014, that rate was eating into Nappi's profits to such an extent that Nappi management concluded that it could not continue . . . [and] decided to use a two percent commission rate for all new hires for wine sales representative positions." *Id.* at 5. Nappi explains that Ms. Tourangeau's "predecessors all had experience running wine sales routes—which [Ms. Tourangeau] did not when she started working for Nappi—and they had tenure with the company, during which time many of them developed their routes," making Nappi's payment decisions "based on business considerations and not on the sex of sales representatives." *Id.* at 6.

### 2.    Retaliation Claims

First, Nappi argues that because "the only conduct that could be fairly characterized as 'protected activity'" was the April 8, 2019, complaint that Ms. Tourangeau filed with the MHRC "months *after* she was notified of Nappi's plan to phase out her base salary . . . the decision to modify her compensation structure could not have been caused by the filing of the MHRC complaint." *Id.* at 7.

Second, Nappi argues that Ms. Tourangeau cannot demonstrate causation to the extent that she alleges Nappi retaliated against her by withholding commissions on sales that were finalized while she was on short-term disability leave in May of 2019 because Ms. Tourangeau's compensation during her leave "would have been the same regardless of any allegations[] she may have made to the MHRC." *Id.* at 8. Nappi submits that under its "long-standing company policy, commissions and incentive compensation are earned when sales are finalized—which occurs when

product is delivered by either delivery or sales personnel and payment is received and reconciled." *Id.*

### 3.    Pregnancy Discrimination Claims

As a preliminary matter, Nappi argues that Ms. Tourangeau's claim under the Pregnancy Discrimination Act (PDA) is time barred because "a plaintiff must first file a timely charge of discrimination with the EEOC." *Id.* at 9 (citing *Lewis v. City of Chicago*, 560 U.S. 205, 210 (2010)). Nappi asserts that in Maine, "a claimant must file an administrative charge within 300 days after the occurrence of the alleged unlawful employment practice." *Id.* at 9 (citing *Rivera-Diaz v. Humana Ins. Of P.R., Inc.*, 748 F.3d 387, 390 (1st Cir. 2014)). In particular, Nappi submits that because the actions Ms. Tourangeau complains of "occurred, at the latest, on December 14, 2017 . . . [Ms. Tourangeau] was required to file her administrative complaint with the MHRC on or before October 10, 2018," which she failed to do, thus barring her PDA claims. *Id.* at 10.

Nappi then contends that to the extent Ms. Tourangeau's PDA claim is not time barred, Nappi's actions were based on legitimate business reasons and not on pregnancy. Nappi reiterates that it followed its long-standing policy with regard to Ms. Tourangeau's maternity leave and short-term disability leave and that because Ms. Tourangeau's alleged conversation with Ms. Fox took place more than a year after her maternity leave, Ms. Tourangeau "was not a member of a protected class under the PDA, as she was not pregnant, nor had she recently given birth." *Id.* at 11. Nappi further contends that none of the allegations made by Ms. Tourangeau

"alter[ed] the terms of employment [and for] these reasons, [Ms. Tourangeau's] PDA claim fails as a matter of law." *Id.* at 12.

### 4. Title VII Claims

As a preliminary matter and for the same reason discussed above, Nappi contends that Ms. Tourangeau's claims under Title VII that accrued before June 12, 2018, including "any of the events discussed as part of the PDA claim, the alleged meeting with Human Resources Director [Ms.] Fox . . . and any other events alleged in the Complaint," are time barred. *Id.* at 12-13. Nappi further contends that Ms. Tourangeau's Title VII quid pro quo discrimination claim is barred because she "failed to exhaust her administrative remedies." *Id.* at 14.

Nappi next argues that "the record evidence in this case does not support [Ms. Tourangeau's] Title VII claim[s]" because "the material terms or conditions of her employment were not affected" by the events she alleges. *Id.* at 13. Nappi submits that it acted for legitimate business reasons and that "the reduction of [Ms. Tourangeau's] salary occurred around the same time the salary of a male wine sales representative who, like [Ms. Tourangeau], was hired after 2014 and who was receiving a two percent commission was eliminated." *Id.* According to Nappi, even if not time barred, Ms. Tourangeau's Title VII quid pro quo harassment claim fails because "the alleged comment—on its face—did not seek any sexual favors, nor did [Ms. Tourangeau] take the comment seriously . . . [and] no one at Nappi ratified or acquiesced to the alleged conduct." *Id.* at 14-15.

### 5.     Maine Human Rights Act Claim

As a preliminary matter and for the same reason discussed above, Nappi argues that Ms. Tourangeau's claims under the MHRA that accrued before June 12, 2018, are time barred.  Nappi then contends that because courts rely on Title VII federal case law for the purpose of construing and applying the provisions of the MHRA, "the Plaintiff's MHRA claim fails as a matter of law" for the same reasons as Ms. Tourangeau's Title VII claims.  *Id.* at 16.

### 6.     Maine Timely and Full Payment of Wages Act Claim

Nappi submits that "[t]o the extent [Ms. Tourangeau] is suggesting that she was not paid her full wages at a regular interval consistent with the provisions of 26 M.R.S. § 621-A(1), Nappi is entitled to summary judgment . . . [because] other than [Ms. Tourangeau's] conclusory assertion, there is no allegation in this case that Nappi has not paid [Ms. Tourangeau] at a regular interval[, nor] is there any record evidence to support such an assertion."  *Id.*  Nappi further submits that to the extent that Ms. Tourangeau's claim under the TFPWL is premised upon her disability leave, Ms. Tourangeau has been "fully compensated for her time out on short-term disability leave." *Id.*

### 7.     Quantum Meruit and Unjust Enrichment Claims

Nappi contends that Ms. Tourangeau "cannot recover under *quantum meruit* for work she claims to have done and for which she seeks recovery" because Ms. Tourangeau "does not allege that she has performed work for Nappi other than that as a wine sale representative . . . [and the] record materials establish that [Ms. Tourangeau's] relationship with Nappi as a wine sales representative is based on an

at-will employment agreement." *Id.* at 18. Nappi submits that because this work was addressed by Ms. Tourangeau's employment contract, Ms. Tourangeau "cannot establish a viable claim under *quantum meruit*." *Id.* (citing *White v. Hewlett Packard Enter. Co.*, 985 F.3d 61, 70-71 (1st Cir. 1996)). Nappi further submits that "the record does not reflect that Nappi has failed to pay [Ms. Tourangeau] for her services." *Id.*

Nappi then argues that it is entitled to summary judgment on Ms. Tourangeau's unjust enrichment claim for the same reasons. *Id.* at 19. Nappi submits that "[t]o the extent [Ms. Tourangeau] asserts she is entitled to commissions or incentives that Nappi delivered to customers and for which Nappi received payment while [Ms. Tourangeau] was out on short-term disability, her assertion is contrary to both Nappi policy and Nappi's short-term disability plan . . . [through which Ms. Tourangeau] opted to receive replacement compensation in lieu of regular compensation." *Id.* at 20.

### B.    Michele Tourangeau's Opposition

Ms. Tourangeau urges the Court to deny Nappi's request because disputes of material fact preclude summary judgment on all claims. Ms. Tourangeau further insists that her claims are not time barred under the Lilly Ledbetter Fair Pay Act of 2009 and the continuing violation doctrine.

### 1.    Statute of Limitations

Ms. Tourangeau first argues that Nappi's analysis of Title VII and the EPA "ignores the statutory amendment to Title VII as part of the Lilly Ledbetter Fair Pay Act," *Pl.'s Opp'n* at 2, which makes it such that "a new cause of action for pay discrimination ar[ises] every time a plaintiff receive[s] a paycheck resulting from an

92

earlier discriminatory compensation practice—even one that occurred outside the statute of limitations period." *Id.* at 5 (quoting *Harrington v. Lesley Univ.*, 2021 U.S. Dist. LEXIS 153603, *15 (D. Mass. Aug. 12, 2021)).

Ms. Tourangeau submits that "[i]n the instant case, the discriminatory pay practice that impacted [Ms. Tourangeau] began in 2014, when she was the first female wine sales representative hired at Nappi . . . at a salary of 2% commission instead of 3% . . . [and that the] discriminatory pay practices have been ongoing from 2014 to the present, because [Ms. Tourangeau] has fewer and less desirable accounts than her similarly situated male peers." *Id.* at 5-6. Ms. Tourangeau then provides a review of the record and how it supports her Title VII and EPA pay discrimination claims. *Id.* at 6-9. Ms. Tourangeau specifically submits that Nappi engaged in discriminatory pay practice in 2016 when Ms. Tourangeau took the "first maternity leave ever at Nappi, without a maternity policy in place or much oversight by management," *id.* at 7, and in 2018 when it decided "to eliminate Ms. Tourangeau's salary without providing her the 3% commission." *Id.* at 9. Ms. Tourangeau further submits that because these discriminatory pay practices "continued into 2019 and 2020 . . . all of her claims are timely under the Lilly Ledbetter Fair Pay Act." *Id.*

Ms. Tourangeau argues that any sex discrimination claim that does not fall under the Act is not time barred because Ms. Tourangeau "can establish a continuing violation by demonstrating a systemic violation exists." *Id.* at 11. She contends that a "jury could reasonably conclude that the initial decision to pay [Ms. Tourangeau] 2% as opposed to 3% was discriminatory based on sex." *Id.* at 12. She further

contends that numerous comments by management, cited to in the record, could also reasonably be considered discrimination based on sex and that a jury "could also find that Nappi's immediate and uninvestigated disregard of [Ms. Tourangeau's] complaint of sexual harassment by a customer constituted sex-based discrimination." *Id.*  Ms. Tourangeau submits that "Nappi's conduct in 2019 and 2020 is just another example of workplace animus, similar to earlier acts, and therefore sufficient to anchor her . . . claim" through the continuing violation doctrine.  *Id.* at 13.

