UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

MICHELE TOURANGEAU, Plaintiff

-versus-

NAPPI DISTRIBUTORS, Defendant

CIVIL ACTION

Docket No: 2:20-cv-00012-JAW

VOLUME I OF V

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for **Jury Trial** held before **THE HONORABLE JOHN A. WOODCOCK, JR.**, United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine, on the 27th day of February, 2023, at 8:35 a.m., as follows:

Appearances:

For the Plaintiff: Danielle M. Quinlan, Esquire
Laura H White, Esquire

For the Defendant: John J. Wall, III, Esquire
Laura Maher, Esquire

Tammy L. Martell, RMR, CRR
Official Court Reporter

(Prepared from manual stenography and computer-aided transcription)

**INDEX OF PROCEEDINGS**


| | Page: |
|---|---|
| Opening Statement by Ms. Quinlan | 21 |
| Opening Statement by Mr. Wall | 49 |


**INDEX OF WITNESSES**


| | Page: |
|---|---|
| WITNESS: JAMES BOURQUE | |
| Direct Examination by Ms. Quinlan | 62 |
| Cross-Examination by Ms. Maher | 88 |
| Redirect Examination by Ms. Quinlan | 101 |
| WITNESS: MICHELE TOURANGEAU | |
| Direct Examination by Ms. Quinlan | 109 |


**INDEX OF EXHIBITS**


| Plaintiff Exhibit No. | Description | Admitted |
|---|---|---|
| 21 pg. 1 | Nappi Management Sales/Photographs | 69 |
| 25 | May 2013 Handout re: Sexual Harassment | 85 |
| 26 | Hiring Documentation | 130 |
| 27 | Additional Hiring Documents 2014 | 142 |
| 28 | E-mail re: Account List 9/22/14 | 144 |
| 28-A | Overview of Active Accounts | 144 |
| 29 | February 2015 Sales Report | 145 |
| 30 | E-mail re: Banfi Incentive 7/3/15 | 166 |
| 31 | E-mails re: Incentive Pay | 171 |
| 32 | E-mail from Ian Brown | 176 |
| 34 | E-mails re: Baby 4/10/16 | 183 |
| 35 | 2016 Communications Maternity Leave | 207 |
| 36 | E-mails re: Incentives on Maternity Leave 6/13/16 | 192 |
| 37 | E-mails re: Benefits FWB | 190 |
| 39 | Text to Masters and Brown 12/14/17 | 204 |
| 86 (pages 2-7) | Texts messages | 156 |
| 86 (page 1) | Text messages | 174 |


*** (Exhibits continued on the next page) ***

| Defendant Exhibit No. | Description | Admitted |
|---|---|---|
| 43 | Nappi Employee Handbook | 91 |
| 45 | Executed Acknowledgement of Receipt of Nappi Employee Handbook | 96 |
| 46 | Tourangeau Executed Acknowledgement of Receipt of Nappi Employee Handbook | 98 |

**SIDEBAR CONFERENCES**

Page: 158, 182, 184

**CHAMBERS CONFERENCES**

Page: (None.)

(Open court.)

THE COURT: Good morning, counsel.

MR. WALL: Good morning, Your Honor.

MS. MAHER: Good morning, Your Honor.

MS. QUINLAN: Good morning, Your Honor.

MS. WHITE: Good morning, Your Honor.

THE COURT: Ready for the jury?

MR. WALL: I just had a couple of preliminary issues, Your Honor.

THE COURT: We had this conversation last Friday.

MR. WALL: We did, but since then, Your Honor, we tried to confirm what the schedule is going to be for the trial and the plaintiffs have indicated that they're planning on calling witnesses into through Thursday morning, and obviously we just are concerned that we would have an opportunity to present the witnesses that we intend to for our case. So I just wanted to let the Court know that that was an issue and that needs to be resolved before we get too deep into -- into the order of --

THE COURT: Well, I -- I expect, Mr. Wall, you'll as usual be succinct in your cross-examination, we'll move the matter right along.

MR. WALL: I will certainly do only what is necessary with regard to the cross-examinations, Your Honor. The other question I had was the -- I don't know whether there is any

plan for the -- whether there is a storm tomorrow whether or not that may affect the -- the course of the trial.

THE COURT: Right. Well, these are hardy Mainers, I expect them to be here.

MR. WALL: Understood. If there is going to be a cancellation, there will be some kind of notification to counsel and the jurors as to how to check in on that?

THE COURT: I think that's what we usually do, Mr. Wall.

MR. WALL: Thank you, Your Honor.

THE COURT: Thank you. Are we ready?

MS. WHITE: Yes, Your Honor.

THE COURT: Would you bring the jury in, please.

THE CLERK: All rise, jury entering.

(Jury entered. Time noted: 8:37 a.m.)

THE COURT: Please be seated. Good morning, ladies and gentlemen.

JURY: Good morning.

THE COURT: Welcome again to this courthouse on a brisk Maine morning. I appreciate your all being here on time. We have, as you have been told, a schedule here in the court that runs from 8:30 to 2:30, so it's very important that we all start on time, and we'll try and get you out at about 2:30 each day.

My name is John Woodcock, and I'll be the judge who is

presiding over the course of this trial. What I am first going to do is I am going to ask the clerk to swear the jury in.

THE CLERK: Please stand and raise your right hand.

Do each of you solemnly swear that you will well and truly try the issue between the parties at the bar according to the laws and the evidence given to you, so help you God?

JURY: I do.

THE CLERK: Please be seated.

THE COURT: I'm going to ask counsel, if they would do so, to introduce themselves and their -- the individuals at counsel table.

MS. QUINLAN: Good morning, my name is Danielle Quinlan. I'm one of the attorneys representing the Plaintiff Michele Tourangeau. This is my co-counsel Laura White.

MS. WHITE: Hello.

MS. QUINLAN: She is also representing Michele.

MR. WALL: Good morning, ladies and gentlemen. My name is John Wall, and Laura Maher and I are representing Nappi Distributors in this case. With us at counsel table is Christine Fox, the human resources director at Nappi.

THE COURT: So, ladies and gentlemen, what we're going to be doing is in short order I will be giving you some preliminary jury instructions that will help you have something of a roadmap or an outline as to what is going to happen in this case. After that, the plaintiff will present an opening

statement; the defendant will be allowed to present an opening statement if they wish to do so; and then the plaintiff will put on her case.

Ladies and gentlemen, I'm now going to give what are called preliminary juror instructions.

THE REPORTER: Judge.

THE COURT: Yes.

THE REPORTER: A juror's hand is up.

THE COURT: Yes, sir.

JUROR: I would like to request some hearing assistance, please.

THE COURT: Oh, yes. Thank you for asking for that. We do have that available for you, sir, thank you.

Can you hear me now?

JUROR: I do.

THE COURT: If you -- if you have -- that's sort of a faint confirmation. Can you hear me or are you having difficulty hearing me?

JUROR: I got you.

THE COURT: Very good, thank you. I'm going to ask my law clerk, who is going into the other room, to get me a final set of preliminary instructions, which she is just about to do. Keep looking, I knew I would find them. Here they are right here.

Members of the jury, now that you have been sworn I will

give you some preliminary instructions to guide you in your participation in this trial.

Thank you, I -- I found them.

Duty of the juror. Jury, it will be your duty to find, from the evidence, what the facts are. You and you alone will be the judges of the facts. You will have to then apply to those facts the law as I give it to you. You must follow that law whether you agree with it or not. And nothing I may say or do -- do during the course of this trial is intended to indicate or should be taken by you as indicating what your verdict should be. That is a matter entirely for you to decide.

Introduction to this case. This is a civil action brought by Michele Tourangeau against Nappi Distributors. Ms. Tourangeau is represented at this trial, as you've heard, by her attorneys Danielle Quinlan and Laura White. Nappi Distributors is represented by its attorney John Wall and Laura Maher.

Ms. Tourangeau claims that Nappi Distributors, one, discriminated against her on the basis of sex and/or pregnancy by paying her less than similarly situated male employees; two, failed to timely pay her for all of the wages that it had agreed to pay her for the work she performed; and, three, retaliated against her for engaging in protected activity.

Ms. Tourangeau further claims that because Nappi

Distributors failed to pay her for the work performed under an implied contract, Nappi Distributors owes her for expenses which she reasonably believed she would be compensated for or that in withholding the pay for work performed in absence of a contract, Nappi Distributors unjustly benefited from her work.

Nappi Distributors denies that it discriminated against Ms. Tourangeau on the basis of sex and/or pregnancy, retaliated against her for engaging in protected activity, or owes her any wages for work performed.

Evidence; objections; rulings; and bench conferences. I have mentioned the word evidence. Evidence includes the testimony of witnesses, documents, and other things received as exhibits, and any facts to which the parties have stipulated. In other words, facts to which they have agreed.

There are rules of evidence that control what can be received into evidence. When a party asks a question or offers an exhibit into evidence, and the party on the other side thinks it is not permitted under the rules of evidence, that party may object. This simply means that the objecting party is requesting I make a decision on a particular rule of evidence.

Then, it may be necessary for me to talk with the parties outside your hearing. Sometimes we do that in court and other times I'll ask you to go to the jury room. Please understand that while you're waiting we are working. The purpose of these

conferences is to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and legal error. We will, of course, do whatever we can to keep to a minimum the number and lengths -- and length of these conferences.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find.

Certain things are not evidence and must not be considered by you, and I will list them for you now.

One, statements, arguments, and questions by lawyers are not evidence.

Two, objections to questions are not evidence. Lawyers have obligations to their clients to make objections when they believe evidence is being -- that evidence being offered is improper under the rules of evidence, and you should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, then you must follow that instruction.

Three, testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

Four, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

Furthermore, a particular item of evidence is sometimes received for a limited purpose only. That is, you can use it only for a particular purpose and not for any other purpose. I will tell you when that occurs and will instruct you with regard to purposes for which the item can and cannot be used.

Finally, some of you may have heard the terms direct evidence and circumstantial evidence. Direct evidence is testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, proof of one or more facts from which one can find or infer another fact.

You may consider both direct and circumstantial evidence. The law permits you to give equal weight to both. But it is for you to decide how much weight to give any evidence. Ms. Tourangeau is not required to introduce direct evidence to prove her case and she may prove her case entirely or primarily through circumstantial evidence.

Credibility of witnesses. In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe everything a witness says or only part of it or none of it.

In deciding what to believe, you may consider a number of factors including the following: One, the witness's ability to see or hear or know the things to which the witness testifies; two, the quality of the witness's memory; three, the witness's manner while testifying; four, whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; five, whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence; and, six, how reasonable the witness's testimony is when considered in light of other evidence which you believe to be true.

Burden of proof. This is a civil case. Ms. Tourangeau, as the plaintiff, has the burden of proving her case by what is called a preponderance of the evidence. That means the plaintiff has to produce evidence which, considered in light of all the facts, leads you to believe what the plaintiff claims is more likely true than not. To put it differently, if you were to put the plaintiff's and the defendant's evidence on opposite sides of the scale, the plaintiff would have the -- have to make the scales tip somewhat on her side. If the plaintiff fails to meet this burden, the verdict must be for the defendant.

Nappi Distributors, as the defendant, has the burden of proof regarding its affirmative defenses. To find for Nappi Distributors on any of its affirmative defenses, you must find

the facts it has proven are more likely true than not.

Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt. That requirement does not apply to a civil case and, therefore, you should put it out of your mind.

Summary of the applicable law. In this case, as I mentioned, the Plaintiff Michele Tourangeau claims the Defendant Nappi Distributors discriminated against her as a woman employee on the basis of sex and pregnancy by paying her less than similarly situated male employees.

She additionally claims, one, that Nappi Distributors retaliated against her for engaging in protected activity; two, that Nappi Distributors failed to timely pay her for all the wages that it had agreed to pay her for the work she performed; three, that by withholding payment for work performed Nappi Distributors owes her for the expenses for which she reasonably believed she would be compensated; and, four, that in withholding payment for work performed Nappi Distributors unjustly benefited from her work. Each of these claims has different legal elements that Ms. Tourangeau must prove to make her case. At the end of trial, I'll give you detailed instructions on the law, and those instructions will control your deliberations and decision.

But to help you follow the evidence, I'll now give you a brief summary of the elements which Ms. Tourangeau must prove

to make her case on each charge.

First, pay discrimination under the Equal Pay Act. To succeed on her pay discrimination claim, Ms. Tourangeau must prove that it is more likely than not that: One, Ms. Tourangeau and at least one male employee have been employed by Nappi Distributors in jobs requiring substantially equal skill, effort, and responsibility; two, the jobs are performed under similar working conditions; and, three, Ms. Tourangeau was paid at a lower wage than the male employee in jobs that require substantially equal skill, effort, and responsibility as Ms. Tourangeau's job and that are performed under similar working conditions.

I earlier mentioned that on some matters Nappi Distributors has asserted what is called an affirmative defense on which it, not Ms. Tourangeau, has an affirmative burden of proof. This is one of those instances. In response to Ms. Tourangeau's Equal Pay Act claim, Nappi has asserted that any differences in pay between Ms. Tourangeau and male workers are due to factors other than sex or pregnancy. On these affirmative defenses, Nappi bears the burden of proof to demonstrate its affirmative defenses are more likely true than not.

There is no dispute in this case that Ms. Tourangeau and male employees have been employed by Nappi Distributors as wine sales representative. Representatives. That those wine sales

representative positions require substantially equal skill, effort, and responsibility, and that the wine sales representatives that cover routes in southern Maine have similar working conditions.

Sex and pregnancy discrimination under Title VII and the Maine Human Rights Act. To succeed on her claims of sex and pregnancy discrimination under Title VII and the Maine Human Rights Act, Ms. Tourangeau must prove by a preponderance of the evidence that Nappi Distributors took adverse employment action against her because of her sex and/or pregnancy. Ms. Tourangeau must persuade you, by a preponderance of the evidence, that her sex and/or pregnancy was one of the determining factors that caused Nappi Distributors to deny her the higher pay enjoyed by male employees or that it made a difference in Nappi Distributors' decision-making about her.

An adverse employment action is one that, standing alone, actually caused damage, tangible or intangible, to Ms. Tourangeau. An employer takes adverse action against an employee only if it, one, takes something of consequence away from the employee, for example by reducing her salary or taking away significant responsibilities, or, two, fails to give the employee something that is a customary benefit of the employment relationship, for example, by failing to follow a customary practice of considering the employee for promotion after a particular period of service. An adverse action by a

supervisor is an action of the employer.

Retaliation under the Maine Human Rights Act and the Equal Pay Act. To prevail in an action for retaliation under the Equal Pay Act and the Maine Human Rights Act, Ms. Tourangeau must prove that it is more likely than not that: One, Ms. Tourangeau engaged in a statutorily protected activity; two, Nappi Distributors subjected her to an adverse employment action; and, three, Nappi Distributors took the action as a reprisal for having engaged in protected activity.

Violation of Maine's Timely and Full Payment of Wages Law. To prevail in an action for violation of Maine's Timely and Full Payment of Wages Law, Ms. Tourangeau must prove that it is more likely than not, one, that Ms. Tourangeau earned wages according to the terms of her employment; two, that Nappi Distributors failed to pay Ms. Tourangeau wages owed; and, three, the amount of the wages owed that Nappi Distributors failed to pay to Ms. Tourangeau.

Quantum meruit. To prevail in an action for quantum meruit, Ms. Tourangeau must prove that it is more likely than not that: One, Ms. Tourangeau provided services or materials to Nappi Distributors; two, at Nappi Distributors' request, or with Nappi Distributors' knowledge and consent; and, three, the circumstances by which Ms. Tourangeau provided the services or materials made it reasonable for Ms. Tourangeau to expect that she would receive compensation.

Unjust enrichment. To prevail in an action for unjust enrichment, Ms. Tourangeau must prove that it is more likely than not that: One, Ms. Tourangeau conferred a benefit on Nappi Distributors; two, Nappi Distributors had appreciation or knowledge of the benefit; and, three, Nappi Distributors accepted the benefit under circumstances such that it would be inequitable for it to retain the benefits without paying Ms. Tourangeau for its value.

Conduct of the jury. To ensure fairness, you as jurors must obey the following rules:

First, you must not consider any information that is not properly before you. Thus, for example, although most people have access to a computer and to the internet, and you may be tempted to consult with the internet, with dictionaries, or other reference materials, you must not use these resources to do independent research on your own in this case. To do so would violate your oath as jurors in which you will recall you promised to base your verdict solely on the evidence and the law. Similarly, do not discuss or publish the fact that you are a juror on any social media such as Facebook or the like, and do not use any social media to look up any of the participants in this trial.

Second, do not talk among yourselves about this case or any one involved with it until the end of the case when you go to the jury room to decide on your verdict.

Third, do not talk with anyone else about this case, or about anyone who has anything to do with it, until the trial is over and you have been discharged as jurors. Anyone else includes members of your family and your friends. You may tell them you are a juror, but do not tell them anything about the case until after you have been discharged by me.

Fourth, do not let anyone talk to you about the case or about anyone who has anything to do with it. If someone should try and talk to you, please report it to me immediately.

Fifth, during the trial do not talk or speak with any of the parties, lawyers, or witnesses involved in the case. You should not even pass the time of day with them. It's important not only that you do justice in this case, but that you also give the appearance of doing justice. If a person from one side of the lawsuit sees you talking to a person on the other side, even if it's simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness may be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall or ride in the elevator or the like, it is not because they are being rude, it is because they are not supposed to talk or visit with you.

Six, do not read any news stories or articles about the case or about anyone involved with it, or listen to any radio or television reports about the case or about anyone involved with it.

Seven, if you need to communicate with me for any reason, simply give a signed note to the court security officer to give to me.

Eight, do not make up your mind about what the verdict should be until after you've heard all the evidence, until you have heard my instructions on the law, and until you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then.

Note taking. I'm going to permit you to take notes in this case, and the courtroom deputy has distributed pens and pads for your use. I want to give you a couple of warnings about taking notes, however. First of all, do not allow your note taking to distract you from listening carefully to the testimony that is being presented. If you would prefer not to take any notes at all but simply to listen, feel free to do so.

Remember, not everything you write down is necessarily what was said. Thus, when you return to the jury room to discuss the case, do not assume simply because something appears in someone's notes that it necessarily took place in the court. Instead, it is your collective memory that must control as you deliberate upon the verdict.

Please take your notes to the jury room at every recess. Don't leave them here in the courtroom. I will have the courtroom deputy collect them at the end of each day and place

them in the vault. They will then be returned to you the next morning. When the case is over, your notes will be destroyed. These steps are in line with my earlier instructions with you that it is important that you not discuss the case with anyone or permit anyone to discuss it with you.

Course of the trial. The first step in the trial will be the opening statements. Ms. Tourangeau's attorney's opening statement will tell you about the evidence she intends to put before you so that you will have an idea of what Ms. Tourangeau's case is going to be.

The opening statement is not evidence. Its purpose is only to help you understand what the evidence will be and what Ms. Tourangeau will try and prove.

After the plaintiff's opening statements, Nappi Distributors' attorneys may choose to make an opening statement. At this point in the trial, no evidence has been offered by either side.

Next, Ms. Tourangeau will offer evidence that she says will support her claims against Nappi Distributors. Ms. Tourangeau's evidence in this case will consist of the testimony of witnesses and may include documents and other witness -- exhibits.

After Ms. Tourangeau's evidence, Nappi Distributors may present evidence that may consist of the testimony of witnesses, documents, and other exhibits.

After you've heard all the evidence on both sides, the plaintiff and the defendant will each be given time for their final arguments. I just told you the opening statements by lawyers are not evidence. The same applies to the closing arguments. They are not evidence either. In their closing arguments, the lawyers for Ms. Tourangeau and Nappi Distributors will attempt to summarize and help you understand the evidence that has been presented.

The final part of the trial occurs when I instruct you about the rules of law that you are to use in reaching your verdict. After hearing my instructions, you will leave the courtroom together to make your decisions. Your deliberations will be secret. You will never have to explain your verdict to anyone.

Now, before I ask the lawyers to give their opening statements, I am going to ask the gentleman who is sitting closest to me in the first row to serve as the foreperson of the jury. I will describe in my final instructions what your role will be.

Is the plaintiff prepared at this time to give the opening statement?

MS. QUINLAN: Yes, Your Honor.

THE COURT: You may do so.

MS. QUINLAN: Tammy, is this -- okay. Good morning, everyone. My name is Danielle Quinlan, and this is my

co-counsel Laura White, and the Plaintiff Michele Tourangeau. We represent -- Laura and I both represent Michele. And I know you've already heard that a couple of times now, but it's in the opening statement that I prepared so I'm just going to go with what I have already practiced.

I would like to start by acknowledging all of our gratitude for your service today and for the service of the court, the clerks, the court reporter, the marshals. We know that this is a huge imposition on your lives. We've taken you away from your work, your families, and we appreciate you being here today.

This opportunity is critical for Michele to have her story heard and for you all to make a decision about a disagreement essentially that she is having about the facts of the case, so thank you for being here today.

Opening statements is a chance for the lawyers to kind of give you a sense for what you're going to hear over the next few days. We'll speak to you at the beginning. We'll tell you about what you're going to hear, kind of present the theories of the case and how we view the facts from the perspective of Michele. At the end, we'll have another chance to speak to you after we put on some evidence, taken testimony from some of the witnesses. And Attorneys John Wall and Laura Maher will have the same opportunity.

So this case is about excuses, and Nappi has got one for

everything. Sometimes their excuses shift and change and grow. And the excuse provided by Nappi Distributors for the differential treatment is no less demonstrative of bias than the discriminatory act itself. They claim that Michele's colleagues are grandfathered into their higher pay rates while she is not.

She is the first female sales representative hired at Nappi. That's significant.

Grandfathered is a term we've heard many times before, and you're going to hear that term a lot this week. One of the ways that you might have heard it used before is when people talk about older buildings and how they might not be required to have certain public accommodations that are otherwise required by the Americans with Disabilities Act.

The term grandfathered itself comes out of the American south where many states enacted laws aimed at preventing African Americans from being able to exercise their right to vote. States enacted voter registration laws that required literacy tests, owning land, and other strategies to kind of create exclusion and restrictions, but because some of these laws would also have the effect of preventing poor white males from having the opportunity to vote they created something called the grandfather clause meaning if your grandfather was able to vote before the Civil War, then you could vote, even if you didn't own land or pass the literacy test.

These clauses became known as grandfather clauses, or grandfathering, and essentially the south came up with ways to include those they wanted to while excluding those they didn't with seemingly neutral language.

So let's get into what happened to Michele. Michele learned of a position at Nappi Distributors in 2014 after speaking with one of her former colleagues Pam Gallagher. Pam, you know, knew Michele, had worked with her, and said I'll reach out to Nappi Distributors for you.

She spoke with the wine director, Paul Carr, on behalf of Michele and said I have this great candidate, I think she would be perfect for your company, you know, explained her experience. And Paul said, well, we have a lot of moving parts and we need to hire women, so have her send me her resume.

So after talking to Pam, Michele sent Paul her resume. He called her up, brought her in for an interview. Michele met with Rocky DeVinney, he was the on-premise wine manager, Mike Hale, he was the off-premise wine manager, and Paul Carr, the director of the wine department.

It was an interview, so, you know, the typical interview questions. They went over her experience. They really liked her. And they explained to her that there were a number of positions because of a promotion and a retirement kind of creating some changes within the department. They had discussed the potential of a northern route but said, you know,

you're not going to be interested in that based on your experience, so let's not even consider it. Then they talked about the southern route.

The southern route was the route that was held by Ian Brown. Ian Brown was going to be promoted to the on-premise -- on-premise wine manager because Rocky DeVinney was retiring so it created this new position, this new opening at Nappi.

Shortly thereafter, Paul Carr brought -- called her up and said, we all loved you, we're so excited to have you come on board, we're happy to offer you the southern sales route. Then he explained to her that all of the sales representatives at the time were paid three percent commission. And he said to her, you know, I think it would make more sense for your route, because it's so seasonal, to pay you two percent commission and then give you a base salary that's representative of that one percent commission so that you don't starve during the winter.

Michele's route was in southern Maine, you know, a lot of beach towns, places that didn't stay open year-round. So Ian Brown, being the sales rep that had held the route before, they joked that he often starved during the winters and there was a gas station that he worked at that would give him hot dogs for free because he was literally making no money in the winter.

So, you know, Michele heard the explanations and said, yeah, that makes sense, that's fine, seems reasonable. Had some questions about benefits and vacation, that sort of thing,

but she was excited to start. She wanted to work for a distributor, that was her goal, and she was happy to join the Nappi company.

Now, fast forward to 2019, January of 2019, and Ms. Tourangeau learned that her base salary was going to be completely eliminated gradually over the next year and a half. At first she said, that's fine, I'll just be a straight three percent, no big deal, and they said no, no, no, you won't be three percent, you're just losing your salary. We're talking about one third of her income essentially. And that act is why we're here today.

So Ms. Tourangeau's Equal Pay Act sex discrimination claim can be described or summarized by defendant's decision to pay her less than her male counterparts. One of the ways that Nappi accomplished this was through this disparate commission rate. Nappi attempts to excuse this decision to decrease the commission rate for the sales representatives, but none of the facts really add up, and we'll kind of go over that in more detail.

And, again, it's just significant that Michele Tourangeau was the first female sales representative hired, and she was hired at a different commission rate, and the line in 2019 for who was grandfathered and who was not was drawn at Michele.

You'll also hear about some discriminatory hiring practices. Why did it take until 2015 for there to be a female

sales representative at Nappi Distributors? Well, it's because they were doing things that they did not want to hire a woman in that position. They had some unconscious bias, some very conscious bias, and we'll go over what that kind of looked like.

Another way, though, that Michele compensated -- that Nappi compensated Michele differently than her male colleagues is in the -- the character of the route that she was provided. First of all, some of the sales representatives had upwards of 200 accounts in their route, and they had a route spanning from southern Maine all the way through northern Cumberland County. Not only did they have more routes, but the accounts that they had were higher volume in sales and they lasted year long.