### 2.    Equal Pay Act Claims

Ms. Tourangeau submits that her EPA claim "can be summarized by [Nappi's] decision to pay her less than Nappi's similarly situated male sales representatives, as summarized in Nappi deposition Exhibit 2."  *Id.* at 15.  Ms. Tourangeau contends that she "'need only establish that she was paid less than a single male employee' to prevail on [her] EPA claim" and that "the facts taken holistically are more than enough to demonstrate a violation of the EPA."  *Id.*  She submits that in addition to the lower commission rate that she was offered, "[a]nother way in which Nappi compensated [Ms. Tourangeau] less than her male peers was through the route she was provided, including the number of accounts she had in comparison to her male peers."  *Id.*  Finally, Ms. Tourangeau contends that Nappi's policy of "grandfathering" in its senior, male sales representatives at a higher commission rate allows Nappi to "seemingly invoke[e] the seniority defense to equal pay claims . . . [when] a company cannot be exempt from the requirements of the EPA by drawing a line at higher pay directly before ending its discriminatory practices."  *Id.* at 15-16. (citing *Corning Glassworks v. Brennan*, 417 U.S. 188, 209 (1974)) (holding that a previously held

employment policy can "nevertheless operate[] to perpetuate the effects of [a] company's prior illegal practice of paying women less than men for equal work").

### 3.   Retaliation Claims

Applying the three-pronged prima facie standard for a retaliation claim, Ms. Tourangeau argues that she meets all three requirements because (1) "[t]here is no question in the instant case that [she] made ongoing, specific, and clear complaints of unequal pay that fall within [] protection," *id.* at 18; (2) "[a]fter complaining about unequal pay, [she] suffered adverse consequences in terms of pay, sales accounts, incentives, and generally hostile treatment," *id.* at 19; and (3) "temporal proximity of these ongoing complaints to the adverse actions suffered by [Ms. Tourangeau] is also sufficient to sustain her [retaliation] claim[s]." *Id.* She contends that "a triable issue of facts exists as to retaliation . . . [and that] Nappi's proffered legitimate, nondiscriminatory reasons for these adverse actions are rife with pretext." *Id.* at 30.

Specifically, Ms. Tourangeau submits that Nappi's decision, allegedly made in 2014, to eliminate salaries and to maintain a strict 2% commission is a "genuinely disputed [material fact] because there is no documentation of the decision being made." *Id.* She furthermore submits that she experienced incidences of rudeness and ostracism that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 29.

### 4.   Pregnancy Discrimination Claims

Reminding the Court that the PDA "prohibits sex discrimination based not only on pregnancy, but childbirth and related medical conditions," *id.* at 21, Ms. Tourangeau argues that she meets the four-pronged standard for a prima facie case

95

of pregnancy discrimination because she "has suffered disparate treatment on an ongoing basis throughout her employment based on her capacity to become pregnant, her pregnancy, her maternity leave, and pregnancy related medical conditions or perceived pregnancy related conditions such as postpartum depression and her urethral sling surgery." *Id.* at 23.

She submits that in addition to showing that Nappi "denied [Ms. Tourangeau] her commissions/incentives/salary for work performed while out for a urethral sling surgery (a pregnancy related medical condition)," *id.* at 23-24, "[t]he record also reveals ongoing and overtly sexist statements by Nappi's management." *Id.* at 23.

### 5.   Title VII and Maine Human Rights Act Claims

Recounting the four-pronged standard for proving a prima facie case of sex discrimination, Ms. Tourangeau contends that "evidence adduced by [Ms. Tourangeau] establishes these elements . . . [as it] is undisputed that [Ms. Tourangeau] is a female, she successfully performs her job, she suffered adverse employment action by way of her salary elimination and denial of a 3% commission rate, and similarly situated male employees were treated more favorably." *Id.* at 24-25. She further contends she can establish that Nappi's proffered legitimate reasons for treating Ms. Tourangeau as it did are pretextual, and "viewing the evidence in the light most favorable to the Plaintiff, a reasonable factfinder could conclude that [Ms. Tourangeau's] salary was not inflated in comparison to her peers." *Id.* at 26.

### 6.   The Maine Timely and Full Payment of Wages Act Claim

Ms. Tourangeau argues that she should be compensated for the unpaid work she did during three leave periods during her employment at Nappi: an unpaid

vacation, her maternity leave, and a short-term disability leave. She submits that "[t]he case law interpreting the language of TFPWL establishe[s] that bonus-based pay has the same status as wages earned . . . [and the] same is true for commissions and incentives." *Id.* at 31 (collecting cases). Moreover, she contends that there is an issue of material fact regarding Nappi's alleged "policy [that] provides in part commissions and incentive compensation are earned when sales are fully finalized" because "no written policy has been produced." *Id.* In particular, she submits that "[d]uring each of the foregoing time periods, Nappi suffered or permitted [Ms. Tourangeau] to work, collecting the benefit of sales she generated during that time. *Id.* at 33 (citation omitted). She contends that because of "Nappi's undisputed failure to pay [Ms. Tourangeau] during these time periods . . . the only remaining dispute [is] the number of hours and incentive pay to which she is entitled for these time periods." *Id.*

### 7.    Quantum Meruit and Unjust Enrichment Claims

Ms. Tourangeau argues that she performed work by which Nappi benefited without paying her owed compensation. She submits that Mr. Hale "directed [her] to continue working throughout her leave of absence in order to maintain the quality of service to the accounts . . . [and] that testimony from Mr. Carr reveals that sales representatives that choose to work through [leaves] are fully compensated based on the work performed and the sales generated." *Id.* at 35. Therefore, she contends that "the evidence proffered . . . establishe[s] a triable issue of fact as to the reasonableness of [Ms. Tourangeau's] expectation that she would be paid salary, incentives, and commissions for the services rendered" while on leave. *Id.* at 34.

### C.    Nappi's Reply and Sur-Reply

In its reply, Nappi argues that Ms. Tourangeau's "claims for unjust enrichment and *quantum meruit* fail as a matter of law in light of the contractual at-will employment agreement between her and Nappi." *Def.'s Reply* at 1-2.  Nappi contends that Ms. Tourangeau "has presented no evidence to suggest that any differences in the composition of her sales route—as compared to other wine salespersons' routes—are based on sex," instead of on "factors such as the market for wine in any given geographic area or the efforts that long-standing wine salespersons have put into developing new accounts within their respective routes." *Id.* at 3.  Nappi furthermore contends that Ms. Tourangeau "has failed to present competent evidence to suggest that Nappi's business reason for implementing a 2% commission rate on all new hires for wine sales positions since 2014 is pretextual," *id.* at 6, and "[t]he record clearly establishes that Nappi has consistently applied its new compensation structure to all newly hired sales representatives since [Ms. Tourangeau's] hire in 2014 regardless of sex." *Id.* at 7.

As to Ms. Tourangeau's retaliation claim, Nappi argues that Ms. Tourangeau's "temporal proximity argument . . . has no merit," *Def.'s Sur-Reply* at 1, because "there is no temporal connection between the alleged protected activity and the alleged adverse actions, since the decision to reduce Ms. Tourangeau's compensation came first." *Id.* at 2.  Nappi submits that Ms. Tourangeau's claims for retaliation under the EPA that occurred before January 10, 2017, are therefore time barred.  *Id.* at 1.  Nappi further submits that "Ms. Tourangeau has presented no facts in the summary judgment record to support an indication of rudeness, ostracism, or other adverse

action [that] would dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 3. It contends that "[t]he summary judgment record, taken in the light most favorable to [Ms. Tourangeau], only contains the type of commonplace indignities that are typical in the workplace." *Id.* at 4.

As to Ms. Tourangeau's TFPWL claim, Nappi argues that Ms. Tourangeau's "claim for work allegedly performed during a 2015 vacation is barred because it was not alleged in her complaint or interrogatory responses . . . and it is reliant on hearsay." *Id.* at 5. Nappi moreover contends that Ms. Tourangeau's remaining claims under the TFPWL fail because the "summary judgment record is devoid of references to work aside from an occasional email or meeting" during Ms. Tourangeau's maternity leave. *Id.*; *see id.* at 6 ("[T]here is no support in the record for [the] contention" that Ms. Tourangeau "continued to work during [her short-term disability] leave").

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

To recap, Ms. Tourangeau brings claims for: violation of the EPA; retaliation in violation of the EPA and the MHRA; violation of the PDA; sex-based discrimination and quid pro quo sexual harassment in violation of Title VII; violation of the MHRA;

violation of the TFPWL; quantum meruit; and unjust enrichment. Nappi contends that it is entitled to summary judgment on all nine counts.

The Court denies Nappi's Motion for Summary Judgment as to Ms. Tourangeau's EPA, retaliation, PDA, Title VII sex-discrimination, MHRA, TFPWL, quantum meruit, and unjust enrichment claims because genuine issues of material fact preclude summary judgment. The Court grants the motion as to Ms. Tourangeau's quid pro quo sexual harassment claim because it is time barred and fails as a matter of law.

### A.       Equal Pay Act Claims

Ms. Tourangeau alleges that Nappi violated the Equal Pay Act (EPA) by compensating her "less for a job requiring substantially equal skill, effort, and responsibility, which was performed under similar working conditions." *Compl.* ¶ 72.

### 1.       Statute of Limitations

To begin, the Court resolves the parties' initial argument that certain alleged pay discrimination is time barred. Nappi argues that Ms. Tourangeau's EPA claim falls outside of the statute of limitations "to the extent it is based on alleged non-willful violations that occurred before January 10, 2018, and alleged willful violations that occurred before January 10, 2017." *Def.'s Mot.* at 3. Ms. Tourangeau contends that the statute of limitations has been tolled under the Lilly Ledbetter Fair Pay Act of 2009 because "the discriminatory pay practices that impacted [Ms. Tourangeau] began in 2014, when she was the first female wine sales representative hired at Nappi, and the first sales representative hired at a salary of 2% commission instead of 3% [commission]." *Pl.'s Opp'n* at 5. Ms. Tourangeau alleges that "discriminatory

101

pay practices have been ongoing from 2014 to the present, because [she] has fewer and less desirable accounts than her similarly situated male peers." *Id.* at 5-6.

> The Lilly Ledbetter Fair Pay Act (the Act) amended Title VII as follows:
>
> [A]n unlawful employment practice occurs, with respect to discrimination in compensation . . ., when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e-5(e)(3)(A). Under the Act, "'a new cause of action for pay discrimination ar[ises] every time a plaintiff receive[s] a paycheck resulting from an earlier discriminatory compensation practice' – even one that 'occurr[ed] outside the statute of limitations period.'" *Kellogg v. Ball State Univ.*, 984 F.3d 525, 529 (7th Cir. 2021) (alterations in original) (quoting *Groesch v. City of Springfield*, 635 F.3d 1020, 1027 (7th Cir. 2011)). "The language of the Lilly Ledbetter Fair Pay Act may be read as broad enough to encompass any employment discrimination claim[, and a]lthough the First Circuit has yet to speak on the issue, the Second, Third, Tenth, and D.C. Circuits, have limited the reach of the Act to the specific claim in *Ledbetter* - that an employer is 'paying different wages or providing different benefits to similarly situated employees.'"[254] *Harrington v. Lesley Univ.*, 554 F. Supp. 3d 211, 223 (D.