A lot of these sales representatives had what are called anchor accounts. Those are the big accounts. They're the ones like your Hannaford, your Market Basket, or, you know, the clubs like BJs, Sam's Club, where the wine turns over quickly and you can make a lot of commission in those accounts. Michele didn't have one of those.

Nappi continues discrimination commission rate disparity between those that are grandfathered and those that are not through -- though phrased in terms of a neutral factor other than sex nevertheless operates to perpetuate the effects of the company's prior illegal practice of not hiring women. Much like how the south utilized the grandfather clauses to exclude

African Americans from voting.

As you view the evidence that comes in during trial, I want you to ask yourself whether Nappi's excuses are legitimate and nondiscriminatory, whether the evidence supports that they are legitimate and nondiscriminatory, or whether they were trying to exclude Ms. Tourangeau from earning the commission rate that every other man hired before her was paid because she is a woman.

I'm just going to take a quick sip of water here, sorry.

So as you view the evidence that comes in -- I did that part, sorry.

So let's talk about the excuses. The first excuse that Nappi Distributors provided to Michele was that the three percenters were grandfathered with no further explanation as to why they were grandfathered and she was not. It was just the fact, like of course. But what you'll hear is that Nap -- Michele always considered herself one of the three percenters because she was hired with the two percent commission and the one percent base salary.

The next excuse Nappi provides is that it had made the decision in 2014 to eliminate the three percent commission. But what you won't see, or hear, or find are any documents that state that this decision was made in 2014. You won't see any e-mails. You won't see any memoranda. You won't see any policies reduced to writing.

What you will see is that the sales representative that was offered the position before her was offered the position at three percent commission and he turned it down. What you will also see is that another sales representative who was formerly in the northern route, they were paid straight salary. He entered the southern route and he got two-and-a-half percent commission. You'll also hear from an individual named Dan Toolan. He began working at Nappi shortly after Michele as a sales assistant with the understanding that he would eventually move into a sales representative position. He tried to negotiate his pay, he wasn't happy about the two percent commission, and Frank Nappi, the president and owner, told him prove yourself. If you do a good job, you work really hard, we can talk about the three percent commission. That conversation happened in 2016.

If the decision had already made -- been made, why wouldn't he have made it clear to Dan Toolan at that time that the two percent -- the three percent commission was off the table?

The next excuse provided by Nappi was that they wanted to reduce the overinflated income of the sales representatives. You'll see all of the income that the sales representatives received. Some of the sales representatives made almost $200,000. Some of the sales representatives made as little as $40,000. There is a big disparity in the -- the money that

they earned at Nappi.

What you won't hear, though -- or what you will hear, sorry, is that Frank Nappi didn't think that Michele's compensation was overinflated. He looked at her compensation with the two percent commission, with her salary, with the incentives she earned, and he didn't think it was overinflated, so why was Michele's salary targeted? Why wasn't she entitled or eligible for the three percent commission?

The next excuse Nappi provided was that some of the sales representatives' income wasn't in line with the industry standards meaning other sales representatives at other distributors weren't making as much money as the sales reps at Nappi.

If that were true, why would Justin Park, the sales representative who was offered Michele Tourangeau's route just prior to her, who was working at Nappi Distributors' competitor --

MR. WALL: Your Honor, I just need to object. We're in argument here, Your Honor.

THE COURT: Overruled.

MS. QUINLAN: Why would Justin Park, a sales representative at Nappi Distributors' competitor, National Distributors, see the route, see the accounts, see the three percent commission offered with that, and turn it down because it wasn't enough to walk away from his job at National?

And then the next excuse that Nappi provided was that these sales representatives shouldn't be making so much money because they're almost making as much or more than management. But, again, the sales representatives are the ones going out there making the sales. They're generating the revenue that pays for everything at Nappi Distributors including management's salaries.

You're going to hear some testimony about members of management at Nappi that clearly did not want women working as sales representatives simply for the fact that they were women. And this is because they were women and they would eventually get pregnant -- get married, get pregnant, and go out on maternity leave, and that is a burden, too big of a burden for Nappi to deal with.

You'll also hear testimony from some other members of management that had sort of an unconscious bias. So maybe not the same disdain or, you know, obvious bias but just kind of held opinions that, you know, maybe women weren't cut out for the job, their priorities might be more at home, or they might not physically be able to perform the duties of the sales representative because you have to lift heavy things and deliver things if there is a missed order, that sort of thing.

You're going to hear testimony that showcases this unconscious bias. Both intentional and unintentional acts of discrimination are contributing to the disparate pay and

disparate treatment experienced by Michele while at Nappi.

But, ladies and gentlemen, this wasn't just a good old boys club. The culture at Nappi is an overtly sexist environment. You're going to hear that the president and owner of the company brought in a stripper to the company and had the women come watch. You're going to hear testimony of overtly sexist e-mails being sent amongst management and employees. You're also going to see e-mails where they joke about women working doing the same job as men but not getting paid the same amount.

In addition to the discrimination based on sex, this is also about pregnancy discrimination. Michele Tourangeau experienced adverse actions because of her pregnancy, because of her childbirth, and because of a pregnancy-related medical condition.

Ms. Tourangeau went out on maternity leave on April 11th, her daughter was born April 9th, 2016, and she stayed out through June 17th of 2016. Though you'll hear from Nappi management that it lasted much longer, that it was 15 weeks, we think it was more like nine weeks and four days.

While out on maternity leave, Mike Hale offered to -- Mike Hale, sorry, was the off-premise wine manager. Mike Hale had a conversation with Michele in preparation for her maternity leave, and he offered to her an incen -- or an opportunity. I think that's how he explained it, an opportunity. He said it

would be beneficial for Michele, it would be beneficial for Nappi, and it would be beneficial for her clients at her accounts if while she was out on maternity leave she stayed in the loop, she stayed in communication with her account contacts, she stayed in communication with the sales assistant who was going to be physically going to her accounts while she was out, that she provide guidance and support for the decisions that needed to be made, that she track the incentive programs and place wines based on what the incentive programs were being offered at the time, and if she did this she could get the incentives earned while she was out on maternity leave.

Well, shortly before she came back Michele received an e-mail from Mike Hale kind of itemizing the incentives, and at the bottom it says 43 percent and what she would earn from the incentives. And Michele responded back okay, thanks, great information, what does the 43 percent mean, I get the rest when I return? And he said, oh, Christine Fox was supposed to have a conversation with you about that on Friday. So Michele forwarded the e-mail to Christine and said do we need to have a conversation? Like what's going on?

So Michele had a conversation with Christine, explained to her the agreement or the arrangement that she had made with Mike Hale about staying in touch and communicating with her accounts, placing orders, tracking the incentives, and, you know, everything that she did while she was on her maternity

leave.

Ladies and gentlemen, she worked the entire time during her maternity leave. And she explained to Christine that based on this agreement Mike had promised her the incentives. And in response Christine calls Michele a liar. She said you're a liar, he never said that. But you're going to hear from Mike Hale that he did say that. He -- he acknowledges it, he made the agreement. He is now providing another excuse that he just doesn't think Michele did enough while she was out on her maternity leave to earn all of those incentives.

Ms. Tourangeau also took a leave of absence in May of 2019. She had a urethral sling surgery. And for those of you who don't know what that is, it's to help with incontinence. And so as some of you might be aware, after you have -- give birth to a child you can pee your pants sometimes. You know, it's like one of those embarrassing things but the realities of our world.

So she went out on surgery to have that fixed, and while she was out on surgery -- while she was out on that leave recovering from the surgery, again, she stayed in touch with her accounts, she was placing orders. It was May, she had just opened up a bunch of accounts, created menus for them, got a bunch of wine placements, by the glass pours, things that really generate a lot of profit and revenue for Nappi and for her sales for her accounts. However, because the sales --

Nappi's excuse -- Nappi decided not to pay her for the commissions for the work that she performed before going out on leave and while she was out on leave because the sale was not complete until the product was delivered and paid for by the client and that happened while she was out of work.

Let's -- let's use a different example to see if this really -- this excuse makes sense. If Michele was selling garage doors and she went to a company and they needed some custom garage door to do some really cool things to help them be more efficient, be more profitable. She worked with the client, really learned about their business, what they needed from this new garage door. They agreed to what she recommended, it was a lot of money, you know, she placed the order, and then she goes out on leave. Garage doors take a while to come in and install. So while she is out on leave the garage door is installed and paid for. Under this excuse provided by Nappi, she would not be entitled to that commission. It doesn't make sense.

Michele sent an e-mail to her management and to Christine Fox, the HR director, asking what's going to happen? Like I've -- I'm placing a bunch of huge orders, this is a big time for my route in my world, she says, because she has got this seasonal smaller route, and she knows that that's going to be a huge loss of income for her even though she is doing the work, and they tell her you're not entitled to

commission.

Ms. Tourangeau also alleges that Nappi retaliated against her. In order to prove a claim for retaliation, as the judge already explained to you, she needs to show that she engaged in protected activity by opposing or complaining of some sort of illegal practice that violates the Maine Human Rights Act or Title VII such as the Equal Pay Act.

You're going to hear from Michele -- sorry. We also need to establish that there is some sort of adverse action such as not receiving her pay for the work that she is performing, having her salary taken away, being excluded from incentives, being written up, being excluded from wine dinners where the management team and the sales representatives all got together with the supplier and got to learn a lot of new information that's really useful to sales representatives in their job.

You'll also hear about a time when she was told she needed to use her PTO because she was busy for a few hours, and we'll get into that a little bit more. And you have to find out whether or not you think the adverse action was caused by her engaging in that protected activity.

So, you're going to hear from Michele that after she didn't receive her incentive pay in 2016 after her maternity leave, she complained to Christine about it. She complained to Mike Hale about it. She thought she should get paid for the work that she did while she was recovering from having a baby.

But then in December of 2017 Michele had a meeting with Christine Fox, the director of human resources, and in this meeting Ms. Fox berated Michele to a level that was completely unwarranted. And this was about the condition of her car. There was a little bit of damage that wasn't reported, it was a little messy. Certainly Michele should keep her car cleaner. A lot of sales representatives had dirty cars, too. And certainly Michele should have reported the damage to her vehicle. But she hadn't noticed it and then by the time she did she just kind of forgot about it. It was on the passenger side so you don't see it if you don't walk up to it, and it just kind of slipped her mind.

She apologized profusely to Christine and Christine berated her over and over to the point where she broke Michele and Michele started crying. Michele's apologizing, I'm sorry, I'm sorry, and Christine says, I don't think you're sorry at all, and then tells Michele she is being passive aggressive. And Michele was confused, she was sorry. She wanted to get the heck out of that room with Christine because it was an extremely uncomfortable position.

The next day she reported that uncomfortable situation to the on-premise and off-premise managers, Ian Brown and Joline Masters, and during the conversation where she is talking about what happened with Christine Ian Brown is listening and he is taking notes, and he looks at her kind of like shocked like,

oh, my God, and he even apologized to Michele like I am so sorry that happened to you, that's awful. And then he asked her a question, he said, do you think this has anything to do with your complaining about not getting your pay during your maternity leave? And Michele said, who knows, but, you know, a light kind of went off for her, probably. Ian Brown reported that to Frank Nappi, Jr., Frank Nappi, Jr., apparently had a conversation with Christine, it didn't go any further.

In August of 2018 a new wine director came onboard, his name was Matt Watson. The old wine director, Paul Carr, retired in 2017 and there had been a pretty significant period of time where there wasn't a wine director.

During one of her meetings with Matt, she discussed her pay with him and how she was paid two percent commission and salary, and it became very obvious to Michele that he had no idea that there were different compensation structures for different sales representatives at the time.

Soon thereafter, Matt told -- or Mr. Watson told Michele that Christine was asking questions about her salary, why she was getting a salary, most of our employees don't really get salary. And so Michele explained, you know, I got the two percent plus the one percent salary because of the seasonal nature of my route, and Matt asked to see any documentation she had about it so she forwarded him her copies of the e-mails from Paul Carr and the offer letter, that sort of thing.

Then the discussion became less of a there is questions about your salary to we think your salary -- there is going to be a change to your salary. We don't know what it is yet, but we think there is going to be a change. And that started to happen not -- in November, and there was a meeting December 7th where they again said, you know, there is going to be a reduction, we don't -- we haven't made a decision but it's coming.

So the earlier conversations have happened in October and November where this kind of idea came to be. So Michele sent them an article, it's called the SevenFifty report. It was a career and salary survey about industry -- industry trends and pay inequities based on gender in the alcohol beverage industry. And in it, it showed that there was like a 15 percent difference in pay between males and females in the alcohol beverage industry.

Michele sent it over to Matt, said it was an interesting read. He forwarded it over to Christine and said I'll let you know the impetus of this. And on December 10th Michele met with Matt Watson and he said, so, why did you send me this article? She said, well, you're talking about reducing my salary, I don't know what it's going to look like, but there are these pay inequities, it seemed like an interesting read, I thought you should look at it before you make any final decision. And he said to her, are you trying to play the girl

card right now because she -- and he pointed behind her to Christine Fox's office -- she is not going to have any of that.

Fast forward to January 22, 2019, and the decision had been made her salary would be completely eliminated over one-and-a-half years, so gradually, and she would not get three percent, and they made the statement there is no gender pay gap at Nappi Distributors.

In March of 2019 Michele informed Nappi Distributors that she intended to file a complaint of discrimination based on sex discrimination with the Maine Human Rights Commission. She then filed the complaint of discrimination with the Maine Human Rights Commission in April of 2019.

This filing is significant because it directly precedes Michele's unpaid commissions for the work that she performed during that May 2019 leave of absence. In the temporal proximity, that's important. So it happened very close in time to the point where she had filed this complaint with the Maine Human Rights Commission.

And one of the justification -- or not justifications, but after explaining their excuse for why they weren't going to pay Michele these commissions, and that it was within their policy and happened to everybody, although you'll hear from management that other sales representatives would receive their commissions while they were out, Nappi absorbed the commissions from the sales that she generated during that time.

In January of 2020 Michele filed the present lawsuit that we're here for today. After filing the lawsuit in federal court, Nappi began to scrutinize her work. And there isn't much for Nappy to work with because they all agree Michele is really good at her job, but they seized upon every opportunity that presented.

In April of 2020 Michele was disciplined for purchasing wine for an incentive program and paying for it with her own money. This is something that Nappi not only allowed by other sales representatives doing it and not getting in trouble for it, but they also encouraged it. You're going to see an e-mail from the wine manager saying this is the incentive program, go -- you have -- this is a must hit. You have to hit this incentive number, not it's optional if you want to. And you can sell it to your mom, sell it to your grandmother, sell it to your friends, buy it yourself, you -- you'll still make a little bit of money.

But in this case suddenly in 2020, after Michele has filed a lawsuit and brought up these issues of pay inequity and sex discrimination, Michele is doing something wrong, and she is completely caught off guard. Completely caught off guard.

She purchased some wine for this incentive program, paid for it with her own check, wasn't trying to hide anything, and suddenly she is getting questioned about it by management.

She is already terrified, she just filed a lawsuit against

her present employer. That's really difficult to do. It takes a lot of courage to stand up for your rights and continue to work there after asserting those rights, so she is feeling uncomfortable at a minimum.

Later in 2020 Matt Watson, the new wine director, told Michele that she was excluded from incentive programs at this account that she had called Mike's Fish Market. Mike's Fish Market was a really good account for Michele incentive wise. It was an off-premise account, kind of these small markets where you could go in, grab a bottle of wine off the shelves, and they were really flexible with what she stocked them with. She had a good relationship with them, so she could really thrive with the incentive programs.

So, all of a sudden, Michele's excluded from the incentive programs here, and you'll hear that's never happened to a sales representative and that it's clearly done with the intent of taking money away from her.

In the winter of 2020, I think December of 2020, Michele was attending a meeting for this case, and this meeting was a few hours long. It involved Michele Tourangeau, counsel for Michele Tourangeau, counsel for Nappi Distributors, Christine Fox. It was a Zoom meeting, but there were a lot of breaks in between, lengthy periods. In between those breaks, Michele was on her computer and placing orders, taking calls from customers, placing orders, she had worked a lot in the morning,

and that evening she had a wine dinner that she was hosting. So at 5:00 o'clock she would have a -- to travel down south and present this wine dinner, introduce them to wine pairings, and it would bring her late into the evening. All of a sudden, you know, because Matt and Christine, she is under this new scrutiny, they're keeping a watchful eye on her, and they notice her timecard. Which is weird because she doesn't punch in and out. No sales representatives punches in and out. It's a -- not a nine-to-five job. It's never been a nine-to-five job. And if you're doing your job well as a sales representative, you're not doing a nine-to-five job. You're working weekends, you're working nights, you're working mornings, it's a lot. It's a demanding job. You're fielding calls, you're doing it.

And they say to her in this e-mail, we noticed your time slip you didn't use any PTO. That meeting was more than three hours long so you need to use your PTO. And she responded, I had never heard of this policy before, is this a new policy? I don't understand why I would suddenly need to do this. I was working throughout the meeting, I worked in the morning to be able to go to the meeting, and I'm going to be working later that night so that I can do this wine tasting, I'm going to be working late into the evening. But it was clear they were trying to penalize her, kind of get that gotcha moment, you know.

Michele also, after bringing forward these issues of sex discrimination, was excluded from a wine tasting dinner at a restaurant in Portland called Chaval. Ian Brown, the on-premise manager, had arranged for a wine tasting with a supplier and had invited many of the sales representatives to go with him. He did not invite Michele even though she had seen him earlier that day.

Michele has also made a claim for unpaid wages, quantum meruit, and unjust enrichment. These claims are all kind of related. There are some technicalities between the three different theories, but essentially it's that Michele worked and she wasn't paid for the work that she performed.

I have kind of already gone over the maternity leave issue, the urethral sling issue. There was also a time in 2015 -- February of 2015 where Ian Brown was covering Michele's route while she was on vacation. At the time she was still a new employee, she was not entitled to any paid time off, but before starting the job with Nappi Distributors she had let them know it's my cousin's wedding in Florida so I'm going to have to go to that. So they said that's fine, we'll work with you, no problem. Ian agreed to cover the route for her. Well, Ian's wife was having a baby, and had the baby earlier than he had expected, so he could no longer cover the route for Michele, so Michele ended up working throughout this entire vacation without any pay.

When she returned to work she saw the director, Paul Carr, and she said to him -- or he said to her, you know, like, hey, welcome back, nice to see you, how was your vacation? She said, you know, thanks, it was nice, but, you know, I ended up working throughout the whole vacation and I'm not getting paid; and he goes, yeah, I kind of heard about that, that's weird, huh, but didn't pay her. So.

Even if -- so -- sorry. My last point on that. Even if you find that Nappi didn't pay Michele these wages for work that she performed because of her sex or because of pregnancy, every man and every woman is entitled to be paid for the work that they perform. The law requires that Nappi pay Michele for the work that she performed and for the sales that she generated as a result of her efforts.

I've already kind of gone through a number of the witnesses that you'll be hearing from. I'll try not to make this too redundant here because I don't want to waste your time and I get the feeling I'm being a little long winded right now. But, like I said, you're going to hear from Michele, you're also going to hear from members of management at Nappi. Those members of management include Jim Bourque. He was the former vice-president of human resources, he's over there in the stands, hi, Jim. You're going to hear from Frank Nappi, Jr., he is the president and owner, and I -- I don't think that's Frank there. I think that's Nick Nappi, another member of

management from Nappi Distributors sitting next to Jim. You're also going to hear from Paul Carr, the former director of the wine department. You're going to hear from Elmer Alcott, the CFO -- former CFO for Nappi Distributors. He is still somewhat involved, I -- I think semiretired status is what he is at right now. You'll also hear from managers Ian Brown, Joline Masters, Mike Hale, and I think Bill Monahan. What you're going to hear from these managers is that Michele was good at her job. Nobody disputes that. She is a hard worker. She is a good sales representative.

You're also going to hear testimony from other witnesses such as Afton Hawkins and Mandi Leigh Ford about their careers at Nappi, and despite management agreeing that Mandi and Afton were really good workers, too, they were sales assistants and merchandisers, they put in a lot of hard work, they applied for sales representative positions repeatedly but they didn't get the positions.

You're going to hear that Mandi Leigh Ford was told by a manager named Frank Maiorino that they don't hire women for sales representatives because they're just going to get married and get pregnant and go out on maternity leave. You're also going to hear that Frank said the sales representative position just isn't a position for women, he has daughters and he would not want them doing that job.

You're going to hear from Afton Hawkins who, after

applying for a sales representative position and being turned down, was told by a member of management, I don't think you got the job because you're a woman.

You'll also hear from Dan Toolan. He is a sales representative at Nappi Distributors. While Michele was out on maternity leave, he was the sales assistant, and while working as a sales assistant he was chatting with a manager Frank Maiorino and Frank said, frustrated by the fact that he had to provide coverage and use a sales assistant to cover Michele's maternity leave, this is why we don't hire women as sales representatives, because it was so burdensome and annoying for him.

When you hear the evidence and the testimony, it might get confusing. We're going to try to make it as clear for you as possible, but it's a lot of information, it's spanning over a lot of time, and you're going to hear long-time lines from various witnesses. And what you'll need to do is determine whether Nappi has met their burden of proof for establishing whether their excuses for the alleged discrimination is in fact legitimate and nondiscriminatory.

You have to look at the evidence as a whole. It's not just the commission rate, and it's not just the routes, it's not just the accounts and the routes, and it's not just the testimony of one person or the other. You really have to wrap your arms around all of the evidence and sort through it and

figure out what makes the most sense to you. And then you have to ask yourself why was the line drawn at Michele Tourangeau and did the fact that she is a woman play any role in that decision.

Unconscious bias happens all the time in the world. Most of the time it's glossed over, right or wrong, to avoid conflict. We've all had that social interaction where somebody says something and you kind of cringe but you don't say anything because you like them, they're nice, and you don't want to have that awkward conflict. But these are real people in positions of power and that's the difference, it's not a social setting. They're in positions of power and their biases have real world implications and they really affected my client Michele.

Michele wasn't willing to overlook it. She wasn't willing to, you know, just kind of cringe and continue on, she stood up for herself. That's why we're here today. These laws, the Equal Pay Act, they don't mean anything unless employees stand up for themselves and hold their employers accountable.

MR. WALL: Your Honor, we're in argument here.

THE COURT: Overruled.

MS. QUINLAN: Equal pay for equal work is a fundamental civil right in our society. All workers, man and woman, should have the right to fair pay. Unfortunately at times reality has failed to live up to this ideal. Prejudice

and discrimination too often deny employees their fair pay based on the work that they do. Such was the case for our client Michele, and we ask that you find in Michele's favor.

And throughout this week we'll outline for you the kinds of lost wages and compensatory damages, but we hope that you see the evidence and see why Michele took the stand that she did and why we're here today. Thank you.

THE COURT: Thank you, Attorney Quinlan.

Ladies and gentlemen, we usually take a break about this time. If you're willing -- if you want to take a break, I'll let you take a break. If you don't want to take a break, we'll go right forward with the next. Does anybody want to take a break now? I don't want to put people on the spot, but I don't want you to be uncomfortable. I see no response.

Mr. Wall, would you like to give your opening?

MR. WALL: Yes, Your Honor, thank you.

THE COURT: You may proceed.

MR. WALL: Good morning, ladies and gentlemen. As I indicated at the outset, Laura Maher and I represent Nappi Distributors in this case. We're joined here today, and throughout the rest of the trial, by Christine Fox who is the human resources director at Nappi.

Nappi Distributors is a family business started by three brothers. They operated for many years out of Portland and currently, since 2007, have operated out of Gorham. The

current president of the company is Frank Nappi, Jr., who is the son of one of the founders. Although Nappi started small, it's currently an employer that employs approximately 200 people.

Nappi's business is a beer and wine distributor, and as you probably surmised what that means is that they buy products from suppliers and they sell them to various different types of retailers. Retailers that sell the -- the products for consumption on site are called on-premise accounts, and that's like restaurants and bars and things like that, and other types of -- of retailers that sell for consumption somewhere else, at home or whatever, are considered off-premise. Just thought you might want to know those terms because they probably will come up throughout the course of the case. Those type of accounts are like grocery stores and shops and things like that.

Now, this case involves the -- the wine side of Nappi's business. Ms. Tourangeau is currently a wine sales representative for Nappi and has been since she started at Nappi in 2015. Currently she is one of three female wine sales representatives for Nappi. During the time she has been a -- a sales rep, Nappi has had as many as five females on that staff.

Ms. Tourangeau took over a route vacated by her current supervisor Ian Brown when Ian Brown was promoted. Before Ian had the route it was covered by Paul Carr who was actually the wine sales director who hired Michele Tourangeau.

Most of the accounts in the route are in York County, Kennebunk, Wells, Ogunquit, which means that most of the accounts are geographically close to where Ms. Tourangeau lives in Ogunquit. And you'll hear that both Ian Brown and Paul Carr, who worked that route for many, many years, describe it as a great route with terrific accounts and -- and a great location.

And Ms. Tourangeau is going to tell you in this case that this was the route she wanted when she met with Paul Carr to discuss employment at Nappi. When she started there were more on-premise accounts than off-premise which meant they were busier in the summer than in the wintertime, so it -- it did tend to be fairly seasonal. Since Ms. Tourangeau has worked there, Nappi has added some accounts which has made it less seasonal, made it more balanced in terms of on -- on-premise and off-premise. In fact, in 2020 Nappi added a Hannaford supermarket to her route that Ms. Tourangeau herself has described as one of the highest grossing retail accounts at Nappi.

Ms. Tourangeau's claims in this case, as you've heard, basically break down to three allegations. First, that Nappi discriminated against her in terms of compensation because of her woman and because of preg -- because she is a woman and because of pregnancy; that Nappi retaliated against her for making complaints about the alleged discrimination; and that

Nappi failed to pay her for work that she did.