---

[254] Although the First Circuit has not addressed the Act's application to the EPA, the Seventh Circuit recently held that the Lilly Ledbetter Fair Pay Act "paycheck accrual rule applies to 'allegations of unlawful discrimination in employee compensation' under the EPA." *Kellogg*, 984 F.3d at 531 (quoting *Groesch*, 635 F.3d at 1024). Even if the Court were not to apply the Act here, however, the statute of limitations would nonetheless be tolled under the continuing violation doctrine. In the context of employment discrimination, "the continuing violation doctrine applies where 'a number of discriminatory acts emanat[e] from the same discriminatory animus, [with] each act constituting a

Mass. 2021) (quoting *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 630-31 (10th Cir. 2012)); *see also Davis v. Bombardier Transp. Holdings (USA) Inc.*, 794 F.3d 266, 271 (2d Cir. 2015); *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375, 389 U.S. App. D.C. 213 (D.C. Cir. 2010); *Noel v. The Boeing Co.*, 622 F.3d 266, 274 (3d Cir. 2010).

Because Ms. Tourangeau's EPA claim regards ongoing pay discrepancies, including variable commission rates, route opportunities, pay structures, and account quality and size, this claim cannot be considered unattached from the pay she has received from Nappi since 2015. Ms. Tourangeau's EPA claim therefore falls precisely within the scope of both the Lilly Ledbetter Fair Pay Act and the continuing violation doctrine and is thereby not time barred.

## 2. Legal Standard

The EPA prohibits wage discrimination "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and

---

separate wrong actionable under Title VII.'" *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 54 (1st Cir. 1999) (quoting *Jensen v. Frank,* 912 F.2d 517, 522 (1st Cir. 1990)). "Sexual harassment, failure to promote, and pay inequity cases often fall into this category. Plaintiffs in these cases experience harm from each employer act (e.g., a harassing comment, a denied promotion, or a smaller paycheck), for which they could recover under Title VII . . . The continuing violation doctrine ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory." *Id.* The Court concludes that Ms. Tourangeau's EPA claim related to her ongoing pay discrimination is not time barred under the continuing violation doctrine, as this is precisely the type of harm that the doctrine intends to preserve. *See LeGoff v. Trs. of Bos. Univ.*, 23 F. Supp. 2d 120, 128 (D. Mass. 1998) ("Because the University continued to pay LeGoff at a discriminatory rate [after the 300-day statutory period], it continued to violate her rights until that date, and this aspect of her Title IX claim is not time-barred"); *see also Bazemore v. Friday*, 478 U.S. 385, 395-96 (1986) (characterizing ongoing discriminatory pay and working conditions as a "continuing violation"); *Fortunato v. Keene State C.*, No. CIV 94-41-SD, 1994 U.S. Dist. LEXIS 21378, at *2 (D.N.H. June 14, 1994) (same).

responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

To prove a violation of the EPA, a plaintiff must first make a prima facie showing "that the employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort and responsibility." *Ingram v. Brink's, Inc.*, 414 F.3d 222, 232 (1st Cir. 2005) (citing *Corning Glass Works*, 417 U.S. at 195) (explaining that to establish a prima facie case under the EPA a plaintiff must show that the employer paid different wages to a member of the opposite sex for jobs performed under similar working conditions and requiring "equal skill, effort and responsibility").

Once the plaintiff establishes a prima facie case of unlawful wage discrimination, the burden shifts to the employer to show that the differential is justified under one of the EPA's four exceptions: (1) the payment was made pursuant to a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1); *see also Corning Glass Works*, 417 U.S. at 196; *Ingram*, 414 F.3d at 232.

### 3.    Analysis

A wage discrimination claim under the EPA is based on different pay for substantially equal work. Ms. Tourangeau argues that Nappi violated the EPA by paying her a lower commission than "all other wine sale representatives already working for Nappi," all of whom were male, *Compl.* ¶ 14, and adjusting her compensation structure in a manner that resulted in lower earning potential than

her male colleagues who were "grandfathered into that [higher commission] rate." *Id.* ¶ 39. Ms. Tourangeau contends that she "has not been provided with a specific reason for why she was not eligible for the [higher] commission rate like her male colleagues." *Id.* ¶ 49. Ms. Tourangeau also contends that Nappi first offered a similarly situated male applicant a higher commission rate than the rate they offered to Ms. Tourangeau. *Id.* ¶ 50.

Nappi challenges Ms. Tourangeau's allegation by asserting that "all wine sales representatives that have been newly hired since 2014 to handle southern Maine sales routes . . . are receiving [the same] commission [rate]" as Ms. Tourangeau and that Ms. Tourangeau "has been paid more than some of Nappi's male wine sales representatives." *Def.'s Mot.* at 4-5. Nappi submits that Ms. Tourangeau cannot meet the "admittedly lenient standard for establishing a *prima facie* case" because her allegation is "based on an inaccurate premise" as "[t]o date, Nappi has not eliminated [Ms. Tourangeau's] base salary—it has merely reduced it from a weekly payment of $432.52 to a weekly payment of $370.02 [and] the current plan is for Nappi to reduce her base salary by half over a three-year period and reassess the need for the salary as time progresses." *Id.* at 4.

First, Ms. Tourangeau must establish a prima facie case of discrimination based on sex. "To establish a prima-facie case under the Equal Pay Act, 'it is appropriate for the plaintiff to compare herself to only one male comparator to determine wage differentials.'" *Díaz v. Infotech Aero. Servs.*, No. 10-1103 (JAF), 2012

U.S. Dist. LEXIS 6381, at *13 (D.P.R. Jan. 19, 2012) (quoting *Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp. 120, 140 n.38 (D. Mass. 1996)).

Ms. Tourangeau alleges and the record supports that she was both the first female wine sales representative and the first wine sales representative to be hired at a 2% rather than 3% commission. *Pl.'s Opp'n* at 15; PSAMF ¶ 11-12. Likewise, Ms. Tourangeau alleges and the record supports that Nappi provided many of her male colleagues with approximately 150 accounts, while Nappi provided Ms. Tourangeau with around 108 accounts. *Pl.'s Opp'n* at 15; PSAMF ¶¶ 18-20, ¶ 69. In addition, Ms. Tourangeau alleges and the record supports that she earns lower commissions than most of the male wine sales representatives with whom she works. *See* PSAMF ¶¶ 284-85, 293. Here, the facts on the record do not make clear whether Ms. Tourangeau and the male wine sales representatives—those hired either before or after Ms. Tourangeau—performed substantially equal work. Nonetheless, because a reasonable jury could find they are compensated differently for performing substantially equal work, Ms. Tourangeau meets her burden to establish a prima facie case of wage discrimination.

Next, Nappi must show that the differential is justified under one of the EPA's four exceptions. Although Nappi does not submit under which of the EPA's four exceptions it seeks to justify its actions, the summary judgment record mentions only seniority as a factor in the route assignment, pay, and 3% commission of the grandfathered wine sales representatives. The Court therefore considers only whether Nappi's actions are justified under the EPA's seniority defense. The Court

concludes that they are not because despite Nappi's alleged shift to 2% commission when Ms. Tourangeau was hired, a shift neither documented nor fully supported by the record, a reasonable jury could find that keeping the grandfathered male sales representatives at a higher starting commission rate does not reflect a difference in seniority at the time Nappi hired the male sales representatives and when it hired Ms. Tourangeau.

In *Corning Glass Works v. Brennan*, an employer attempted to remedy its EPA violation by allowing women to work night shifts and by prospectively providing equal base pay to both day and night workers. 417 U.S. at 208-9. The Supreme Court held that because women had previously not been allowed to work the night shifts, which had been compensated at a higher rate than day shifts, "the company's continued discrimination in base wages between night and day workers, though phrased in terms of [seniority,] a neutral factor other than sex, nevertheless operated to perpetuate the effects of the company's prior illegal practice of paying women less than men for equal work." *Id.* at 209-10*; see Hodgson v. Corning Glass Works*, 474 F.2d 226, 235 (2d Cir. 1973) ("The problem stems from the "red circle" rate whereby any employee hired before January 20, 1969, receives a basic rate for night shift work some four to twelve cents per hour higher than for the day and afternoon shifts").

Here, a jury could reasonably conclude that Nappi's offering of a lower initial commission rate to Ms. Tourangeau, and/or reducing Ms. Tourangeau's salary without a commission increase or the addition of new high-earning accounts, is not the result of her lack of seniority. Moreover, the record lacks any evidence as to the

professional experience of these male wine sales representatives at the time they were hired and offered 3% commission by Nappi, thereby the Court is unable to determine whether seniority justified this initial pay discrepancy, which a reasonable jury could find Ms. Tourangeau still suffers the consequences of today.

Thus, because Nappi failed to show by a preponderance of the evidence that seniority justifies the pay, route, and commission differences between its male employees and Ms. Tourangeau, the material facts that would support a finding of sex-based wage discrimination are genuinely in dispute. The Court thereby cannot conclude that summary judgment in Nappi's favor is warranted as a matter of law. FED. R. CIV. P. 56(a).

## B. Retaliation in Violation of the Equal Pay Act and the Maine Human Rights Act

Ms. Tourangeau alleges that Nappi retaliated against her by subjecting her to a hostile work environment and more specifically by excluding her from work-related dinners and an incentive-based compensation opportunity. *Compl.* ¶¶ 67-68; *Pl.'s Opp'n* at 29-30.

### 1. Legal Standard

To make out a prima facie case of unlawful retaliation, whether under the EPA or the MHRA, an employee must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action after or contemporaneous with such activity; and, (3) there existed a causal link between the protected activity and the adverse job action. *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 175 (1st Cir. 2003); *Wyatt v. City*

*of Boston*, 35 F.3d 13, 15 (1st Cir. 1994); *Bishop v. Bell Atlantic Corp.*, 143 F. Supp. 2d 59, 62 (D. Me. 2001).