And I just want to talk to you a little bit about in sort of more general terms some of the evidence that we expect you'll hear to address those allegations.

Before Ms. Tourangeau was -- applied to Nappi, Nappi had decided to go to a two percent commission rate for all its new wine sales representatives. Previously Nappi had used a three percent commission rate, but Nappi had more overhead for the wine department in terms of supporting the sales staff. Many of the wine sales representatives were making significantly more than the other employees at Nappi and other peers in their industry, and part of that was due to the fact that many of the wine sales representatives at Nappi at the time had been there for many, many years and had grown their routes sort of organically, if you will.

By 2014 Nappi realized that some rerouting needed to be done not only to adjust the routes but also to improve customer service. So in 2014 the majority of the wine sales representatives working for Nappi had been working for the company for anywhere from seven to 20 years with a couple of the wine sales representatives working there 25 years or more. Based on their seniority with Nappi and their experience in wine sales, Nappi decided to keep their commission rate at two -- at three percent.

And Nappi decided -- decided to handle it that when those

people retired or they left the company Nappi would replace them with new wine sales representatives at a two percent commission, and that is what Nappi has done since 2014. You will hear that all new wine sales representatives who are compensated by commission at Nappi have been brought on with a two percent commission rate regardless of their gender.

So when Paul Carr hired Ms. Tourangeau in 2014, he offered her the two commission -- two percent commission rate. His offer -- officer -- offer also included incentives. And incentives are basically promotions that are done in conjunction -- Nappi does it in conjunction with suppliers in order to promote new placements for new products.

Because the route was pretty seasonal at the time that Paul Carr had offered it to Ms. Tourangeau, he included a base salary of approximately $22,000. Now, normally Nappi preferred not to use those type of base salaries for routes in southern Maine, but Mr. Carr wanted to ensure that Ms. Tourangeau would be able to budget for the slow periods that tended to occur on the route which is why he put in the salary component.

About a year later, Mr. Carr hired Dan Toolan to work a route in southern Maine. Like Ms. Tourangeau, Mr. Toolan received a two percent commission. Mr. Toolan also got a salary to augment the commissions and incentives that were part of his package.

Now, Mr. Toolan, you're going to hear, lobbied hard to get

a three percent commission, and he took it right to Frank Nappi, Jr., with his -- with his arguments, and you'll hear that Mr. Nappi refused to budge, he kept him at the two percent rate consistent with all the other new wine sales representatives.

In 2018 a new wine sales director came onboard, a gentleman by the name of Matt Watson. He completed some rerouting that needed to be done with the wine sales routes, again to improve efficiency, and these reroutings did have an impact on the compensation for most of the wine sales representatives.

Nappi took the opportunity to notify Ms. Tourangeau and Ms. -- Ms. Tourangeau and Mr. Toolan that their salaries would likely be eliminated. Ms. Tourangeau pushed back and made arguments to Matt -- Matt Watson as to why Nappi should not eliminate her -- her salary. Mr. Watson looked at the issues that she raised, and as a result Nappi agreed to simply reduce the salary by half in three steps. To date, only one of those reductions has occurred. The others were suspended when -- when COVID hit. By contrast, Nappi simply eliminated Mr. Toolan's salary in 2019.

Since that time, both Ms. Tourangeau and Mr. Toolan have both made at least $80,000 a year. For example, in this past year, 2022, Ms. Tourangeau made about $95,000 and Mr. Toolan made about $80,000. You will hear that Ms. Tourangeau has

never made less than $72,000 a year for a full year's work at Nappi. And in -- during 2020 she made about 80 -- $85,000 thanks in part to a supplemental salary that Nappi paid her and other wine sales representatives to tide them through the shutdown.

Now, Ms. Tourangeau suggests that she didn't get paid for work on three specific occasions. The first is a vacation she took in 2015. And you will hear that Mr. Brown -- Ian Brown, her supervisor, was covering for her but that his wife went into early labor, and of course he -- he went to be with her to take care of her during that time. You will hear evidence that the period that he was unable to do coverage was only a matter of days. And you will hear that during that period Ms. Tourangeau was in Key West, Florida. You will also hear that Mr. Brown arranged for coverage by others, other -- people other than Ms. Tourangeau for most of that time.

Second, Ms. Tourangeau refers to a maternity leave she took in 2016. Now, what Ms. Tourangeau didn't mention in terms of her opening statement was that for that leave she elected to take short-term disability for which she received wage replacement. And like anyone else who went out on short-term disability leave, she did not receive her salary or compensation for sales that she -- that were made when she was out. And you will also hear that no one at Nappi required her to work during that leave.

Third, Ms. Tourangeau refers to a medical leave that she had in 2019. Now, she took that leave -- as most people would, she took that leave without describing what the -- the medical procedure was and again she elected --

MS. QUINLAN: Objection, Your Honor.

THE COURT: Overruled.

MR. WALL: And again she elected to take short-term disability. Now, you're going to hear that prior to leaving on that short-term disability leave Ms. Tourangeau met with Becky Douglass, who is the payroll specialist at Nappi, and Ms. Douglass went over the short-term disability paperwork with Ms. Tourangeau. Ms. Douglass explained to Ms. Tourangeau that she could opt to take vacation time instead which would have made Ms. Tourangeau eligible -- eligible to receive her salary and commission, but Ms. Tourangeau did not want to take her vacation time and so she again elected to -- elected to take short-term disability and receive the wage replacement instead. And again, like anyone else who went out on short -- short-term disability, she was not eligible for the commissions and salary that she otherwise would have had.

Related to that leave, you will also hear that Nappi later offered to allow her to reverse that election and take vacation time which would have therefore made her eligible for the commissions and salary, but Ms. Tourangeau did not take Nappi up on that offer.

Ms. Tourangeau's claim of retaliation is based in part on the allegation that she was excluded from one dinner with a supplier. Mr. Brown, Ian Brown, will be here and he will explain how that dinner came about, how it was impromptu and in the middle of the week and in Portland, and he figured he would mention it to people who were locally in Port -- in Portland at the time. He will tell you that he did not exclude anyone from the dinner in retaliation for anything or because of their sex.

Ms. Tourangeau also bases her claim of retaliation because -- on -- on the allegation that she was prevented from earning incentives from one account. There were actually a couple of instances in which Matt Watson had to address Ms. Tourangeau's incentive sales.

One occasion she appeared to be placing them with closed accounts. Mr. Watson met with her and explained that that was not permissible. During that meeting she apologized, and she also acknowledged during that meeting that she did not feel as though she was being singled out.

On another occasion, Mr. Watson learned that Ms. Tourangeau had been placing incentive items with one account, it's called Mike's Fish Shack, for an extended period of time without any reorders. He considered what he was seeing to be an abuse of the incentive programs which were designed to promote new placements. So he and Mr. Brown will explain that they had never seen this type of overreaching in any kind of

incentive program by any other sales representative. Mr. Watson let her know that she wouldn't be eligible for incentives at that account moving forward for that reason. He will explain that it had noting to do with her allegations in this case, that he was simply addressing what he considered to be a grossly irregular business practice.

Finally, Ms. Tourangeau will suggest that Nappi discriminates generally with regard to hiring women. In actuality, you're going to hear about the many women who work at Nappi and keep the place going. You'll also hear from some of them as witnesses. Some of them are women who used to work at Nappi in the wine department, some are women who currently work at Nappi such as Ms. Fox who is the director of human resources and Joline Masters who is the manager of key accounts in the wine department. Both of these women are management level positions, hold management level positions at Nappi. And of course you'll hear from Ms. Tourangeau herself who is still currently employed at Nappi.

Now, you will hear her say that Nappi gave her the route she wanted. She will acknowledge that Nappi has made improvements to the route over -- that she covers over the years including giving her one of the highest grossing accounts that Nappi has. You will hear evidence that Nappi has paid her for the work she has done and that it has compensated her at the same commission rate as all other new wine sales

representatives hired since 2014.

Now, at the end of the case we'll have an opportunity -- Ms. Quinlan and I will have an opportunity to talk to you about what we think the evidence shows in this case, and at that time we will ask you to return a verdict -- Nappi will ask you to return a verdict in favor of it -- Nappi on all claims.

In the meantime, Nappi appreciates your work in this case and looks forward to presenting the evidence, and we know that you'll pay close attention to everything that's submitted by the parties. Thanks very much.

THE COURT: Thank you, Mr. Wall.

Ladies and gentlemen, we are now going to take our first break. We're going to take a break for 15 or 20 minutes. Don't discuss the case and enjoy yourselves.

THE CLERK: All rise, jury exiting.

(Jury exited. Time noted: 10:12 a.m.)

THE COURT: Court will stand in recess.

(A break was taken from 10:13 a.m. to 10:34 a.m.)

THE COURT: Would you bring the jury in, please.

MS. WHITE: Your Honor, I actually had an objection that we wanted to make to the opening statement by defendant, if that's something that should be handled now or at sidebar. I didn't want to delay the break any longer.

THE COURT: All right, you can be seated. What's the objection?

MS. WHITE: Well, Your Honor, my understanding from our conference the other day was that any mention of wage replacement or short-term disability benefits in terms of the collateral source motion in limine defendant would essentially have the burden of proving why that was not a collateral source. To our understanding there is no further evidence. We've certainly not received any documentation or information that proves that up. So we're very concerned that the jury has now been tainted by hearing about wage replacement. I think it warrants a curative instruction unless there is going to be some evidence that will prove that up, and of course if there is such evidence we need to have it.

THE COURT: Mr. Wall.

MR. WALL: Well, Your Honor, I don't believe your ruling indicated that this was not something that could be discussed as part of opening or that it wouldn't be subject to proof as part of this case. In addition, the existence and receipt of short-term disability benefits goes beyond any collateral source issue and goes to basically what she elected to do in the circumstances, so we think it's perfectly acceptable to comment on it.

THE COURT: Yeah, I -- I think it's -- the comment was there for more than one reason and --

MS. WHITE: Okay.

THE COURT: -- therefore I'm going to overrule the

objection. I don't think it was strictly on collateral source, and collateral source is a question of setoff which would be argued or not to the jury based on whatever proof the employer comes up with.

MS. WHITE: Thank you, Your Honor, and one other very brief issue. We had a witness calling into the clerk's office this morning inquiring whether he would be appearing live or by Zoom tomorrow. We counsel had an opportunity to discuss it briefly, and our understanding is it's been more than five days since he was diagnosed with COVID so we're wondering if he is allowed to appear live, which would be the witness's preference, and counsel's as well, I believe.

THE COURT: Well, I think I told you to talk to Eric Storms about that.

MS. WHITE: Oh, thank you.

THE COURT: Would you bring the jury in, please.

(Jury entered. Time noted: 10:41 a.m.)

THE COURT: You may be seated. First witness.

MS. QUINLAN: Yes, Your Honor, plaintiff calls James Bourque to the stand.

THE CLERK: Please raise your right hand. Do you solemnly swear that the testimony you shall give in the cause now in hearing shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE CLERK: All right, please be seated, pull yourself right up to the microphone, please state and spell your first and last name for the record.

THE WITNESS: James, J-A-M-E-S, Bourque, B-O-U-R-Q-U-E.

DIRECT EXAMINATION

BY MS. QUINLAN:

Q. Good morning, Mr. Bourque.

A. Good morning.

Q. And is it okay if I call you Jim or would you prefer --

A. That's fine.

Q. -- Mr. Bourque?

A. No, Jim's fine.

Q. Okay, Jim. How are you doing today?

A. Very well, and you?

Q. Good, thank you.

A. Great.

Q. So I just wanted to talk to you about your career at Nappi Distributors. I understand that you started working there sometime around 2000, 2002; is that right?

A. Yes.

Q. And how was it that you came to start working at Nappi Distributors?

A. I was -- I was a part owner of an outfit called Cumberland & York Distributors, and we were purchased by Nappi

Distributors, and Nappi was kind enough to bring all of our employees onboard when the sale took place.

Q. And what was your position when you were working at Nappi -- Cumberland & York Distributors?

A. President.

Q. You were the president?

A. Yes.

Q. Okay. And how did you become the president of Cumberland & York Distributors?

A. Actually, it was kind of a sad situation. My brother was working at Cumberland & York and was killed in a car accident. At the same time where I was working the -- closing shop and moving to South Carolina, at the time I was working in Massachusetts. And my dad, who was one of the -- the major stockholder at Cumberland & York, asked me do you think you would like to come back and start working in the beer business, so that's how that happened.

Q. I'm really sorry about that.

A. Thank you.

Q. So I understand you had sort of a career shift at that time?

A. Yes.

Q. What was it that you were doing before going to Cumberland & York?

A. I was a project engineer which was kind of like mechanical

engineering background at an outfit called American Bosch in Springfield, Massachusetts -- Massachusetts, excuse me.
Q. Okay. And how long was it that you were working at Cumberland & York Distributors?
A. Probably, oh, 15, 20 years almost. 15, 18 years, I think.
Q. Okay. And were you the president for the entire duration?
A. I -- I think so. I can't remember. We had a -- we had -- I might have been the VP for a while and then we had some -- some shifts. They made my -- my dad was president, they made him a CEO and I became a president.
Q. Okay. And what was it that you were doing as the president of Cumberland & York Distributors?
A. Kind of learning -- learning the ropes a little bit. Most of the stuff had to do with buying insurances, meeting with bankers, stuff like that.
Q. Okay. So more of the business end as opposed to the sales end; is that correct?
A. Correct.
Q. Okay. And so I understand you started working for Nappi Distributors when Nappi acquired Cumberland & York Distributors?
A. Yes.
Q. And when you started working for Nappi Distributors, what was your position?
A. I think vice -- I was a vice-president.

Q. And as -- were you the vice-president of human resources?
A. Yes.
Q. And as the vice-president of human resources, what were the sorts of things that you did on a daily basis?
A. Actually quite a bit it had to do with safety on the workforce, workers' comp, dealing with insurances, car accidents that happened with the employees, mostly on that side. Some -- a few other things. Sometimes I would be called into disciplinary situations. So quite a lot of it was the nuts and bolts of workers' comp and auto insurance. Worked quite closely with Becky Douglass on certain occasions.
Q. And that kind of segued right into my next question. Who was it that reported to you while you were the vice-president of human resources?
A. I think Becky did, but it was really kind of a loose situation. I didn't really -- I don't think I had many direct reports.
Q. Okay. And did you report to anybody at Nappi Distributors as the vice-president?
A. Probably Elmer Alcott.
Q. And who was Elmer Alcott?
A. He would be like he would have been the CFO, chief financial officer.
Q. And how long did you work at Nappi Distributors?
A. Probably 15 years. Ten, fifteen, in that ballpark.

Q. And as the vice-president of human resources, did you have any duties for training employees on discrimination policies, retaliation policies, that sort of thing?
A. We -- I think we had part of that as an introductory thing we highlight it in the employee handbook and make people aware of it.
Q. Did you provide any trainings to employees beyond what was stated in the employee handbook with respect --
A. No, not that I can remember.
Q. Are you aware of anybody at Nappi Distributors, aside from yourself, that would have or did provide training to the employees at Nappi Distributors on the discrimination and retaliation policies?
A. No, I -- I can't think of it. We mostly referred to the handbook, kind of a boilerplate situation.
Q. Did you draft the handbook?
A. No. The handbook we had I think it was probably a meld of what Nappi had and what Cumberland & York had. We tried to update it as -- as time went on.
Q. Was there ever an occasion where you went through and sort of drafted what would be contained in the handbook or pick and chose which portions would comprise the handbook as it was updated?
A. Mostly we'd -- we -- we would go online, I think we -- at least one service online, and we kind of relied on them to make

sure we covered all the bases. Some of the stuff -- you know, any things that were, you know, company specific I think we would add that, but the overall thing I think we -- I think we hired a -- either got online or hired a service to make sure we try to be compliant.

Q. Okay. While you were working at Nappi Distributors, did you ever receive any complaints of discrimination?

A. I don't remember any.

Q. And how about any complaints of retaliation, did you ever receive those?

A. No, not that I can recall.

Q. If those complaints had come about, would you have been the person responsible for investigating those complaints?

A. Yes. Yes.

Q. I would like to know about any management meetings that you participated in. While you were the vice-president of human resources at Nappi Distributors, did you have any regularly scheduled or regularly held meetings with other members of management?

A. We tried -- toward the end we tried to get together on a weekly basis. It -- it was not a real hard and fast schedule, but we did try to get together. I attended some of the sales meetings really not as a -- as a management role but just to, you know, see what was going on in both beer and sales -- sales meetings, sales meetings, wine -- beer and wine.

Q. And when you started having these weekly management meetings, who were the people that were attending those meetings?
A. We'd have usually Frank Nappi, Jr.; Elmer Alcott; Frank Nappi, Sr., when he was alive; myself; operations guy Nick Nappi; and usually the -- oh, the head -- the -- of beer and wine sales heads, usually both -- jeepers, I think it was --
Q. Would that have been Chris Black and Tim Coffee?
A. Tim Coffee, Chris Black, and Paul Carr. Generally speaking, that was -- that was the makeup.
Q. Okay. And I would like to show you what I have marked as Exhibit 21. Can you see the document that I'm putting up on your screen?
A. No. Oh, there we are.
Q. Can you see it now?
A. Yes.
Q. And are these the individuals that you just described for me?
A. Say it again?
Q. Are those the individuals that you just named for me?
A. Yes.
MS. QUINLAN: Your Honor, I would like to admit Plaintiff's Exhibit 1 -- 21, page one.
THE COURT: Any objection?
MS. MAHER: No, Your Honor.

THE COURT: 21 -- you said 21, page one?

MS. QUINLAN: 21, page one, yep.

THE COURT: Is admitted without objection.

MS. QUINLAN: And if I could, I would like to publish this to the jury.

THE COURT: You may.

BY MS. QUINLAN:

Q. And I'm just kind of using my pointer here, is this gentleman over to the side here Tim Coffee?

A. Move it again.

Q. Right here?

A. Yes.

Q. And then next to him is this Paul Carr?

A. Yes.

Q. And is this Nick Nappi?

A. Yes.

Q. And then in the middle is that Frank Nappi, Jr.?

A. Yes.

Q. And Elmer Alcott?

A. Yes.

Q. And then yourself?

A. Yours truly.

Q. And then Chris Black --

A. Yes.

Q. -- is that correct? Okay. Thank you.

So in these meetings that you had with those individuals, what -- what types of things were discussed?
A. Oh, general things, problems that might have been going on, you know, in different areas: Sales complaints; warehouse complaints; worker shortages; employment issues; and maybe insurance, you know, if we had a bad accident or -- either truck, car, whatever.
Q. When you discussed the worker shortages, would you also discuss posting jobs or the need to hire for certain positions?
A. Say that again.
Q. When you were discussing in these meetings the worker shortages, would you also discuss job postings or the need to hire for certain positions?
A. Yes.
Q. And what was your understanding of how Nappi Distributors would hire for the sales representative positions if they became available?
A. Quite often they would look inside and the -- the people in those areas had a feel for the -- the general market and that might include talent at other organizations. Not always, but, you know, some of them might -- some grapevine issue might come up and say, oh, so and so.
Q. Oh, I didn't quite catch that last part, sorry.
A. Oh, what did I say? Grapevine.
Q. Through the grapevine?

A. Yes. Yeah, there is -- the people that worked those things they know the area pretty well and you hear a lot of scuttlebutt, and typically you try to look for someone with the talent and try to promote from within if at all possible.
Q. Okay. So Nappi would either look at people that were already employed by Nappi --
A. Yes.
Q. -- in terms of some sort of promotion; is that right?
A. Yes.
Q. And if that wasn't a viable option then they'd sort of refer on referrals or recommendations from people already within the organization; is that right?
A. Yes, and that -- and it -- that could extend beyond even the local market. Every -- every product line we have they have representatives and they come in. That's another pool. Sometimes there is -- there is folks that would like to come from the supply side into the distributor side. That happened -- Chris Black, for instance, at one time worked for a supplier, and, you know. Which was good, that gives him a lot of good experience, and ended up coming back into the distributor network.
Q. So oftentimes supplier representatives might be a resource for filling these positions or know somebody who --
A. Yes, and networking I guess you would call it, yeah.
Q. Would you say it was more often the case than not that

that's how the positions were filled and -- for sales representatives and that the jobs weren't themselves publicly posted where somebody could read it somewhere and send in an application or a resume?
A. As -- as networking within the organizations and within the supply people that we would use as a primary. As -- as -- during my tenure there, online stuff became more popular and that started to become another -- and instead of we used to -- way back you would run an ad in the paper and then that all changed, you know, you would go online.
Q. Are you specifically aware of any sales representative position being posted online or in the paper?
A. I can remember some, yes. Yes. The ones I got involved were usually warehouse and -- warehouse and drivers.
Q. And I kind of want to set -- oops, sorry. I kind of want to set aside the warehouse and --
A. Yes.
Q. -- the driver positions, but specifically --
A. Sales I don't remember that much going to the -- you know, online or on the -- it could have happened, I don't -- I don't recall it.
Q. Okay. Would you say it's fair to say that more often than not those positions were filled through the grapevine?
A. Well, within -- certainly part of it, yes.
Q. Okay.

A. We always tried to do from inside, though, if at all possible, look for in-house talent.
Q. Okay. And Chris Black, I understand that he is one of the individuals who started working at Cumberland & York and then kind of came over to Nappi Distributors; is that right?
A. Yeah, he worked at -- geez, he worked at Cumberland & York drive -- as a -- in a driver position, and I think he got into sales, and then left and I believe he -- Shipyard, I think he went to work for Shipyard for a while. And it was interesting because at the time Shipyard was purchased by Miller Brewing Company, and that was -- that was quite an experience to have a big outfit come in and you get to learn how they operate, and then I think it reverted back to local ownership, and then he came back into the distributor fold.
Q. Okay. And Shipyard, those are -- that's one of the beer suppliers that Nappi sells to its accounts; is that right?
A. Yes.
Q. Okay. Did you have -- while you were working at Nappi Distributors, were there any female sales representatives?
A. In -- in beer. If I remember right, we had at least two I can recall.
Q. And what were their names?
A. Kristen Curran.
Q. Kristen Curran?
A. Curran, yeah.

Q. Is her name currently Connelly?
A. Yes, it is, that's -- I forgot, you're right.
Q. And who else?
A. Shayla.
Q. Shayla Wormel?
A. I think so, yes, yep. Those are the two I can recall.
Q. And is it your understanding that they were sales representatives or were these two people sales assistants looking to become sales representatives?
A. Shayla might have been on the assistant level and Kristen was I believe working into -- she may have got into sales, but definitely in the sales force.
Q. Okay. Do you know whether Kristen Connelly or Kristen Curran had her own route?
A. I can't remember the arrangement, but she was out -- definitely out on the tree. I can't exactly rather remember the -- I don't know if that -- I don't know the -- what the technical breakdown was, but she was definitely in sales, had accounts. Mostly I think or some in -- a lot in Portland and beyond.
Q. Did you say she was out on maternity leave?
A. Say that again.
Q. I couldn't -- I couldn't tell if you had just said she was out on --
THE COURT: Why don't you pull the microphone up. I

think he is having trouble hearing you, pull the microphone up.

Q. Oh, I -- I couldn't tell if you had just said something about Kristen being out on maternity?

A. No.

Q. No, okay.

A. No, she had -- she might -- geezers creepers. I meant she had -- her accounts were in town and some beyond the city.

Q. Okay. How long was Kristen working at Nappi Distributors?

A. Boy, I don't know, five, six years, I think. That's a guess.

Q. Do you think she was hired on as a sales representative or was she hired on as a sales assistant or a merchandiser?

A. I don't recall.

Q. And I understand her husband was also employed at Nappi Distributors?

A. Yes.

Q. Okay. And was his name Pat?

A. Pat, yes.

Q. Okay. And did Kristen end up leaving Nappi?

A. Yes.

Q. Do you know why she left?

A. I think -- I think she had a -- had an injury lifting a barrel, she tweaked her back. And we worked -- jeepers, we worked pretty hard with her trying to get her back to full -- full duty status and, jeepers, I -- I think she eventually just

left because of that.
Q. And since you handled the comp claims, is that how you're familiar with her --
A. Yes.
Q. -- injury? Okay. Did her husband also leave his employment with Nappi Distributors or did he stay there?
A. No, he left.
Q. Do you know why he left?
A. I'm not exactly sure. I think -- he was a driver for us and that's a lot of physical work. It's more than just the driving, it's the delivering. He had a lot to contend with, the weather and so forth. I think he got a little worn out from that, and I believe he went to a job that was more of a long haul tractor trailer type job.
Q. Okay. Do you know who Melanie Larocca is?
A. Yes. I've heard the name and I've met her.
Q. And you met her?
A. Yes.
Q. How did you meet her?
A. I can't remember. I think there was a reception of some kind having to do with she was I think a wine salesperson at Nappi before I was involved there.
Q. Was she part of the wine management team?
A. I'm not sure if it was wine management or wine sales, I can't -- I don't know.

Q. Okay. Did you come to understand that she had claimed that she was discriminated against because of her sex?
A. I -- I heard something -- I don't know if it was sex or if there was pregnancy involved.
Q. Okay. Other than Kristen and Shayla or Shayle, who may or may not have been sales assistants or sales representatives, while you were working at Nappi Distributors are you aware of any other female sales representatives?
A. In sales, I -- not that I can recall.
Q. Okay.
A. In my time there.
Q. What is your understanding of why it took so long to hire a female sales representative?
A. Boy, it -- it traditionally had been a -- a male role. I -- when my dad had his company, started in 1947, I would hang around there a lot and a hundred percent male. Just looking back, things started to change and part of it was the suppliers would start to send female reps, and I think that kind of led to, you know, more openings or more consideration of, you know, male -- female representatives in sales. It can be a physically -- physically challenging job.
Here's what usually happens, you'll be the biggest -- the biggest day of the year for most beverage companies is 4th of July, that weekend, everything builds up to that and it takes off. If 4th of July is a Sunday, you're going to get the call

4:30 on a Friday afternoon, all your trucks are out, the whole crew is gone, the sales guy is making -- I'm out delivering probably, that's the time you get so and so needs a barrel in Kittery, two barrels right now, and that, boom, you got to try to handle that.
Q. Okay.
A. So those kind of situations it's -- it's -- it can be a challenging, but it's -- it's not impossible though.
Q. Right.
A. You know what usually happens, we -- the gals will go and make the delivery and the -- the accounts help them so it works out great.
Q. Yep. Okay. Do you know who Frank Maiorino is?
A. Yes.
Q. Who is he?
A. I believe he was like a rep -- supervisor in the wine department.
Q. Okay. And was his role primarily to manage the sales assistants?
A. No, I think salesmen.
Q. Salesmen? Okay.
A. I think it was the sales guys.
Q. Had you ever received any complaints about any of the comments that Frank Maiorino made?
A. No.