The First Circuit has defined "adverse employment action" to include a variety of conduct, such as "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998). An adverse employment action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 356 (D. Me. 2018) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "An employee has suffered an adverse employment action when the employee has been deprived either of 'something of consequence' as a result of a demotion in responsibility, a pay reduction, or termination, or the employer has withheld 'an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service.'" *LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 20, 909 A.2d 629 (quoting *Blackie v. State of Maine,* 75 F.3d 716, 725 (1st Cir. 1996)); *see also Higgins v. TJX Companies, Inc.*, 331 F. Supp. 2d 3, 6-7 (D. Me. 2004).

In addition to establishing an adverse employment action, Ms. Tourangeau must also show that there is a causal connection between her MHRC complaint and the adverse employment action. "An employee's protected activity is causally connected to the adverse employment action 'when the alleged retaliation was a

substantial, even though perhaps not the only, factor motivating the adverse employment action.'" *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624 (quoting *Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 14, 126 A.3d 1153). "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." *Wyatt*, 35 F.3d at 16; *see also Taghavidinani v. Riverview Psychiatric Ctr.*, No. 1:16-cv-00208-JDL, 2018 U.S. Dist. LEXIS 35403, at *17 (D. Me. Mar. 5, 2018) (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, 45 A.3d 722, 728 (Me. 2012)). "[O]n a motion for summary judgment the lack of temporal proximity" between an employee's protected activity and termination "is not, as a matter of law, a dispositive factor." *Brady*, 2015 ME 143, ¶ 23, 126 A.3d at 1154; *see also Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 68 (D. Me. 2010).

### 2.    Analysis

Here, the Court starts with the unchallenged premise that Ms. Tourangeau's April 8, 2019, filing of a complaint with the EEOC and the MHRC constitutes "protected activity." *Benoit*, 331 F.3d at 175. Although Ms. Tourangeau makes some reference to "adverse actions" occurring before April 8, 2019, *see Pl.'s. Opp'n* at 19-20, Ms. Tourangeau does not argue that a "protected activity" took place before April 8, 2019. The Court therefore limits Ms. Tourangeau's retaliation claim to retaliation in response to the undisputed April 8, 2019 "protected activity."

### a. Michele Tourangeau's Exclusion from Incentives at the Mike's Account

Ms. Tourangeau argues that Nappi retaliated against her by removing her from an incentives opportunity at an account called Mike's. Nappi argues the Court should grant summary judgment on Ms. Tourangeau's retaliation claim, insofar as it relates to her exclusion from incentives at Mike's, because this allegation was not alleged in her complaint or interrogatory responses. The Court disagrees. Ms. Tourangeau alleges that Nappi has "retaliated against [her] since she filed her charge of discrimination by excluding her from an incentive-based compensation opportunity." *Compl.* ¶ 68.

Nappi further argues that Ms. Tourangeau's claim is unsupported by the record because it "clearly demonstrates that she was abusing an incentives program and her conduct not only meant Nappi was not earning money from the products she placed, but it also prompted complaints from a supplier" and shows Ms. Tourangeau "became ineligible for the incentive program at Mike's because the supplier complained to Nappi that the placed product would be returned or never ordered again." *Def.'s Sur-Reply* at 7. Reviewing the record in the light most favorable to Ms. Tourangeau, the Court concludes that a reasonable jury could determine that Ms. Tourangeau's removal from the incentive program at Mike's—which the record indicates was the first removal of its kind in all of Nappi's history—constituted an adverse action in taking away "something of consequence," *Blackie,* 75 F.3d at 725, or "with[olding] 'an accouterment of the employment relationship,'" from Ms. Tourangeau. *LePage,* 2006 ME 130, ¶ 20, 909 A.2d 629 (quoting *Blackie v. State of*

*Maine,* 75 F.3d 716, 725 (1st Cir. 1996)).   Whether Ms. Tourangeau's actions otherwise merited Nappi's removal of the Mike's incentive account from her is a question of fact for the jury, not the Court.

Finally, Ms. Tourangeau must meet the causal connection requirement to sustain her retaliation claim.  Ms. Tourangeau argues that the "temporal proximity" to the "adverse actions suffered by [Ms.] Tourangeau is also sufficient to sustain her [retaliation] claim." *Pl.'s Opp'n* at 19.  Temporal proximity can create an inference of causation in the proper case.  *See Wyatt,* 35 F.3d at 16 ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action").  "But to draw such an inference, there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006); *see also Soileau* v. *Guilford of Me., Inc.*, 105 F.3d 12, 16-17 (1st Cir. 1997).  The Court concludes that the temporal proximity between Ms. Tourangeau's April 2019 complaint and January 2020 exclusion from the Mike's account presents an inference of causation.  The Court thereby concludes that Ms. Tourangeau's retaliation claim based on exclusion from incentives at Mike's meets the causal connection requirement.

Ms. Tourangeau makes out a prima facie case of unlawful retaliation insofar as her claim relates to her exclusion from the incentives program at the Mike's account.  Because there remains a genuine dispute as to the reason behind Ms. Tourangeau's exclusion from incentives at the Mike's account and the pay that could

have accompanied these incentives, the Court cannot rule that summary judgment is warranted as a matter of law. Summary judgment as to Ms. Tourangeau's exclusion from an incentives opportunity at the Mike's account is inappropriate because the material facts that would support a finding of prima facie retaliation are genuinely in dispute. The Court now turns to Ms. Tourangeau's retaliation claim insofar as it relates to ostracism in the workplace.

### b. Michele Tourangeau's Ostracism at Work and Exclusion from a Work-Related Dinner

Ms. Tourangeau argues that she experienced rudeness and ostracism in the workplace in retaliation for her complaint. Specifically, Ms. Tourangeau argues that Nappi retaliated against her by excluding her from a dinner at which many of her male colleagues were present. Ms. Tourangeau submits that "[c]ase law has . . . identified additional adverse employment actions, such as 'excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement,' which under *Burlington* 'might well deter a reasonable worker from complaining about discrimination.'" *Pl.'s Opp'n* at 28 (quoting *Burlington*, 548 U.S. at 69).

The First Circuit has written "if protected activity leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness), a reasonable person would not be deterred from such activity." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005). It has further elaborated that employees "can expect to encounter such tribulations even if [they] eschew[] any involvement in protected activity." *Id.* The First Circuit has surmised that "[w]ork places are rarely

idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 23 (1st Cir. 2002).

It is true that courts have consistently held that standing alone, the type of rudeness and ostracism Ms. Tourangeau alleges does not rise to the level of adverse employment action. *See Billings v. Town of Grafton*, 515 F.3d 39, 54 (1st Cir. 2008) ("We agree that some of Connor's behavior—upbraiding Billings for her question at the Board of Selectmen meeting, criticizing her by written memoranda, and allegedly becoming aloof toward her—amounts to the kind of 'petty slights or minor annoyances that often take place at work and that all employees experience' and that, consequently, fall outside the scope of the anti-discrimination laws" (quoting *Burlington*, 548 U.S. at 68)).

However, given the Court's conclusion that summary judgment is not proper on Ms. Tourangeau's retaliation claim as it relates to the Mike's account, the Court concludes that these other instances of alleged retaliation likewise cannot be resolved at summary judgment because they do not stand alone and because they provide context to the Mike's account issue. Thus, the Court views these allegations of ostracism and exclusion as cumulative potentially informing the jury's view of Nappi's alleged retaliation against Ms. Tourangeau. The Court thereby concludes that these cumulative claims of retaliation regarding ostracism and exclusion from a work-related dinner survive summary judgment.

### C.     Pregnancy Discrimination Claim

Ms. Tourangeau alleges that "[a]s a woman affected by pregnancy and childbirth, Nappi did not treat [her] in the same manner as other employees not so affected, who had the same ability to work as Tourangeau." *Compl.* ¶ 84.  Nappi contends that it treated Ms. Tourangeau "the same as any other salesperson who has taken short term disability leave." *Def.'s Mot.* at 10.

#### 1.     Statute of Limitations

The Court turns to whether Ms. Tourangeau's claims regarding unfair allocation of commission and incentives while on maternity-related leave is time barred.  In April 2016, Ms. Tourangeau took a maternity leave under Nappi's short-term disability leave program.  DSMF ¶ 57; PSAMF ¶ 130.  In May 2019, Ms. Tourangeau took a leave of absence for urethral ring surgery to resolve issues with incontinence after her pregnancy and birth.  PSAMF ¶ 244; DSMF ¶ 118.  Ms. Tourangeau filed a charge of discrimination with the MHRC and the EEOC and received a notice of right to sue letter on or about October 17, 2019.  *Compl.* ¶ 8. Plaintiff did not file a complaint regarding her first maternity-related leave with the EEOC within 300 days.  *See Rivera-Díaz*, 748 F.3d at 390; 42 U.S.C. § 2000e—5(e)(1) (providing "that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred . . ."); *see also* 5 M.R.S. § 4611 ("[A] complaint must be filed with the commission not more than 300 days after the alleged act of unlawful discrimination").

Ms. Tourangeau may nonetheless be able to bring pregnancy discrimination claims regarding both maternity-related leaves under the continuing violation doctrine.

"The First Circuit has recognized two different types of continuing violations: systemic violations, which 'ha[ve] [their] roots in a discriminatory policy or practice . . . [that] itself continues into the limitation period,' and serial violations, which are 'composed of a number of discriminatory acts emanating from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII.'" *Thomas*, 183 F.3d at 53 (quoting *DeNovellis v. Shalala,* 124 F.3d 298, 307 (1st Cir. 1997)).   In the context of employment discrimination, "the continuing violation doctrine applies where 'a number of discriminatory acts emanat[e] from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII.'" *Thomas*, 183 F.3d at 54 (quoting *Jensen,* 912 F.2d at 522). "Sexual harassment, failure to promote, and pay inequity cases often fall into this category.  Plaintiffs in these cases experience harm from each employer act (e.g., a harassing comment, a denied promotion, or a smaller paycheck), for which they could recover under Title VII . . . The continuing violation doctrine ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory." *Id.*

Viewing the record in the light most favorable to Ms. Tourangeau, a reasonable jury could find that Nappi's short-term disability leave policy, as it applies to maternity-related leaves, creates "systemic violations, which 'ha[ve] [their] roots in a

discriminatory policy or practice.'" *Id.* at 53 (quoting *DeNovellis*, 124 F.3d at 307). Moreover, because Ms. Tourangeau complains of the same pay discrimination while on both maternity-related leaves, it could plausibly have taken time for her to foresee that Nappi's short-term disability policy inflicted a pattern of repeated harm. *See id.* at 54 ("The continuing violation doctrine ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory").