Q. Okay. Do you know Mandi Leigh Ford?
A. Say it again.
Q. Do you know Mandi Leigh Ford?
A. Mandi?
Q. Amanda, sorry.
A. Yes, yes.
Q. Did she ever come to you and tell you that Frank said he wouldn't hire her for a sales position because she was a woman?
A. Boy, I -- I would have remembered that I think. I don't remember that.
Q. Okay. How about Afton Hawkins, do you know who Afton Hawkins is?
A. Yes.
Q. Did Afton ever tell you that she was passed over for a sales position because she was a woman?
A. No, that -- not that I recall.
Q. Have you ever heard Frank Maiorino say that he has daughters and that he wouldn't want them working in the sales position?
A. No.
Q. You have daughters, correct?
A. Yes.
Q. How many?
A. One.
Q. And do you have a daughter-in-law?

A. Excuse me?
Q. Do you have a daughter-in-law?
A. Yes, yes.
Q. Is the -- is there something about the sales representative position that would make you not think it was a good job for them to have?
A. My daughter and my daughter-in-laws I don't think they would have a problem with it at all. I -- they'd --
Q. Okay.
A. They would adapt and make it happen. That's just the way they are.
Q. Strong women.
A. My feelings or -- geez, I wouldn't hesitate in the -- at all.
Q. Okay. Did you have any role in setting the compensation for the sales representatives?
A. No.
Q. Was the compensation for the sales representatives discussed in any of these management meetings that you attended?
A. If it was, very globally, you know, just.
Q. Okay. And I understand that sometime in like 2007 there was a reduction in the commission rates for wine sales representatives; is that right?
A. That may be true.

Q. And my understanding is that that reduction in the commission rate from three-and-a-half percent to three percent was applied across the board to all representatives; is that right?
A. I don't know.
Q. Okay. How about the hiring procedures? Were you at all involved in interviewing or making job offers to applicants for Nappi Distributors for --
A. No. What I would do is -- I would just check the license, driving license.
Q. Did you have any responsibility for keeping track of payroll or signing off on payroll?
A. No.
Q. Who was doing that?
A. When you say payroll, you -- do you mean the nuts and bolts like a administration or?
Q. I mean both. So the nuts and bolts administration and whoever had to sign off and approve it?
A. Okay, that would be all of the supervisors or -- and I don't -- a lot of that would be supervisors, and if there was a -- if it was a big change for -- or whatever it would be bounced up probably right to Frank, Jr.
Q. Okay. I wanted to show you one more document. And I'm showing you what's been marked as Exhibit 25, can you see this document?

A. Yes.
Q. And it's a little big, let me -- I mean a little small, let me make that bigger.
A. Yes.
Q. Did you send this e-mail?
A. Ooh. I guess I did.
Q. And why were you sending this e-mail out?
A. Well, we tried to establish a monthly safety meeting, and I -- that's interest -- sexual harassment, I didn't even realize we had done that. Most of the meetings were because I was involved with the workers' comp aspect. We tried to have a meeting and then we would have heads of each department come to the meetings and, you know, go over we would like you to tell your guys to remember to lift correctly and use your back and we're planning a session, you know, to have someone come in to help you with stretching and different things like that.
Q. And I see here that you have attached a handout on sexual harassment.
A. Yes.
Q. Is this the type of thing that you would provide to the employees on issues such as sexual harassment?
A. We would provide it to the managers --
Q. Okay.
A. -- or supervisors.
Q. And the managers would be responsible for --

A. Yes.
Q. Okay.
A. Yep.
Q. Do you know whether or not sales representatives were required to punch in and out while they worked at Nappi Distributors while you were there?
A. Sales -- sales reps typically not. That I can remember.
Q. Okay.
A. Sales you mean pure sales guys?
Q. Yep. Yep.
A. No, usually not.
Q. Okay. And what is the reason for that?
A. It's -- it's not an hourly position, you know, it's commissions and draws and this. Typically they'll -- they maybe not even come in to punch in every day, they leave right from work to the first stop.
Q. And do you mean by that that they're out with their accounts on the road going from restaurant to store?
A. Yes.
Q. Bouncing around kind of? And is the job a typical nine-to-five job --
A. No.
Q. -- where --
A. Not at all.
Q. Okay. So I understand that the sales reps they're kind of

doing their thing at all hours; is that right?
A. Quite possibly, yes.
Q. Okay. And I understand that for the -- the sales representatives across the board the summer is really the peak season for everybody; is that right?
A. Absolutely, yes.
Q. And did Nappi have to hire sales assistants to assist the sales representatives through that peak season?
A. I think sometimes yes.
Q. Okay. So the function of the sales assistant was not solely to cover vacations when sales representatives weren't present, it was also to just be an extra set of hands when things were crazy.
A. Repeat that.
Q. Is it true that the sales assistants were not -- the position was not created by Nappi solely to cover vacations and time away for sales representatives, but they were also hired because Nappi and the sales reps need an extra set of hands when things were really busy and everybody -- it was kind of an all hands on deck situation?
A. I recall mostly it would had to do with our -- we have a group of individuals called pack out people that go to both wine and beer and to fill the coolers and shelves at major big accounts. That was usually where the bulking -- bulking up went.

MS. QUINLAN: Your Honor, I move to admit Exhibit 25.

THE COURT: Any objection to 25?

MS. MAHER: No, Your Honor.

THE COURT: 25 is admitted without objection.

MS. QUINLAN: I would like to publish to the jury.

THE COURT: You may.

BY MS. QUINLAN:

Q. Jim, I'm almost done with you, I promise.

A. That's all right.

Q. While you were at Nappi Distributors, was there any maternity policy?

A. Yes.

Q. And was that maternity policy reduced to writing?

A. Say it again.

Q. Was the maternity policy reduced to writing?

A. Boy, I missed that, I'm sorry.

Q. Sorry. Was the maternity policy written down anywhere?

A. It probably was in the handbook something to that I think.

Q. So if there was a maternity leave policy we could look in the handbook and that's where we would find it?

A. Yes, so I don't -- usually the same options that John Wall outlined, you know, as far as time off or using your own time, try to have some flexibility like that.

Q. And what was the maternity leave policy as you remember it?

A. Gee, that's not -- I can't remember what it was.
Q. Okay.
A. Usually the -- the folks would go to see Becky and give them the options what was involved.
Q. Who was it, Becky?
A. Becky Douglass, yeah, Rebecca.
Q. And the policy that you're referring to, is it just Nappi's short-term disability policy?
A. It could be that, whatever what -- was available.
Q. And I understand that short-term disability not all employees at Nappi Distributors get that benefit, they have to elect it and pay for it; is that right -- is that right?
A. I believe so. I think that's correct.
Q. Did you ever have any training yourself on discrimination based on sex, sexual orientation, disability, race, that sort of thing?
A. What was the last one?
Q. Race.
A. Race, no, not -- not really formal. I probably attended seminars.
Q. And you attended seminars that were teaching you as a member of management what you needed to know?
A. Yes, at least some exposure to it.
Q. Okay.
A. Probably not nearly as much as I needed to know, but.

Q. And while you were there at Nappi, what was your understanding of what you would do if you learned of a complaint of discrimination?
A. I -- we would try to meet with the person to verify what was going on, have a meeting. We had one situation where we had I think in the wine -- wine department a few years back we had a -- a black individual working there, nice guy, and there was something going on, they were giving him a hard time, so there is a fellow in the -- Mr. Nick Nappi and I got the crew together and we made it very clear that what you're doing it's -- we're not going to put up with it, it's -- it's illegal. And I kind of referred to, you know, I lived through some of this stuff, granted in the north but in the early -- right through the 60s a lot of -- lot of civil rights stuff going on, and it -- we just -- it's the law, we're not putting up with it, if you don't like it the way it is, you don't have to work here, no one is forcing you, and it all seemed to go away.
Q. Okay. And was that individual's name Martin Cleveland?
A. Boy, I can't remember. Geez. Geez, he had a son named -- oh, boy. He had a son that he named after a famous dancer and I called him on it, he said, yeah, I named him after him, but I -- I can't remember the name now.
Q. Okay, no worries.
A. I can't think of it.

MS. QUINLAN: Okay. I don't think I have any further questions.

THE COURT: Thank you. Cross-examination?

MS. MAHER: Sure.

CROSS-EXAMINATION

BY MS. MAHER:

Q. Good morning, Jim.

A. Good morning.

Q. I'm Laura Maher. I'm working with John Wall and we represent Nappi on this matter. Can you hear me okay?

A. Yes.

Q. Okay, great. I don't have many questions for you, just some follow-up. First, can you tell me a little bit about yourself. Are you married, have kids?

A. Yes, married, three children.

Q. And you live locally?

A. Yes, Westbrook.

Q. And you talked a little bit about how you became involved in the beverage industry, can you sort of explain that to us?

A. Yes, I have been around it all my life. My dad was in the business. He got in and -- into it after World War II. He and two other veterans started it back in 40s, late 40s, so always around it, never in it. Went to school, I ended up working in Massachusetts at a manufacturing outfit, and again my brother was when -- when the -- the timing was right he actually was --

should have been in my role, had he not been killed in a car accident he would have been -- he would have been sitting here right now.
Q. So that sort of changed the course of your life --
A. Quite a bit, yes.
Q. -- didn't it? Yep. And you retired from Nappi in what year?
A. Probably 2015.
Q. So altogether you had about 30 plus years in the beverage industry?
A. Yes. Yes.
Q. And your position at Nappi was always vice-president of HR?
A. It was -- yes, I believe it was, yes.
Q. Didn't change at all during the course of your time there?
A. No. No.
Q. And you said you retired in 2015 --
A. I believe that.
Q. -- do you remember what month?
A. No.
Q. No?
A. I don't.
Q. I only ask because Ms. Tourangeau started working in 2015, so your time there would have overlapped?
A. I remember her in some of the sales meetings, I believe.

I think we --

Q. And earlier you mentioned that you knew of a Melanie Larocca?

A. Yes.

Q. But she was employed before your time --

A. Yes.

Q. -- correct? And you don't have any personal information concerning why she left Nappi, right?

A. No.

Q. During your time at Nappi, Nappi did have policies against discrimination and sexual harassment in the workplace, correct?

A. Yes.

Q. And those policies, as far as you know, were consistent with state and federal law?

A. Yes.

Q. I'm going to show you what's been premarked for identification as Defendant's Exhibit 43. Do you see that?

A. Yes, I do.

Q. Do you recognize --

A. This looks familiar.

Q. -- that document?

A. Yes.

Q. What is it?

A. It's the Nappi Distributors employee handbook.

Q. Okay. And is that the hand -- does that look like the

handbook that was in place when you were employed by Nappi?
A. Yes.
Q. Okay. And if we can just scroll through it, it is 28 pages long. It looks like we're drawing --
A. Yeah, you -- you can -- I can't seem to scroll.
Q. Is that you?
A. Yes, I thought I was -- I was trying to scroll.
Q. We'll scroll --
A. I couldn't figure it out.
Q. -- and if you need us to scroll let us know. You've added some nice artwork.
A. Thank you.
THE COURT: Why don't you -- why don't you strike that from the -- why don't you strike his markings.
MS. MAHER: Sure, I'll -- is this how we do that? Okay. All right.
BY MS. MAHER:
Q. Try not to touch it, if you can.
A. I will -- I won't. I won't.
MS. MAHER: All right. So -- well, first, Your Honor, I would like to admit this into evidence.
THE COURT: Any objection?
MS. QUINLAN: No objection, Your Honor.
THE COURT: It's admitted.
Q. All right. So we're not going to go through the entire

handbook, it is 28 pages long, but if we could skim to page 25.

THE COURT: Do you want to show that to the jury?

MS. MAHER: Yes, please, Your Honor.

THE COURT: You may do so.

THE WITNESS: Oh, there it is.

BY MS. MAHER:

Q. So on page 25 if you scroll down we've got, as subsection 703, sexual and other unlawful harassment; do you recognize that?

A. Yes. Yes.

Q. Okay. And does that look like the policy that was in effect while you were at Nappi?

A. It does.

Q. Okay. And I'm not going to read the whole thing, but it basically says Nappi is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. Did I read that correctly?

A. Yes.

Q. And is that what you remember about the policy when you were there?

A. Yes.

Q. Okay. And it goes on to say that actions, words, jokes, or comments based on an individual's sex, race, color, national

origin, age, religion, disability, sexual orientation, or any other legally protected characteristic will not be tolerated; did I read that correctly?
A. Yes.
Q. Okay. And then it goes on to describe sexual harassment in more detail, correct?
A. Yes.
Q. All right, and if we go to the next page. It basically tells an employee what to do if they experience or witness sexual or unlawful harassment in the workplace, do you see that paragraph?
A. Yes.
Q. It says, if you experience or witness sexual or other unlawful harassment in the workplace, report it immediately to your supervisor. Is that your understanding of the policy while you were at Nappi?
A. Yes.
Q. If the supervisor is unavailable or you believe it would be inappropriate to contact that person, you should immediately contact the department manager or any other member of management. Is that what you remember as well?
A. Yes.
Q. Okay. And member of management would include yourself?
A. Yes.
Q. Or some other member of management that an employee could

go to to report this kind of conduct?
A. Yes.
Q. And while you were there you don't recall -- while you were at Nappi you don't recall anyone ever reporting this type of conduct to you?
A. Yes, I do have one instance.
Q. The one you talked about earlier?
A. No.
Q. What's the other one?
A. One of the female employee came to me and said one of -- another employee at Nappi was kind of making suggestive comments, I don't know exactly, but it made her uncomfortable.
Q. And did you investigate that?
A. Yes. I confronted the -- the offender and -- and -- and he -- I said she doesn't want to see you there anymore so just avoid her.
Q. And did that resolve the issue?
A. It did.
Q. And she had no further comments?
A. As far as I recall, none.
Q. Okay. All right. I think we're all done with that exhibit. And I just want to be clear, this employee handbook is provided to all new employees?
A. Yes.
Q. At the time of employment?

A. Yes.
Q. Okay. And I'm going to show you what's been premarked for identification as Defendant's Exhibit 45. Do you recognize this document?
A. Yes. Yes.
Q. What is it?
A. It's an acknowledgment form. There's probably a signoff. There you go, yeah.
Q. And basically it's an acknowledgment that the new employee has received a copy of the handbook; is that correct?
A. Yes.

MS. MAHER: And, Your Honor, at this time I would move for this to be admitted.

THE COURT: And which one is that?

MS. MAHER: Defendant's Exhibit 45.

THE COURT: Is there any objection to 45?

MS. QUINLAN: I object, Your Honor. There has been no foundation laid that Ms. Tourangeau received the handbook or that it's her signature on the page.

MS. MAHER: Your Honor, I'm simply asking him if this is the form. I think we'll establish later that this is Ms. Tourangeau's signature.

THE COURT: She -- is she denying it's -- that it's her signature?

MS. QUINLAN: I withdraw my objection, I just asked

her if it was hers.

THE COURT: All right. 45 is admitted without objection.

MS. MAHER: Okay. And I would ask that we publish that to the jury.

THE COURT: You may.

MS. MAHER: Thank you.

BY MS. MAHER:

Q. All right. And -- and so what I just want to bring your attention to is that bottom paragraph. It says, I acknowledge that this handbook is neither a contract of employment nor a legal document -- document. I have received the handbook and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

Is that your understanding of the policy while you were at Nappi?

A. Yes.

Q. And all new employees signed these forms?

A. Yes.

Q. When they receive a copy of the handbook?

A. Yes.

Q. Okay. And -- and Ms. Tourangeau has just let us know that that is in fact her signature, but were you present when she signed this document?

A. I don't believe so.
Q. Okay. All right. And I also just want to show you one -- one more document that's been marked --
MS. MAHER: Your Honor, I would move to admit -- oh, we already did, sorry. Your Honor, if we could pull up Defendant's Exhibit 46.
BY MS. MAHER:
Q. Do you see that?
A. Yes. Yes.
Q. Okay. And can you tell me what it is?
A. It looks like an acknowledgement of receiving different information from -- from us, Nappi Distributors.
Q. Is that a document that you created?
A. I'm not -- it's possible, I'm not sure.
Q. Okay. So at the top it says memo to new employee and then it says from Jim Bourque?
A. Yes.
Q. That's you, correct?
A. It sure looks like it, yes.
Q. Okay. Do you have any reason to believe you did not create this document?
A. I probably did.
Q. Okay. And what is the document exactly?
A. It is -- I think it's a -- it's -- an introduction; how to contact me; injuries, that was the big one, yeah, where to go;

and then the different policies that we had we try to --

Q. And --

A. -- make sure people had.

MS. MAHER: Your Honor, I would move to admit Defendant's Exhibit 46.

THE COURT: Any objection?

MS. QUINLAN: No objection.

THE COURT: 46 is admitted.

BY MS. MAHER:

Q. And is this a document that's provided to all new hires?

A. Yes.

Q. And if --

MS. MAHER: Can I publish this to the jury, Your Honor?

THE COURT: You may.

Q. All right. So this document is what you said it is, it's sort of an introduction to Nappi and provides the employer with information concerning some of Nappi's policies, correct?

A. Yes.

Q. And specifically work-related injury information and who to contact for that?

A. Yes.

Q. And as part of that checklist it indicates that the employee handbook and specifically the sexual harassment section are highlighted; is that accurate?

A. Yes.

Q. Okay. And again this form is purportedly signed by Ms. Tourangeau, were you present when she signed this form?

A. I don't believe so.

Q. Okay. Now, as part of this lawsuit you're aware that Ms. Tourangeau has alleged that Nappi discriminated against women in the hiring practices.

A. Yes.

Q. You're not aware of any complaints of pay disparity in the wine sales division while you were at Nappi; is that correct?

A. Say that again.

Q. You're not aware of any pay disparities, or complaints about pay disparities rather, in the wine division while you were at Nappi?

A. Constantly. Just pay disparity -- pay? Absolutely. Nobody ever thought they were getting paid enough --

Q. But that wasn't --

A. -- for that kind of stuff, but no --

Q. Wasn't based on gender?

A. -- not in -- excuse me?

Q. It wasn't based on gender?

A. No, no.

Q. And you weren't involved in the decision to move from three percent to two percent commission rate for wine sales, were you?

A. No.
Q. And you weren't -- I think you testified you weren't really involved in the hiring of new wine sales representatives at Nappi?
A. No, I -- usually I try to get -- make sure this stuff was in place after the fact --
Q. The paperwork?
A. -- quite often. Yes.
Q. But you weren't involved in the decision whether or not to hire someone?
A. Correct.
Q. And you're not the one who hired Ms. Tourangeau?
A. That's correct.
Q. Were you involved in her hiring at all?
A. Not that I'm aware of.
Q. You weren't involved in determining what her compensation rate would be, correct?
A. Oh, no.
Q. You weren't involved in any rerouting processes at Nappi concerning sales reps, were you?
A. No.
Q. Have you ever disqualified a candidate from employment at Nappi because she was a woman?
A. No.
Q. Are you aware of anyone at Nappi ever disqualifying a

candidate simply because she was a woman?
A. I -- no.
Q. Have you ever attempted to influence another manager at Nappi to not hire a candidate simply because she is a woman?
A. No.
Q. And just one last question, you mentioned earlier that you -- you know Frank Maiorino, correct?
A. Yes.
Q. You have never heard Frank Maiorino say that Nappi shouldn't hire women because they get pregnant and Nappi has to cover their leave, have you?
A. I don't recall that.

MS. MAHER: Okay. I have no further questions for you, Jim, thank you.

THE WITNESS: Thank you.

THE COURT: Thank you.

Further questions, Ms. Quinlan?

MS. QUINLAN: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. QUINLAN:
Q. I just wanted to ask you a few follow-up questions.
A. Yes.
Q. I think you said that the policies in the handbook were consistent with state and federal law; is that right?
A. That was the attempt, yes.

Q. Okay. Do you know what state and federal law requires for harassment and discrimination policies for employers?
A. I'm not exactly sure, but we -- our attempt was to try to cover it through the handbook.
Q. And do you know what state and federal law requires for training employees on these policies?
A. That I'm not aware of either.
Q. At these management meetings that you had, was it ever discussed that they needed to hire women?
A. No.
Q. Was it ever discussed that they needed to hire female sales representatives?
A. Say it again.
Q. Was it ever discussed or, you know, apparent to the management team that there weren't any female sales representatives and that they should probably hire one?
MS. MAHER: Objection, Your Honor, calls for speculation.
THE COURT: Overruled. You may -- you may answer if you can.
A. No.
BY MS. QUINLAN:
Q. Okay. You also said that while you were at Nappi you never received any complaints about pay disparity; is that right?

A. That's correct.
Q. I think you kind of alluded to the fact that you did receive complaints about people wanting to earn more money?
A. No, no, that's just I -- not making light of it, but quite often. No one is satisfied with what they're making typically, but that's -- but to your point, no.
Q. Okay. Isn't it true that when you were at Nappi Distributors there weren't any female sales representatives in the wine department to make a complaint to you about pay disparity?
A. That could be. Oh, wait. Say that again?
Q. Isn't it true that while you were at Nappi Distributors there weren't any women sales representatives to make any complaints to you about pay disparity in the wine department?
A. Well, if it was pay disparity and gender, definitely, correct.
Q. Okay. You referred to receiving a report of sexual harassment, who did that involve?
A. The one that I described?
Q. Yeah.
A. It was a gal in -- a woman in our -- our graphic.
Q. Graphic design?
A. Yeah, was.
Q. Was it Katturah?
A. Carla -- no.

Q. Jamie Colpoys?

A. No. Can't think of her name. She is the head of it though. Kate -- Kate. Kate.

Q. Kate?

A. Kate.

Q. Brousseau?

A. Yes, thank you.

Q. And what did she complain to you about?

A. Salesman I believe he came into the office and kind of making -- made her uncomfortable. I don't know if there was innuendo involved or just being a -- you know, not -- not -- not appropriate.

Q. So he was making some comments to her that made her feel uncomfortable?

A. Correct.

Q. And did she think that the comments were kind of sexual in nature?

A. Yes. Yeah. That was the drift I -- excuse me, the drift I got, yeah.

Q. And who was the sales representative that was kind of making these comments?

A. Oh, geez. He has -- he has since retired. Bob Cormier.

Q. Okay. And did you also receive a complaint of some sort of sexual harassment or the same sort of inappropriate comment from Mary Johnson involving Dick Thomas?

A. I don't recall.
Q. Do you know who Mary Johnson is?
A. Yes.
Q. Who is she?
A. She was like a -- I think she was on the support staff. I believe she was -- it was wine administrator or wine --
Q. Beer administrator?
A. -- wine or beer. I -- I can't -- I think pricing, was it? I'm not even sure.
Q. Sorry, I didn't mean to interrupt you.
A. Yeah.
Q. Did she report to Chris Black?
A. I -- yes, I believe so.
Q. Okay.
A. It had to have been beer then, yep.
Q. Okay. And do you know who Dick Thomas is?
A. Yes.
Q. Who is he?
A. He was like -- he worked -- he was a financial guy, basically reported to Elmer.
Q. Do you know --
A. I can't -- go ahead.
Q. Do you know who Greg Hoyt is?
A. Yes.
Q. Did Greg Hoyt ever come to you and say that he had

observed or learned of this comment that was made to Mary Johnson that was inappropriate?

A. Boy, I --

MS. MAHER: Objection, Your Honor.

THE COURT: Basis?

MS. MAHER: He has already testified that he is unaware of any -- or he cannot recall any such comment.

THE COURT: Overruled. This is effectively cross-examination, it's a hostile witness, I'm going to allow her to ask questions.

A. I don't recall, and if it was Greg I would have recalled. He is a -- a ex-marine, great guy, and, boy, if he did I don't remember.

BY MS. QUINLAN:

Q. Okay. Was there also an incident while you were at Nappi Distributors involving Anthony Dibiase and a wine picker?

A. I believe so, yes.

Q. And was that an incident involving sexual harassment?

A. You know, it was a strange thing because he came to me and said that he thought a wine selector, probably a coworker -- he might have been in a supervisory role at that stage, I can't remember -- was -- was accusing him of trying to, for lack of a better word, put the moves on her and he was -- he -- he is a married man, and his concern was if it got back to his wife, you know, could be some fireworks. I -- I -- I asked him

pointblank is it true and he denied it. I said if it's true you're going to have to, you know, take some action, and, you know, get yourself ready, if you did it then own up to it, but he claimed he didn't.

Q. All right.

A. And I drilled him on that one. I said, you know, if -- if -- if -- if that's not what happened, fine, if it did happen, look out.

Q. Okay. And did you --

A. And I never -- go ahead, excuse me.

Q. Sorry. Did you talk to the woman who was --

A. No.

Q. -- saying --

A. No.

Q. Okay.

A. No. That's what I would have expected to -- see, this stuff comes to me, you don't -- you don't -- you -- you don't -- I'm not really an investigator that much, but usually if there is a problem people come to you, period. He is the only one that came to me worried about his marriage, I never heard from her.