The allegations and record here paint a picture of an ongoing policy that a jury could reasonably find disadvantages pregnant women and women who have recently given birth.  Because Ms. Tourangeau's second claim of pregnancy discrimination regarding denial of her commissions and incentives during her leave for urethral sling surgery occurred within the statutory limit and she filed a timely complaint with the EEOC, her PDA claim regarding commissions and incentives during her 2016 maternity leave is not barred by the statute of limitations.  Because both leaves were taken under Nappi's ongoing short-term disability leave policy, the continuing violations doctrine applies to Ms. Tourangeau's pregnancy discrimination claims to the extent that they relate to Nappi's short-term leave policy.[255]

---

[255]    It is unclear to the Court whether Ms. Tourangeau is alleging pregnancy discrimination beyond that related to commission and incentives during her two maternity-related leaves.  Ms. Tourangeau argues that she "suffered disparate treatment on an ongoing basis throughout her employment based on her capacity to become pregnant, her pregnancy, her maternity leave, and pregnancy related medical conditions or perceived pregnancy related conditions such as postpartum depression and her urethral sling surgery."  *Pl.'s Opp'n* at 23.  She submits that "[t]he record also reveals ongoing and overtly sexist statements by Nappi's management." *Id.*  Ms. Tourangeau does not point the Court to which incident could be considered an "anchoring act" within the limitations period to allow such claims to fall under the continuing violation doctrine.  Therefore, the Court concludes that any allegation of pregnancy discrimination unrelated to Nappi's short-term leave policy would be

### 2.     Legal Standard

Title VII makes it an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."   42 U.S.C. § 2000e-2(a)(1).   The Pregnancy Discrimination Act of 1978 (PDA) extended Title VII's protection against discrimination to specifically include discrimination "because of or on the basis of pregnancy, childbirth or related medical conditions."   42 U.S.C. § 2000e(k); *see Martinez-Burgos v. Guayama Corp.*, 656 F.3d 7, 12 (1st Cir. 2011).   The PDA thus clarified that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy.   The PDA's second clause says that employers must treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."   42 U.S.C. § 2000e(k); *Young v. UPS Inc.*, 575 U.S. 206, 210 (2015).

Where, as here, there is no direct evidence of discriminatory intent in a Title VII case, this Court employs the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under step one of the *McDonnell Douglas* burden-shifting framework, Ms. Tourangeau has the burden of establishing a prima facie case of pregnancy discrimination by a preponderance of the evidence.   *Id.* at 802.   To prove that a

---

time barred, as Ms. Tourangeau's use of and continued treatment under the policy serve as the "anchoring act" to permit her pregnancy discrimination claim insofar as it relates to her commission and incentives payment while on her first maternity-related leave.

particular adverse employment action taken with respect to Ms. Tourangeau amounted to discrimination because of her pregnancy, she must show that: "(1) she was pregnant at the relevant time, (2) her job performance was satisfactory, but (3) her employer took some adverse employment action against her while (4) treating non-pregnant employees differently." *Gorski v. New Hampshire Dep't of Corr.*, 290 F.3d 466, 474-75 (1st Cir. 2002). "Meeting the initial prima facie requirement is 'not especially burdensome.'" *Martinez-Burgos*, 656 F.3d at 12 (quoting *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir. 1995)). A properly established prima facie case gives rise to an inference of intentional discrimination. *See Ingram,* 414 F.3d at 230.

The burden then shifts to an employer to provide a legitimate, nondiscriminatory reason for its decision. *Id.* "If the employer does so, the burden of production reverts to the plaintiff, who must then prove that the employer's neutral reasons were actually a pretext for the alleged discrimination." *Id.*

### 3.   Analysis

Ms. Tourangeau alleges that "[a]s a woman affected by pregnancy and childbirth, Nappi did not treat [her] in the same manner as other employees not so affected, who had the same ability to work as [Ms. Tourangeau]." *Compl.* ¶ 84. She contends that "[t]he fact that a woman is pregnant and ultimately requires a leave of absence is not a legitimate, nondiscriminatory reason to discriminate against that woman, by expecting her to work throughout leave without pay in order to maintain her accounts." *Pl.'s Opp'n* at 20. Nappi submits that it "followed its short-term disability plan when it paid the Plaintiff a wage substitute while she was [on] short

term disability leave after giving birth rather than commissions or incentives based on sales that were completed while she was out." *Def.'s Mot.* at 10. Nappi contends that it treated Ms. Tourangeau "the same as any other salesperson who has taken short term disability leave" and that Nappi therefore "had a legitimate nondiscriminatory reason for paying the Plaintiff a wage substitute while she was on short-term disability leave after giving birth rather than commissions or incentives based on sales that were completed while she was out." *Id.*

First, Ms. Tourangeau must establish a prima facie showing of pregnancy discrimination. She must show that "(1) she was pregnant at the relevant time, (2) her job performance was satisfactory, but (3) her employer took some adverse employment action against her while (4) treating non-pregnant employees differently." *Gorski*, 290 F.3d at 474-75. Ms. Tourangeau was pregnant during her first maternity-related leave. Because the PDA extends pregnancy discrimination to "related medical conditions," Ms. Tourangeau's second maternity-related leave also satisfies the first requirement. 42 U.S.C. § 2000e(k) (mandating that "women affected by pregnancy, childbirth, and related medical conditions shall be treated the same for all employment-related purposes"). Ms. Tourangeau satisfies the second requirement because it is not disputed that her job performance was satisfactory.

Viewing the record in the light most favorable to Ms. Tourangeau, she likewise satisfies the third and fourth requirements. She alleges that she suffered an adverse employment action when Nappi told her to work during her leave and subsequently

withheld commission and incentives and thereby did not fully compensate her for her work.

An alleged adverse action "must be cast in objective terms" as "the mere fact than an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie*, 75 F.3d at 725. It "typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) (internal quotation marks omitted). In general, "[d]etermining whether an action is materially adverse necessarily requires a case-by-case inquiry." *Blackie*, 75 F.3d at 725.

An employer's taking of "something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities" or its decision to "withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice" have been found to constitute adverse actions. *Id.* (citations omitted). On summary judgment, there is a disputed question of material fact as to whether Ms. Tourangeau suffered direct economic harm from Nappi's decision to withhold commission and incentive pay from Ms. Tourangeau, despite her alleged agreement with Nappi management to continue working while on leave. The record indicates that Ms. Tourangeau had an arrangement with Mr. Hale to continue working while on maternity leave. *See* PSAMF ¶ 109. Moreover, the record is equivocal as to whether Nappi's alleged short-

term disability leave policy indicated how commission and incentive payments work during leave and whether this policy was in fact provided to Ms. Tourangeau before she took her leaves. The record is also ambiguous as to whether any non-pregnant employees on leave were either expected to work or necessarily deprived of commission and incentives when working during short-term disability leave.

Viewing the record in the light most favorable to Ms. Tourangeau, a jury could reasonably conclude that there was no clear short-term disability policy applied to maternity leaves at Nappi, as members of Nappi's management themselves remain confused as to how payment works under this policy and whether there exists any leave program for new mothers.[256] Ms. Tourangeau has therefore met the lenient burden to make a prima facie showing of pregnancy discrimination.

The burden now shifts to Nappi to provide a legitimate, nondiscriminatory reason for its decision. *Id.* Nappi submits that its policy treats all employees equally and it "followed both its long-standing policy as to when commissions and incentives are earned: commissions and incentive compensation are earned when sales result in product being delivered and payment is received in full." *Def.'s Mot.* at 10. Nappi thereby contends that it had a "legitimate nondiscriminatory reason for paying the Plaintiff a wage substitute while she was short term disability leave after giving birth

---

[256] When asked: "And how about a leave of absence policy? If an employee needed to take a couple of weeks off, how – how would that work?", Mr. Carr testified: "I'd say they'd still be getting their pay." *Carr Dep.* at 49:5-9; PSAMF ¶ 135 ("This was the first maternity leave Mr. Hale knew of at Nappi"); PSAMF ¶ 100 ("Mr. Carr was unaware of any maternity leave policy at Nappi while he was working there").

rather than commissions or incentives based on sales that were completed while she was out." *Id.*

Because Nappi provided a nondiscriminatory reason for its decision to deny commission and incentives to Ms. Tourangeau during her short-term disability leaves, Ms. Tourangeau must now prove the employer's neutral reasons were actually a pretext for the alleged discrimination. "An employee may show pretext by establishing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." *Martinez-Burgos*, 656 F.3d at 14 (citation and internal quotations omitted).

Viewing the record in the light most favorable to Ms. Tourangeau, it contains inconsistencies and contradictions when it comes to Nappi's maternity leave under Nappi's short-term disability program. For example, Mr. Hale testified this was the first maternity leave he was aware of at Nappi, *Hale Dep.* at 47:10-13, while Mr. Carr testified that he was unaware of a maternity leave policy and believed at least some people are paid while taking leave. *Carr Dep.* at 49:2-9. Moreover, a reasonable jury could consider the fact that Ms. Hawkins covered many leaves before Ms. Tourangeau's maternity leave and had never once received incentive pay prior to Ms. Tourangeau's leave to indicate that the sales representatives for which Ms. Hawkins previously covered in fact had received their own incentives while on leave. PSAMF ¶ 152. Taking the record in the light most favorable to Ms. Tourangeau, these

inconsistencies present genuine issues of material fact that preclude summary judgment for Nappi on Ms. Tourangeau's pregnancy discrimination claim.

### D.  Title VII and MHRA Claims

Ms. Tourangeau brings claims for quid pro quo sexual harassment in violation of Title VII and sex-based discrimination in violation of Title VII and the MHRA. *Compl.* ¶¶ 92, 97-98, 104.  Nappi argues that Ms. Tourangeau's Title VII and MHRA claims are either time barred or unsupported by the record.  *Def.'s Mot.* at 12-13.

#### 1.  Statute of Limitations

##### a.  Title VII Statute of Limitations

Title VII provides "that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred . . . ." 42 U.S.C. § 2000e-5(e)(1).