Q. Okay. Do you have any understanding whether lower level of management was dealing with the situation?

A. No idea.

Q. Did --

A. Usually that would have ended up in my office.
Q. That sort of issue would have come to you?
A. Absolutely, yeah.
Q. And that was my next question, did management know that if that sort of issue arose that it should come to you?
A. They should know that, yes.
Q. Okay.
A. They should know that.
Q. And is that something that you would communicate to management?
A. Usually they -- I didn't get involved. They didn't want to deal with it quite often, they would throw it at me, so, yes, I believe they would -- they should have known that.

MS. QUINLAN: Okay. Okay. I have no further questions.

THE WITNESS: Okay.

MS. QUINLAN: Thank you, Jim.

THE COURT: Thank you.

Anything further?

MS. MAHER: No, Your Honor, thank you.

THE COURT: Thank you. You may stand down, sir.

THE WITNESS: Thank you.

THE COURT: Next witness.

MS. QUINLAN: We call the Plaintiff Michele Tourangeau.

THE CLERK: Please raise your right hand. Do you solemnly swear that the testimony you shall give in the cause now in hearing shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE CLERK: All right. Pull yourself right up to the microphone, please state and spell your first and last names.

THE WITNESS: Michele, M-I-C-H-E-L-E, Tourangeau, T-O-U-R-A-N-G-E-A-U.

DIRECT EXAMINATION

BY MS. QUINLAN:

Q. Getting myself, sorry, Michele. Okay, good morning, Michele. Good morning, Michele, how are you doing?

A. Good morning. I'm okay. A little nervous, I have to admit to feeling a little queasy, but going to breathe through it.

Q. Same, you're in good company.

A. Thank you.

Q. So, Michele, if you could, would you tell the jury a little bit about yourself? Where do you live?

A. I currently live in Ogunquit, Maine.

Q. And who do you live with there?

A. My husband, Timothy Pasterczyk, and our daughter, Sloan.

Q. And how old is your daughter?

A. She is six, she will be seven in April.

Q. And where are you from? Where did you grow up?

A. Well, my father was in the military so I was -- he was stationed in Virginia when I was born, but right before I was a year old we moved to Springfield, Massachusetts. Funny, Jim Bourque just mentioned working there. But, yeah, we moved there and that's where my father's family was initially from and where he grew up.

Q. Okay.

A. And I lived there through high school, college, it was my family's like primary residence probably until ten years ago or so.

Q. Okay. And did they end up moving somewhere else or living somewhere else?

A. No. Well, my father passed away almost 20 years ago and so my mom was in the house, you know, by herself, but then she ended up selling and she bought a home in Maine in Ogunquit, near where we are, where she spends like the summers and -- this was after she retired fully, summers and some -- the fall so she can be there to enjoy the area but also support Tim and I with Sloan and help with her during our really busy work times. And then the other time when she is in Massachusetts she has an in-law apartment at my sister's home which is in Hadley, Massachusetts.

Q. Oh, nice. So I understand that in 2014 you applied for a job with Nappi Distributors --

A. Yep.
Q. -- is that right?
A. I did, yes.
Q. Okay. And, if you could, just kind of take the jury through your employment history leading up to your employment at Nappi Distributors?
A. Okay. Well, I started working when I was 15 years old in the restaurant business. I -- my first job was as a breakfast server at the motel that friends of my parents owned, so I worked there Saturday and Sunday mornings. And then through high school and college I worked in the restaurant business in various forms, various places, hostess, server, bartender, just, you know, that was my -- my kind of thing all through high school.

I went to UMass Amherst in Amherst, Massachusetts, where I got my degree in hospitality management, and during that time I also worked four shifts a week at a bar/restaurant in town there.

After well graduation -- right before graduation my college boyfriend dumped me and broke my heart so my plan of going with him to tour, you know, cross-country to just be kind of free ended, so I just moved to Boston, Mass., just with some friends just to kind of figure out my next move.

And I worked in the restaurant business there as a server in Beacon Hill; and then I managed a restaurant in Boston for a

bit; a couple of years later moved back to western Mass.; and I was a corporate trainer for the Olive Garden corporation training their front of the house staff; I managed restaurant -- a restaurant -- another restaurant for a while. I got into hotel sales, so I was a sales manager for a couple -- two different properties over the period of six or so years.

Then I -- and so during that time I always -- I continued to bartend or serve like on the side part-time jobs so I always did that as well. I like to work a lot. And in I forgot the year but from there I was hired as director of events in marketing at Hampshire College, which is in Amherst as well, and I was there for 12 years in that role.

Q. And if I could just stop you right there, Michele, what did you do as the director of the events and marketing?

A. Yeah, so I had a -- a department -- excuse me, a department of four who I oversaw, and we were responsible for selling the property, the campus, the facilities on campus, to generate revenue for the college. I created -- they had a beautiful old rustic barn that I wrote a business plan and a proposal for the administration to kind of renovate it, put some money into it so we could turn it into a profit center where we hosted weddings. Now they host like a hundred weddings a year or so, it's insane how it blew up, so that was kind of my claim to fame there. I did that, and then the summers the campus is vacant. There was no summer school, per

se, at all on that campus. So all the facilities full -- fell under my purview to sell, generate revenue, book clients, oversee the whole operation, the food service, you know, kind of the whole thing, so the whole kind of support services of the campus reported to me, with me, we, you know, did -- that's what I was really responsible for --

Q. Sure.

A. -- for the most part. I was again, you know, the managers meetings all the time because I was department head, all the administration -- admin -- oh, sorry, administrative things that come along, you know, with that kind of a role.

Q. Sure. Sure. And you might have already said this, but how long were you at the college?

A. 12 years.

Q. 12 years, okay. And what was your next position? What was your next --

A. Well, so I didn't quite finish. Just -- well, because during my time at the college I started also I started to become like pursue my entre -- entrepreneurial side so I started my own sales -- side sales business, so I sold jewelry for a while on the side. And then I created a business called F & B Marketing and Promotions where I reconnected with, you know, a lot of the contacts I had made in the hotel/restaurant/liquor industry through those roles. So I -- so at first it was just me in the -- in the company that I

started where I would be -- I became a contract provider to various distributors of wine, beer, and spirits in the Massachusetts area. Martignetti companies was a big one, M.S. Walker, Barr Hill.

Q. And I just want to stop you right there. You said distributors, but did you mean suppliers?

A. So distributors, suppliers. I'm sorry if I said -- yeah, distributors which would be like what Nappi is but there were companies like that in Massachusetts.

Q. Okay.

A. Suppliers, which we also have at Nappi, are the -- the companies like, for example, Jackson Family would be a supplier who represents Kendall-Jackson wine, they sell it to Nappi, Nappi sells it to the buyers. So that same role but I had relationships with both the distributors and the suppliers of various companies and so I became a contract provider.

So they would hire me to represent them at various trade shows, on -- on-premise -- as Mr. Wall explained earlier, on-premise and off-premise. On-premise are like restaurants, hotels, anywhere you're consuming the product on property, and then off-premise are like retail stores.

So I would do like promotions at -- at retail where people would come in, I would explain the products to them, sample them on the product, and help to facilitate further sale with the sales reps. Trade shows, like I said I represented them,

did -- became pretty much like a part of the Martignetti team because I did the most work for them.

So I would travel from time to time luckily with the sales force and the sales managers to go to like the Nantucket Wine Festival, the festival in Martha's Vineyard, and just -- you know, so I was just really exposed to and got to learn a lot about the kind of beverage industry from that side. So I did that throughout. You know, not throughout the whole time at Hampshire, but until from Hampshire College that's also when I had met my now husband in that area and we, you know, just kind of decided we were both ready for a change and we decided to move to southern Maine, which we did, and so I left my job at Hampshire College. And by that time I had hired a couple of employees at my sales business that I was able to oversee from Maine so I maintained that for another year or so. They would do things on my company's behalf, but I was responsible for them, carried the insurance, held the liability, did the trainings for them, that kind of thing.

Q. Okay.

A. So --

Q. And so does that kind of bring us up to when you started working at Nappi Distributors?

A. Well, when my husband and I -- he wasn't my husband then, but he is now, but we moved to Maine and bought a bed and breakfast in Ogunquit that we owned and operated for -- up

until actually 2019, but I did that with him full-time from June of 2013 until I started at Nappi in January of 2015.

Q. Okay. And what made you decide to go look for a job at Nappi if you had this bed and breakfast?

A. So we bought the inn in June and it was -- it had to happen that way for us because, you know, we -- we came right in right when it was time to really start making the money, and that's the only way we could have done it, and we scraped whatever we could to get in and so we just worked like -- you know, like crazy. I don't know if -- you know, just who knows about that type of business but it's seven days a week, 18-hour days, through season. So did that, slowed down at the end of October, and then the winters get really calm, really calm, and quiet.

So did that, in April things start to gear up again, did our second season and -- and just had a really serious talk with Tim about how as much as I loved it, it was just not quite enough for me.

The winters were just so quiet and I was not used to that much downtime, and quite frankly I didn't really like it, I like to be busy, and so -- and just, you know, talked about maybe it would make more sense and I wanted to be the one to go back out into the workforce outside of the home if he would take the lead at the inn.

So that decision was made and then it was such a

natural -- like I knew I wanted to work for a distributor, a wine distributor, because --

Q. And why did you want to work for a wine distributor?

A. Well, because right before I moved to Maine, you know, I had the -- the business that I ran that really exposed me to that -- you know, all of that, and knew that it was something that I was really interested in doing full-time, so -- and being in southern Maine it just seemed like a good idea. I don't, you know, remember a lot more than that, just knowing I wanted to do that, and I had made --

Q. How did you -- sorry, I don't mean to cut you off.

A. It's okay. I talk a lot, you can stop me, please.

Q. I'm just trying to give you a little break here so I'm --

A. Sorry.

Q. Okay. So how did you learn of the -- the position at Nappi Distributors?

A. So when I decided I was, you know, going back to work outside of the home I reached out to a colleague that I had made while I was doing my sales business, Pam Gallagher, who worked for a supplier Rutherford Wine Company, and I knew her markets were Massachusetts and Maine, I don't know what else but I think all of New England, but I let her know -- she knew I had moved to Maine. I let her know I was interested and who did she think would be the best company for me to look into and she immediately --

MR. WALL: Objection, Your Honor, calls for hearsay the portion of this testimony.

MS. QUINLAN: Your Honor, it's not going for the truth of the matter asserted, it's going for state of mind and why she applied to Nappi.

THE COURT: I don't think it's for the truth that it was the best company or whatever else, I think it's just to indicate why she applied. So if you want me to instruct the jury on that, I will.

MR. WALL: Yes, Your Honor, please.

THE COURT: Ladies and gentlemen, there is a difference between something being admitted for the truth of something. She just mentioned, for example, that this woman told her that the distributor was the best company. She is not saying that it actually was the best company. She is saying and you are to take it as a reference to the fact to explain why she applied. Not that it's the best company, but hearing that it was the best company tells you why she applied to it.

THE WITNESS: Okay --

MS. QUINLAN: Okay.

THE WITNESS: -- thank you.

BY MS. QUINLAN:

Q. And so after you spoke to Pam and she told you, you got to go to Nappi, it's the best company, what else did she tell you?

A. Well, Pam --

MR. WALL: Your Honor, objection, this calls for hearsay.

A. Okay, I don't --

THE COURT: Well, I have a -- I've -- I'm overruling that.

Ladies and gentlemen, whatever response is not for the truth, I just told you that. It's not for the truth of the matter but to explain why she did what she did only.

A. So Pam --

THE COURT: The objection is overruled. You may proceed.

THE WITNESS: Sorry, Your Honor.

MS. QUINLAN: Thank you, Your Honor.

A. Pam was -- worked directly with Nappi Distributors because she was their supplier, so she knew people there so recommended it might be a good place, and she said, you know, I'll reach out to Paul Carr, who she knew obviously and was the wine director at the time, to see, you know, what was going on, if they might be having openings. And so she did and then let me know that Paul had told her --

BY MS. QUINLAN:

Q. And let me just stop you right there. Did you call her back or did she call you to let you know that she had spoken to Paul?

A. I don't really remember how it went.

Q. Okay. And what did she tell you that she discussed with Paul?

A. That Paul had told her it was actually really good timing because they had a retirement coming up which was going to -- someone was getting promoted so there was -- there was going to be an opening in a northern route, they were looking for sales assistants, there was just different things going on. And, you know, it was also good timing because they had decided they really -- or he -- I don't know if it was they or he decided they needed to start hiring women so it seemed like a great -- a great time that this had come up, so --

Q. So once she told you this information, what did you do next?

A. So she connected me -- she gave me Paul's contact information, I reached out to him, he asked me to send him his (sic) resume, which I did.

Q. Okay. And after you sent him your resume, did you hear back from him, did you follow up with him?

A. Yes. Paul got back to me pretty quickly and asked if I would come in for, you know, a conversation, interview, at the Nappi home office.

Q. And did you go in to have an interview?

A. I did. I went in and I met with Paul Carr, Mike Hale, and Rocky DeVinney.

Q. And we already know who Paul is, but who is Rocky?

A. Well, Rocky DeVinney was the -- I think his title was fine wine sales manager. It's the job Ian Brown now has, but that was Rocky's role. And then Mike Hale was a sales manager mostly for the off-premise, I believe.

Q. Okay. And what did -- did they ask you any questions at the -- this meeting?

A. Yeah. I mean it was an interview, so it was -- we were in one of their conference rooms there and they asked me, you know, typical kind of interview questions. They all had a copy of my resume, we went over that. They explained to me how again Rocky was going to be retiring and Ian Brown, who currently had the southern sales route, was going to be moving into Rocky's role. They didn't know what was happening with the southern sales route, they had a northern sales route that would be available as well, some sales assistants positions, so we just kind of talked through that. They --

Q. I'm sorry, when -- what was the timing of when this meeting occurred?

A. So it would have been probably Septemberish of 2014.

Q. Okay. And during this meeting did they tell you what position they might be considering you for for hiring?

A. Well, it was -- it was just -- it was a conversation that the three of them were sort of having with me in the room and then I was a part of it, but they were, you know, saying well, yeah, you know, Ian is leaving the south -- you know, they were

just talking about the actual opportunities that were out there.

I think it was Paul who said -- you know, after we were talking for a while, they looked at my resume, asked me questions, Rocky made a comment that he was -- and I remember this because it meant a lot to me, he was impressed by my diverse level of experience and all the different things I had done. And they -- or Paul I think said, you know, this northern route most likely wouldn't work for you because first of all where you live it's way up -- it's way up north but most importantly it's not a big revenue-generating route so you wouldn't make the money that you probably want to make I think it was. And we hadn't really talked at that time at all about what I was looking for, but he concluded that on his own and said, you know, we won't even talk about the sales assistant's positions because you're definitely overqualified for that.

So I mean I -- when I left the meeting it -- there wasn't a specific, you know, offer on the table or anything like that, it was more I felt that the meeting went really well, it was nice to meet them, they said it was nice to meet me, knew they had a lot of moving parts going and that somebody would be in touch.

Q. Then --

A. Something else to mention, though, I just don't want to lose my train of thought, but during the meeting when they were

talking about Ian Brown in the southern routes amongst themselves, but I was sitting there so I heard, had said, well, Ian's route in the south, you know, he makes about 85,000 so that's probably a route that would be better for her. As I'm sitting there listening to that I'm thinking, yeah, that would work, you know, that, and my -- where the area where I live and like that sounded pretty good. So I think for the most part that's all, you know, that was that meeting.

Q. Okay. And so what did you do when you left the meeting? Did you have any further contact with anybody at Nappi after the meeting?

A. Yeah. I don't remember exactly when, but shortly thereafter I sent thank you I think it was e-mails or letters, I don't remember which, but to all three of them thanking them for their time. And then shortly thereafter, it was within the week, I was in the Rite Aid in Wells, I remember that, and my phone rang and it was Paul Carr who just said he was, you know, thanking me for the letter but checking in with me and said I haven't heard from you, you know, and I said well, well, you know, I was just kind of giving you guys a little time and I did send the letter. But it was flattering because he, you know, just said, well, you're not looking at any other distributors, right, we don't want to lose you to anyone else. And I was flattered certainly, and I just said, no, I mean I really liked our conversation and was looking forward to

hearing back on what might be available. So --

Q. And did Paul give you any idea of, you know, whether or not Nappi was still considering you for a position there?

A. He did. He said that they had spoken, I assumed he meant the three that were in the room but had spoken and had decided they wanted to offer me the southern sales route and was I still interested, and I said, yeah, absolutely, that -- that sounds really good, and --

Q. Did he have any conversation with you about what your compensation would be during this call or anything like that?

A. I -- I don't know exactly. I just -- give me a minute to just think because this is all -- but -- I mean I know we definitely had a conversation about compensation, but was it then. I -- I'm not absolutely positive.

Q. Okay. What was the next conversation that you recall having with somebody at Nappi?

A. Well, it definitely was Paul, and it would have been certainly about compensation because that's -- was important obviously a piece of the puzzle. I -- you know, I had a lot of questions about just the actual territory, the number of accounts, things like that, but initially just wanted to -- you know, I think -- well, I know in my head, because I had heard them talking, you know, about what Ian made for money, in my head I was sort of thinking that would be a ballpark, so we talked about that. He -- he told me that --

Q. And, sorry, I just want to stop you right there. When you say we talked about that, do you mean you talked about the $85,000 compensation that --

A. Well, we -- no, I had heard them talking about it during our meeting, but about compensation I knew we had -- we were going to be talking about that. And he said -- he let me know that the sales reps that were already employed at Nappi were all earning a three percent commission and he for my route given -- or the route I would be getting -- the seasonality of it all being in southern Maine, with a lot of seasonal accounts, beach accounts, so on, he wanted to offer a two percent commission plus a base salary in lieu of that one percent so that I would have money coming in all winter and I wouldn't like, quote, unquote, starve in the winter.

Q. And did he use that language with you specifically that -- so you wouldn't starve in the winter?

A. Yeah, that definitely was said for sure, yep.

Q. Okay. And did he give you any reference for why he might have said that?

A. Oh, about the starving? Yeah, I mean he made just kind of jokes that Ian working in the south, you know, in January, February, when it's just so quiet made like no money, and Ian joked about one of the gas stations that had become an account at Pine Tree Store how he would just goof around with them there and Dee, one of the server -- one of the cashiers who was

working always on Thursdays when he would be in there, would just give him hot dogs because she felt sorry for him. It was kind of a joke, like he didn't -- he wasn't begging or anything like that, but, you know, it was just kind of a joke so.
Q. Okay.
A. He literally meant so you don't starve.
Q. Okay. And so after Paul told you this information about what the compensation structure was for all of the other sales representatives and what he planned to do for you, what did you think? What was your response?
A. It -- yeah, I said I mean it seemed to make sense to me why that would be, and the idea of not starving in the winter was good, I thought.
Q. And what about it made sense to you?
A. Well, that you would always -- that I would always have at least some -- a paycheck all the time regardless of what month it was. There wouldn't be weeks or months without a paycheck.
Q. Okay.
A. So, yeah.
Q. And what was your next contact with somebody at Nappi Distributors?
A. So definitely was with Paul and --
Q. And do you think it was by phone or by e-mail?
A. We -- we had both, some phone calls and there was some e-mail. But the phone call I remember was about actual

compensation because, you know, I had asked or I was asking -- wondering the sales route and what the sales route generated at that current time because I wanted to do the math and check what two percent was. And incentives, I don't know if I mentioned that, but the compensation package was two percent commission, base salary, plus incentive earning possibilities, so that was like the package we discussed and --
Q. Can I just pause you right there?
A. Mm-hmm.
Q. I don't think we've talked about it yet in detail, what are incentives?
A. Incentives are really are programs -- are programming, I should say, that are created by the suppliers that Nap -- that, you know, we represent as well as input from I believe Nappi management, and they're programs to help promote certain products and to get products out into the market. Some of them are about placements, so if you place three bottles of this brand or of this type within a certain timeframe you get paid this much. Some of them are volume incentives, so for this particular supplier or these particular brands if you reach a certain goal within a certain time you get paid on that. So they're -- it's an opportunity to earn money which, yeah, that's what they are.
Q. So it's sort of like bonus money if you hit these sales goals?

A. Yeah, I -- it never was referred to as bonus money, but.
Q. Would you say it's money that you aren't entitled to unless you hit the goals that Nappi identifies?
A. Oh, sure, because there are, yeah, programs that not -- that people don't hit ever or some do, you know, so it -- it all depends how.
Q. And what is your understanding of where that incentive money that goes to the sales representatives comes from?
A. Well, what I -- I just assumed and thought and I -- I know from talking --
MS. WHITE: Objection, Your Honor.
THE COURT: That's sustained.
THE WITNESS: Oh.
THE COURT: We're not looking for assumptions, we're looking for your knowledge.
THE WITNESS: Okay, sorry. Go ahead.
BY MS. QUINLAN:
Q. And I understand that maybe you previously didn't know where the incentive payments came from, but now do you know where -- who funds the incentive payments that sales representatives receive?
A. Yes. So when Matt Watson joined the company he was the first person I had heard from that the suppliers pay 60 percent of the incentive program -- programming and Nappi pays 40 percent.

Q. And are there some suppliers who pay a larger percentage?
A. I'm not sure.
Q. Okay. I'm actually going to just use this book because I think it will somehow flow better. Okay. So, Michele, I am going to show you what I have marked as Exhibit 26.
A. Okay.
Q. There we go. Have you seen this document before?
A. I have.
Q. And what is it? If you look at this first e-mail, it looks like it's an e-mail from you to Paul Carr on September 9, 2014; is that right?
A. It is.
Q. And why were you sending Paul an e-mail?
A. It was in response to a phone call that Paul and I had. So I was thanking him for his time, was reiterating that I was going to be out of town from November 12th through the 27th so wouldn't be available during that time, I could have started before if he wanted me to train, and then I said I was looking forward to receiving the wine portfolio information as well as the compensation details offers -- offer that we had discussed earlier so I could review it.
Q. Okay. And as we go through this document there are going to be some notations on it like there are down here at the bottom.
A. Okay.

MS. QUINLAN: I'm sorry. Your Honor, I move to admit Exhibit 26.

THE COURT: Any objection?

MR. WALL: No objection, Your Honor.

THE COURT: 26 is admitted.

MS. QUINLAN: If we could publish it to the jury?

THE COURT: You may.

MS. QUINLAN: Thank you.

BY MS. QUINLAN:

Q. Okay. And so as we go through this document we're going to see that there is some notations like what we see down here at the bottom where it's highlighted, are these your notations on the document?

A. Yes.

Q. And why did you make notations to this document?

A. This was a -- I believe if this is the copy.

Q. Do you want me to show you the whole thing so that --

A. Maybe, but I -- I know why, we just have -- yeah. So, yeah, this is the e-mail interaction between Paul Carr and myself. Later on when Matt Watson was with the company at one point we had talked about my salary and he had asked me -- he wasn't sure -- or Christine Fox wasn't exactly sure, you know, where -- why I was getting a salary or how it -- how it came about, so I explained to him it was part of my compensation negotiation offer from Paul, and he asked me to share with him

the e-mail and so I did, and so that's where this would have come from was just some just highlights and such that I had made prior to sending it to him.

Q. Okay. And then looking at page two of Exhibit 26. I'm just going to Zoom in right here at this e-mail that you received from Paul Carr on September 18th of 2014. Do you recall receiving that e-mail from Paul?

A. Yes.

Q. And what was he telling you in that e-mail?

A. He was telling me that he -- I had asked for a company info packet to be sent out, and he had -- he was saying the person who would do that had been out so far during the week so he would get it to me. As far as compensation, he said he promised I would be making at least 60,000 in my first year with a combination of base pay, commissions, and incentives. He couldn't get me a list of the accounts that I had asked for because no one in sales knew that he had hired me and he wanted to keep it that way until we got closer to December 1st because other people wanted that route and he didn't have the other pieces together for whatever changes he was going to make, so -- and he would talk to me later today.

Q. Okay. Is there any reason why he couldn't provide you, the person who was going to be working the route, with the information about the accounts that you would have on that route while maintaining confidentiality so others didn't learn?

A. Well, I would say because he would have -- well, probably two things. He would have had to ask --

MR. WALL: Your Honor, I'm just objecting, this sounds like speculation to me.

THE COURT: Right, this is -- we're not looking for what you're guessing, we don't want speculation.

THE WITNESS: Okay.

THE COURT: We want what you know.

THE WITNESS: Okay.

THE COURT: All right. If you know it, you can testify to it. If you don't know it, you can't.

BY MS. QUINLAN:

Q. Okay, and I'll just move along to the next e-mail here. On September 18th of 2014 you responded to Paul about the offer where he said he could guarantee you that you would be making 60,000 in your first year. What was your response to him about that?

A. So I said I understood keeping it quiet, fine. If we can talk later, that would be great, because when we had spoken the week prior I was sure that he had said a guarantee of 65,000 in the first year with the probability of making 75 to 80 if I hit above average incentives. I asked him about a car allowance because we hadn't talked about that. I wanted to see how that fit into the compensation package so that we -- to be sure we had a clear understanding and were on the same page.

Q. Okay. And then Paul responded to you on September 14th of 2017. What did he tell you about your -- your compensation?
A. So he asked me to give him a call that afternoon if I could. He said he promised me 60,000 but it was so he would get it through the owner who thinks every wine salesperson makes too much money, you will -- you will make much more than that because that 60,000 was predicted on a base salary of $22,491, commission of two percent on sales, and $5,000 on incentives. You should make much more on incentives because Ian did more like $13,000 in incentives with four months to go for the rest of the year. The route slows down particularly in the early winter months so the base would work out to $433 a week so you don't starve if you're not good at stashing away. He let me know I get a van, free gas, free maintenance, and insurance on the vehicle.
Q. Okay. And since you have been working at Nappi did you experience periods where your only income was, during the slow times, that salary pay?
A. Yeah. Well, how it all -- you know, I don't have a paycheck in front of me that summarizes it, but there were -- there are still and there were weeks where my take home pay would be under $400.
Q. Okay. And then I just want to move along to this response here from you on September 18th. What was your concern with the information -- or were you concerned with the information

that he provided you about your compensation?