Ms. Tourangeau's harassment claim under Title VII arises from an alleged 2015 incident of sexual solicitation by one of her customers and does not relate to pay discrimination.  Ms. Tourangeau alleges quid pro quo sexual harassment, saying that "[b]ecause [she] rejected the customer's sexual advances, Nappi took adverse action against her that impacted her earning potential with the company" by removing her from the account. *Compl.* ¶¶ 97-98.  Ms. Tourangeau did not file a charge with a state or local agency within 300 days.  Therefore, in order to be equitably tolled, the claim must fall within the scope of the continuing violations doctrine.  The Court

concludes that it does not.[257]  Viewing the record in the light most favorable to Ms. Tourangeau, the alleged incident remains a single, isolated event that occurred in 2015, and Ms. Tourangeau does not allege otherwise.  Nappi urges the Court to dismiss Ms. Tourangeau's quid pro quo sexual harassment claim because it "is time-barred for failure to file a timely administrative action."  *Def.'s Mot.* at 14.  Ms. Tourangeau does not make an argument to the contrary in her opposition to summary judgment.  The Court concludes that Ms. Tourangeau's quid pro quo sexual harassment claim is time barred and grants summary judgment to Nappi on this claim.

Ms. Tourangeau's sex-based discrimination claim under Title VII arises out of her ongoing employment at Nappi.  Ms. Tourangeau alleges that "Nappi has engaged in discrimination against [her] on the basis of sex" and "has also engaged in sex stereotyping and subjected [her] to unequal working conditions on the basis of sex." *Compl.* ¶¶ 92-93.  She specifically alleges that she "suffered adverse employment action by way of her salary elimination and denial of a 3% commission rate."  *Pl.'s Opp'n* at 24-25.  The Court concludes that insofar as Ms. Tourangeau's claim relates to pay discrimination, it is equitably tolled by the Lilly Ledbetter Act.[258]  The Court additionally finds that the continuing violation doctrine is applicable here for the reasons explained above in Section V(C)(1) because the claim is premised on continual acts that allegedly impacted Ms. Tourangeau's pay, including her commission rate

---

[257]    *See* Section V(C)(1) above for the Court's description of the continuing violation doctrine.
[258]    *See* Section V(A)(2) above for the Court's full explanation of the Lilly Ledbetter Act and its application to pay-based discrimination claims.

and sales route. *Id.* at 25. Ms. Tourangeau's sex-discrimination claim under Title VII is equitably tolled and thereby not time barred.

### b.    MHRA Statute of Limitations

The MHRA provides that "[t]he action must be commenced not more than . . . 2 years after the act of unlawful discrimination complained of." 5 M.R.S. § 4613(2)(C). The "two-year limitation period begins to run when an employee receives 'unambiguous and authoritative notice of the discriminatory act.'" *Berounsky v. Oceanside Rubbish, Inc.*, 2022 ME 3, ¶ 9, 266 A.3d 284 (quoting *LePage*, 2006 ME 130, ¶ 15, 909 A.2d 629). "The discriminatory act needs to 'have a degree of permanence, sufficient to put a reasonable claimant on notice of discrimination,' and '[m]ere suspicion and rumor are insufficient.'" *Id.* (quoting *Lepage*, 2006 ME 130, ¶ 11, 909 A.2d 629).

Although the Lilly Ledbetter Act tolls the statute of limitations in Ms. Tourangeau's pay-related Title VII claim, the Act does not apply to her claim under the MHRA; the statute of limitations is nonetheless equitably tolled under the continuing violation doctrine.[259]  Applying the continuing violation doctrine, Ms.

---

[259]    The Law Court has not definitively resolved whether the continuing violation doctrine is cognizable under Maine law, *see McKinnon v. Honeywell Intern., Inc.* 2009 ME 69, ¶ 14, 977 A.2d 420 ("Although [the Law Court has] discussed the possible applicability of the [continuing violation] doctrine in the context of employment discrimination . . . [it has] never adopted the continuing violation doctrine as a means of tolling the statute of limitations").

The First Circuit has stated that "[w]here the state's highest court has not definitively weighed in, a federal court applying state law 'may consider analogous decisions, consider[] dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" *Janney Montgomery Scott LLC v. Tobin*, 571 F.3d 162, 164 (1st Cir. 2009) (quoting *N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 38 (1st Cir. 2001)). In such circumstances, the federal court "must 'make an informed prophecy—to discern the rule the state's highest court would be most likely to follow under these circumstances, even if our independent judgment might differ.'" *Id.* (quoting *Lapalme*, 258 F.3d at 38 (internal quotation marks omitted)).

Tourangeau's claim survives dismissal because Nappi's alleged actions related to Ms. Tourangeau's commission and sales route could be considered either "systemic" or "serial" violations.  *See Thomas*, 183 F.3d at 53.  Accepting Ms. Tourangeau's allegations as true, Ms. Tourangeau's alleged pay discrepancy and lower-value sales route as compared to her male colleagues could be described as both having their "roots in a discriminatory policy or practice" and "emanating from the same discriminatory animus" of providing higher commissions and greater financial opportunities to men than to women employees.  *Id.*  Ms. Tourangeau's sex-discrimination claim under Title VII is equitably tolled and thereby not time barred.

### 2.    Legal Standard

Title VII protects against workplace discrimination on the basis of certain protected categories, including sex.  42 U.S.C. § 2000e et seq.  The Maine Human Rights Act (MHRA) protects the interests of individuals in fair employment against discrimination on the basis of sex, amongst other categories.  5 M.R.S. § 4552.  Maine

---

This is not the first time this District and the First Circuit have been faced with deciphering state law absent explicit guidance from the highest state court. *See, e.g.*, *Noviello*, 398 F.3d at 91 (looking to federal law in the absence of precedent from the Massachusetts Supreme Judicial Court in determining whether Massachusetts law permitted claims for retaliatory hostile work environments); *Thayer Corp. v. Reed*, No. 2:10-cv-00423-JAW, 2011 U.S. Dist. LEXIS 74229, at *54-55 (D. Me. July 11, 2011) (comparing federal law and Maine law on a motion to dismiss to resolve whether the MWPA applied to former employees, which was an open question under Maine law).

As relevant here, the Law Court has consistently interpreted the MHRA with reference to Title VII.  *Currie v. Industrial Sec., Inc.*, 2007 ME 12, ¶ 13, 915 A.2d 400 (noting that the Law Court's "construction of the MHRA . . . has been guided by federal law" including Title VII, in the absence of Law Court precedent); *see also LePage*, 2006 ME 130, ¶ 19, 909 A.2d 629 (citing the Law Court's adoption of the *McDonnell Douglas* burden shifting analysis as an example of how the Law Court looks to federal caselaw); *Winston v. Me. Technical Coll. Sys.*, 631 A.2d 70, 74-75 (Me. 1993) ("We have stated that because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA").  Because of the Law Court's strong reliance on federal law in interpreting discrimination claims under state law, the Court applies the continuing violation doctrine to Ms. Tourangeau's sex-discrimination claim under the MHRA, as it does above when considering Ms. Tourangeau's sex-discrimination claim under Title VII.

courts have used federal precedent surrounding Title VII for the purposes of construing and applying the provisions of the MHRA. *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053 (Me. 1992); *see Knight v. O'Reilly Auto Enters., LLC*, No. 2:17-cv-300-NT, 2019 U.S. Dist. LEXIS 47018, at *8 n.2 (D. Me. Mar. 21, 2019) ("Maine courts look to Title VII caselaw when considering MHRA claims") (citing *Cole v. Maine Office of Info. Tech.*, No. 1:17-CV-00071-JAW, 2018 U.S. Dist. LEXIS 163857, 2018 WL 4608478, at *27 (D. Me. Sept. 25, 2018)). Accordingly, the Court will apply the same legal standard in considering whether the case survives summary judgment under both federal Title VII law and state MHRA law. *See Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 n.3 (1st Cir. 1997).

In the absence of direct evidence of discrimination, the First Circuit employs the *McDonnell Douglas* burden-shifting framework to evaluate whether a plaintiff can make out an inferential case of the alleged discrimination. *See Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88 (1st Cir. 2018) (citing *McDonnell Douglas Corp.*, 411 US. 792); *Lockridge v. Univ. of Maine Sys.*, 597 F.3d 464, 470 (1st Cir. 2010). Under this analysis, a plaintiff must first show that a prima facie case of sex discrimination exists. Under Title VII and consequentially the MHRA, Ms. Tourangeau must first demonstrate that "(1) [s]he is a member of a protected class; (2) [s]he met [her] employer's expectations; (3) [s]he suffered adverse employment action with respect to compensation; and (4) similarly-situated employees outside the protected class received more favorable treatment." *Prescott v. Higgins*, 538 F.3d 32,

40 (1st Cir. 2008).  Such a showing is "not onerous and is easily made." *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003).

Moving to step two, if such a showing can be made, then there is an inference of discrimination and "the burden of production shifts to the defendant to produce evidence 'that the adverse employment actions were taken for a legitimate, nondiscriminatory reason.'" *Cham v. Station Operators, Inc.,* 685 F.3d 87, 94 (1st Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507(1993)).  If the employer can demonstrate such a reason, the analysis then progresses to step three: "[i]f the defendant carries this burden of production, [then] the plaintiff must prove, by a preponderance, that the defendant's explanation is a pretext for unlawful discrimination." *Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 221 (1st Cir. 2007).

### 3.    Analysis

Nappi disputes only the third and fourth prongs, arguing that Ms. Tourangeau did not suffer an adverse employment action and male employees did not receive more favorable treatment.  Ms. Tourangeau argues that "she suffered adverse employment action by way of her salary elimination and denial of a 3% commission rate, and similarly situated male employees were treated more favorably." *Pl.'s Opp'n* at 24-25.  She contends that "similarly situated male employees were treated more favorably . . . [and] compensated at a higher rate" in part because "Nappi engaged in discriminatory hiring practices and did not hire women for the sales representative positions" before 2015. *Id.* at 25.

On summary judgment, there is a disputed question of material fact as to whether Ms. Tourangeau suffered direct economic harm from Nappi's decision to pay her at 2% commission rather than 3% commission and to reduce her salary without raising her commission.  Viewing the record in the light most favorable to Ms. Tourangeau, a jury could reasonably conclude that Ms. Tourangeau suffered economic harm by being the first sales representative provided only 2% commission and by having her salary reduced without a commission raise or the addition of high-earning sales accounts.  The Court therefore finds that Ms. Tourangeau meets the "not onerous" and "easily made" threshold to show that a prima facie case of sex discrimination exists.  *Kosereis*, 331 F.3d at 213.