A. So I was questioning the $433 a week and are you thinking that I would need to live on that from December until April because for me that -- let me see. I want to say what's here. It concerned me because I had bills to pay and that wasn't very much money.

Q. Well, was the concern how long was that going to last for and was it really going to be that much?

A. Right. And I would have been starting right in the winter when this would have been the case, so I wanted definitely an idea of what my sales could be during the winter months so that I could calculate what two percent of that would be, so -- and I figured out on my own based on the numbers that he had given me with the base salary of 22,491, two percent -- oh, I figured out because -- yeah, the dollar amount, the two percent commission, I figured out that the route he was planning to give me would currently generate about 1.6 million, I asked is that right and can you give me an idea of the opportunity there would be in the territory.

Q. Okay. And then looking at his response -- oh, did you also want to know about the benefits, had he discussed any of that with you?

A. Yes. So -- so this -- this what I'm looking at right now is not a continuation of what I was first looking at, this seems like a different --

Q. No, it is.
A. Okay, let me just see. Could you give me -- but these -- okay, wait a second, I'm sorry. This was his response. I was summarizing my questions.
Q. No, this is your question to him.
A. Okay, wait a minute.
Q. Take your time.
A. Yes, thank you.
Q. Yeah.
A. Okay. Can you -- I'm ready to move to the next if you are ready. Okay, so --
Q. And my question to you was just did you also want to inquire about what your benefits would be, what was --
A. Yeah, and that was another question I had asked, an idea of benefits, health insurance, when I would be able to enroll, vacation time, stuff like that.
Q. Okay. And he provided to you that you were correct, it was 1.6 million in roughly sales each year, right?
A. He does confirm that, yes.
Q. Okay.
A. He said -- because this is an e-mail from him on September 20th, so yes.
Q. And then if we just look at the sentence after 1.6 million --
A. Right.

Q. -- what did he say there?

A. So your route does generate around 1.6 million. That's not saying you can't do more than Ian. You might have an advantage being a woman selling wine to account buyers being men. Places are closed in the winter. I don't have what the territory does. He -- he gave me the towns.

Q. And I just want to stop you right there. Did you have any understanding of what he meant by, you might do better than Ian because you're a woman selling to men?

A. Selling to men? Because women -- yeah, because women selling to men I could charm them, I could, you know, just -- I'm not sure how to say it, but use -- use -- how do I say it? I don't know.

Q. Okay. And I understand that after 90 days you would be entitled to your health benefits and your 401K; is that right?

A. Yes.

Q. Okay. And did you get health benefits and your 401K after 90 days?

A. I did.

Q. Okay. And then he also told you about vacation?

A. Yes. He --

Q. What was the vacation that Paul communicated to you that you would be entitled to?

A. He said the first year doesn't come with any vacation until you've served a year, then you get one week paid

vacation, and after two years you get two weeks paid vacation, after seven years you get three weeks paid vacation, sorry, I don't have control over company policy. I want you to start on December 1st without any reservations about your job. If anything mentioned above changes your mind about taking the position, please let me know now, but I think -- please let me know now, but I think you will do quite well and will be happy working for Nappi.

Q. Okay. And you responded that you were happy to accept the position and just wanted clarity on what the compensation package would be, right?

A. Yes, I did, and I refer to in this e-mail on September 23rd a conversation I had had with Mike Hale. It says Mike, but I know it was Mike Hale. And I had a good grasp on things after that, I was confident that I would be a strong asset, and I promised that I would give them 110 percent of my effort, my skills, my expertise, so -- and I did then just express to him that, you know, I was very excited about the job, I was looking forward to it, I didn't have reservations, but I wanted to be honest and transparent and let him know that as someone who had been working in the professional industry for over 20 years it was disappointing to be offered just one week of vacation after working even a full year, the norm is a minimum of two weeks, and that was what I was hoping for and expecting. You know, I just wanted to -- to say that and, you

know, I -- I reiterate there are many benefits working for the company, I wasn't going to let the vacation issue deter me, but it was disappointing, and I was surprised by it.

Q. Okay. And then I'm going to show you -- oh, I think you said down below that you were waiting for the official offer letter; is that right?

A. Yeah. I hadn't heard since that -- that was the last interaction we had at some point in September, so then I sent him a message I think it was a week later that was joking haven't heard from you, do I still have a job, ha ha. It was -- I hadn't received an offer letter from HR, so -- I assumed that's who it would come from, and so I asked about that. He responded back on October 2nd and said HR doesn't have anything to do with hiring, I will send you a hiring letter on Nappi letterhead today, have a great weekend.

Q. Okay. And then I'm going to show you is this the offer letter that you received?

A. So it looks like on October 2nd -- well, not looks like, he did on October -- on October 2nd --

MR. WALL: Your Honor, I just want to object. This hasn't been offered yet. I'm not planning on objecting, but just for the purposes of keeping things straight --

MS. QUINLAN: This was all part of Exhibit 26.

MR. WALL: Oh, I'm sorry, is it part of? I apologize, I thought this was a separate exhibit. My bad.

MS. QUINLAN: That's okay.
A. Yes, so this is the offer letter that Paul sent to me. It's a copy of that. Is everyone seeing this or just me, should I read it?
BY MS. QUINLAN:
Q. Yep. No, everybody can see it. That's fine.
A. No, I just didn't know if I needed to read it or.
Q. Okay. And then this here is the payroll department status form?
A. Yes, so this is --
Q. And does this -- if we look over here, does this show what your compensation package was?
A. Yeah, it lists the date of hire, it says salary commission $432.52 a week, base plus two percent commission, plus incentives.
Q. Okay. And at the bottom that's Paul Carr, right?
A. That's Paul Carr's signature.
Q. Okay. And then this is all your information right here?
A. Yeah, that's my name, my address, what the title of the position would be --
Q. Okay. And do you know --
A. -- and --
Q. -- what this notation is here?
A. Yeah, that is -- MA is Michelle Apt who is the CFO. She was then and she currently still is the CFO at Nappi.

Q. Okay. And I see here that it says date of hire January 5th of 2015?
A. 5th, 2015.
Q. I understand that you were supposed to start in December of 2014, was there a reason why you weren't able to?
A. Yes, so I -- the week the vacation that I was going on prior to starting I broke my ankle while I was on vacation and so I let them know, and so we pushed my start date back because I needed to be cleared before I could start work.
Q. Okay. And I understand that you had to go through a physical before you could start working; is that right?
A. Yes.
Q. And did you pass the physical?
A. I did.
Q. Okay.

THE COURT: Is this a good time to break?

MS. QUINLAN: Sure, yeah.

THE COURT: Ladies and gentlemen, we're going to take our second break. Don't discuss the case and we'll see you back here in about 15 or 20 minutes.

THE CLERK: All rise, jury exiting.

(Jury exited. Time noted: 12:34 p.m.)

THE COURT: Court will stand in recess.

(A break was taken from 12:34 p.m. to 12:57 p.m.)

THE COURT: Would you bring the jury in, please.

(Jury entered. Time noted: 12:58 p.m.)

THE COURT: You may be seated. Thank you. Attorney Quinlan.

MS. QUINLAN: Thank you, Your Honor.

BY MS. QUINLAN:

Q. So, Michele, I think when we left off we were talking about some of the correspondence that you had with Paul Carr before you started working at Nappi about your compensation and the benefits. Did you also have a conversation with anybody else at -- sorry, with anybody else at Nappi Distributors that was in management?

A. Mike Hale.

Q. Okay. And what did you discuss with Mike Hale?

A. Paul had let him know -- shared with him my questions and so Mike sent me an e-mail and just said, you know, give him a call and we could talk about some of his questions. Some of my questions.

Q. And did Mike also -- did Mike also send you an e-mail that had your -- the accounts that you might be receiving as part of your route?

A. He did. He -- he sent me an e-mail and said they're not really in any specific order or by geography, but it's -- yeah.

THE COURT: Do you have the headset?

JUROR: Yes, I do, please.

THE COURT: Thank you. We don't want -- we want you

to be able to hear, sir, so if we don't get the headset to you, let us know. It's vital that you hear everything.

JUROR: Thank you.

THE COURT: Thank you, sir.

BY MS. QUINLAN:

Q. Okay. Michele, I'm showing you what I have marked as -- no, I'm not, not yet. Okay, I'm showing you what I have marked as Plaintiff's Exhibit 27, and it's a series of documents that I'll just go through to make sure that you have seen.

Are these the e-mail communications that you had with Mike Hale following your conversations with Paul Carr about your compensation?

A. Yes, they are.

MS. QUINLAN: Okay. Your Honor, I move to admit Exhibit 27.

THE COURT: Any objection to 27?

MR. WALL: No objection, Your Honor.

THE COURT: It's admitted.

Q. Okay. And then I would also like to show you what I have marked as Exhibit 28, and it's an e-mail from Mike Carr -- Mike Hale to you on September 22, 2014, and he said that he is providing you with a list of your accounts in your route?

A. Yes.

Q. And it looks like you reviewed those routes; is that correct?

A. Yes.
Q. And did you have an account -- question about some accounts that you did not see in your route?
A. Yes. I asked him about a few restaurants I knew about in Kennebunk, and I didn't see them on my account list so I asked if there was another Nappi rep in that area, and if not then they weren't on Nappi's purview and I would go after them.
Q. And what did Mike Hale say to you in response?
A. There is another sales rep in Kennebunkport, his name is Terry O'Brien, he is a great salesman, doesn't always play well, keep these accounts just between him and I.
Q. Okay. And then are these the accounts he sent you?
A. I think so. I mean, yes, they're -- it's just hard to read, you know, who -- which accounts they actually are.
Q. Is that because of the formatting?
A. I think so.
Q. Okay.
MR. WALL: Your Honor, again I -- I -- are we talking about Exhibit 28 at this point?
MS. QUINLAN: Yes.
MR. WALL: I don't think it's in evidence yet. I don't have an objection to it's admission, I just want to see if we can, you know, before she talks about it have it admitted first, that's all.
MS. QUINLAN: Your Honor, I move to admit Exhibit 28.

THE COURT: Any objection?

MR. WALL: No objection.

THE COURT: 28 is admitted. Thank you, Mr. Wall.

MS. QUINLAN: Okay. And then I would just like to go to the last page here which I would like to publish to the jury?

THE COURT: You may.

BY MS. QUINLAN:

Q. It says here at the bottom that you had 128 accounts. Did you start with 128 accounts?

A. No, I don't believe so.

Q. Okay. And then I would like to show you what I have marked as Exhibit 28-A, do you recall seeing this document?

A. Yes.

Q. What is this document?

A. This is a document Ian Brown gave me when I first started at -- before I started -- well, I had just started and I trained with him for the first two weeks, so this was a -- an overview of my active accounts.

MS. QUINLAN: Okay. Your Honor, I move to admit Exhibit 28-A.

THE COURT: Any objection to 28-A?

MR. WALL: No objection, Your Honor.

THE COURT: 28-A is admitted.

Q. Okay. And if we go through and add up the accounts that

are listed in this exhibit, do you have an idea of how many accounts there are in what Ian provided you would be part of -- part of your route?

A. How many are in that exhibit?

Q. Yeah.

A. I don't want to -- I think, I believe it was somewhere in the 80 range, but I would have to count them to be accurate.

Q. And does 87 sound accurate to you?

A. It does.

Q. Okay. Next I'm showing you what I have marked as Exhibit 29. Have you seen this document before?

A. Yes.

Q. And what is it?

A. It is a report from February 28th of 2015, which is the last day of February, a report that shows --

Q. And hang on.

A. I'm sorry.

MS. QUINLAN: That's okay. And, Your Honor, I move to admit Exhibit 29.

THE COURT: Any objection?

MR. WALL: No objection, Your Honor.

THE COURT: 29 is admitted.

MS. QUINLAN: And I would like to publish to the jury.

THE COURT: You may.

BY MS. QUINLAN:

Q. Okay. So if we look at Exhibit 29 here -- and I'm going to Zoom in, this is a little out of focus -- it looks like this first list is of your on-premise accounts that you had in 20 -- February of 2015; is that right?
A. Yes.
Q. Okay. And then it looks like at the bottom it starts with your off-premise accounts?
A. Yes.
Q. Is that right?
A. It is.
Q. Are these all of the accounts that you have -- had at the time?
A. These -- these accounts would have shown any account that had sales for the year at that point, so any account that would have been closed currently would most likely not be on this report because they had no sales yet for that current year.
Q. Okay. So in February of 2014 this document shows how many accounts you had actually doing business and placing orders?
A. In 2015 you mean?
Q. Yes.
A. Yes, exactly.
Q. Okay. Okay. And so it looks like by my count that you had about 31 on-premise accounts that were currently ordering from you; is that right?
A. Yes.

Q. Okay. And it looks like you had by my count 26 off-premise accounts ordering from you at the time; is that right?
A. Yes.
Q. Okay. And then if we slide over here where it says year '15 February, year '14 February, and it shows your off-premise sales, and it looks like in February of 2015 you did 69,486 and in this number next to it in 2014 where it says 65,724, what does that number represent?
A. So that is they're dollars. This -- this particular -- these particular columns are dollars, and it would show year-to-date through -- so January and February totals year-to-date for each account what the total sales were.
Q. Okay. And does it show that you had done more in sales than what those accounts did for sales in the year prior?
A. Yes, that's what it looks like here.
Q. Okay. And then same thing for the on-premise accounts, if we look down here for the total for year February of 2015 --
A. Yes, yes.
Q. -- compared to February of 2014 it looks like you did better in sales for those accounts that year, right?
A. Yeah, because if you look to the right it's 31 percent higher.
Q. You did 31 percent more --
A. That's what this says, yes.
Q. -- in sales? Okay. Okay. Can you tell us a bit about

what it is you do as a sales representative for the wine department at Nappi Distributors?

A. Sure. So I have customers obviously, and I see them weekly, biweekly, talk to them whenever they need things. So I will go to their places of business and talk to them about either taking -- you know, see what they want to order. It's different all the time depending on the type of account, but for restaurants my on-premise, for example, you are taking their order, you are keeping an eye on inventory for them, if something that they have on their wine list is getting low you need to give them a heads up on that so they can either order more or make a decision to make a replacement. If they -- if -- if I suggest or if they want to make a replacement, I present them with some comparable ideas. At time -- sometimes I will then taste them, have them taste those actual products to see if they will work for them, so that.

And then I -- there are many of my customers and restaurants who I assist them with their actual wine list production, so I help them with that getting it laid out, price it out. I do a lot of inventory spreadsheets for customers that helps them maintain their pars.

Retail I same thing, will meet with the customer to take the order. I have some accounts where I go in every week and generate the order, then meet with the buyer or the owner to review it. Some accounts that I have worked with for a while

just will say -- they don't have to review it with them every week, I just send them a total of what's coming in. It's different but it's, you know, constant working with folks.

In the say like April through October but mostly July -- June -- end of June -- the summer months, end of June through the beginning of September, it's operations, operations, operations. It's just main -- keeping -- you're just running constantly, getting orders in.

Whenever there are, you know, mistakes that happen -- Nick's sitting out there, mistakes never happen. Sorry. It is -- yeah, so you are -- if things don't make the truck, you are making sure the customers get them. If something is mispicked and they get the wrong product, you have to fix that. If you key something in incorrectly, you need to fix that. So it's -- it's a lot of operations. It's a lot of service. It's a lot of running around.

You're doing a lot of merchandising, restocking in retail before you can even begin to generate an order. You're, you know, putting things away, making sure things are lined up properly in the right spaces, and --

Q. Okay.

A. -- so that really -- summer is just running, running, running. And your customers are really busy as well because they're managing their businesses, so they don't want to spend a lot of time with you, which works out well because you're so

busy taking care of their needs.

Then towards the end of the season things will start to calm down, get a little bit of breathing room, and then for me I start gearing up really in January. Because of all the restaurants, for example, on-premise accounts that I have if -- the first couple of years if you're not used to it you get nailed by, you know, March-April, suddenly everyone is back and wants to talk to you and get --

Q. And so I kind of want to pause you right there.

A. Thank you.

Q. So is there something that's unique about your route that causes some variation to what you have to do depending on the time of year?

A. Well, right, because I'm in a seasonal area in southern Maine, so that's really what I'm describing. People if they -- if they're closing their businesses they will either go on a longer vacation or they check out for a while, so they're not always available to -- or want to even look at you or talk to you until they're ready to get back in that mode. So a lot happens at once or it can happen at once if you're not strategic about it and try to get ahead of it, and so I've learned to really do that.

So I, you know, now being February I have a good reference because I'm living it right now, but I'm already -- yeah, just busy. Friday I had three presentations just this Friday,

Friday night I was at a customer's house with him presenting 12 wines to him and his son for when they open beginning of April. And I wanted to get ahead of that because they're in town, why not get it done now. So there is a lot of work to get the sale accomplished when they reopen.

The retail is similar in certain independent retail accounts. Independent meaning it's, you know, family who owns them or it's specific one owner, it's not a chain like a grocery store or a Walgreens or something like that. So the independents some people you're meeting with doing the same thing, presenting them on different products, different regions. I have some fine wine shops that really want to dig into -- for example, I just did a tasting for, you know, red wines priced between 15 and $25 from Bordeaux and Burgundy so we concentrated on that. So I have -- what I like about my accounts specifically is there is such a range of different types of customers, different types of wines, different levels of -- you know, so we have a portfolio of almost 3,000 SCUs of wine and my route base, my customer base, allows me to touch on pretty much all of them. I don't know, is that good?

Q. Yeah. And is there -- is one of the goals of Nappi, or the goals for you, to get Nappi products -- Nappi wine products on the menu by the bottle, by the glass, is doing that something that you're aiming to do?

A. Well, you want as many by the glass pours as you can get

because that equals higher sales, you're selling more. You know, the customer is buying more wine that they're selling by the glass generally than what they're selling by the bottle, so that is a huge kind of on-premise accomplishment. Where you have a restaurant that might have six glass pours, if you get two of them, three of them, sometimes the -- all of them or four, you know, it's a -- you feel great about it.

If it's a restaurant that your company hasn't done business with or you -- they switched buyers, they're no longer buying from you, you -- you keep on them and you keep meeting with them and you keep showing up and you keep, and then when you -- when you crack them and you finally get that it feels like you just won the lottery, like it's such a sense of accomplishment, even though -- yeah, so that's just like an on-premise kind of feeling.

If you look at the sales from that all the time it doesn't -- you might sell more in a larger retail account, but the reward doing that is really gratifying for me.

Q. And is there a lot of work that goes into getting those items from Nappi on the menu by the bottle, by the glass, before you actually make that sale?

A. Well, right, yeah, and I was trying to touch on that a little bit about, you know, you present -- you do a presentation first. I do -- I use our program SevenFifty to create a PDF, excuse me, that will show various options and

price points of things that I know would suit their list. We'll review it with the customer. Sometimes they'll say, oh, this all looks great, can we taste them, that's great; sometimes they'll say, no, I'm looking for more for this region or that, so you go back to the drawing board. So that's a process back and forth and then you actually --

Q. And does it require some persistence on your end?

A. I'm sorry, some what?

Q. Sorry, does it require some persistence on your end?

A. Absolutely.

Q. Okay. So if you would just tell us how that first month went when you started working as a sales representative at Nappi?

A. Okay, yeah, so it was January so it was a quieter time. Ian Brown, who was -- I was going to be reporting to, was also training me. So I went out with him in his car for the first two weeks, and we saw the accounts that were open, met the buyers. He drove me by some of the accounts that weren't quite open yet. I met other sales reps, attended some sales meetings, started to learn the processes at Nappi and who you see for what, if you need, you know, some sort of administrative support or shelf talkers or things like that, learning all of that. How the invoicing works. How the warehouse works. Did that.

Ian talked to me quite a bit about the incentive program

during that time and encouraged me, if I could, to sit down with John Lambert who was one of our senior, I guess, off-premise sales reps who Ian had said was just incredible at the incentives and really knew how to work the programming and he thought he could be helpful, so I spent some time with John on that.

Q. And so things seemed pretty good that first month?

A. Yeah, it was just, yeah, just.

Q. Getting up to speed?

A. Trying to get up to speed, knowing that I hadn't met nearly, you know, the amount of customers I was going to meet, but it was a good way to start getting acclimated.

Q. Okay. And then how was the next month, February of 2015?

A. So February it was -- it was good. I mean my real only take away memory of that is when before I had started I let Paul know that my cousin was getting married in Florida, in southern Florida, so I was going to have to take four to five days off, and I understood I wasn't going to get paid for it because I didn't earn any vacation yet. So did do that, was away.

And I think Dan -- Attorney Quinlan mentioned Ian, who was covering for me, his wife was pregnant and she went into labor sooner than expected, so he did reach out to me, let me know that, and that he -- you know, I was going to have to kind of manage things from my end where I could. He told me if I felt

I needed help in some way I could reach out to Terry O'Brien who was another sales rep. I -- I didn't, you know, I didn't need him to go -- or I didn't -- yeah, so I didn't. I didn't really know what I would ask him to do. So I took phone calls and answered e-mails and texts and placed some orders and such while I was away.

Q. Okay. And I just want to pause you right there and show you what I have marked as Plaintiff's Exhibit 86.

A. Okay.

Q. And it looks like this is text message from Ian Brown and you're responding; is that right?

A. Yes.

Q. Are these the text messages that you had with Ian Brown over your vacation and when you returned from vacation?

A. Yes.

MS. QUINLAN: Okay. Your Honor, I move to admit Exhibit 20 -- sorry, 86.

THE COURT: Any objection?

MR. WALL: Only that the first page, Your Honor, doesn't have anything to do with this topic so.

MS. QUINLAN: I'll move to admit pages two through seven.

MR. WALL: I have no objection to two through seven, Your Honor.

THE COURT: Pages two through seven of 86 are

admitted.

BY MS. QUINLAN:

Q. Okay. So I understand I think you just told me that you went on vacation February of 2015, was that a paid vacation or an unpaid vacation?

A. Unpaid vacation.

Q. Okay. And you had told management about that before you started at Nappi?

A. I did.

Q. What were you going on vacation for?

A. My cousin's wedding.

Q. Okay. And when you returned from your vacation, did you have any conversation with anybody at management about the work that you did while you had this unpaid vacation?

A. Yeah, I -- I -- I had seen Paul Carr at the office when I was back and he asked how vacation was; I told him it was great, said I -- you know, I ended up working the whole time, you know, throughout and without pay and, you know, it was kind of, yeah, so I -- I said that to him; and he said yeah, I had heard that, that's a bummer. So he knew that had happened, but that was the end of that.

Q. Okay. Did you end up getting paid?

A. I did not.

Q. Okay. Was there a time when you were trying to take a babymoon at Nappi? Sorry, let me hold off on that. I just got

ahead of myself a bit.

So after you had this conversation with Paul Carr and not being paid while working through your vacation time, how was the next year at Nappi?

A. I -- fine, I think. I was just -- yeah, just doing my thing, working, learning more and more about my route.

Q. Okay.

A. I'm not sure specifically.

Q. And was there a time when you had an awkward interaction with a customer?

MR. WALL: Objection, Your Honor.

THE COURT: Basis?

MR. WALL: It's leading.

THE COURT: Overruled.

A. Okay. So, yeah, so during -- yeah, so for the next year I went about my business as I explained already the types of things I was doing. I had quite a few supplier work-withs during that time that first year. Supplier work-withs would mean a supplier representative would be in our market or in our area for a day or a couple of days and then sales reps would be assigned to keep them with you for the day, bring them to accounts and try to help them sell their product. So I did quite a number of those during that time.

During, yeah, one of them I had visited an account in Cape Porpoise called -- Cape Porpoise Kitchen, thank you, and I had

a supplier with me so we did a presentation there, and there was a buyer named Bill Barksdale who, you know, I had been speaking with and taking his orders and such and, yeah, he was -- he -- it started to get a little awkward with him.

MR. WALL: Your Honor, I just move to strike any testimony regarding this. I believe you've already ruled that this issue is not in the case, and so if she is leading into discussions with Mr. Barksdale we would object as both hearsay and excluded from the case.

MS. QUINLAN: Your Honor, could we sidebar?

THE COURT: Yes.

(Sidebar conference.)

THE COURT: Where we going with this?

MS. QUINLAN: I understand that we have no claim for the hostile work environment --

THE COURT: Don't -- you don't need -- we have got the white noise on.

MS. QUINLAN: Oh, okay.

THE COURT: I can hardly hear you.

MS. QUINLAN: Okay, sorry. I understand that we have no claim for the hostile work environment, but in terms of how they responded to her complaint and how they just took the accounts away from her, took his word for what it was --

THE COURT: How does that relate to?

MS. QUINLAN: It goes to the sex discrimination.

Because she is a woman what she said didn't matter, she wasn't provided comparable accounts for taking them away, and they didn't investigate whether she in fact turned this guy down. It goes to the disparate treatment of women.

MR. WALL: Your Honor, first of all, what she is going to testify to is hearsay, and, second of all, this is a way of trying to backdoor in information regarding a claim that's already been --

THE COURT: I'm sorry, I can't hear, you're mumbling here.

MR. WALL: Yeah, sorry, it's -- No. 1, it's hearsay what she is going to elicit from this witness, and, No. 2, this is a way of backdooring in an issue that Your Honor has already ruled is out of this case.

THE COURT: Well, I don't know what she is going to say. I don't think it's hearsay because it's not for the truth. The jury isn't going to be -- isn't going to know anything about a hostile work environment claim. So to the extent it's admissible what would only be admissible in the theories before the jury.

MR. WALL: And it's our indication that there is no relevant information with regard to the claims that are current here. There is no retaliation claim with regard to Title VII or the Maine Human Rights Act as it pertains to Title VII, it's only with regard to the Equal Pay Act, so this has no relevance

to any kind of retaliation issue, Your Honor.

THE COURT: I think that's correct.