 Nappi argues that its actions related to Ms. Tourangeau's commission and salary reduction were "based on legitimate, nondiscriminatory business reasons," including the need to bring down inflated compensation in the wine sales department. *Def.'s Mot.* at 13.  Nappi submits that "any distinctions in compensation structures between the Plaintiff and some of her male counterparts are based on factors other than sex." *Id.* at 5.  Nappi additionally submits that "[t]he record clearly establishes that Nappi has consistently applied its new compensation structure to all newly hired sales representatives since Ms. Tourangeau's hire in 2014 regardless of sex." *Def.'s Reply* at 6-7.

Because Nappi provided a nondiscriminatory reason for its decision to compensate Ms. Tourangeau at 2% and to reduce her salary without additional commission, Ms. Tourangeau must prove the employer's neutral reasons were

actually a pretext for the alleged discrimination. "An employee may show pretext by establishing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." *Martinez-Burgos*, 656 F.3d at 14 (citation and internal quotations omitted).

Ms. Tourangeau argues that the record is "rife with inconsistencies" and submits that a factfinder "could conclude that [Ms.] Tourangeau's salary was not inflated in comparison to her peers [and that Nappi] did nothing to reduce the compensation of those identified as having inflated salaries." *Pl.'s Opp'n* at 26. Ms. Tourangeau additionally submits that "[m]anagement was unaware of a prohibition against 3% commission [and] there is no documentation reflecting this policy change." *Pl.'s Opp'n* at 26.

Viewing the record in the light most favorable to Ms. Tourangeau, the Court concludes that a reasonable jury could find that Nappi's decision to offer Ms. Tourangeau a 2% commission was not consistent with any strict or documented commission policy. *See* PSAMF ¶ 33 ("Mr. Brown was unaware of any policy prohibiting deviation from a flat 2% commission').[260] The Court likewise concludes that a reasonable jury could find Ms. Tourangeau's salary was not overinflated in comparison to her male colleagues who receive 3% commission or that Ms. Tourangeau's initial 2% commission was not legitimized by a lack of experience in

---

[260] When asked "[a]s of that point had you heard that there was a new policy which prohibited any deviation from a flat 2 percent commission?", Mr. Brown responded: "I was not." *Brown Dep.* at 17:10-13.

the industry as compared to her male colleagues. Taking the record in the light most favorable to Ms. Tourangeau, these inconsistencies, amongst others, present genuine issues of material fact.

The Court concludes that genuine issues of material fact prevent summary judgment on Ms. Tourangeau's sex-discrimination claims under both Title VII and the MHRA. The Court therefore grants summary judgment to Nappi only on Ms. Tourangeau's Title VII quid pro quo sexual harassment claim (Count V) and denies summary judgment on Ms. Tourangeau's Title VII sex-based discrimination claim (Count IV) and violation of the MHRA claim (Count VI).

### E.   Maine Timely and Full Payment of Wages Act Claim

Ms. Tourangeau alleges that Nappi "failed to pay [her] commissions and incentives earned and owed for work she performed within the time provided for under Maine's Timely and Full Payment of Wages Law" [TFPWL]. *Compl.* ¶ 107. Ms. Tourangeau contends that she was "not compensated for work performed" in three instances: a 2015 unpaid vacation, a 2016 maternity leave, and a 2019 maternity-related disability leave. *Pl.'s Opp'n* at 31-33. Nappi insists that it "fully compensated" Ms. Tourangeau "for her time out on short-term disability leave." *Def.'s Mot.* at 16. Nappi argues that Ms. Tourangeau's TFPWL claims fail because the "summary judgment record is devoid of references to work aside from an occasional email or meeting" during Ms. Tourangeau's maternity leave. *Def.'s Sur-Reply* at 5; *see id.* at 6 ("[T]here is no support in the record for [the] contention" that Ms. Tourangeau "continued to work during leave").

### 1.   Legal Standard

Title 26 M.R.S. § 621-A is part of Maine's Timely and Full Payment of Wages statute. Section 621-A governs the payment of wages during employment and provides, in relevant part, that "at regular intervals not to exceed 16 days, every employer must pay in full all wages earned by each employee . . . [and e]ach payment must include all wages earned to within 8 days of the payment date." 26 M.R.S. § 621-A. The Law Court has interpreted the phrase "pay in full all wages" used in 26 M.R.S. to include bonus-based pay. *OfficeMax Inc. v. Sousa*, No. 2:09-cv-00631-JAW, 2011 U.S. Dist. LEXIS 31079, at *111-12 (D. Me. 2011) ("The Maine Supreme Judicial Court has emphasized that [26 M.R.S.] section 626 is intended to be read broadly in accordance with its protective purposes . . . [t]hus, . . . this Court holds that "incentives" . . . fall within the ambit of section 626['s requirement to pay in full all wages]").

### 2.   Statute of Limitations and Validity of Claim as it Pertains to Ms. Tourangeau's 2015 Unpaid Vacation

The Court turns to whether Ms. Tourangeau's claim for unpaid wages during her 2015 vacation is time barred or otherwise improperly brought. First, Nappi argues that the Court should "disregard the suggestion [because] any claim premised upon that specific alleged failure [of unpaid wages from 2015] is time-barred." *Def.'s Reply* at 4 n.1. Nappi additionally argues that Ms. Tourangeau's "claim for work allegedly performed during a 2015 vacation is barred because it was not alleged in

her complaint or interrogatory responses . . . and it is reliant on hearsay." *Def.'s Sur-Reply* at 5.[261]

To support its statute of limitations argument, Nappi cites 29 U.S.C § 255(a), applicable to FLSA claims, *LeGoff v. Trustees of Boston Univ.*, 23 F. Supp. 2d 120, applicable to EPA claims, *Rivera-Díaz*, 748 F.3d 387, applicable to Title VII claims, and 42 U.S.C. § 2000e-5(e)(1), applicable to the PDA pursuant to Title VII. Nappi does not argue that these limitations apply to 26 M.R.S. § 621-A or otherwise provide support as to why Ms. Tourangeau's claim under 26 M.R.S. § 621-A is time barred.[262] As Nappi has not supported its argument that Ms. Tourangeau's claim as it relates to her 2015 unpaid vacation is time barred, the Court considers this issue waived.

Next, Nappi argues the Court should grant summary judgment on Ms. Tourangeau's 26 M.R.S. § 621-A claim, insofar as it relates to her 2015 vacation, because this allegation was not alleged in her complaint or interrogatory responses. To support this argument, Nappi cites *Traverse v. Gutierrez Co.*, No. 18-cv-10175-DJC, 2021 U.S. Dist. LEXIS 148230 (D. Mass. Aug. 6, 2021).[263] The Court finds

---

[261]    The Court does not exclude Ms. Tourangeau's 26 M.R.S. S 621-A claim insofar as it relates to her 2015 unpaid vacation as inadmissible hearsay. The Court is not convinced that the entire claim as it relates to Ms. Tourangeau's 2015 vacation is premised on inadmissible hearsay and does not find exclusion of the claim appropriate at the summary judgment stage.

[262]    The Court is aware of Maine's general six-year statute of limitations in civil suits and is unaware of any exception that would apply here. 14 M.R.S. § 752 (2022); *see Bartlett v. Morrison*, Civil Action No. RE-20-4, 2021 Me. Super. LEXIS 146, at *8 (Me. Super. Jul. 1, 2021) ("There is a six-year statute of limitations that applies to unpaid wages claims").

[263]    Nappi also cites footnote 2 in *Conrad v. Caliber Home Loans, Inc.*, Civil Action No. 16-12524-FDS, 2017 U.S. Dist. LEXIS 62520, at *10 n.2 (D. Mass. Apr. 25, 2017) to support its argument. The Court concludes that the *Conrad* Court did not address the precise issue at hand here because the court sua sponte refused to consider the plaintiff's "unpleaded claims," noting that the plaintiff brought entirely new allegations in its response to a motion for summary judgment. The Court does not consider Ms. Tourangeau's claim insofar as it relates to her unpaid vacation to be a "new allegation" because it is brought pursuant to unpaid wages under 26 M.R.S. § 621-A, a claim properly brought in

*Traverse* readily distinguishable from the case at hand.  In *Traverse*, the plaintiff initially alleged a pay-related complaint regarding behavior that occurred within a certain time frame and later "asserted a new, related allegation in their opposition motion for summary judgment, alleging that Defendants employed four building supervisors during [that same time frame] when only two were needed." *Id.* at *18. Here, Ms. Tourangeau does not bring a "new, related allegation."  Instead, she alleges an additional instance of untimely wage payment pursuant to her 26 M.R.S. 621-A claim.   Unlike in *Traverse* where the facts were overlapping but the allegations different, here, the facts differ but the allegation of unfair payment practice is the same.  The Court therefore concludes that Ms. Tourangeau's 26 M.R.S. § 621-A claim, insofar as it relates to her 2015 vacation, is neither time barred nor improperly pleaded.

### 3.    Analysis

In its Motion for Summary Judgment, Nappi cites *Richardson v. Winthrop Sch. Dep't.*, 2009 ME 109, 983 A.2d 400 to argue that Nappi did not violate Ms. Tourangeau's rights under Maine's TFPWL.  *Def.'s Mot.* at 17.  Nappi cites no further caselaw in its Reply or Sur-Reply.   The Court therefore examines *Richardson*.   In *Richardson*, the plaintiff signed an employment contract less than one year before his retirement stating that upon retirement, he would be paid up to thirty days of accumulated vacation time.  2009 ME 109, ¶ 2, 983 A.2d 400.  The plaintiff then brought a claim pursuant to 26 M.R.S. § 626-A against his employer for vacation pay

---

Ms. Tourangeau's complaint.  *Compl.* ¶¶ 106-108 (Count VII: Violation of the Maine Timely and Full Payment of Wages Law (26 M.R.S. § 621-A et seq.)).

in excess of thirty days.  *Id.* ¶ 3.  The *Richardson* Court held that "[a]lthough section 626 creates a statutory right for former employees to *seek* payment, *entitlement* to payment is governed solely by the terms of the employment agreement . . . a former employee may only claim what is owed according to the terms of the employment agreement."  *Id.* ¶ 7.  The Law Court explained that "[d]espite [the plaintiff's] contentions, the plain language of provision 8.2 clearly limits his entitlement to vacation pay upon retirement to thirty days," making it such that the plaintiff was not entitled to any further payments under 26 M.R.S. § 626.  *Id.* ¶ 11.