MS. QUINLAN: We did allege retaliation under the Maine Human Rights Act, though, with the sex discrimination.

MR. WALL: But it only incorporated what was retaliation in the Equal Pay Act, it made reference to what appeared before in the complaint.

MS. QUINLAN: This just goes to the history of how they were treating women, and it's a long history. She is the first female sales representative. What happens when this issue comes up? They mishandle it.

MS. WHITE: It also seems relevant just based on the routes and having one taken away and others not replaced seems highly relevant to the issues.

THE COURT: All right. Well, I'm going to allow it, but I want you to move quickly through it.

MS. QUINLAN: Yes, Your Honor.

THE COURT: Your objection is noted.

MR. WALL: Thank you, Your Honor.

(Open court.)

BY MS. QUINLAN:

Q. Okay. So I understand that Bill Barksdale became flirtatious and kind of chummy with you. Was there an occasion when he tried to call you?

A. Yeah, so --

Q. Okay.
A. Yes.
Q. And when did he -- when did he try to call you?
A. I don't remember the exact date or when it was, but yeah. I had gotten a creepy feeling from him and it was night, I was sleeping, I heard my phone ring, I looked at it, it woke me up, and it was about almost 1:00 in the morning, and I saw it was his number.
Q. Okay.
A. I ignored it, but I thought it was very strange.
Q. Okay. And then did something else happen with Bill Barksdale that made you feel uncomfortable?
A. Yeah. So I had saw him, I had seen him a time after that at the store, and just the way he would look at me made me uncomfortable, and he said he had been talking with his girlfriend Joyce and thought it would be great if I could join the two of them for a drink sometime. The way he said it to me just felt weird and I --
Q. Why did it feel weird, did it --
A. Well, again, because the -- the way he had been acting in -- in looking at me and the way he said it, I -- my take away was he didn't want to just have a drink with me and his girlfriend, I think he wanted more than that.
Q. Okay. And did you -- what did you do in response? Did you go for the drink with him --

A. No.

Q. -- and his girlfriend?

A. No, I just kind of blew it off, you know, so, no, I never did and --

Q. Did you report this to anybody at Nappi Distributors?

A. I didn't officially report anything. I mean I knew it was creepy and I didn't like it, but, you know, I grew up in the restaurant business, I'm used to this kind of thing, I can handle myself. You know, I wasn't worried about it like that. I did -- I'm not sure how long after it, but I was with Ian Brown in his office just chatting about something else and I did tell him that Bill Barksdale creeps me out; he said why; and so I told him the vibes I was getting from him and how he asked me to join him and Joyce for a drink and it felt inappropriate to me and weird; and Ian agreed, he said, yeah, that's strange, definitely don't need to go obviously, and just tell him between your job and the inn and your life you're just you're too busy for that, blow him off for sure, you know, if that's what you want to do, which I did.

Q. Okay.

A. And I did.

Q. And did anything else come about with this interaction with you and Bill Barksdale?

A. Well, it was sometime after that -- so then I just never -- you know, I responded to his drink request after that

but went about my business trying to be his sales rep, and then I don't know how long after exactly but Paul Carr called me one morning and said he had gotten a call from Bill Barksdale and he wasn't happy with the service I was providing and had requested a new sales rep.

Q. And do you think that this conversation with Paul occurred about two months after you turned Bill Barksdale down?

MR. WALL: Objection, Your Honor. That's --

THE COURT: Yeah. Why don't you just ask a question rather than telling her the answer first.

MS. QUINLAN: Okay. Sorry, Your Honor.

A. Yeah, I don't -- I don't know.

BY MS. QUINLAN:

Q. Sorry, let me just ask you the question.

A. Okay, sure.

Q. How close in time to the -- when you turned Bill Barksdale down did you have this conversation with Paul Carr?

A. I would say it was a couple of months.

Q. Okay. And, I'm sorry, I think you started to tell me this -- this happened in 2015, right?

A. Yes.

Q. Okay. What did Paul tell you was the issue with Bill Barksdale?

A. Well, he just said he wanted a different sales rep and -- I don't know -- yeah, and so I was surprised by that and upset.

You know, it was my first year and I was trying to work really hard, and I thought I was doing a good job, so it, you know, upset me. He was very apologetic and just said I don't -- you know, I just don't have a choice because if we don't switch reps, you know, he'll -- he won't do business with us anymore. And he wasn't the owner of the business, a woman named Peggy was the owner of that business and another business Kitchen Chicks Catering, so it really like affected two accounts, so --

Q. So you lost two accounts?

A. I did.

Q. Okay. And who did those accounts go to?

A. Terry O'Brien.

Q. Okay. And did you have any other follow-up conversation with any other member of management at Nappi about this occurrence?

A. About -- oh, yeah. And so after a sales -- shortly after, I don't know if it was a couple of weeks, I think, because when our next sales meeting was talking with Paul about that and he said why do you think he doesn't like you or, you know, why did he not want you anymore, or something along those lines. And I said, well, he creeped me out anyway, and he was I think really trying to hit on me, and I didn't want any part of it and that probably irritated him. And he just kind of rolled his eyes and yep, probably, like that's Bill, because he knew him as well. And I mean that was pretty much the end of the -- end of

it.
Q. Okay. And did you get any accounts provided to you to replace the accounts that you lost --
A. No.
Q. -- as a result of this? Okay. I am going to show you what I have marked as Exhibit 30. Have you seen this document before?
A. I'm sorry?
Q. Have you seen this document before?
A. Oh, yes, I have.
Q. Okay. Okay. And what is this document?
A. This summarizes during one of our sales meetings Paul had mentioned a product that we -- he wanted us to -- you know, we had six cases of I think in-house, he wanted to get -- get rid of it, let's get it out so we can order more, replace it, and --
Q. Let me just pause you right there. Is this an e-mail that you sent between --
A. Oh.
Q. -- yourself and Ian Brown about an incentive program?
A. Yeah, so I sent -- this initial e-mail was to Valarie Ellis. She is the -- was the -- the wine administrator at the time and was the person who figured out I think the incentive payouts and processed those payments so.
Q. Okay.

A. Yes.

MS. QUINLAN: And, Your Honor, I move to admit Exhibit 30.

THE COURT: Any objection to 30?

MR. WALL: No objection, Your Honor.

THE COURT: It's admitted.

MS. QUINLAN: And if we could publish to the jury?

THE COURT: You may.

MS. QUINLAN: Thank you.

BY MS. QUINLAN:

Q. Okay. So if we look at this bottom e-mail here, I think you were just starting to explain to me I think you said it was an e-mail that you had sent to Valarie?

A. Yeah, so the opportunity Paul had told us about in the sales meeting I -- you know, it was -- was -- he had said $50 per placement, six-pack placement, so I thought that was pretty good money, so I just went out that day and was able to sell three of the six-pack cases. I figured 150 bucks, that's pretty good.

Q. Were you sending Valarie an e-mail because you wanted to check on what you had been paid and it wasn't what you expected for that incentive program?

A. Yes, this e-mail --

MR. WALL: Your Honor, it's leading.

THE COURT: It is leading. I'm not a stickler on

leading --

THE WITNESS: Okay, sorry.

THE COURT: -- but you really should just try and ask a question that doesn't --

MS. QUINLAN: Sorry, I was trying to be efficient.

THE COURT: -- have the answer in it. I know, go ahead. Go ahead.

BY MS. QUINLAN:

Q. So why -- why were you sending this first e-mail to Valarie?

A. Okay. So Valarie was the wine administrator responsible for paying out the incentives. I didn't think that I was paid properly on it, so I was questioning it.

Q. Okay. And did Valarie respond to you?

A. Yeah, and I copied Ian because he was my immediate supervisor. And he said he misspoke, that Banfi when he -- his recollection is they used to pay $50 per -- per placement on that product but it wasn't the same as what it used to be.

Q. Okay. And then I think you sent this e-mail after?

A. Yep, just saying, you know, not a big deal but Paul said it, I had sold the three cases, it ended up being $20 a placement instead of 50, so it was just, you know, an inconsistent thing that happened.

Q. So both Ian Brown and Paul Carr had told you that this incentive was $50 per placement?

A. Yes, they -- they said it to the sales -- the whole sales team.
Q. And so you made some sales based on that incentive payout?
A. Sure, yes.
Q. And you said you made three?
A. Three.
Q. And what did you end up receiving for that?
A. $60.
Q. Okay. Instead of the 150 that you thought you would get?
A. Yes.
Q. And is this something that happens here and there with Nappi Distributors' incentive programs?
A. Yeah, I mean some of -- yeah, I mean sometimes the -- the way things are worded as far as like placements and there is a -- a non buy type situation, so it's -- if it -- I would have to see it right in front of me, but would say like 90 days non buy. So if you count 90 days between the last time it was received into the account and it's more than 90 days or more between the next time it's sent in, it -- it would qualify. But that's not actually the way it really is, which I found out at some point. So that's just, you know, one thing.
I don't know if I can think of right now, you know, a specific example of when -- you know, sometimes there is typos in -- in the incentive programming that we get, it would say, you know, $15 for a placement and then when you actually get

paid it's not that much and you question it and said, oh, it was a typo, it should have said 10, not 15, like a human error kind of thing, but things like that do happen. Is that what you mean?
Q. Okay. So I understand that at some point you found out you were pregnant; is that right?
A. Yes.
Q. And when did you find out you were pregnant?
A. It was August of 2015.
Q. And that must have been a very exciting time for you?
A. Yeah, it was, at my age, too.
Q. Yeah. And when was it that you let management at Nappi know that you were expecting?
A. I -- I told Ian first and I think it was probably October -- September-October. I'm not exactly sure, I think it was October, so I let Ian know.
Q. Okay. And what did Ian say to you?
A. He was supportive and congratulated me. I told Mike Hale, I think, after Ian, he was, you know, supportive, said congratulations. Both Ian and Mike had said to me that have you told Paul yet, asking me if I had told Paul Carr, and I said no, not yet, and they separately expressed to me that they -- each of them were concerned just in how he might react and wanted to know if I wanted one of them or both of them to come with me when I told him. I -- you know, kind of freaked me out

a little, you know, I thought that was strange and concerning, but I didn't. But I did then go in to see Christine Fox from HR just to let her know because I also wanted to, you know, just let that department -- benefit department know so I could, you know, try to learn about what my benefits were going to be, and I mentioned to Christine that Mike and Ian were concerned about me telling Paul, and Christine said I'm sure he'll be fine, but, you know, are you -- do you want me to go with you, or something to that line, and I said no, I'm okay, and I went right next-door and told Paul and -- and he was fine so.

Q. And how did it make you feel when Mike and Ian kind of expressed their concern for revealing your pregnancy to your employer?

A. Well, yeah, I mean that was concerning, and it -- I was -- I was really nervous to go in and talk to him thinking I was -- I don't know -- I didn't know what he would say to me. You know, I hadn't been there that long so I just didn't know. But the fact that they were both concerned about it and talked to me about it and made a thing of it like they were concerned, it stuck with me as just seemed strange.

Q. Okay. And when was it that you think you told Paul and Mike and Ian about your pregnancy?

A. It was pretty -- I told Ian first, but it was very kind of shortly thereafter. I don't know exactly, but within a two-week timeframe I would say.

Q. But I mean what month did you tell them?
A. Oh. Oh, I'm thinking it was probably October.
Q. Okay.
A. I think so.
Q. I'm showing you what I have marked -- did you already go over this?
I'm showing you what I have marked as Exhibit 31. Have you seen this document before?
A. Yes.
Q. And is this e-mail correspondence between you and Ian?
A. Yes, but initially it's an e-mail that I had sent to Valarie Ellis with questions about incentives and then --
Q. Okay, and I will pause you right there.
A. Sure.
MS. QUINLAN: Your Honor, I move to admit Exhibit 31.
THE COURT: Any objection?
MR. WALL: One moment, Your Honor.
THE COURT: Sure.
MR. WALL: No objection, Your Honor.
THE COURT: 31 is admitted.
MS. QUINLAN: And I would like to publish to the jury.
THE COURT: You may.
BY MS. QUINLAN:
Q. Okay. So if we go down to this bottom e-mail, was this the e-mail that you had first sent to Val?

A. Yes.
Q. And why were you sending an e-mail to Val asking her for your breakdown about your September incentive pay?
A. Well, because, you know, I get direct deposit and so sometimes I don't know when we're going to -- I'm going to get paid for incentives except the money will just like show up in my account and I have no idea how it was paid, how it was calculated. So I wanted to see that so I could check it against what I had been keeping track of just to make sure it was all -- you know, it was accurate. With Excel, and this has happened before, you know, again human error, nobody's perfect, but with formula errors and such it's happened before that I have caught it and then questioned it and then it gets fixed. But, you know, you -- it's money, it's my money, so I keep a good eye on it --
Q. Okay.
A. -- so I wanted to see the breakdown.
Q. Okay. And then why did you forward it along to Ian?
A. I think it was like a week -- yeah, a week later and I hadn't heard from Val. And I had also asked Mike Hale for the same report, he sort of oversaw a lot of the incentives so I asked him, and I hadn't heard back from either of them so I just asked Ian, you know, I -- and I just was a little confused why I wouldn't hear back almost immediately because the work would have been done to come up with the dollar amount I was

getting paid, so I -- and I was asking him that, am I -- you know, am I missing something, this work should have -- would have been done so to copy and paste and send to me, that's how it should go, right? So I was just more questioning him am I handling this correctly and could you help me get my -- get the information.

Q. Okay. So after you announced your pregnancy, and I understand that at some point you planned a babymoon; is that right?

A. Yeah. So in -- I was due in April I think it -- yeah, it was in January, wanted to just, if I could, go away with my husband for a few days.

Q. Okay. And where did you plan to go with your husband?

A. We were going to go to the Caribbean.

Q. Okay. And when was this -- when were you trying to plan this trip for?

A. January.

Q. And so was that kind of the slower time of year for you?

A. That's my slowest month of the year hands down.

Q. Okay. And did you ask anybody at management whether you would be able to take the time to do this babymoon?

A. Yeah, I -- I spoke to Ian first and just let him know that I was, you know, wanting to go away, a slow time of the year, and, you know, I still hadn't earned any vacation time at this point and knew -- so I just didn't really -- you know, I just

asked him if I would be -- if I could go away --

Q. Okay.

A. -- and would that work and -- and I know Mike -- I think I spoke to Mike Hale, as well, after Ian, said we could work it -- we could -- we could make that work, I think.

Q. Okay. And I'm just going to show you page one of Exhibit 86. Have you seen this before?

A. Oh, yes, yes.

Q. And what is it?

A. So it's texting -- a text -- text messages between myself and Ian.

MS. QUINLAN: Okay. Your Honor, I move to admit page one of Exhibit 86.

THE COURT: Any objection?

MR. WALL: No objection, Your Honor.

THE COURT: Page one of 86 is admitted.

MS. QUINLAN: And I would like to publish to the jury.

THE COURT: You may.

MS. QUINLAN: Thank you.

BY MS. QUINLAN:

Q. Okay. So it starts with a text message from you to Ian Brown on October 13, 2015, and you say oh, my God, listen to this dysfunction junction. What was the dysfunction junction?

A. Well, I had started at Nappi on January 5th and because it was five days after the start of that new year I was not going

to get vacation for another year I think is what it was. I -- I didn't qualify for vacation because I hadn't been there a full year starting on January 5th. So I was like this is insanity, this is almost comical, this is crazy, I only get three personal days in a year --

Q. So --

A. -- no vacation.

Q. So at this point you weren't accruing time off?

A. Yeah, right, it sounds like.

Q. But if you had started January 1st or a little bit earlier you would have been accruing days as you progressed?

MR. WALL: Your Honor, this is again it's leading.

THE WITNESS: No.

THE COURT: Why don't you rephrase.

MS. QUINLAN: I will rephrase the question.

BY MS. QUINLAN:

Q. Was the time -- the -- was the timing that you began did it have an affect on how you accrued benefits?

A. Yeah, I thought -- I'm sorry, I thought I just said that. Because I started on January 5th I wasn't there a full year so I was not going to earn vacation for the next year. I had found that out I believe from Becky Douglass.

Q. Okay. And was this when you were trying to figure out whether you could take the time off for a babymoon?

A. I was starting to think about it because obviously I was

pregnant and I had already told them by then that I was pregnant, so.

Q. Okay. And what did Ian say in response?

A. He said, I'm speechless, only at Nappi, he would talk to Mike Hale and if there was ever a time to make an exception this would be -- this would be it.

Q. Okay. And why did he think that you should talk to -- or he should talk to Mike Hale?

A. Because he might be able to persuade Becky Douglass to make an exception.

Q. To allow you to take some time off?

A. Yes, that's what this.

Q. Okay. And then I want to show you what I have marked as Exhibit 32. Have you seen this document before?

A. Yes.

MS. QUINLAN: Your Honor, I move to admit Exhibit 32.

THE COURT: Any objection to 32?

MR. WALL: One moment, Your Honor. No objection, Your Honor.

THE COURT: 32 is admitted without objection.

MS. QUINLAN: And I would like to publish to the jury.

THE COURT: You may.

BY MS. QUINLAN:

Q. So, Michele, it looks like this starts at the bottom with an e-mail from you to Ian Brown, but I would like to point you

to this response from Ian to you on January 25, 2016, and he says on another note I wish things had gone smoother at Nappi while you were away. I tried to keep the ship calm but my colleagues aren't quite as relaxed.

Was this period of time where you were away that Ian was referring to for a babymoon?

A. Yes.

Q. And what did he mean that his colleagues aren't quite as relaxed, was it upsetting to them that you had gone on the babymoon?

MR. WALL: Objection, Your Honor.

THE COURT: Well, they -- the problem with the question is you're asking her what he meant --

MS. QUINLAN: Could I rephrase?

THE COURT: -- so -- yes, you need to rephrase. It's -- it's her understanding of what he meant, correct?

MS. QUINLAN: Yes.

THE COURT: Okay.

MS. QUINLAN: Thank you.

BY MS. QUINLAN:

Q. Did you have an understanding of what Ian was referring to when he made the statement, on another note I wish the things had gone smoother at Nappi while you were away. I tried to keep the ship calm but my colleagues aren't quite as relaxed?

A. Yes. While I was away I had missed a phone call from Mike

Hale and when I got back I think I sent -- yeah, I'm not exactly sure of the exact timing, but when I got back was told that I think Becky -- it was Becky Douglass had -- was questioning what -- you know, that -- if I was away -- I think someone -- one of my customers called the main Nappi to ask a question or something and so Becky was -- went into Mike Hale's office where he kept a calendar of peoples time off and I wasn't written on the calendar, I believe, and so Mike kind of panicked, called me, and so I -- that's what he was referring to. I don't know.
Q. Had you done anything wrong? Had you gotten approval to go on the trip by your managers Ian and Mike?
A. Yes.
Q. Okay. Okay. When was your due date, first of all?
A. April of 2016. I don't remember the exact date.
Q. Okay. And when did you end up giving birth to Sloan?
A. Oh, I remember that, it was April 9th of 2016.
Q. Okay. And what did you do to prepare for your maternity leave?
A. So I had conversation -- several conversations with Mike Hale and he -- just about my leave, who would be covering for me, because he did oversee the sales assistants, and he thought it would be beneficial to Nappi, to me, to my customers, if I were willing to stay connected. Given the time of the year as well, April is when people are starting to really open and

business gets going. And I was happy to hear that because so much of the work that I do, as I explained before, is all winter trying to get things ready for when the accounts open in the spring and if -- so that -- that really has an impact on how the whole season is going to go for the most part and money that I would earn. So we talked about me staying involved, doing as much work as possible ahead of time, getting all my restaurant menus done, presenting to -- everything I explained before, I'm not going to bore you with me repeating it again, but the types of things I would do to get accounts ready. If I did all of that and gave Afton, who was the sales representative who would be covering for me --

Q. And I just want to stop you right there, the sales assistant, right?

A. Sales assistant Afton.

Q. Yep.

A. Who would be covering for me.

Q. Okay.

A. Did I say that? Yeah, so I -- to give her any and all information that she would need to make covering for me seamless. Where the decisions would be made on what new items might be placed here and there she basically would just take orders. I would to be -- I was to be available to Afton to talk as often as she needed, which I did, and, you know, my customers all knew I'm on maternity leave --

Q. And before we get there, I -- I just kind of want to stop you because I was just focusing on what you did to prepare for it. Did you also create like a big printout of your accounts and --
A. That --
Q. -- where Afton should physically go each day, that sort of thing?
A. Well, yeah, that was part of the spreadsheet I created for Afton was, yeah, very detailed with who she would see when, as I would do any time I'm away, but spreadsheets for retail stores, for example, that were going to be opening where I created the whole wine set and basically, you know, did a -- laid out the shelving, what's going to go here, what's going to go there, did all of that research and all of that ahead of time so it was done so when they actually opened or were opening she could physically go into the account and punch the order in as I had laid it out. That was an example of something that I did for several different places.
Q. And for the accounts that are more seasonal and aren't open year-round, had you made sure to go visit all of those accounts that were not yet opened, soon to be opening, to make sure that they knew that you were on maternity leave, that sort of thing?
MR. WALL: Your Honor, I object to the form of the question, it's basically an answer.

THE COURT: Overruled.

A. Yes.

BY MS. QUINLAN:

Q. Okay. Did you do anything else to make sure that the accounts were ready to go to open while Afton was covering on your maternity leave?

A. Well, yeah, so everything I have said, and my customers I -- everyone obviously knew I was having a baby and knew that I would be out on leave because I told them that, also said, you know, any questions on anything, new items, anything above and beyond placing your, you know, regular weekly orders I'm -- I'm here for you, please let me know, I'm happy to help. I want to -- excuse me, I want to, you know, stay involved with this so when I do come back in June we're -- everything is good for the summer.

Q. And did you work right up to your delivery day with Sloan?

A. I did. I was supposed to be induced at some point, I forget the date, but then I had her on April 9th, which was a Saturday, and I had worked that Friday before with Afton, and, you know, starting to get a little crampy, and Afton was driving and I was in the passenger seat. So we did, we worked almost a full day, and then I started having pretty bad cramps around midnight and so my husband and I went to the hospital and then had the baby on -- had Sloan on Saturday afternoon.

Q. And I want to show you what I have marked as Exhibit 34,

and is this the e-mail from you letting Nappi management know that you had given birth to Sloan?

A. Yes, that was to Paul and Christine letting them know I did have the baby. I sent a picture, let them know her size and that she was healthy, and that I was obviously on maternity leave now.

MS. QUINLAN: Your Honor, I move to admit Exhibit 34.

THE COURT: Any objection?

MR. WALL: We do have an objection to the second page of the exhibit, Your Honor.

THE WITNESS: I can't see it. Oh.

THE COURT: What's the basis?

MR. WALL: Well, may we approach sidebar, Your Honor?

(Sidebar conference.)

MR. WALL: For one --

THE COURT: A picture of a baby?

MR. WALL: Yes. For one thing it's -- my understanding is that these kind of pictures are not supposed to be part of the record if it's possible to keep them out; but, second of all, it seems pretty obvious why it's in there, so it's unnecessary for the purposes of the questioning.

THE COURT: Yeah. I'm going to overrule it. I don't see it's any harm -- there is any harm for it.

MR. WALL: Thank you, Your Honor.

(Open court.)

THE COURT: Objection is overruled.

MS. QUINLAN: Your Honor, I would like to publish to the jury.

THE COURT: You may.

BY MS. QUINLAN:

Q. Okay. And I think this e-mail chain starts at the bottom with you letting them know that you had given birth on April 9th at 4:21, six pounds, fifteen ounces, and is this a picture of your baby?

A. It is.

Q. And you sent that to Paul and Christine when you let them know?

A. Yeah, yeah.

Q. Okay. And then Paul responded to you congratulations and he let you know that Afton would be getting your iPad; is that right?

A. Well, we were going to swap iPads because mine was faster than hers.

Q. Okay.

A. And so I was going to swap with her while I was out, and he also just said someone would come and get my van and hold it for me at Nappi until I was ready to come back to work.

Q. Okay. And did that happen?

A. It did.

Q. Okay. And then I am going to show you what I have marked

as Exhibit 35, and this is -- I guess I shouldn't tell you. Have you seen this before?
A. Yes.
Q. And what are all of these text messages?
A. These are text messages between myself and Afton Hawkins.
Q. And are these text messages between yourself and Afton Hawkins while she was covering for your maternity leave?
A. Yeah, before -- they start right before Sloan was born and then as you're pulling the pages I'm seeing the dates April 11th and --
Q. So yes?
A. So yes.
MS. QUINLAN: Okay. Your Honor, I move to admit Exhibit 35.
THE COURT: Any objection?
MR. WALL: Yes, Your Honor, they're hearsay.
MS. QUINLAN: Your Honor, these are not -- it's only partial hearsay first, it's statements that -- communications that Michele had with her coworker, and she has testified that they're demonstrative of the communications that she had with Afton while she was out of -- out on maternity leave but staying in touch with her in accordance with the agreement between her and Mike Hale.
THE COURT: All right. I'll see counsel.
(Sidebar Conference.)

THE COURT: Well, I don't -- I don't think they're hearsay so long as they're part of her real business record, but these appear to be both a mixture of personal commentary, some of them don't have anything to do with the price of tea in China, and if it's to keep a coworker advised of what is going on for purposes of business it's one thing, but if it's chatting about the beautiful baby it's another.

MS. QUINLAN: I think there is only one chat really about the baby and it's on her way to go see Michele at her house to have discussions about --

THE COURT: Well, and I haven't seen it so why don't you show it to me. What's your?

MR. WALL: Well, Your Honor, first of all, I do think it's hearsay because I don't think this would be considered a regular -- a business -- a record of regularly conducted business. This is a personal communication between two individuals, both of whom -- it's out-of-court statements, not being offered for the truth of the matters asserted, so --

THE COURT: They are -- as I understand it, this is her replacement during the period --

MR. WALL: I understand it, Your Honor.

THE COURT: -- so.