This Court finds *Richardson* minimally helpful here for the simple reason that the Court cannot determine whether Ms. Tourangeau's employment contract included an unambiguous provision regarding her commission and incentive pay during either short-term disability leave or unpaid vacation leave.  As far as the Court is aware, Nappi has not included any such employment contract or otherwise signed policy in the record.  Due to the lack of a record on this issue, the Court is unable to rely on the Law Court's reasoning in *Richardson* except insofar as to find that the lack of an unambiguous provision prevents summary judgment.

Because the Court cannot determine whether Nappi's employment contract with Ms. Tourangeau included any such relevant and unambiguous provision to override Ms. Tourangeau's cause of action pursuant to 26 M.R.S. § 621-A, the Court concludes that a genuine issue of material fact remains regarding Ms. Tourangeau's commission and incentive pay while on leave.  The Court therefore concludes that

genuine issues of material fact preclude summary judgment for Nappi on the TFPWL count.

**F.      Quantum Meruit Claim**

Nappi contends that Ms. Tourangeau "cannot recover under *quantum meruit* for work she claims to have done and for which she seeks recovery" because Ms. Tourangeau "does not allege that she has performed work for Nappi other than that as a wine sale representative . . . [and the] record materials establish that [Ms. Tourangeau's] relationship with Nappi as a wine sales representative is based on an at-will employment agreement." *Def.'s Mot.* at 18.  Nappi further submits that "the record does not reflect that Nappi has failed to pay [Ms. Tourangeau] for her services." *Id.*  Ms. Tourangeau argues that she performed work by which Nappi benefited without paying her owed compensation, as "the summary judgment record contain[s] no dispute over the fact the [Ms.] Tourangeau rendered services to Nappi, with Nappi's express knowledge, consent, and benefit." *Pl.'s Opp'n* at 34.  Therefore, she contends that "the evidence proffered . . . establishe[s] a triable issue of fact as to the reasonableness of [her] expectation that she would be paid salary, incentives, and commissions for the services rendered" while on leave.  *Id.*

**1.      Legal Standard**

Quantum meruit claims permit "recovery for services . . . provided under an implied contract, which is a contract inferred from the conduct of the parties." *Runnells v. Quinn*, 2006 ME 7, ¶ 10, 890 A.2d 713.  A quantum meruit claim has three elements: "that (1) services be rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that

make it reasonable for the plaintiff to expect payment." *Id.* "The prevailing plaintiff is entitled to 'the reasonable value of the services provided.'" *Dinan v. Alpha Networks, Inc.*, 2013 ME 22, ¶ 20, 60 A.3d 792 (quoting *Jenkins, Inc. v. Walsh Bros., Inc.*, 2001 ME 98, ¶ 17, 776 A.2d 1229)). "Quantum meruit is a legal, not an equitable, remedy and thus is distinct from the theory of unjust enrichment." *Id.* Under a quantum meruit theory, "damages are not measured by the benefit realized and retained by the defendant, but rather are based on the value of the services provided by the plaintiff." *Paffhausen v. Balano*, 1998 ME 47, ¶ 7, 708 A.2d 269; *see Dinan v. Alpha Networks Inc.*, 857 F. Supp. 2d 162, 168 (D. Me. Apr. 23, 2012).

### 2. Analysis

Nappi insists that all the work completed by Ms. Tourangeau was done within the confines of her at-will employment contract and argues that "a plaintiff 'cannot recover under a theory of quantum meruit for work that is directly addressed by his employment contract.'" *Def.'s Mot.* at 18 (quoting *White v. Hewlett Packard Enter. Co.*, 985 F.3d 61, 70-71 (1st Cir. 2021)).

In *White*, the First Circuit addressed a similar issue when the plaintiff sought accrued vacation and bonus pay, both of which were addressed through a written policy linked in the plaintiff's employment offer letter. *Id.* 985 F.3d at 63. The First Circuit held that a plaintiff "cannot recover under a theory of quantum meruit for work that is directly addressed by his employment contract." *Id.* at 71. The *White* Court, however, specified that "[a] contractual relationship does not necessarily bar quantum meruit recovery. As [the First Circuit] has previously stated, under Maine law quantum meruit recovery may be available alongside contractual remedies when

the services at issue are outside of the scope of the contract, or in 'circumstances that render the contract inoperative.'" *Id.* at 70 (quoting *Hodgkins v. New England Tel. Co.*, 82 F.3d 1226, 1232 (1st Cir. 1996)); *see also Uncle Henry's Inc. v. Plaut Consulting Co. Inc.*, 399 F.3d 33, 46 (1st Cir. 2005); *Runnells*, 2006 ME 7, 890 A.2d at 716-17 (contractor could seek quantum meruit recovery for work completed on the basis of an oral agreement made in addition to a written contract).

Although *White* stands for the principle that an employee cannot recover under quantum meruit when the work performed is directly addressed by the employee's contract, the summary judgment record here is devoid of evidence indicating that work done by Ms. Tourangeau during her unpaid maternity-related leaves would result in no commission or incentive pay. While Nappi alleges that it treated Ms. Tourangeau's maternity-related leave under its "long-standing policy as to when commissions and incentives are earned," the record is likewise devoid of evidence that this "long-standing policy" was documented or included in Ms. Tourangeau's employment contract. *Def.'s Mot.* at 10. Because nothing in the record indicates that there was an applicable short-term disability policy addressed by Ms. Tourangeau's employment contract with Nappi, a reasonable jury could infer a secondary contract specifically addressing Ms. Tourangeau's pay while on leave from the conduct and communications of the parties.

A reasonable jury could infer a contract here even if the communications between Ms. Tourangeau and Nappi were not unequivocal on the matter. The Law Court has explained that "[q]uantum meruit may lie when there [i]s not a clear

accession on both sides to one and the same terms, if services are provided under circumstances that negative the idea that the services were gratuitous." *Paffhausen v. Balano*, 1998 ME 47, ¶ 9, 708 A.2d 269 (internal quotation marks and citation omitted). Moreover, whether Nappi intended to form an implied contract with Ms. Tourangeau or to compensate her through commission or incentives while on leave is irrelevant because the Law Court held that a claimant did not need to prove the defendant's "*intention* to compensate [the employee] fully for all of his labor and expenses" because "[a]ll that the law of quantum meruit requires [the plaintiff] to prove . . . is that he had a reasonable expectation that his work was not gratuitous and that [the defendant] *by her words or conduct* justified this expectation." *Id.* (emphasis in original).

Here, particularly as the Law Court has made clear that the issue does not turn on the employer's intent, a reasonable jury could discount Nappi's assertion that it did not expect Ms. Tourangeau to work during her leave and could instead find that she had a reasonable expectation of compensation.

Whether Ms. Tourangeau "had a reasonable expectation that [her] work was not gratuitous and that [Nappi] *by* [its] *words or conduct* justified this expectation," *Paffhausen*, 1998 ME 47 ¶ 9, 708 A.2d 269, depends on how a factfinder interprets Ms. Tourangeau's maternity work arrangement with Mr. Hale, her level of involvement with Ms. Hawkins during her leave, her email communications with Nappi addressing her continued work while on leave, and the fact that the alleged arrangement was counter to Nappi's policy, which was recognized by some members

of Nappi's management as in contradiction to how employees are typically paid while on leave.  The Court concludes that these genuine issues of material fact preclude summary judgment for Nappi on the quantum meruit count.

G.       **Unjust Enrichment Claim**

Nappi argues that it is entitled to summary judgment on Ms. Tourangeau's unjust enrichment claim for the same reasons it is entitled to summary judgment on Ms. Tourangeau's quantum meruit claim, *Def.'s Mot.* at 19, and that Ms. Tourangeau's "claims for unjust enrichment . . . fail[] as a matter of law in light of the contractual at-will employment agreement between her and Nappi." *Def.'s Reply* at 1-2.  Ms. Tourangeau argues that "the evidence proffered . . . establishe[s] a triable issue of fact as to the reasonableness of [Ms. Tourangeau's] expectation that she would be paid salary, incentives, and commissions for the services rendered" while on leave.  *Pl.'s Opp'n* at 34.

1.       **Legal Standard**

"Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 105 n.3 (Me. 1994).

To allege a prima facie case of unjust enrichment under Maine law, "a claimant must establish that: (1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain

the benefit without payment of its value." *Tucci v. City of Biddeford*, 2005 ME 7, ¶ 14, 864 A.2d 185.

Because "[r]ecovery under the doctrine of unjust enrichment is measured by the value of the benefits that the plaintiff proves are actually received and retained by the defendant," the Law Court has held that "a *blanket exclusion* of a plaintiff's overhead, costs, and profits is improper unless the court determines that they have no meaningful relationship to the value of the benefit conferred and the extent to which a defendant has been enriched." *A.F.A.B., Inc.*, 639 A.2d at 106 (emphasis in original).

### 2.    Analysis

Viewing the record in the light most favorable to Ms. Tourangeau, it is not clear that Ms. Tourangeau's employment contract addressed payment on maternity or short-term disability leave.   For the same reasons addressed under Ms. Tourangeau's quantum meruit claim, there is a disputed question of material fact concerning Ms. Tourangeau's expectations regarding commission and incentives while on leave.

Even if the jury finds that there was no implied contract between Ms. Tourangeau and Nappi, to the extent that equity requires reimbursement of some kind, a question remains as to whether the circumstances make it inequitable for Nappi to retain the benefit of Ms. Tourangeau's work during her leaves without paying her in full for this work.  Thus, Nappi is not entitled to summary judgment on Ms. Tourangeau's unjust enrichment claim.

## VI.   SUMMARY

The Court concludes that Ms. Tourangeau has plausibly alleged claims for violation of the EPA, (Count I); retaliation in violation of the EPA (Count II); violation of the PDA (Count III); sex discrimination in violation of Title VII (Count IV); violation of the MHRA and retaliation in violation of the MHRA (Count VI); violation of the TFPWL (Count VII); quantum meruit (Count VIII); and unjust enrichment (Count IX).  The Court concludes that Ms. Tourangeau's claim for quid pro quo sexual harassment in violation of Title VII (Count V) is time barred.

## VII.   CONCLUSION

The Court GRANTS in part and DENIES in part Nappi Distributors' Motion for Summary Judgement (ECF No. 76).  The Court GRANTS summary judgment on Claim V and DENIES summary judgment on Claims I–IV and Claims VI–IX.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of December, 2022