MR. WALL: But she -- she is not --

THE COURT: Let's assume for a moment that they are talking about business, how is that account going, how is this

account going, that would not be hearsay, right?

MR. WALL: Well, if -- I don't think just because they're talking about business doesn't necessarily make it a business record, Your Honor.

THE COURT: Well, two -- for two employees to communicate between each other I think fits within the business records exception of the hearsay rule.

MS. QUINLAN: And this is --

THE COURT: So long as the conversation is about business.

MS. QUINLAN: And this is how --

THE COURT: This is like I'm upstairs nursing the baby, can you give me 20 minutes if you're in town. I mean I haven't looked at this whole thing --

MS. QUINLAN: But that's because Afton was coming to her house to meet to discuss the accounts so she was just saying I'm upstairs nursing. I can --

THE COURT: This has got all sorts of stuff.

MS. QUINLAN: I can lead to --

THE COURT: I mean I could use a case of prune Riesling and a box of Chablis if you do.

MS. QUINLAN: I could certainly wait and lay the foundation with Afton, I'm happy to do that as well.

THE COURT: Well, I don't think -- I don't think it's a foundational issue. I don't think you're objecting on

foundational grounds.

MR. WALL: My objection is not on foundational grounds, Your Honor.

THE COURT: Why don't -- why don't we do this, I haven't looked at this. Why don't you -- do you need to ask questions about this?

MS. QUINLAN: No.

THE COURT: I mean I can take a look at it during the course of the rest of the day and figure out how much of it's admissible and whether or not I really have a problem with it. I do think it --

MS. WHITE: Would the Court prefer redactions?

THE COURT: Well, I don't -- I have never seen it, so I really don't know anything about it. And I don't know if -- is there stuff in here that you really would -- I mean they're talking about come on over, I've got some muffins for you. Do you think that's going to be prejudicial?

MR. WALL: I just think, Your Honor, that there is aspects of this back and forth that really is quite remote from anything going on in this case and it seems objectionable. Again, I do think it is hearsay. I understand Your Honor's view on the business record exception, but I don't think this constitutes anything that would be considered a business record kept by a business in the ordinary course --

THE COURT: You're going to lose on that one because I

have already made up my mind.

MR. WALL: I understand that, Your Honor. But in addition to that I think there is substantial information in there that's in no way probative of any issue in this case and frankly it's just, you know, you're talking about issues that relate to, you know, personal communications that I think is --

MS. QUINLAN: And, Your Honor, it's not so much about what the communications say, it's establishing when Afton is going to Michele's house to meet with her on her maternity leave to discuss business issues. So they may seem personal in nature, but the timing of them shows how often and how frequently they were meeting to discuss --

THE COURT: All right. Well, I'll -- I'll look at it while we're finishing up. I'm going to tell them to come in, by the way, tomorrow at -- at nine. We've got a storm and I want them to get the advantage of daylight, so rather than coming here and being here by 8:30 I think maybe if I delayed it by half an hour that won't put a crimp in your style and I think that will show that we're concerned about the safety of the jurors. So I'll take a look at this --

MS. QUINLAN: Okay.

THE COURT: -- and we'll defer it until just before we break.

MS. QUINLAN: Okay. Thank you.

MR. WALL: Thank you, Your Honor.

(Open court.)

THE COURT: I'm going to defer ruling on that and will review it before the end of the day. You may proceed.

MS. QUINLAN: Okay.

BY MS. QUINLAN:

Q. Were you meeting with Afton during your maternity leave?

A. Yes.

Q. How frequently were you meeting with her?

A. At least once a week on average, sometimes more.

Q. Okay. And when you would meet with her, where would you two meet?

A. She would come to my house.

Q. Okay. And would she text you to let you know when she was on her way over?

A. Sure, we texted quite a bit. Which a lot of business conversations happened via text as well, but, yeah, she wouldn't just show up unannounced.

Q. Okay. And those communications where she said she was coming to see you, was the purpose of the meeting to discuss business or was it personal?

A. No, it was always to discuss business. There was one time right after Sloan was born that she brought me a candle when she came over with like a picture of her on the candle, it was very cute, so that was a personal gesture, but she never came just to like hang out with me and the baby ever.

Q. Okay. I would like to show you what I have marked as Exhibit 37. Have you seen this document before?
A. Yes.
Q. And it looks like this is an e-mail string between you and Christine Fox; is that right?
A. Yes.
MS. QUINLAN: Your Honor, I move to admit Exhibit 37.
THE COURT: Any objection?
MR. WALL: No objection, Your Honor.
THE COURT: It's admitted.
MS. QUINLAN: And if I could publish to the jury.
THE COURT: You may.
BY MS. QUINLAN:
Q. And it says here if we look down at the bottom, it's an e-mail from Christine on Friday, June 4, 2016, and she says at the bottom, PS how did your first week go?
Had you gone to work -- was that your first week back from maternity leave?
A. Yes.
Q. So you started that Monday before?
A. I did.
Q. Okay.
A. I remember it was the day of the Nappi picnic.
Q. Okay. And it looks like you were just starting to get enrolled in the 401K; is that right?

A. Yes.
Q. Okay. Was there a reason why you had waited so long?
A. Yeah. I don't know if I have to see that again if I was changing beneficiaries because of having the baby. I'm not quite sure, I would have to read it. Yeah, I don't know.
Q. So if you had returned to work that Monday, that means that you were out on maternity leave from April 11th to June 17th of 2016; is that right?
A. Yeah, yes.
Q. Okay. And that's just a little over nine weeks; is that right?
A. I think so. I'd have to go through the weeks in the calendar to be quoted, but.
Q. So going back to the incentive payment while you were out on maternity leave, did you end up getting that?
A. No. I got an e-mail from Valarie Ellis that showed 43 percent -- it showed the breakdown of the incentives during that time period and 43 percent in the dollar amount that -- that I was to be paid and that's what I was paid.
Q. Okay. And just to clarify for the record, if we refer to Valarie Ellis or Valarie Hale we're referring to the same person, right?
A. Yes, Valarie Ellis, but she got married I don't know how many years ago so now it is Valarie Hale, but it's the same person.

Q. And who did she get married to?
A. Mike Hale who was the sales manager at Nappi that we keep talking about.
Q. Okay. So I'm going to show you Exhibit 36. Have you seen this document before?
A. Yes.
MS. QUINLAN: Your Honor, I move to admit Exhibit 36.
THE COURT: Any objection to 36?
MR. WALL: No objection, Your Honor.
THE COURT: 36 is admitted.
BY MS. QUINLAN:
Q. So I'm just starting with the first part of this e-mail string, and it starts with an e-mail from Valarie Ellis on June 13, 2016. Is this the report that you were referring to earlier?
A. Yes.
Q. And it says here down at the bottom the total incentives earned and at 43 percent $1,719.96. Is that how much you were paid out?
A. Yes.
MS. QUINLAN: Oh, I would like to publish to the jury, Your Honor.
THE COURT: You may.
MS. QUINLAN: Thank you.
Q. Okay. And then up here it says, very helpful, thank you.

What does the 43 percent? I get the rest when I come back to work officially? Is that what you wrote to Mike Hale?
A. It is.
Q. Okay. And then what was his response to you?
A. He said that Christine was supposed to speak to me on the previous Friday and he would be happy to have a conversation with me if I wanted to give him a call. So I forwarded the e-mail to Christine Fox and just said please see below, is there something we need to talk about.
Q. Okay. And did you end up having a conversation with Christine Fox about the incentive pay on your maternity leave?
A. Yes, I did.
Q. And was it a phone conversation or was it in person?
A. It was a telephone conversation because I wasn't back to work yet.
Q. Okay. And what did the two of you discuss in this phone conversation?
A. So it was about -- you know, it was about the incentives because I was expecting to get paid one hundred percent and --
Q. Did you tell Christine the arrangement that you and Mike had made?
MR. WALL: Your Honor --
A. Yes, so --
MR. WALL: -- I'm objecting, it's leading.
THE COURT: Overruled.

A. So, yes, I ex -- yeah. And I know I wasn't exactly clear. I mean I knew Christine was the head of HR, but why she was going to be talking to me about this? So I mean, you know, we got on the phone and I don't remember exactly how it started but that was the topic, it was the incentives and I didn't get them, and I was surprised I didn't get them, and I had worked and spoken to Mike Hale several -- several times and we worked out an agreement. And I already explained the agreement so I won't say it again. But I explained that to Christine, and, you know, she said, well, I spoke to Mike and he didn't tell you that and you're lying. So that shocked me. She has called me a liar.

BY MS. QUINLAN:

Q. And I just want to go back, you said you were surprised that you were having the conversation with Christine, why was that surprising to you?

A. Well, it was -- I hadn't talked -- she hadn't been a part of this conversation at all before, you know, it was something that Mike and I had talked about, and I really hadn't up until this time had very much interaction with Christine, it just -- I hadn't had to. So I just -- yeah, I don't know. I remember being -- just wondering why is she the one I have to talk to about this, she wasn't a part of the agreement, I remember that --

Q. Okay.

A. -- but.
Q. Okay. And when she called you a liar, or said that you were lying, how did that make you feel?
A. Awful because I -- I -- I knew I was telling the truth, I had lived it, you know. And so I was upset, I was angry, I was counting on getting that money, I had, you know, not been working. So I had a lot of emotions and feelings and I was very upset. I -- I cried a lot when I got off the phone. I might have even cried on the phone, I don't know.
Q. And do you think you held up your end of the bargain in --
A. A thousand percent I did and -- yeah. I mean I kept in touch -- I did everything I was supposed to do and probably more because that's just how I am. I keep in touch with my customers and I always want to make sure things are -- are going well because it -- it protects my income.
Q. So after you returned to work how was it adjusting back to work life after having a baby?
A. Well, it was hectic, you know, I was tired for sure, but I was happy to be back to work. Let's see. So I came back in June, busy season. I'm trying to think just timewise -- yes, so I -- you know, the incentive thing that had happened in my mind never got resolved. I had spoke to Ian about it, he was aware of it, and, you know, definitely said if I wanted to bring it to Frank, Jr., I certainly could, but he didn't think it would matter, that I wouldn't win that battle --

Q. Okay.
A. -- with Christine so don't -- you know, so there was that.
Q. I understand that at some point -- or actually let me back that up.
After having this kind of uncomfortable conversation with Christine when she told you you were lying, how was your relationship with Christine once you did return?
A. Well, in the -- in my job being in outside sales I'm not at the offices that much. You know, I come when we have sales meetings or if I need to pick up product or samples, but, you know, I live in my territory which is almost an hour away so I don't have a reason to go there all the time so I don't really -- I didn't really see her a whole lot, but there was definitely awkward tension.
She was always nice -- you know, she is nice to me and compliment my clothes and would smile at me and ask me about the baby, and she had a picture of the baby on the refrigerator that -- you know, in the staff area, as she did some other babies as well, or other children, but -- but then I would, you know, see her just sometimes just kind of glaring at me with just a look of contempt and I said wow she really doesn't like me. I remember thinking that, she doesn't like me. Which not everyone does, I mean that -- it happens, but it was just looks that kind of --
Q. Okay.

A. Yeah, just looks that she would give me and so I --
Q. I understand -- sorry, I'm just going to pause you right there.
A. No, it's okay.
Q. I don't mean to interrupt you.
A. No, it's fine. I just -- so I didn't have a lot of interaction unless there was a reason if I had to, and there was a reason that I had to. Not that long I think after coming back she had wanted to see me in her office to talk about some damage that had been noticed on the side of my work vehicle.
Q. Okay. And when did she -- where were you when she asked to speak with you about this damage to your vehicle?
A. Ian had sent me an e-mail and said that she wanted to see me. And so it was a sales meeting day that I was on property and she I think may have been in that sales meeting, I don't exactly remember, but she did say I -- you know, I -- can I see you after this, or I will see you after this, or something where I didn't have a choice kind of thing, which was fine, I was there. So that is when we spoke, after that sales meeting on a Thursday.
Q. Okay. And did you go into her meeting?
A. I went into her -- I went to her office. She was with somebody at the time and, you know, yelled over to me, I'll be with you shortly, and actually Dan Toolan heard that because he was -- he is another sales rep and who was in the area, and he

just said, wow, what did you do to her like, you know, it was sort of like a firm I will see you in a little bit, you know, kind of thing, so.

Q. Okay. What did the two of you discuss in the meeting when you went in?

A. So I went in to the office and she asked me about some damage to the side of my van on the back passenger side door.

Q. And what -- what was the damage?

A. Yeah, there was a -- a dent -- I think a smallish dent in the side that had occurred the winter before so, and this was in I think -- this was in the winter, I think Decemberish or something, so it had to -- it was during the winter -- the following winter I was out at an account in Eliot and it was snowing terribly, like I don't think I should have even been on the road. It was like towards the end of the day, and there were no other cars in the parking lot, and I like backed into the parking spot and I heard like a bump or I heard something, so I parked and I got out and I went -- I looked around and there was snow everywhere so I didn't see anything. There were no people there, there was no accident, you know, so I didn't really think much of it, I got home, went about my business. Shortly weeks or month or -- after my husband actually said to me one day in our driveway, what happened to your car here, so he had noticed, and I said I don't know, what, and so I looked, and then I thought about it and said oh, geez, that must have

happened, you know, when that happened, so that was the dent in which she was referring to.

Q. And did you explain that to her?

A. Yes.

Q. What did she ask you about the damage to your car?

A. Well, she was upset that I -- she asked me why didn't you report this so it could be fixed or why didn't you report this and --

Q. And what did you tell her?

A. I told her -- you know, I apologized right away and I just said honestly, Christine, I just didn't think of it, it -- I told her how it had happened the year before, how I hadn't even noticed it and my husband pointed it out but then when I looked at it, yes, there was definitely a dent. And I -- I don't like to damage property, so I wasn't happy about the dent, but the car was drivable -- you know, there wasn't an accident, it wasn't like I had to report an accident, I just didn't think to do it, and, you know, I'm sorry that I didn't.

Q. Were you --

A. Because I was sorry.

Q. Were you intentionally trying to hide the dent?

A. No.

Q. Okay. And after you explained this to her and said that you were sorry, what did she say to you?

A. Well, she -- just it was the look, the glaring at me again

from across the desk, and just wouldn't accept my apology, wouldn't, and just told me she didn't believe I was sorry, you know, why would I do this, why wouldn't I report it, and just kind of kept asking me the same questions. I just kept saying I'm sorry, I didn't intend to make you upset or to -- to hurt anybody, I'm sorry.

And then she brought up how at a time previously Ian had said something to me after a sales meeting about the condition of the inside of my work van. That Nick had -- Nick Nappi had come to talk to him and told him that he had heard it was like dirty or dirty meaning just stuff in there and -- just dirty was the word they used, so Ian mentioned that to me, and I remember being horrified and so embarrassed, and it was, you know, right after I had had the baby and so I was just like, oh, my God, sleep deprived and I was so embarrassed because, you know, all I -- like as a sales rep I live in that car, I live in it. You know, I don't go eat lunch places. I eat my Cheerios, you know, out of the cup. I have my trail mix.

Q. So your car did get a little messy, is that --

A. Yeah, it does, and I admit that, and from others I've seen it -- it does, but I have never had a pet in there, I have never had my child in there. Like, you know, I haven't -- it would -- yeah, it was -- so, yes. So she brought that up to me to say well then we had that episode with you that happened then, you know, and so I'm thinking that's kind of old news, I

already apologized for that. I had the car detailed almost like the following week, you know, it was spotless.

Q. The year prior you had the car detailed?

A. My work van, yes. No, I brought it somewhere and paid to have it detailed so it was like spotless, and I mean I was totally embarrassed, I felt like an idiot. So she had brought that up. So then she -- she said you had throw up in your car, and that I was -- I did not have throw up in my car, I definitely didn't. And I realized she had to be talking about the smoothie that had spilt which was a like chocolate oat smoothie I get from this place in Kittery, and I remember the day it tipped over in the car and I was like, oh, bad word, and in my glove box there were napkins there, wiped up the best I could, threw it away. You know, I just -- and it was on the side of the seat so it had -- like there was some left that had stuck to the seat, and that is one of the things that Nick had noticed. I believe that's what Ian had said to me, that it was just dirty and something was spilled, but never was throw up mentioned to me because I would have said no way.

Q. So when we talk about the smoothie or the what Christine said was the vomit, she is talking about something that happened a year prior?

A. Well, it happened, yeah. I don't know how long before it, but it had happened and been addressed, dealt with. It was old news kind of thing as far as I could tell, so I didn't know why

she was bringing that up. And then said I had throw up in my car, I was shocked, I said absolutely did not. She called the garage, you know, to -- and asked for somebody, I think Walter in there, and asked if he remembered the time I had brought my car in and did I have throw up in my car, and I -- and he was on speaker so I heard the conversation, and I don't know if he said what -- I don't think he said he thought it was throw up, but he acknowledged it, but it was just strange that she was bringing it up and questioning that and like trying to prove that I had throw up in my car by calling somebody when I did not, and I was horrified by that, so it was just very uncomfortable.

And during this -- this whole time this was right after a sales meeting, which is at 7:00 a.m., usually they last a couple of hours. Thursday is one of my busiest days of the week, my routes, my accounts are all down south. So it's just about an hour to the warehouse where the meetings are and I'm going -- I'm thinking in my head I need to get out of here, I have to go do my job. This is -- this is feeling really crazy, like she is berating me, I can't get her off my back.

So I was so upset and I just was like I started crying, and then she stopped and just looked at me and said that I was passive aggressive because I was crying, I think, I don't know why she said I was passive aggressive, but -- so that happened.

And then she said I don't think you're sorry, I just don't

think you're sorry, and I just didn't know what to do. And I'm like this woman is not going to let me out of here until she breaks me, so I let her break me and I started crying. And then she told me I should probably see a doctor and get my medications checked because my hormones must be out of whack, and I'm thinking I don't know, I know I just had a baby and everything, so -- but this reaction, if -- if there was a fly on the wall watching this happening, I can't imagine anyone who would have thought my reaction was not appropriate.

Q. And by your reaction you mean the crying?

A. The crying.

Q. Okay.

A. I was just broken. I just couldn't do it anymore.

Q. Okay. And did you leave after she made these comments to you?

A. I did.

Q. What did -- did you report this interaction with --

A. I got in my car and I drove south because I needed to get, and I thought about it the whole time, and as soon as I like parked I had to -- I was late for a meeting with a customer, ran in, did that, came back out, and I sent a text message to Ian Brown and just said, hey, I think -- and Joline might have been on it as well, I don't remember, but I said are you -- are you and Joline free available tomorrow morning, there is something I would like to come talk to you about, and he said

how is 9:00 a.m., and I said perfect.
Q. Okay. And I will show you what I have marked as Exhibit 39. Is this the text message you were just telling me about?
A. It is, it is to Ian and Joline.
MS. QUINLAN: Your Honor, I would like to admit Exhibit 39.
THE COURT: Any objection?
MR. WALL: No objection, Your Honor.
THE COURT: It's admitted.
MS. QUINLAN: And if I could publish to the jury?
THE COURT: You may.
MS. QUINLAN: Thank you.
BY MS. QUINLAN:
Q. And so if we look here it looks like it was in fact a text message to Ian and Joline that you sent asking them to meet the following day on December 14, 2017.
A. Yes.
Q. Did you end up meeting with them the next day?
A. I did. I did. We met in Joline's office. That is not her current office, it's the office where she used to be. They were both there. Joline was sitting behind her desk, Ian and I were at chairs in front of her desk. I told --
Q. Did --
A. -- them --

Q. I was going to say, what did you tell them?

A. Right, I'm trying to go timing so I'm trying to do it -- no, no, so I told them that I had talked to Christine the day before; and Ian said actually Christine did mention that, that you had a meeting and that you were very upset; and I said well did she tell you why I was upset; no, you know, we didn't get into that. So I just said I -- I summarized what had happened to Ian and Joline, and I told them that, you know, it was shocking to me, and that I've had several professional positions in my life at different companies, have worked with several different HR human resource professionals, and I was shocked at the way she treated me and spoke to me. It was just -- I don't even know what to say other than shocking and appalling. And so I let them know --

Q. Did you tell them about the comment that she made about your needing to get your medications checked?

A. Yes, I told them -- just I summarized exactly what I just summarized for you all here.

Q. And how did they react to it?

A. Well, Ian had -- he was taking notes. I mean the look that -- the look on his face was of like shock but also sympathy or -- I mean he said, you know, I'm really sorry you had to deal with that, or I'm sorry that happened to you is what I think he said. He asked me if I wanted to go see Frank, Jr. -- Frank Nappi, Jr., about it, did he want me to -- did I

want him to bring it to Frank, and I said honestly, no, I don't -- you know, Christine -- see Christine -- human resources of direct -- director of human resources but also has -- and that is a powerful position, but the position -- I mean she -- Frank -- she is number -- his next in line pretty much, so she holds a lot of power, and being in the even office with her I mean I was intimidated -- intimidated, annoyed, scared, all of those things, but I'm thinking she is freaking out on me right now and she has the power to fire me, that's what I was thinking. So I said, you know, honestly, no, I don't need you to bring it to anyone. I wanted someone to be aware of it, just know what you're dealing with here with her. I don't know what's going on, I just want it documented in my file, I really prefer not to have any more one-on-one meetings with her.

Q. Did Ian ask you any questions?

A. Well, yeah. So then at some point he said if I -- he asked me if I thought this treatment was because of what had transpired between us during my maternity leave about the incentive situation. And, you know, I hadn't really thought about that 24 hours before but I said, you know what, could be, honestly it really could be, so that was that.

Q. Did Joline --

A. I --

Q. Sorry, did Joline say anything to you or interact with

you?

A. Just -- just -- yeah. I mean she didn't really participate as much, she was listening. But when I said no, I don't want it brought to Frank, I don't want to make a thing of it, honestly I prefer to fly under the radar, do my job, do my thing, and I don't want to cause trouble, and Joline said you know I'm the same way, I like to fly under the radar, too. I remember her saying that. But other than that she -- she didn't really say too much, she was just there as another set of ears.

Q. Was there a reason why you wanted them, as you said, to make a note of it to your file?

A. Well, I -- I'm a -- I have been in business long enough to know I mean it's good to have things documented like that because I don't know what could have -- what else could have happened in the future or. And that was -- that was not a normal occurrence in a professional situation or a professional job, that was not normal, so it needed to, you know, be acknowledged as that.

THE COURT: Is this a good time to break?

MS. QUINLAN: Sure, yep.

THE COURT: All right. Why don't you -- by the way, I'm going to admit over objection Plaintiff's 35. I'm admitting over objection Plaintiff's 35.

MR. WALL: Thank you, Your Honor.

THE COURT: Why don't you stand down, ma'am.

So, ladies and gentlemen, I've got some words of advice for you. First, I understand that old man winter has decided to make his appearance in February. He has not darkened our door very much this year, but he is here, and we have no choice but to let him in.

Now, you're all hardy Mainers, so I assume you can -- you know how to drive through snow. Do you have your -- can you hear me?

JUROR: I'm all set.

THE COURT: Okay. I'm still a little worried about the travel conditions tomorrow morning, so what I'm going to do is ask you to come at nine and not 8:30, that will give you a little more daylight to travel in. So be here by 9:00 and we'll start at 9:00.

One of the unique things about a jury is that we can't all -- we can't start until all of you are here, and you don't want to be the one we're looking for. So just try -- you made an effort today and I appreciate the effort, try and be here in advance of 9:00 so we can start on time.

Secondly, I have a feeling what's going to happen when you get home tonight and someone may well greet you and they'll say, what happened in court today? I'm all ears, tell me all about it. I'm so interested. What do you think? And you're going to say, I can't talk about it.

Now, the reason I'm telling you that is not to test your self-restraint. It is because when you start talking about the case you're deliberating, and you can't deliberate about this case with anyone other than a member of the jury. So you have to tell them I can't talk about it, and if you start to talk about it you're violating my instructions. If they pester, if they won't take no for an answer, tell them to give me a call, I'll be glad to talk to them about it.

The second thing that I want to tell you about is this, I've told you in the earlier instructions that you can't do any research, and I'm -- I'm going to reinforce that now. Juries all over the country are given the same instruction that I just gave you this morning, that you can't do any research, you can't Google people, you can't go on Facebook and try and look them up, and they're violating judge's instructions. They ignore it because, I don't know, they're addicted to Facebook or they can't ignore the internet for a period of time.

And there are two reasons you can't do it, and the first is that you can get a lot of information and misinformation from the internet, and we're going to a lot of trouble here in court, as you've seen, to make certain with these lawyers that the information you get to decide this case properly is based on the rules of evidence. Well, the information you're getting on Google is not based on the rules of evidence.

And the other reason that you can't do it is because the

attorneys have to know what you know about the case in order to frame their arguments and to make appropriate closing arguments to you and to adjust the evidence that is properly before you, and if they don't know what you know they're going to be at a disadvantage.

So I'm urging you in the strongest terms not to do what some other juries -- jurors have done around the country, and when they do it causes terrible trouble with the trial, not to go on the internet, not to do any research, stay out of social media, don't talk about your role on Facebook or some other social media on this case.

After the trial is over, you're not constrained at all, you can do whatever you want to do; but while the trial is going on, you have to obey my instructions on this.

With those admonitions, I'm going to tell you that you can leave and have safe travels here tomorrow and I'll look forward to seeing you tomorrow morning.

THE CLERK: All rise, jury exiting.

(Jury exited. Time noted: 2:46 p.m.)

THE COURT: Anything before we break?

MS. QUINLAN: No, Your Honor.

MR. WALL: No, Your Honor.

THE COURT: Okay. Court will stand in recess.

(Time noted: 2:46 p.m.)

**C E R T I F I C A T I O N**

I, Tammy L. Martell, Registered Merit Reporter, Certified Realtime Reporter, and Official Court Reporter for the United States District Court, District of Maine, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: March 28, 2023

/s/ Tammy L. Martell

Official Court Reporter