UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MICHELE TOURANGEAU,              )
                                 )
        Plaintiff,               )
                                 )
        v.                       )
                                 )        No. 2:20-cv-00012-JAW
NAPPI DISTRIBUTORS,              )
                                 )
        Defendant.               )

**ORDER ON PLAINTIFF'S MOTION FOR NEW TRIAL**

After a five-day jury trial ending in a defense verdict, an employee-plaintiff brings a motion for new trial against her employer-defendant. The Court denies the plaintiff's motion for new trial because it concludes that: (1) the evidence submitted to the jury was sufficient to support the jury verdict; (2) it properly instructed the jury on the defendant's affirmative defenses; (3) it did not err in the jury selection process; and (4) there was no juror bias to merit a new trial.

I.    **BACKGROUND**

      A.    **Procedural History**

On January 10, 2020, Michele Tourangeau filed a lawsuit in this Court against her employer, Nappi Distributors (Nappi), alleging unequal pay practices and related retaliation, sex and pregnancy discrimination, and sexual harassment. *Pl.'s Compl. and Demand for Jury Trial* (ECF No. 1) (*Compl.*). Ms. Tourangeau proceeded to trial against Nappi on six legal claims: one, that Nappi violated the Equal Pay Act by paying Ms. Tourangeau less than similarly situated male employees; two, that Nappi

discriminated against Ms. Tourangeau on the basis of sex and pregnancy under Title VII; three, that Nappi retaliated against her for engaging in protected activity under the Maine Human Rights Act, the Equal Pay Act (EPA), and Title VII; four, that Nappi violated Maine's Timely and Full Payment of Wages Law by failing to pay timely wages owed to Ms. Tourangeau; five, that Nappi failed to pay Ms. Tourangeau for work performed and owes her for expenses for which she reasonably believed she would be compensated; and six, that Nappi failed to pay Ms. Tourangeau for work performed, and unjustly benefitted from her work. *Compl.* ¶ 1.

The case was tried before a jury from February 27, 2023 to March 3, 2023, and on March 3, 2023, the jury issued a verdict in favor of Nappi on all submitted counts. *Jury Verdict* (ECF No. 204). Specifically regarding Ms. Tourangeau's EPA claim, the jury concluded that Ms. Tourangeau proved "by a preponderance of the evidence, that Defendant Nappi Distributors paid her less than at least one male wine sales representative engaged in work requiring substantially equal skill, effort, and responsibility and performed under similar working conditions," but that Nappi proved "by a preponderance of the evidence, that the differential in pay . . . was due to quantity or quality of production and/or to a business decision, such as adjusting its payroll to reflect industry standards, not based on gender." *Id.* at 1.

On April 4, 2023, Ms. Tourangeau filed a motion for new trial. *Pl.'s Mot. for New Trial* (ECF No. 214). On April 10, 2023, Ms. Tourangeau filed an amended motion for new trial. *Pl.'s Am. Mot. for New Trial* (ECF No. 219) (*Pl.'s Mot.*). On May 8, 2023, Nappi objected. *Def. Nappi Distributors' Corrected Opp'n to Pl.'s Am. Mot.*

*for New Trial* (ECF No. 227) (*Def.'s Opp'n*).  On June 5, 2023, Ms. Tourangeau replied. *Pl.'s Reply Mem. in Support of Am. Mot. for New Trial* (ECF No. 235) (*Pl.'s Reply*).

### B.     The Legal Issues

Ms. Tourangeau claims that a new trial is warranted for four reasons: (1) the evidence at trial was insufficient to support the jury's finding that Nappi proved an affirmative defense under the EPA; (2) the Court erred in denying Ms. Tourangeau's requested EPA jury instruction derived from *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974); (3) the Court erred in denying Ms. Tourangeau's request to strike for cause Juror Number 89 while granting Nappi's request to strike for cause Juror Number 14; and (4) Juror Number 161 displayed such bias, hostility, and false responses to voir dire that his presence tainted the entire jury pool against Ms. Tourangeau.  *Pl.'s Mot.* at 1-28.

## II.    THE PARTIES' POSITIONS

### A.     Michele Tourangeau's Motion

Ms. Tourangeau argues that the "Court should award Plaintiff a new trial for several compelling and unusual reasons." *Id.* at 1.  First, "the Court should grant a new trial because the jury's verdict was against the great weight of the evidence as to Nappi's affirmative defense" under the EPA.  *Id.*

Second, the Court should grant retrial because its "denial of Plaintiff's requested EPA instruction could have affected the jury's lengthy (but ultimately adverse) deliberations."  *Id.* at 24.

Third, the Court "should also grant a new trial because the unusual circumstances of this case indicated such overwhelming juror bias that a miscarriage of justice has occurred." *Id.* at 2. Specifically, Ms. Tourangeau argues that a new trial is required due to juror selection issues regarding Juror Numbers 89 and 14 and due to juror bias of Juror Number 161.

### 1.    Nappi's Affirmative Defense under the EPA

Ms. Tourangeau argues that "a new trial is warranted because the jury's verdict was contrary to the law and against the great weight of the evidence under the [EPA]." *Id.* at 4. Ms. Tourangeau submits that "there was no dispute that [she] met her burden of proving a prima facie case of unequal pay," and thus "the only dispute to be decided by the jury based on the evidence presented at trial was whether Nappi met its burden of proving an affirmative defense under the [EPA]." *Id.* at 5. Ms. Tourangeau further submits that during trial "the Court appropriately ruled that Nappi had failed to produce evidence of a bona fide seniority system that would entitle it to an affirmative defense under the EPA," yet Nappi "consistently cited 'grandfathering' as the basis for unequal pay in this case." *Id.* Ms. Tourangeau asserts that "[a] new trial is warranted because 'grandfathering' is the same thing as a 'seniority system'—the only difference is semantics." *Id.* According to Ms. Tourangeau, "[b]ecause Nappi could not prove that its 'grandfathering' of male wine[] sales representatives was the kind of 'bona fide seniority system' the U.S. Supreme Court has found to qualify as an affirmative defense under the EPA, this Court must grant a new trial." *Id.*

Ms. Tourangeau contends that "Nappi had the burden of proving that a 'business decision' or 'industry standards' separate and distinct from a seniority system or 'grandfathering' warranted the pay disparity here . . . [and] Nappi simply failed to meet its burden of proof." *Id.* at 5-6. Ms. Tourangeau summarizes the "facts adduced at trial regarding unequal pay and Nappi's 'business decision'" and argues that "[i]n light of [the trial] testimony, it was false and misleading for Nappi to poison the jury into thinking that [Ms.] Tourangeau's hire date marked a companywide policy of paying only 2% commission to wine sales representatives." *Id.* at 8. Specifically, Ms. Tourangeau points out that Nappi manager Paul Carr "made it clear that the 'grandfathering' of wine sales representative salaries was not based on any bona fide seniority system, but rather based on 'the ones that are hired before [Ms. Tourangeau.]" *Id.* at 9 (quoting *Tr. of Proceedings* at 522 (ECF Nos. 208-212) (*Trial Tr.*)). In Ms. Tourangeau's view, "[t]his testimony is inconsistent with the above evidence that [she] was also effectively paid three percent commission (two percent commission and one percent salary) upon her hire date and right up until her salary was taken away." *Id.*

Ms. Tourangeau relies on *Mundell v. Acadia Hospital Corporation*, 585 F. Supp. 3d 86 (D. Me. 2022) and *California Brewers Association v. Bryant*, 444 U.S. 598 (1980) to argue that Nappi's use of the word "grandfathering" at trial impermissibly allowed the jury to consider seniority as an affirmative defense. *Id.* at 11-16. Ms. Tourangeau then directs the Court to *Corning* and submits that "[t]he circumstances in *Corning* apply with equal weight to [her] circumstances, because Nappi admittedly

found it unacceptable to reduce the commission rate of its 'grandfathers,' whether those male employees had several years' seniority or thirty years' seniority." *Id.* at 22-23. Ms. Tourangeau concludes that "[t]he evidence at trial simply did not support that Nappi had a legitimate reason other than sex to take [Ms.] Tourangeau's salary away" because the Court "ruled that a bona fide seniority system was 'just not what happened here,'" *id.* at 11 (quoting *Trial Tr.* at 1030-31), and "the record lacked any evidence to support the catchall affirmative defense under the EPA that Nappi paid [Ms.] Tourangeau less due to any business factor other than seniority." *Id.* at 16. She further submits that "this Court should grant a new trial because Nappi had nothing but illusory, post-event, undocumented reasons for why it paid [her] less." *Id.* at 19.

### 2.    Denial of Requested EPA Jury Instruction

Ms. Tourangeau "also seeks a new trial because the Court erred in denying [her] request for a jury instruction under the EPA about employment policies that perpetuate historical unequal pay practices." *Id.* at 24. Ms. Tourangeau contends that the Court erred in excluding her proposed EPA jury instruction because "[i]f all the employees who were previously paid in a more favorable manner were men, then the EPA's direct purpose is advanced by giving the instruction at issue in *Corning*." *Id.* at 24-25. Ms. Tourangeau therefore "asks the Court to grant a new trial in which the jury will receive an instruction pursuant to *Corning* if the jury finds Nappi has met its burden of proving an affirmative defense to the EPA." *Id.* at 25.

### 3.    Jury Selection Process

Ms. Tourangeau contends that "[a] new trial is warranted because the court erred in denying Plaintiff's challenge for cause to Juror Number 89," *id.* at 26, and in "granting Defendant's for-cause challenge to Juror Number 14 over Plaintiff's objection." *Id.* at 28. Ms. Tourangeau submits that "[f]rom [her] perspective, Juror Number 89 answered truthfully twice when he hedged on his response about impartiality, saying *not necessarily* rather than an outright 'no' on questions related to bias," and "[t]hese honest responses reflected the juror's bias and were only changed once the Court pressed further." *Id.* (emphasis in plaintiff's motion). Ms. Tourangeau moreover submits that during her "direct and cross examination of [Nappi]'s management witnesses, Juror Number 89 appeared visibly angry" and "[d]uring closing argument, Juror Number 89 looked so incensed by [Ms. Tourangeau]'s arguments that he became completely red faced and appeared obviously angry." *Id.* Ms. Tourangeau explains that she "could not use her peremptory challenges to exclude Juror Number 89 because of juror research suggesting other biases within the jury pool" and, moreover, she "should not have had to use a peremptory challenge to excuse this juror." *Id.*

Regarding the jury selection process, Ms. Tourangeau also argues that "[a] new trial is warranted because the Court erred in granting Defendant's for-cause challenge to Juror Number 14 over Plaintiff's objection." *Id.* Ms. Tourangeau submits that Juror Number 14 "expressed no hesitation about her ability to be fair and impartial, noting that she would not have a problem finding for one side or another, depending on the evidence," and "[a]lthough Juror Number 14 said she would be

7

likely to 'lean' toward someone being undercompensated, if the facts involve a woman being undercompensated for equal work, the law would require her to 'lean' that way." *Id.* at 29.  According to Ms. Tourangeau, "[t]he verdict must be set aside because the Court erred in dismissing Juror Number 14, a woman who was truthful about her perceived experience of prior gender discrimination," and "Defendant's gender-based discrimination in the use of peremptory and for cause challenges during jury selection resulted in a jury that was neither impartial nor appropriately inclusive of women." *Id.* at 30.

### 4.    Juror Bias of Juror Number 161 During Trial

Finally, Ms. Tourangeau argues that "a new trial is warranted because Juror Number 161 displayed such bias, hostility, and false responses to voir dire that his presence tainted the entire jury pool" against Ms. Tourangeau.  *Id.* at 31.   Ms. Tourangeau explains that "one of the factors that led Plaintiff to request that Juror Number 161 be disqualified was that his conduct, demeanor, and hostile utterances toward Plaintiff and her counsel revealed overt discriminatory animus, bias, and prejudice that should have disqualified him from sitting on the jury." *Id.*  According to Ms. Tourangeau, she "heard Juror Number 161 repeatedly scoffing at Plaintiff's table during trial . . . [and he] also rolled his eyes at Plaintiff and her counsel, exhibiting obvious disdain for testimony presented by Plaintiff." *Id.* (internal quotations omitted).  Ms. Tourangeau explains that "[b]ased on this overtly biased conduct, counsel researched Juror Number 161's Facebook page," which "revealed that Juror Number 161 'liked' a Facebook group called 100PercentFEDUP." *Id.*

According to Ms. Tourangeau, "[t]he group is *entirely dedicated* to sexist and anti-feminist propaganda as well as conspiracy theories and overtly discriminatory content." *Id.* (emphasis in plaintiff's motion).

Ms. Tourangeau submits that "[t]he 100PercentFEDUP group is a fringe and radical organization of individuals who loathe anti-discrimination laws and feminism," *id.* at 32, and "[a]ny juror belonging to this Facebook group is fundamentally compromised and unable to apply the law to the facts of a sex-based discrimination case." *Id.* at 33. Because Juror Number 161 liked this page on Facebook, Ms. Tourangeau concludes that "it is crystal clear that Juror Number 161 lied during voir dire" because his "philosophical beliefs were directly germane to Questions 7 and 8 on the juror questionnaire." *Id.* at 35. Ms. Tourangeau further contends that Juror Number 161 did not stand when "he should have" in response to the magistrate judge's following questions:

> Have any of you, members of the jury, ever been a member of an organization that has advocated on topics relevant to women's rights or gender-related issues?
>
> Have you ever been a member of any organization who has advocated regarding -- that is lobbied, advocating, for any organization regarding women's rights or gender-related -- or gender-equity-related issues? If so, I ask that you stand.

*Id.* at 36 (quoting *Tr. of Jury Selection* at 5:20-6:1).

Ms. Tourangeau then argues that "[s]imilarly concerning, Juror Number 161's Facebook page has changed, and he no longer 'likes' the 100PercentFEDUP group," a change which "occurred in the past week, raising a question of how this juror learned his Facebook page was at issue on post-trial motions." *Id.* at 37. Ms. Tourangeau

contends that plaintiff's counsel has not contacted the juror and assumes that neither has defense counsel, and she then proposes three hypothetical answers to why Juror Number 161 may have 'unliked' the Facebook page: (1) "[i]t is possible that an enormous coincidence has occurred, and this juror removed the 100PercentFEDUP 'like' from his Facebook page for reasons having nothing to do with this case"; (2) "the juror has decided to stay informed about this case and review all post-judgment motions that are filed on PACER, including Plaintiff's Motion for New Trial"; (3) "someone from Nappi Distributors may well have [contacted him . . . which] begs the question whether someone at Nappi has overlapping interests with Juror Number 161, and whether he knew Nappi employees before trial." *Id.* at 37-38.   Ms. Tourangeau contends that "[g]iven the unusual circumstance of this case, Juror Number 161 should be questioned by the Court about why and when he 'unliked' the 100Percent FEDUP Facebook page [or a]lternatively the Court should order a new trial." *Id.* at 38.   "From Plaintiff's perspective . . . the Court should have questioned Juror Number 161 on his affiliation with 100PercentFEDUP and his responses to Questions Number 7 and 8." *Id.* at 40.   According to Ms. Tourangeau, "when the verdict was read in favor of Defendant and against Plaintiff, Juror Number 161 smirked and took such obvious pleasure in finding against [Ms.] Tourangeau that his bias was unmistakable." *Id.*

**B.   Nappi's Response**

**1.   Nappi's Affirmative Defense under the EPA**

Nappi submits that "[e]ven without Plaintiff's indisputable concession and subsequent waiver" regarding the Court's jury instructions on Nappi's affirmative defenses, "the jury received ample evidence that Nappi's decision in 2014 to compensate all new wine sales representatives moving forward at two percent was based on a business decision that had nothing to do with sex." *Def.'s Opp'n.* at 23. According to Nappi, it is "undisputed that all new wine sales representatives hired by Nappi since 2014–regardless of their sex–have been compensated at a two-percent commission rate" and that "Nappi decided to go to a two-percent commission rate for new wine sales representatives *before* [Ms.] Tourangeau ever applied for a position at Nappi." *Id.* at 23 (emphasis in defendant's opposition). Nappi submits that "[i]t was further undisputed that the move to a two-percent commission rate for new wine sales representatives was part of an effort to 'cap' the amount Nappi was spending on wine sales representatives" and that "[s]uch a move was intended to bring the overall compensation in the wine department down over time to a realistic level as compared to compensation within Nappi and within the beverage industry." *Id.* 23-24. Nappi therefore contends that "the jury had an ample basis to conclude that the decision to move to a two-percent commission rate had no connection with sex." *Id.* at 23.

Regarding Ms. Tourangeau's arguments about Nappi's use of the term "grandfathering," Nappi submits that "the contention [Ms.] Tourangeau has built around [the term] is both subjective and convoluted" and "[t]he testimony at trial established that Nappi's use of the term 'grandfathered' was not synonymous with the term 'seniority' as [Ms.] Tourangeau intimates." *Id.* at 26. Nappi further submits

that Ms. Tourangeau's "morphed interpretation of the term 'grandfathered' ignored the evidence the jury received of Nappi's legitimate business reasons for its decisions regarding wine sales representative commissions, the justifications for those reasons, and the undisputed fact that those reasons had nothing to do with sex." *Id.*

### 2.      Denial of Requested EPA Jury Instruction

Nappi first argues that "[t]he Court properly instructed the jury on [its] affirmative defenses under the EPA and ample trial evidence supported the jury's determination that the defendant met its burden of proving its defenses." *Id.* at 17. Nappi contends that Ms. Tourangeau's "attempt to undermine the jury's determination with regard to Nappi's EPA affirmative defenses fails" because: (1) "the Court properly instructed the jury" and Ms. Tourangeau "agreed that the evidence had generated the instruction that a business decision that was unrelated to sex was a defense to her claim"; (2) "contrary to [Ms.] Tourangeau's suggestion, this case does not implicate the Supreme Court's decision in *Corning*," and; (3) "the evidence presented at trial supported the jury's determination that Nappi had proved its affirmative defenses by a preponderance of the evidence." *Id.* at 17-18.

Nappi explains that "during the course of the charge conference . . . [Ms.] Tourangeau agreed that the evidence justified an instruction on the affirmative defense of business decisions unrelated to sex" and she "did not object when the Court stated that [it] intended to instruct the jury on the 'quantity or quality of production' defense and the business decision unrelated to sex defense." *Id.* at 18-19.  According the Nappi, Ms. Tourangeau similarly "confirmed that she did not have any issues

with the EPA defense question on the proposed verdict form." *Id.* at 19. Nappi submits that "[c]onsistent with that consensus, the Court instructed the jury on Nappi's affirmative defenses under the EPA . . . [and p]rior to submitting the case to the jury, [Ms.] Tourangeau did not object to th[e] instruction on the grounds that it was misleading or that it did not accurately state the law pertaining to the EPA affirmative defenses." *Id.* Nappi further submits that "[t]here can be no doubt, therefore, that [Ms.] Tourangeau waived any objection she may have had to the Court's inclusion of the EPA affirmative defense pertaining to business reasons unrelated to sex in its jury instructions or to the Court's description of that defense." *Id.*

Nappi next argues that "the Court did not err in declining to include" Ms. Tourangeau's requested EPA jury instruction because "the proposed instruction does not accurately state the law" and "[m]oreover, the trial evidence did not justify instructing the jury on the correct standard derived from *Corning*." *Id.* at 19-20. According to Nappi, "the Court's instruction in its totality adequately informed the jury as to the controlling issues in an EPA claim," so "the Court did not err in declining to include the language suggested by [Ms.] Tourangeau." *Id.* at 20.

Nappi contends that "[n]one of the elements of reversible error exist with regard to the Court's refusal to include" Ms. Tourangeau's requested instruction. *Id.* at 20. According to Nappi, "the Supreme Court's decision in *Corning* turns not on alleged historical discriminatory treatment generally, but rather on a historical 'practice of paying women less for equal work.'" *Id.* at 21 (internal citation and

emphasis omitted).  Nappi further contends that "*Corning* does not support [Ms.] Tourangeau's proposed language, which refers to 'the company's prior illegal practice of not hiring women for the sales representative positions' and not to a prior practice of paying women at a different rate than men to work as wine sales representatives." *Id.*

Nappi submits that "the pertinent portion of the *Corning* decision is not implicated by the trial evidence" because Ms. Tourangeau "did not present any evidence at trial that Nappi had a practice of paying women at a different rate than men to work as wine sales representatives prior to its decision to compensate new wine sales representatives with two-percent commissions." *Id.* According to Nappi, "the testimony established that all new wine sales representatives hired since 2014— beginning with [Ms.] Tourangeau—have received two percent commissions, regardless of their sex," making it such that "the Supreme Court's reference in *Corning* to a 'prior illegal practice of paying women less than men for equal work' has no relevance to the issues in this case." *Id.*

Finally, Nappi submits that its "burden of proof with regard to its affirmative defenses is substantially incorporated in the instructions the Court gave the jury as to the EPA claim." *Id.* at 22.  Nappi notes that "[t]he Court eliminated the affirmative defenses set forth in 29 U.S.C. § 206(d)(1) that it ruled were not generated by trial evidence" and "instructed that Nappi bore the burden of proof to demonstrate its affirmative defenses are more likely true than not," such that "the Court's instruction

14

on Nappi's burden with regard to the affirmative defenses . . . more than adequately informed the jury as to the controlling law." *Id.*

### 3.   Jury Selection Process

Nappi contends that "the Court did not abuse its discretion in ruling on the challenges for cause during jury selection" because the Magistrate Judge neither erred in releasing Juror Number 14 nor in refusing to strike Juror Number 89. *Id.* at 26. First, Nappi argues that the Magistrate Judge did not abuse his discretion in striking Juror Number 14 because the juror "admitted that she would be 'more likely to lean towards someone who is being undercompensated,'" and the Magistrate Judge "was able to observe the juror when she spoke those words." *Id.* at 27. According to Nappi, the Magistrate Judge "observed that she seemed hesitant about her responses to questions about whether she could be fair and impartial" and noted that "her prior personal experience with an unequal pay issue that had never been adequately addressed by her employer was a close parallel to the allegations in this case." *Id.* at 27.

Regarding Juror Number 89, Nappi explains that "in refusing [Ms.] Tourangeau's request to strike Juror Number 89 for cause due to his prior litigation experience, the Magistrate Judge noted his own observations about [the juror]'s responses and his demeanor," indicating "that the juror had satisfied him that [his] prior experience as a defendant would not affect his ability to be fair and impartial in this case." *Id.* at 29. Nappi contends that because the Magistrate Judge's "assessments are amply supported by the record, the Court should conclude that the

Magistrate Judge's ruling[] . . . in refusing to strike Juror N[umber] 89 w[as] well within his discretion." *Id.* at 31.  Nappi further contends that the Magistrate Judge "rejected [Ms.] Tourangeau's attempt to equate the experiences and presentation of Juror N[umbers] 14 and 89," and "[i]n doing so, he made it clear that both the jurors' answers and his observations about their demeanor were important distinguishing factors." *Id.* at 29.

Specifically regarding Ms. Tourangeau's allegation of bias expressed by Juror Number 89 during trial, Nappi submits that "[b]y waiting until her Amended Motion for New Trial to raise these allegations, [Ms.] Tourangeau has waived them as a basis to prove juror bias." *Id.* at 31.  Moreover, Nappi submits that Ms. Tourangeau "has nothing but speculation to support her argument of bias, since there is no evidence as to why Juror N[umber] 89 might have been upset." *Id.* at 32.

### 4.    Juror Bias of Juror Number 161 During Trial

Nappi submits that "there is no evidence of juror misconduct" and that because Ms. Tourangeau "cannot meet the[] requirements [of demonstrating that Juror Number 161 lied in his voir dire responses], the Court should deny the request for new trial on this ground." *Id.* at 32-33.  Nappi contends that "[a]s this Court noted during its careful assessment of this issue at trial, there is no competent evidence that Juror N[umber] 161 failed to answer either question [seven or eight] honestly." *Id.* at 33.  Specifically, regarding voir dire question seven, Nappi further contends that Ms. Tourangeau "has presented no evidence of any feelings or beliefs held by Juror N[umber] 161 relative to such laws or that he was lying about his opinion of

16

his ability to be fair and impartial in a case involving such laws." *Id.* (emphasis omitted).  Regarding question eight, Nappi similarly contends that Ms. Tourangeau "has presented no evidence of any feelings or beliefs held by Juror N[umber] 161 relative to lawsuits for money damages or that he was lying about his ability to be fair and impartial in a case involving such claims." *Id.* at 34 (emphasis omitted).

In response to Ms. Tourangeau's argument about Juror Number 161's liking of the 100PercentFEDUP Facebook page, Nappi submits that Ms. Tourangeau's "representation" about the significance of liking this page, "whether implicit or explicit, is simply inaccurate," and moreover, the "Facebook page she references is not a group; it is a page . . . to express conservative views" and Ms. Tourangeau "can— and does—speculate freely as to what it means for a person to like a Facebook page, but there is no evidence to substantiate any of that speculation." *Id.* at 34.  Nappi further submits that "there is no evidence as to when Juror N[umber] 161 'liked' the page, what posts to the page, if any, Juror N[umber] 161 actually saw, commented on, or liked, and whether [he] agreed or disagreed—in whole or in part—with the material in posts on the page" and "[n]or is there anything about the Facebook page that illuminates Juror N[umber] 161's feelings or philosophical beliefs about anti-discrimination laws or lawsuits for money damages." *Id.* at 34.  Nappi concludes that "there is nothing about the Facebook page that would suggest—let alone establish— that Juror N[umber] 161 lied when he indicated he could be fair and impartial in this case." *Id.* at 35.

### C.    Michele Tourangeau's Reply

### 1.     Nappi's Affirmative Defense under the EPA

Ms. Tourangeau first submits that "[b]efore 2019, [Ms.] Tourangeau's wages were exactly the same as a three percent commission rate," and "Nappi's decision to reduce [Ms.] Tourangeau's compensation in 2019 had no valid justification other than gender." *Pl.'s Reply* at 1 (internal quotation marks omitted). Thus, according to Ms. Tourangeau, "it is pure fabrication for Nappi to suggest that [Ms.] Tourangeau's compensation at the time of her hire was based on a policy to pay new wine sales representatives wages amounting *solely* to a 2% commission rate." *Id.* (emphasis in *Pl.'s Reply*). Ms. Tourangeau further submits that "[f]unctionally, this argument is both misleading and false because the evidence at trial established that [Ms.] Tourangeau's *actual wages* were 'the same' as a 3% commission rate until 2019." *Id.* at 1-2 (emphasis in *Pl.'s Reply*). Ms. Tourangeau submits that "Nappi's excuse for unequal pay is nothing more than a post hoc ergo propter hoc fallacy crafted in hindsight four years after the events occurred." *Id.* at 2 (emphasis omitted).

Ms. Tourangeau contends that "Nappi's claim of grandfathered tenure and seniority is tantamount to giving better rights (i.e., compensation) to certain employees over others because of length of service" and that "[g]ood reason exists for the United States Supreme Court's requirement that a bona fide seniority system affirmative defense under the EPA be based on clearly defined rules and specific benchmarks for attaining (or losing) seniority." *Id.* at 4. According to Ms. Tourangeau, Nappi "fails to explain how receiving higher pay based on length of service under the guise of 'seniority' is different from a 'bona fide seniority system.'"

18

*Id.* Ms. Tourangeau further contends that "[i]f the term 'grandfathering' is to be distinguished from a 'seniority system' at all (which Plaintiff disputes), it is because 'grandfathering' connotes a decision to afford rights to a certain group over others based on their status at a particular point in time," and "[t]he evidence at trial simply did not support 'grandfathering' as a basis for taking away [Ms.] Tourangeau's 1% salary in 2019. *Id.* at 5-6 (emphasis omitted). Ms. Tourangeau concludes that "comparator evidence showed that [she] had more tenure and seniority when Nappi began reducing her salary in 2019 than males earning 3% commission in 2014 and 2015," including Robert Hole, Daniel Kane, and Dwayne Preble, and the "evidence did not establish any other valid business decision under the EPA's catchall affirmative defense." *Id.* at 9-10.

### 2.   Denial of Requested EPA Instruction

Ms. Tourangeau submits that "[n]othing contained in Defendant's Opposition changes the argument advanced by Plaintiff that a new trial is warranted because the jury's deliberations were impacted by the Court's decision not to give the *Corning* jury instruction" since "[t]he facts of *Corning* are more analogous to the instant case than the Court's ruling suggested." *Id.* at 12. According to Ms. Tourangeau, "[t]here is no language in *Corning* that requires a prior illegal pay practice to be 'baked into' a current EPA violation." *Id.* Ms. Tourangeau further submits that "[t]he *Corning* jury instruction does not apply only to perpetuation of unequal pay *within the same workplace*, but within our society as a whole." *Id* (emphasis in *Pl.'s Reply*). Ms. Tourangeau submits that "based on the purpose, language, and history of the EPA,

19

the jury should have been instructed that Nappi's prior decision not to employ any female wine sales representatives at all before 2015 perpetuated the illegal decision to remove [Ms.] Tourangeau's salary beginning in 2019." *Id.* at 13.

### 3. Jury Selection Process and Juror Bias

Regarding Juror Number 89, Ms. Tourangeau asserts that he "repeatedly expressed hesitation about his ability to remain impartial, because he had 'insight' about being 'wrongfully accused' that would obviously have 'some impact' on his view of this case." *Id.* According to Ms. Tourangeau, "[a] juror who displays such personal bias, or bias in fact, must be dismissed." *Id.* at 13-14. Ms. Tourangeau submits that "[a]llowing him to remain on the jury, indeed as the foreman, was an abuse of discretion," especially "considering that his answers to voir dire revealed the potential for direct bias as a matter of law because Juror 89 was connected to at least three different recent lawsuits concerning his employer." *Id.* at 14 (emphasis omitted).

Ms. Tourangeau then asserts that the "facts in [*United States v. Tucker*, 61 F. 4th 194 (1st Cir. 2023)] reveal why Juror 161 should have been questioned and then excused here," because the "kind of behavior related to Juror 1 in *Tucker* is no different from the kind of behavior that Plaintiff's counsel observed with Jurors 89 and 161 in the instant case." *Id.* at 14-15. Finally, Ms. Tourangeau submits that although "Nappi contends that it cannot be determined beyond speculation whether 'liking' a Facebook page means that the juror 'likes' all of the content contained therein . . . it is the membership in the group itself, and not every single post or view maintained, that would have given Plaintiff the ability to challenge for cause." *Id.* at

15. Ms. Tourangeau concludes that "[t]hese issues are of such significant importance that Plaintiff requests a hearing with the Court to further evaluate Juror 161's truthfulness in responding to voir dire." *Id.*

## III. LEGAL STANDARD

"The decision to grant a new trial is squarely within the trial court's discretion." *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993). At the same time, the First Circuit has noted that the district court's discretion to order a new trial after a jury has reached a verdict is "quite limited." *Id.* at 428. A motion for a new trial under Rule 59 requires a finding that "the verdict is so seriously mistaken, so clearly against the law or evidence, as to constitute a miscarriage of justice." *TransAmerica Premier Insurance Company v. Ober*, 107 F.3d 925, 929 (1st Cir. 1997) (internal quotation marks omitted); *see also Sanchez v. Puerto Rico Oil Company*, 37 F.3d 712, 717 (1st Cir. 1994) (a district court will set aside the jury verdict only if it "is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice").

The First Circuit has emphasized that a "'district judge cannot displace a jury's verdict merely because he disagrees with it' or because 'a contrary verdict may have been equally . . . supportable.'" *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (quoting *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996)). A new trial is a remedy "sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *Sebastino v.*

21

*Springfield Terminal Railway Co.*, 530 F. Supp. 3d 81, 86 (D. Mass. 2021) (citing *United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010)).

## IV. DISCUSSION

### A. Sufficiency of the Evidence of Nappi's Affirmative Defense under the EPA

Ms. Tourangeau argues that a new trial is warranted because the jury verdict was against the great weight of the evidence and no rational jury could have found that any discrepancy in pay between Ms. Tourangeau and the "grandfathered" male colleagues was due to quantity or quality of production and/or to a business decision, such as adjusting its payroll to reflect industry standards, not based on gender. The Court disagrees with Ms. Tourangeau and concludes that a rational jury could well have found—and in fact did find—that Nappi proved by a preponderance of the evidence an affirmative defense to Ms. Tourangeau's EPA claim.

#### 1. Legal Standard

"[C]ourts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." *Monteagudo v. Asociacion de Empleados del Estado Libre Asociado*, 554 F.3d 164, 170 (1st Cir. 2009) (citations omitted). "As part of this analysis, courts 'may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.'" *Mesías v. Hosp. Hima San Pablo*, No. 18-1988 (JAG), 2021 U.S. Dist. LEXIS 57090, at *3 (D.P.R. Mar. 24, 2021) (quoting James Wm. Moore, MOORE'S FEDERAL PRACTICE § 50.06[6][b] (3d ed. 2003)).

22

### 2. Analysis

### a. The Prima Facie Case and Affirmative Defense

To begin, the Court notes what is and is not at issue. As the Court instructed the jury, to prove her pay discrimination claim under the EPA, Ms. Tourangeau was required to prove by a preponderance of the evidence: 1) that Ms. Tourangeau and at least one male employee have been employed by Nappi Distributors in jobs requiring substantially equal skill, effort, and responsibility, 2) that the jobs were performed under similar working conditions, and 3) that Ms. Tourangeau was paid a lower wage than the male employee in jobs that require substantially equal skill, effort, and responsibility as Ms. Tourangeau's job and that are performed under similar working conditions. *Trial Tr.* at 1107:11-21..

The Court further instructed the jury that "[t]here is no dispute in this case that Ms. Tourangeau and male employees working at Nappi as wine sales representatives with southern Maine routes work in jobs that require substantially equal skill, effort, and responsibility with similar working conditions. There is also not dispute in this case that Ms. Tourangeau was paid a lower commission rate than at least one male wine sales representative working in a job with substantially equal skill, effort, responsibility, and working conditions." *Id.* at 1108:3-11. The Court informed the jury that Ms. Tourangeau needed only to compare herself to one "male employee working in a job with substantially equal skill, effort, and responsibility and working conditions." *Id.* at 1108:12-15. The Court instructed the jury that Ms.

Tourangeau "need not show that Nappi Distributors had a discriminatory intent [in paying] her unequal wages." *Id.* at 1108:15-17.

These instructions all but informed the jury that Ms. Tourangeau had made out a prima facie case against Nappi under the EPA, and the jury verdict on question one is consistent with this assessment. *See Special Verdict Form* at 1 (ECF No. 204) (*Verdict Form*).

The nub of the controversy was whether Nappi had sustained its burden to prove its affirmative defense by a preponderance of the evidence, namely that "any differences in pay between Ms. Tourangeau and male workers are due to quantity or quality of production and/or to a business decision, such as [adjusting] its payroll to reflect industry standards, not based on gender." *Trial Tr.* at 1108:19-25. In issuing its verdict, the jury concluded that Nappi had sustained its burden of proof on this affirmative defense. *Verdict Form* at 1. The Court turns to the record evidence on this affirmative defense.

### b.    The Two-Percent Commission: Nappi's Reasoning and Timing

The record at trial established that all new wine sales representatives hired by Nappi since 2014—regardless of their sex—have been compensated at a two-percent commission rate. *Trial Tr.* at 762:24-763:4. Nappi presented evidence to the jury showing that the move to a two-percent commission rate for new wine sales representatives was part of an effort to "cap" the amount Nappi was paying its wine sales representatives. *Id.* at 522:10-20. According to Nappi, such a move was intended to bring the overall compensation in the wine department down over time

24

to a "realistic" level as compared to compensation within Nappi and within the beverage industry. *Id.* at 726:22-727:11. Nappi further presented evidence that it decided to go to a two-percent commission rate for new wine sales representatives before Ms. Tourangeau applied for a position at Nappi. *Id.* at 518:5-519:3; 761:24-762:13.

### c.    Regional and National Compensation Standards

The jury similarly heard that the compensation Nappi paid its wine sales representatives stood out as inflated when compared to distributors both in the Northeast and nationally. *Id.* at 726:22-727:11; 762:14-23. Ms. Fox, for example, testified that the "SevenFifty report" Ms. Tourangeau had sent to Mr. Watson contained survey information that supported and "validated" Nappi's decision to reduce wine sales representatives' compensation. *Id.* at 735:15-736:16. Although Ms. Tourangeau asserts in her motion for new trial that "the record evidence established that Nappi's competitors were paying wine sales representatives *more than* 2% commission," she provides no evidence or citation to the record, and the Court concludes that based on the trial testimony, a reasonable jury could find that Nappi's desire to bring its wine sales compensation more in line with the company's own compensation structure and the industry as a whole is a valid business reason other than sex for the new commission rate that Nappi applied equally to all new wine sales representatives hired since 2014. *Pl.'s Mot.* at 18 (emphasis in *Pl.'s Mot.*).

### d.    Nappi's Increased Costs

Nappi likewise presented evidence that the reduction of the wine sales commissions to two percent helped to offset increased costs for fuel, energy, product, shipping, technology, and additional support staff. *Trial Tr.* at 730:2-11; 762:14-23. Finally, the jury heard from Nappi's president, Frank Nappi, Jr.—the person who made the decision to move to two-percent commissions—that continuing with three-percent commissions for wine sales representatives was not feasible from a business perspective. Specifically, Mr. Nappi, Jr. testified that "three percent is not sustainable, not for a long period of time [because w]ith wine [Nappi's] margins are not huge and over time they've—they've shrunk, [s]o we make a lot less money so there is a lot less to pass on." *Id.* at 832:13-21.

### e. Nappi's Exception for Long-term Sales Representatives

The jury also heard evidence that Nappi's decision to keep the wine sales representatives who were with the company prior to 2014 at a three-percent commission rate was based on business reasons unrelated to sex. Specifically, the jury heard that wine sales representatives were kept at three-percent commissions when the new rate was adopted because of their established positions and tenure at Nappi, their general experience in wine sales, and their existing role in driving sales for Nappi. *Id.* at 727:12-23. Frank Nappi, Jr. testified that relationships with accounts that are developed over time are an important aspect of wine sales and that the company valued the relationships the existing sales representatives had developed, which motivated Nappi to keep those representatives at three-percent

commissions when the new reduced commission rate was implemented.[1]  *Id.* at 832:22- 833:14.  Ms. Fox testified that Nappi did not want to lose these valued wine sales representatives who had been with the company for many, many years.[2]  *Id.* at 766:10-25.

Based on the extensive record from the five-day trial, the Court concludes that the jury had a sufficient basis to find that Nappi's decision to move to a two-percent commission rate at the time it hired Ms. Tourangeau in 2014 was motivated by a

---

[1]      Mr. Nappi, Jr. testified:

Q. Okay.  You also were asked some questions about -- or I believe the existing wine sales representatives were kept at three percent commission; is that right?
A. The ones with long tenure, yes.
Q. Okay.  And why did you keep those at three percent?
A. Selling a wine sales route takes – takes a lot of work.  You need to develop relationships with your accounts to get, you know, most of their business.  You know, instead of having three bottles on the shelf, you want six bottles on the shelf or 12.  You want all their business, and it takes a while to – to grow that.  And if you – if you – if a salesperson that's been there for 20 years, you break down their commission rate from three to two and they decide to leave, it will take a very long time, perhaps a year, two years, to develop that route again.
Q. Okay.  So it was the – you valued their – their tenure and seniority with regard to those type of – of activities?
A. Yes.

*Trial Tr.* at 832:22-833:14.

[2]      Ms. Fox testified:

Q. Okay.  And did you have an understanding as to why Nappi kept those individuals at a three percent rate?
A. Yeah, I mean they -- as I talked previously a couple of times about the long tenure, the long seniority that they've had, they were performing very well for us.  We want – Frank wanted to keep them, he did not want them to leave the company, you know, so the decision was made that we were going to keep them at the three percent and as they – like the – one of the retirements is Steve Cohen, when he retired and we – his replacement is Matt Auger, Matt took over at two percent.
Q. Okay.  So I think you're indicating Frank Nappi wanted to retain these people, their tenure for the company and experience was important to him?
A. Very.
Q. Okay.
A. To all of us.

*Trial Tr.* at 766:10-25.

business decision unrelated to sex.  The Court thus concludes that a reasonable jury could in fact have found that Nappi met its burden of proving its affirmative defense.

**B.    The Court's Instruction on Nappi's Affirmative Defenses and Denial of Ms. Tourangeau's Requested EPA Instruction**

Ms. Tourangeau argues that the Court erred in instructing on a "catchall affirmative defense" and in allowing Nappi to use the term "grandfathering" colloquially when arguing in favor of the catchall defense.  Ms. Tourangeau additionally argues that a new trial is warranted because the Court refused to give Ms. Tourangeau's requested EPA instruction under *Corning*.

The Court concludes that it properly instructed on the catchall affirmative defense, that Ms. Tourangeau waived any objection against this affirmative defense when she did not object to its inclusion in the jury instructions, and that the Court did not err in allowing Nappi to use the term "grandfathering" to mean something other than a bona fide seniority system.  The Court moreover concludes that its thoroughly explained decision not to include an instruction based on *Corning* was correct as a matter of substantive law and that the given instructions as a whole encompassed all required elements to properly charge the jury.

**1.    Factual Background**

On March 2, 2023, on the fourth day of trial, the Court held a charge conference and reviewed the proposed jury instructions with the parties.  *See Trial Tr.* at 878:21-929:24.

Prior to trial, Nappi submitted the following proposed jury instruction on its affirmative defenses:

> If you find that Tourangeau has proven her claim, you will then consider Nappi Distributors' defenses. Nappi Distributors contends that the differential in commission rate between the wine sales representatives is the result of a bona fide system based on seniority and experience in wine sales. Nappi also contends that the differential is based on a business decision made before Tourangeau was hired to reduce commission rates for wine sales representatives to better align with the industry and with compensation within Nappi generally.

*Def.'s Proposed Jury Instructions* at 8-9 (ECF No. 127).

First, the Court discussed with the parties whether an instruction on the seniority defense under the EPA was generated by the evidence at trial. Ms. Tourangeau argued that it was not, specifying: "I think [Nappi is] entitled to the affirmative defense on the idea that this was a business judgment or another factor as we talked about initially, but I think it's -- I think it would be inconsistent with the evidence to instruct on a seniority system." *Id.* at 883:3-7. The Court indicated that it would review Ms. Tourangeau's proposed caselaw and rule on availability of the seniority defense. *Id.* at 886:10-12; 921:24-922:3.

Regarding the jury instructions related to Nappi's other affirmative defenses under the EPA, the Court proposed the following instruction:

> THE COURT: What -- what it now says -- I think we can continue with the discussion. What it says is Nappi -- if you find Ms. Tourangeau has proven her claim, and this is under the Equal Pay Act, you will then consider Nappi's -- Nappi Distributors' defenses. Nappi has asserted that any difference in pay between Ms. Tourangeau and male workers are due to differences in their seniority, to application of the merit system to quantity or quality of production, and/or to a business decision such as adjusting its payroll to reflect the industry standards not based on gender. On these affirmative defenses Nappi bears the burden of proof to demonstrate its affirmative defenses are more likely than not true or not.

29

So do you want to – what's Nappi's position concerning -- I think the -- the one that clearly has been generated is business decisions such as adjusting its payroll to reflect industry standards not based on gender. That's the real enchilada; isn't it?

MR. WALL: I think so, Your Honor, yes.

THE COURT: Do you want to -- you want me to eliminate the -- the other affirmative defenses listed here?

MR. WALL: Well, no, Your Honor, because if they're going to be arguing, for example, the routes issue and whether or not one is favorable over another, then the quality or quantity of production becomes relevant to that.

THE COURT: Okay.  How about --

MS. QUINLAN: Your Honor --

THE COURT: Well, let me -- let me just -- let me finish with this.

MR. WALL: I would agree that merit system I don't think is really -- is not really an issue, it's really more seniority, if they're going to be arguing the allocation of routes then there is a production issue, and then the last one that you just read, Your Honor.

THE COURT: Okay.  So the seniority issue will depend on my reading of the Supreme Court case that's going to be sent to me or you'll -- after this conference you can let me know.  If it is as described, then it doesn't seem that Nappi has that kind of formal seniority system; you agree to that?

MR. WALL: I -- I agree there is no formal system that has been generated by the evidence so far.

THE COURT: Right, so it depends on what the Supreme Court said.  So I know that you want seniority, and unless the law prohibits it I'll give it.

MR. WALL: Thank you, Your Honor.

THE COURT: And then I'll strike application of the merit system and we'll go with quantity or quality of production.  I think it's sort of -- I

think it's been generated.  And then the final one.  Is there anything
further from either one on this?

MS. QUINLAN: Not on that part right there.

*Id.* at 884:20-886:19.

The Court later reiterated its intentions regarding Nappi's EPA defenses when
it reviewed the proposed verdict form with the parties.  Ms. Tourangeau sought to
ensure that "the affirmative defense language [in the verdict form] tracks the
discussion we've already had about seniority system, merit based, et cetera."  *Id.* at
921:20-23.  The Court confirmed that the question on the verdict form regarding
Nappi's EPA defenses would conform to the instructions generated by the evidence:

> We'd have to eliminate -- so we're -- we're really talking -- this talks
> about bona fide seniority system, and we have -- and depending on the
> information you give me I may or may not include seniority system,
> we're striking merit system.  And then we need to infuse and/or business
> decision.

*Id.* at 921:24-922:4.  Ms. Tourangeau confirmed that she did not have any further
issues with the EPA defense question on the proposed verdict form.  *Id.* at 922:5-6.

On March 3, 2023, before commencement of the final day of trial, the Court
discussed with the parties its decision with respect to instructing on a bona fide
seniority system as an affirmative defense to the EPA claim.  *Id.* at 1030:17-1031:15.
The Court distinguished between a bona fide seniority system and the term
"grandfathering," as used at trial, and indicated that it would incorporate
grandfathering within the parameters of the business-related affirmative defense.
*Id.* at 1031:8-15.  The Court's discussion regarding seniority and grandfathering
proceeded as follows:

> THE COURT: Let me talk about seniorities and affirmative defense under the Equal Pay Act. I looked at AT&T versus Hulteen, H-U-L-T-E-E-N, which is 556 U.S. 701, and this quotes *California Brewer's*, which is 444 U.S. 598, a 1980 case.
>
> And it says here, a seniority system is a scheme that, alone or in tandem with non-seniority criteria, allots to employees ever-improving rights and benefits as their relative lengths of employment increase. That's not what happened here. It's just not what happened here. This is -- Nappi's change was grandfathering. It wasn't a bona fide seniority system in which you get ever-improving rights and benefits as your relative length of employment increases. So I'm not going to instruct on -- on seniority.
>
> MR. WALL: I understand our objection is on the record.
>
> THE COURT: Sure.
>
> MR. WALL: I mean, Your Honor, if it's incorporated within the sort of parameters of the fourth provision that grandfathering is a -- business-related rationale that's not related to sex --
>
> THE COURT: No, you can argue that, but I'm talking about your -- your request that I instruct the jury on seniority as an affirmative defense. I don't think you have met it.

*Id.* at 1030:17-1031:15. The Court further ruled that Nappi could use the term "seniority" in the colloquial fashion in closing, as the evidence established these individuals had seniority and tenure with the company. *Id.* at 1035:2-16. Ms. Tourangeau did not object to the Court's ruling. *Id.* at 1035:13-23.

On the last day of trial, the Court also addressed Ms. Tourangeau's requested instruction under *Corning*. Ms. Tourangeau had asked the Court to include the following jury instruction:

> If you find that Nappi has proven their defense, that the decision to pay Ms. Tourangeau was based on a neutral factor other than sex, but that it nevertheless operated to perpetuate the effects of the company's prior

32

illegal practice of not hiring women for the sales representative positions, then you must find in Ms. Tourangeau's favor.

*Proposed Jury Instructions* at 12 (ECF No. 142).  After reviewing the facts and

holding of *Corning*, the Court denied Ms. Tourangeau's request:

> What I -- what I see *Corning* as saying is that if an employer's prior discriminatory practice is baked into its wage structure, even after it changed its wage structure, a company's insistence that it change its wage structure neutrally doesn't eliminate its prior discrimination. That's the way I read it.
>
> So I don't think that's what happened here under any scenario because Ms. Tourangeau was the first woman hired.  So there is no evidence that Nappi paid women sales representatives less before it hired Ms. Tourangeau because Ms. Tourangeau was the first woman, so there is no indication that any of its prior practice was baked into what it did here.  This was a new practice, which you claim, I think the jury will decide, was discriminatory.  But it's not a function of -- it's not a wage structure that was baked into its current structure for which it's now offering a neutral reason.  So the bottom line is I don't think *Corning* applies and I'm not going to give the instruction.

*Trial Tr.* at 1029:9-1030:1.  After the close of evidence, the Court instructed the jury

on the EPA claim, including Nappi's defenses, as follows:

> If you find that Ms. Tourangeau has proven her claim, you will then consider Nappi's defenses.  Nappi has asserted that any differences in pay between Ms. Tourangeau and male workers are due to quantity or quality of production and/or to a business decision, such as adjust[ing] its payroll to reflect industry standards not based on gender.  On these affirmative defenses, Nappi bears the burden of proof to demonstrate its affirmative defenses are more likely true than not.

*Id.* at 1108:17-25.  In addition, the Court reviewed with the jury the relevant question

on the verdict form:

> Two.  This is the affirmative defense.  Has Nappi Distributors proven, by a preponderance of the evidence, that the differential in pay between Ms. Tourangeau and the comparable male employee, or employees, was due to quantity or quality of production and/or to a business decision

33

such as adjusting its payroll to reflect industry standards[,] not based on gender? Yes or no.

*Trial Tr.* at 1123:17-23.

Ms. Tourangeau addressed the EPA affirmative defenses in her closing argument. In discussing the preponderance of the evidence standard and how it applied to Nappi's defenses, she stated:

> The same is true for affirmative defenses. So if Nappi is able to prove that the only reason they did what they did when it comes to [Ms. Tourangeau]'s compensation, the only reason was business necessity, and you put those facts on the same scale and it tips ever so slightly in their favor, then you would find for them on that affirmative defense.

*Id.* at 1145:2-7. After both parties concluded their closing arguments, the Court met with the parties at sidebar prior to committing the case to the jury. During that sidebar conference, the Court confirmed with the parties that they did not have any objections to the jury instructions other than those already raised during the charge conference. Neither party objected. *Id.* at 1181:25-1182:7.

### 2.  Legal Standard

The First Circuit has held that "[a] trial court is obliged to inform the jury about the applicable law, but, within wide limits, the method and manner in which the judge carries out this obligation is left to his or her discretion." *Elliott v. S.D. Warren Co.*, 134 F.3d 1, 6 (1st Cir. 1998). The First Circuit has further stated that "the real test is whether as a whole 'the instructions adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury.'" *Rosa-Rivera v. Dorado Health, Inc.*, 787 F.3d 614, 620 (1st Cir. 2015) (citing *United States v. DeStefano*, 59 F.3d 1, 3 (1st Cir.1995)).

34

"A refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." *Estate of Keatinge v. Biddle*, 316 F.3d 7, 17 (1st Cir. 2002) (citing *Elliott*, 134 F.3d at 6). In discussing this standard, the First Circuit has stated that "[t]he district court should refuse a request for an instruction that states a legal holding which is not applicable to the facts, even if it is otherwise correct." *Id.* (citing 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2552 (2d ed. 2002)). The moving party bears the burden of demonstrating that the alleged error was "harmful, i.e., that it affected that party's substantial rights." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 102 (1st Cir. 1997) (citing FED. R. CIV. P. 61)).

A new trial based on an alleged erroneous jury instruction is warranted only if the objecting party can show that the instruction in question was "'misleading or gave an inadequate understanding of the law.'" *First Act, Inc. v. Brook Mays Music Co.*, 429 F. Supp. 2d 429, 432 (D. Mass. 2006) (quoting *Steinhilber v. McCarthy*, 26 F. Supp. 2d 265, 278 (D. Mass. 1998) (citations omitted)). "An erroneous jury instruction necessitates a new trial only if the error could have affected the result of the jury's deliberations." *Allen v. Chance Manufacturing Company, Inc.*, 873 F.2d 465, 469 (1st Cir. 1989); *see also La Plante v. American Honda Motor Company, Inc.*, 27 F.3d 731, 737 (1st Cir. 1994). Harmless error turns on "whether th[e] court can say with fair

assurance . . . that the judgment was not substantially swayed by the error." *Nieves-Villanueva*, 133 F.3d at 102 (citing *Ahern v. Scholz*, 85 F.3d 774, 786 (1st Cir. 1996)).

### 3.   Analysis

#### a.   "Grandfathering" Encompassed by Nappi's Business Decision Affirmative Defense

Ms. Tourangeau's contention that Nappi should not have been allowed to discuss "grandfathering" as a reason for its business decision is borderline frivolous. *Pl.'s Mot.* at 5 ("Nappi consistently cited 'grandfathering' as the basis for unequal pay in this case. A new trial is warranted because 'grandfathering' is the same thing as a 'seniority system'—the only difference is semantics"). As noted previously, the Court viewed the term "grandfathering" to encompass two concepts: 1) a "bona fide seniority system", and 2) a more colloquial and informal employer policy that recognizes that sales representatives become more valuable the longer they are employed, in part because the representatives gain deeper personal contacts with customers. Finding no evidence that Nappi had a bona fide seniority system, the Court declined to instruct the jury on that issue.

But regarding the more common-sense definition of grandfathering, it was Ms. Tourangeau, not Nappi, who first introduced the concept to the jury. During her opening statement, Attorney Quinlan informed the jury that Nappi was going to "claim that Michele's colleagues are grandfathered into their higher pay rates while she is not." *Trial Tr.* at 23:4-5. Attorney Quinlan told the jury that "[g]randfathering is a term we've heard many times before, and you're going to hear that term a lot this week." *Id.* at 23:9-10. Attorney Quinlan explained that the term comes from the

36

American South, "where many states enacted laws aimed at preventing African Americans from being able to exercise their right to vote." *Id.* at 23:15-18. Attorney Quinlan went on at length to describe the historic origins of the term, "grandfathering," and its association with southern repression of African Americans. *Id.* at 23:18-24:4. Having given the jury this concept, Attorney Quinlan stated that when Nappi grandfathered, it drew the line in 2019 at Ms. Tourangeau. *Id.* at 26:20-23. Attorney Quinlan told the jury that "Nappi continues discrimination commission rate disparity between those that are grandfathered and those that are not through - - though phrased in terms of a neutral factor other than sex nevertheless operates to perpetuate the effects of the company's prior illegal practice of not hiring women. Much like how the south utilized the grandfather clauses to exclude African Americans from voting." *Id.* 27:20-28:1.

In her extended comments about grandfathering in her opening statement, Attorney Quinlan was not referring to grandfathering in the sense of a bona fide seniority system, but in its more general sense. For Ms. Tourangeau to throw down the grandfathering gauntlet in her opening statement, compare Nappi's use of grandfathering in her case to the South's repression of African Americans during the Jim Crow era, and then assert that Nappi should be prohibited from responding is untenable.

Furthermore, by failing to object to what Ms. Tourangeau now refers to as the "catchall defense under the EPA," *Pl.'s Mot.* at 11, Ms. Tourangeau waived any objection to the Court's affirmative defense instruction regarding "a business

decision, such as adjusting its payroll to reflect industry standards, not based on gender." *Jury Verdict* at 1; *see Tang v. Citizens Bank*, 741 F. App'x 11, 13 (1st Cir. 2018) (holding that a party had waived any objection it may have had to the jury instructions if the party allowed the case to be submitted to the jury without an objection on the record) (citing FED. R. CIV. P. 51(c)(2)(B)); *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 112 (1st Cir. 2015)).

At trial, not only did Ms. Tourangeau not object to the so-called catchall affirmative defense, but she actively agreed with the Court that the evidence generated at trial supported the inclusion of this instruction. Similarly, Ms. Tourangeau did not object to the Court allowing Nappi to use the term "grandfathering" in its closing arguments, a decision that the Court discussed in the presence of both parties. Ms. Tourangeau thus waived any objection to the Court's instructions to the extent they omitted the seniority defense, as requested by Ms. Tourangeau, and incorporated "grandfathering" into the catchall business decision defense.

On March 2, 2023, on the fourth day of trial, the Court held a charge conference and reviewed the proposed jury instructions with the parties. *See Trial Tr.* at 878:21-929:24. First, the Court discussed with the parties whether an instruction on the seniority defense under the EPA was generated at trial. Ms. Tourangeau argued that it was not, specifying: "I think [Nappi is] entitled to the affirmative defense on the idea that this was a business judgment or an other factor as we talked about initially, but I think it's -- I think it would be inconsistent with the evidence to instruct on a

seniority system." *Id.* at 883:3-7. The Court indicated that it would review Ms. Tourangeau's proposed caselaw and rule on the seniority defense. *Id.* at 886:10-12; 921:24-922:3.

Regarding the jury instructions related to the catchall affirmative defense under the EPA, the Court provided:

> THE COURT: . . . So do you want to – what's Nappi's position concerning -- I think the -- the one that clearly has been generated is business decisions such as adjusting its payroll to reflect industry standards not based on gender. That's the real enchilada; isn't it?
>
> MR. WALL: I think so, Your Honor, yes.
>
> . . .
>
> THE COURT: And then I'll strike application of the merit system and we'll go with quantity or quality of production. I think it's sort of -- I think it's been generated. And then the final one. Is there anything further from either one on this?
>
> MS. QUINLAN: Not on that part right there.

*Id.* at 885:7-886:19.

The Court later reiterated its intentions regarding Nappi's EPA defenses when it reviewed the proposed verdict form with the parties. Ms. Tourangeau sought to ensure that "the affirmative defense language [in the verdict form] tracks the discussion we've already had about seniority system, merit based, et cetera." *Id.* at 921:20-23. The Court confirmed that the question on the verdict form regarding Nappi's EPA defenses would conform to the instructions generated by the evidence:

> We'd have to eliminate -- so we're -- we're really talking -- this talks about bona fide seniority system, and we have -- and depending on the information you give me I may or may not include seniority system,

we're striking merit system.  And then we need to infuse and/or business decision.

*Trial Tr.* at 921:24-922:4.  Ms. Tourangeau confirmed that she did not have any further issues with the EPA defense question on the proposed verdict form.  *Id.* at 922:5-6.

On March 3, 2023, before commencement of the final day of trial, the Court discussed with the parties its decision with respect to instructing on a bona fide seniority system as an affirmative defense to the EPA claim.  *Id.* at 1030:17-1031:15. The Court distinguished between a bona fide seniority system and the term "grandfathering," as used at trial, and indicated that it would incorporate grandfathering within the parameters of the business-related affirmative defense. *Id.* at 1030:17-1031:15. The Court further ruled that Nappi could use the term "seniority" in the colloquial fashion in closing, as the evidence established these individuals had seniority and tenure with the company.  *Id.* at 1035:2-16.  Ms. Tourangeau did not object to the Court's ruling.  *Id.* at 1035:13-23.  Because Ms. Tourangeau neither objected to the Court's inclusion of the catchall affirmative defense—in fact, she agreed that the instruction was generated by the evidence at trial—nor to the Court's decision to allow Nappi to argue that its decision to grandfather certain employees was a business decision unrelated to sex, Ms. Tourangeau waived any objection to the jury instructions and verdict form submitted to the jury.  *See Tang*, 741 F. App'x at 13 ("[W]hen the jury retired to deliberate, there was no objection on the record, a circumstance in which this court has made it clear that a subsequently dissatisfied party has bypassed its opportunity to object under

40

Federal Rule of Civil Procedure 51(c)(2)(B), and has thus waived the objection."); *Putnam Resources v. Pateman*, 958 F.2d 448, 456 (1st Cir. 1992) ("Silence after instructions, including instructions on the form of the verdict to be returned by the jury, typically constitutes a waiver of any objections"); *Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co.*, 295 F.3d 68, 79 (1st Cir. 2002) ("Rule 51 of the Federal Rules of Civil Procedure states that an objection to a jury instruction is waived unless the party 'stat[es] distinctly the matter objected to and the grounds of the objection'") (quoting FED. R. CIV. P. 51); *see also Ray*, 799 F.3d at 112.

Moreover, the Court concludes that it did not err in allowing Nappi to colloquially use the term "grandfathering" to refer to the wine sales representatives that it hired before its alleged transition to a two-percent commission rate in 2014. Nappi's use of the word "grandfathering" at trial was not synonymous to a bona fide seniority system. In fact, the Court found that trial evidence did not support a seniority defense because Nappi's alleged grandfathering was not indicative of a bona fide seniority system. *Trial Tr.* at 1030:21-1031:3 ("And it says here, a seniority system is a scheme that, alone or in tandem with non-seniority criteria, allots to employees ever-improving rights and benefits as their relative lengths of employment increase. That's not what happened here . . . Nappi's change was grandfathering. It wasn't a bona fide seniority system in which you get ever-improving rights and benefits as your relative length of employment increases").

Although Ms. Tourangeau cites *California Brewers Association v. Bryant*, 444 U.S. 598 (1980) to argue in favor of her position, *California Brewers* supports

precisely what the Court did at trial in removing the seniority defense from the jury instructions and verdict form. *Id.* at 605-06 (holding that a bona fide seniority system "is a scheme that, alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase").   Furthermore, although Ms. Tourangeau submits that "multiple courts have recognized, construed, or reviewed collective bargaining agreements that use the term 'grandfathering' as synonymous with seniority," the Court does not conclude (and Ms. Tourangeau does not provide caselaw) that it is improper for a court to permit a party to use the word "grandfathering" at trial when the evidence does not generate a seniority defense but the employer is arguing an affirmative defense based a business decision to retain employees with greater experience and longer client relations.

The Court therefore concludes that a new trial is not warranted based on the Court's decisions during trial to remove the seniority defense from the jury instructions, to include a "business decision not based on sex" defense in the jury instructions, and to allow Nappi to make use of the word "grandfathering" to explain its alleged business decision to change its wine sales representative commission rate from three percent to two percent in 2014.

### b.   Ms. Tourangeau's Requested *Corning* Instruction

Before trial and again during the charge conference, Ms. Tourangeau submitted the following proposed jury instruction derived from *Corning Glass Works v. Brennan* regarding a prior illegal practice: "If you find that Nappi has proven their

defense, that the decision to pay Ms. Tourangeau was based on a neutral factor other than sex, but that it nevertheless operated to perpetuate the effects of the company's prior illegal practice of not hiring women for the sales representative positions, then you must find in Ms. Tourangeau's favor." *Proposed Jury Instructions* at 12. After reviewing the facts and holding of *Corning*, the Court denied Ms. Tourangeau's request:

> What I -- what I see *Corning* as saying is that if an employer's prior discriminatory practice is baked into its wage structure, even after it changed its wage structure, a company's insistence that it change its wage structure neutrally doesn't eliminate its prior discrimination. That's the way I read it.
>
> So I don't think that's what happened here under any scenario because Ms. Tourangeau was the first woman hired. So there is no evidence that Nappi paid women sales representatives less before it hired Ms. Tourangeau because Ms. Tourangeau was the first woman, so there is no indication that any of its prior practice was baked into what it did here. This was a new practice, which you claim, I think the jury will decide, was discriminatory. But it's not a function of -- it's not a wage structure that was baked into its current structure for which it's now offering a neutral reason. So the bottom line is I don't think *Corning* applies and I'm not going to give the instruction.

*Trial Tr.* at 1029:9-1030:1.

Arguing in her motion for new trial that, just like in *Corning*, Nappi did not meet its burden of proving that Ms. Tourangeau's two-percent compensation was due to any factor other than sex—Ms. Tourangeau submits that "[i]t does not matter if some male wine sales representatives at Nappi also received a lower commission in line with [Ms.] Tourangeau's, because the EPA requires only a comparison to one similarly situated male employee." *Pl.'s Mot.* at 21.

But, here, the jury found that Ms. Tourangeau proved that Nappi paid her less than at least one similarly situated male employee, despite evidence presented at trial that Nappi also paid some similarly situated male wine sales representatives a two-percent commission. *Jury Verdict* at 1.

Ms. Tourangeau further submits that the argument in *Corning* "is similar to Nappi's implicit decision that it should reduce [Ms.] Tourangeau's salary until she earned only 2% commission, but that it could not or would not reduce the commission structures of 'grandfathers,' all of whom were men" because "[i]mplicit in this argument is the idea that male sales representatives at Nappi would not stand for such a reduction in pay—but [Ms.] Tourangeau would." *Pl.'s Mot.* at 22.

Having reviewed *Corning* once more, the Court affirms its determination that this case is dissimilar from *Corning* and concludes that instructing the jury on prior illegal practice would be inappropriate here. In *Corning*, the defendant company was engaged in a prior practice that was made illegal by the enactment of the EPA. Corning Glass Works paid night inspectors—a position women were excluded from holding—more than day inspectors—a position held exclusively by women—who performed the same tasks as the night inspectors. *Corning*, 417 U.S. 188 at 191. Eventually, after the EPA was enacted and state laws were changed, the company then provided a "red circle" rate to the night inspectors hired before January 20, 1969, who, by law, were all men. *Id.* at 194. This "rate served essentially to perpetuate the differential in base wages between day and night inspectors." *Id.*

44

The Court views the scenario in *Corning* as distinct from the scenario here, where Nappi decided in 2014 to pay all newly hired wine sales representatives at a two-percent commission rate rather than the former three-percent commission rate. Although Nappi had no female wine sales representatives before hiring Ms. Tourangeau in 2014, there was no equivalent job held by women who were paid lower wages than the male wine sales representatives earning three percent. The Supreme Court's decision in *Corning* turned not on an alleged historical discriminatory treatment in the abstract, but, rather on a historical "practice of paying women less than men for equal work." *Id.* at 209-10. Therefore, although Nappi chose to lower its commission rate from three percent to two percent at the same time it hired its first female wine sales representative, there is no "prior illegal practice," as in *Corning*. Employing only male wine sales representatives prior to Ms. Tourangeau is not an illegal practice in and of itself that permits the Court to adopt Ms. Tourangeau's proposed *Corning* instruction.

Moreover, the Court concludes that the instructions in their totality, as presented to the jury, adequately informed the jury as to the controlling issues in Ms. Tourangeau's EPA claim, and, therefore, a new trial is not warranted. *Elliott*, 134 F.3d at 6 ("A trial court is obliged to inform the jury about the applicable law, but, within wide limits, the method and manner in which the judge carries out this obligation is left to his or her discretion").

### C.    Jury Selection Process Regarding Juror Numbers 89 and 14

45

Ms. Tourangeau argues that a new trial is warranted because the Court improperly dismissed Juror Number 14 while empaneling Juror Number 89. Ms. Tourangeau additionally submits that Juror Number 89 expressed visible bias during the trial that "likely resulted in the adverse verdict" against Ms. Tourangeau, *Pl.'s Mot.* at 28, and that the verdict must be set aside because Nappi's "gender-based discrimination in the use of peremptory and for cause challenges . . . resulted in a jury that was neither impartial nor appropriately inclusive of women." *Id.* at 30.

The Court concludes that the Magistrate Judge did not abuse his discretion in dismissing Juror 14 while empaneling Juror 89 and that Ms. Tourangeau has waived her claims as to the alleged bias of Juror 89 during trial and the gender makeup of the jury by failing to raise these concerns at any time before her motion for new trial.

### 1. Factual Background Regarding Jury Selection

#### a. Juror Number 89

During jury selection held on February 6, 2023, Juror Number 89 answered "yes" to the following question: "Have you ever been party to a lawsuit either as a plaintiff, that is the person bringing the lawsuit, or the defendant and the person against whom your lawsuit was asserted?" *Tr. of Jury Selection* at 6:4-10 (ECF No. 217). In response to a follow-up inquiry by the Magistrate Judge, Juror Number 89 stated that twenty-two years ago, while he was employed as an emergency room physician in Louisiana, he was sued by the family of a young woman who died as a result of injuries from a car accident. *Id.* at 58:2-14. He explained that the family dropped the lawsuit prior to trial, *id.* at 58:2-59:9, acknowledged that being accused

46

of something made the litigation experience personal, and specified that his prior experience "wouldn't necessarily pertain to this case." *Id.* at 59:20-60:12.

A conversation between the Magistrate Judge and Juror Number 89 proceeded:

THE COURT: Do you think [your experience being sued] would in any way affect your ability to evaluate the evidence, and if the plaintiff was able to prove her case, based on the law and the facts that you found, would you have any difficulty ruling in favor of the plaintiff?

JUROR 89: Not necessarily, I don't think I would, no.

THE COURT: Okay.  The only thing that gives me hesitancy is when you say not necessarily.  Is there something that caused you to have some hesitancy or that -- that maybe there is something lingering there that could -- could affect that assessment?

JUROR 89: No, sir, no.

THE COURT: Okay.

JUROR 89: I think that's just a figure of speech.

THE COURT: Figure of speech.

JUROR 89: Right.

THE COURT: Okay.  So you're confident -- again, not putting words in your mouth, I'll ask it more in a direct way.  Are you confident that if you were seated as a juror that both sides would have the opportunity -- a fair opportunity before you, that is you would evaluate the evidence and decide the case on the merits?

JUROR 89: Yes, I do.

*Id.* at 60:3-61:10.  Ms. Tourangeau, through counsel, followed up with Juror Number 89 on this question.  In response to Ms. Tourangeau's questions, the juror confirmed that his experience being sued did not leave him with a predisposition about the legitimacy of lawsuits:

MS. QUINLAN: And did -- did that experience [of being sued] make you feel like there are too many frivolous lawsuits or too many people filing lawsuits that have no merit?

JUROR 89: It did not. I didn't think that that case was frivolous. I think it was more a reaction of like a -- the anger reaction by the family of a -- of a grieving family, which I can't say I wouldn't feel myself if I was in that same situation, so I didn't think that case was frivolous.

*Id.* at 62:2-9.

Ms. Tourangeau asked the Magistrate Judge to strike Juror Number 89 for cause. She argued that because he indicated that the lawsuit was personal for him, he could not be an impartial juror. *Id.* at 62:18-25. Nappi opposed Ms. Tourangeau's request, noting that Juror Number 89 stated unequivocally that he could be fair and impartial and that Ms. Tourangeau's own questioning established that his experience with litigation twenty-two years ago did not leave him with any predispositions about whether lawsuits were legitimate. *Id.* at 63:1-7. The Magistrate Judge overruled Ms. Tourangeau's request to strike, concluding that the juror could be fair and impartial:

THE COURT: Yeah, I mean I -- I understand the concern any time somebody has been a party to a lawsuit -- particularly a defendant if you're the plaintiff, and the plaintiff if you're a defendant -- that that experience could have some impact. I think this juror, however, has directly responded to those concerns.

And I, too, was struck by his last response when [Ms. Tourangeau's counsel] asked him directly about the -- whether this caused him to kind of view the civil justice system in a negative way or in a negative light and that too many lawsuits are filed, and despite the fact that he felt he had done his job and he understood why the lawsuit was brought. I don't think he harbors any bitterness towards -- he didn't express any bitterness toward the -- the plaintiff or the system. He -- in response to my questions about being fair to both parties, I mean I thought he answered that directly and appropriately if he is going to remain. So I understand the concerns, and I'm going to overrule the objection, and Juror 89 will remain in the pool and he can return to his seat.

*Tr. of Jury Selection* at 63:13-64:6.  Ms. Tourangeau then asked Juror Number 89

additional questions concerning his knowledge of pending litigation against his

employer:

> MS. QUINLAN: I just had a couple of follow-up questions.  I see that you're employed at Northern Light.  Are you aware of any ongoing litigation involving Northern Light currently?
>
> JUROR 89: Yes, I am.
>
> THE COURT: And what litigation is that?
>
> JUROR 89: That's the case against Dr. John Henson who I worked with for -- for several years there.
>
> MS. QUINLAN: Okay.  And is that a medical malpractice lawsuit?
>
> JUROR 89: Yes, it is.
>
> MS. QUINLAN: Okay.  And have you had any involvement in that lawsuit in terms of being deposed or anything like that?
>
> JUROR 89: No, I have not.
>
> MS. QUINLAN: Okay.  Are you aware of another lawsuit filed against Northern Light with the plaintiff Sahara Dominguez?
>
> JUROR 89: No, I am not.
>
> MS. QUINLAN: Okay. And then how about the -- the Equal Pay Act lawsuit that was filed against Northern Light, are you aware of that lawsuit?
>
> JUROR 89: I have a -- I have an inkling of it.  It wasn't in Portland, was it; is that correct?  I believe it was elsewhere.
>
> MS. QUINLAN: Yeah, it was.  It was in northern Maine.
>
> JUROR 89: I think I saw it -- I read an article about it.

49

> MS. QUINLAN: And did you form any opinions about the validity of that lawsuit after becoming aware of it?
>
> JUROR 89: No, I don't think I could.  I don't know enough about it.
>
> MS. QUINLAN: Okay. Okay. I don't have any other questions.

*Id.* at 65:3-66:11.  Ms. Tourangeau did not ask to have Juror Number 89 stricken for cause based on his responses to the Northern Light litigation questions.  *Id.* at 66:14-22.

### b.      Juror Number 14

Juror Number 14 answered "yes" to three questions on the written juror questionnaire: questions one, four, and six.[3]  *Tr. of Jury Selection* at 70:16-17. Question one involved whether she or an immediate family member had ever been discriminated against.  *Special Jury Questionnaire* at 1-2 (ECF No. 139) (*Jury Questionnaire*).  In response to inquiry from the Magistrate Judge about question one, Juror Number 14 stated that "[o]ne of my first jobs I was promoted into a management position and there was a young man who was hired after me who was ranked underneath me who I found out later on had been paid more from his hire date."  *Id.* at 71:8-11.  She stated that she complained about the pay disparity to her

---

[3]      The relevant jury selection questions are as follows:

  1. Have you or an immediate family member ever experienced discrimination based on sex or gender?
  4. Have you been involved in the discipline of an employee or determining the compensation to be paid to an employee?
  6. Have you ever observed a person experience what you believe was discrimination in the workplace based on sex or gender?

*Special Jury Questionnaire* at 1-2 (ECF No. 139).

supervisor, "but without much action nothing really happened." *Id.* 71:15-18. When she asked for an explanation, the only response she ever received was that "there is a certain way that things are done." *Id.* at 71:15-72:13. Juror Number 14 stated that she found her employer's response to her complaint about pay disparity unsatisfactory. *Id.* at 76:11-14. She further testified that the disparity in pay continued until she left her employment in 2014. *Id.* at 71:19-23.

Question six involved whether she had ever been involved in the discipline of an employee or determining the compensation to be paid an employee. *Jury Questionnaire* at 1-2. In response to an inquiry from the Magistrate Judge about question six, Juror Number 14 stated that in her current employment position, her supervisor's boss had discriminated against her supervisor on the basis of sex. *Id.* at 72:14-20. She specified that she witnessed her supervisor's boss discriminating against her supervisor on the basis of sex through microaggressions. *Id.* at 72:24-73:9. She explained that "[i]t would be comments about women being in management versus men and how sometimes you need to evaluate what emotions can do." *Id.* at 73:1-3. She also said that this was "nothing . . . that required action." *Id.* at 72:22-23.

Question four asked whether the juror had been involved in employee discipline or determining employee compensation. *Jury Questionnaire* at 1-2. Finally, in response to an inquiry from the Magistrate Judge about question four, Juror Number 14 stated that she had disciplined employees up to and including

dismissal.  *Id.* at 73:10-22.  She had been involved in terminating an employee who was not truthful in his employment background check.  *Id.* at 73:18-22.

The Magistrate Judge explained to Juror Number 14 that the claims in this case involved allegations of sex discrimination including discrimination based on pay.  *Id.* at 74:2-11.  After initially indicating that she did not think her past experiences with discrimination and unequal pay would affect her ability to assess the merits of the case and render an objective, neutral decision, the following colloquy occurred:

> THE COURT: Do you believe that you would be predisposed one way or another to look at the case in a certain way based on your own experiences?
>
> JUROR 14: I don't think so.  I can't say that for sure, though.
>
> THE COURT: Okay, why can't you say it for sure?  I understand your hesitancy, but why can't you say it for sure?
>
> JUROR 14: I think I would be more likely to lean towards someone who is being undercompensated, and given the political climate, given my own experiences, I -- I would be more likely to lean that way.

*Tr. of Jury Selection* at 75:5-15.[4]

Nappi asked the Court to strike Juror Number 14 for cause.  *Id.* at 77:5-22.  In making its argument, Nappi noted the lengthy pause Juror Number 14 took before she admitted that she could not say for sure whether her own experiences would predispose her one way or the other.  *Id.*  Nappi also repeated its concern as to Juror Number 14's admission that she "would be more likely to lean towards someone who

---

[4]     Nappi submits that "[a]lthough not captured on the transcript of proceedings, Juror N[umber] 14's response to the first question in the above-quoted sequence was preceded by a lengthy pause." *Def.'s Opp'n* at 5.

is being undercompensated" given her own experiences. *Id.* Finally, Nappi noted

that Juror Number 14's pay disparity issue occurred less than ten years ago. *Id.*

Ms. Tourangeau opposed Nappi's request to strike Juror Number 14 for cause.

The Magistrate Judge sustained Nappi's objection based on the following reasoning:

> Again, with this juror I don't question her intentions here at all. I do think that she answered honestly when she expressed some hesitancy and then ultimately said that she'd probably lean toward the plaintiff. Now, one way of interpreting that, I understand, is that if the plaintiff proves her case that she would lean that way, I understand that. But a principle claim here by the plaintiff is that she was paid less than a male in a similar role or less than she should because of her gender. This juror believes she was paid less than a male because of her gender. And I understand it was 2014, which was some eight, nine years ago, but that experience -- given that experience, I'm not surprised to hear her kind of hesitate in some of her answers and ultimately describe it as leaning toward.
>
> So I just think there is enough similarities here that give me pause and I think it's appropriate that she be released and excused, so I'm going to sustain the objection.

*Id.* at 78:10-79:1. Ms. Tourangeau responded:

> MS. QUINLAN: Might I speak to it just?
>
> THE COURT: Go ahead.
>
> MS. QUINLAN: I just think that, you know, this was nine years ago, she didn't file a lawsuit --
>
> THE COURT: I understand.
>
> MS. QUINLAN: -- based on it, so it's not like she was litigious or was litigious leading. We also have a physician who was sued –

*Id.* at 79:2-9. The Magistrate Judge then addressed Ms. Tourangeau's attempt to

equate Juror Number 89 and Juror Number 14:

THE COURT: I'm not going to compare one juror to the next. The juror that was sued that's seated has nothing to do with employment, nothing to do with disparate pay allegation, nothing to do with what is perceived to be unequal. So the fact that there is a lawsuit filed against somebody is a separate issue from whether there are experiences similar to the plaintiff in this case or a party in this case, that's really the distinction.

I cut you off, so I'm sorry, so make sure -- make sure you get on the record, Ms. Quinlan, everything you want to say. I -- I get it, so feel free to share the --

MS. QUINLAN: No, no worries, that's okay. That's all right.

THE COURT: No, I -- I do understand, and, believe me, as I weigh these rulings I am aware of how one ruling may affect another ruling, or be perceived, and I think it's understandable that you point out the distinction that you point out. I just see this as too close to the plaintiff's actual claim, the substance of pay and differential disparate pay based on gender which unfortunately it sounds like the juror was -- the juror experienced herself, and for that very direct similar experience to what the plaintiff is claiming I would be surprised if it didn't impact how she saw the evidence, frankly. I think it would be understandable; I think her hesitation reflects that. But I certainly acknowledge why you are pointing to the physician juror having been a party to a lawsuit yet staying in the pool. I understand, but I just see a distinction in terms of the substantive claim --

MS. QUINLAN: Sure.

THE COURT: -- and these are line drawings that aren't always perfect. But --

MS. QUINLAN: Sure.

THE COURT: -- your objection is noted and I understand. I just want to make sure you had felt you had fair opportunity just to voice it, and if you would like to add to it -- the objection, I would give you that opportunity.

MS. QUINLAN: No. No, thank you, Your Honor.

*Id.* at 79:10-80:22; *see id. at* 77:5-22 (Ms. Tourangeau equating Juror Number 89 and

14).

After the parties exercised their peremptory challenges, the Magistrate Judge asked the parties if the jury was satisfactory. *Id.* at 91:7-10. Both parties indicated that it was. *Id.* Before empaneling the jury, the Magistrate Judge again asked both parties if there were any issues they wanted to raise. *Id.* at 91:11-92:2. Both parties responded that there were no issues to raise. *Id.* Having empaneled the jury, the Magistrate Judge confirmed with the parties once more that they were satisfied with the jury. *Id.* at 92:9-16. Finally, before excusing the jury for the day, the Magistrate Judge once more confirmed with the parties that the jury was satisfactory and that they had no other issues pertaining to jury selection. *Id.* at 95:18-24.

### 2.   Legal Standard

A trial judge's exercise of discretion in empaneling a jury is reviewed under a "clear abuse" standard. *United States v. Bartelho*, 71 F.3d 436, 443 (1st Cir. 1995). The First Circuit has held that a "trial court has considerable discretion in ruling on challenges for cause." *United States v. Gonzalez-Soberal*, 109 F.3d 64, 69-70 (1st Cir. 1997) (citing *Dennis* v. *U.S.*, 339 U.S. 162, 168 (1950)). Further, the First Circuit has noted that "[s]ubstantial deference is due the trial court's exercise of its discretion in handling situations involving potential juror bias or misconduct." *United States v. Angiulo*, 897 F.2d 1169, 1185 (1st Cir. 1990). Finally, the First Circuit has emphasized that "[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury." *United States v.*

*McCarthy*, 961 F.2d 972, 976 (1st Cir. 1992) (quoting *United States v. Gullion*, 575 F.2d 26, 29 (1st Cir. 1978)).

### 3.   Analysis

Ms. Tourangeau first contends that "[a] new trial is warranted because the court erred in denying Plaintiff's challenge for cause to Juror Number 89," *Pl.'s Mot.* at 26, and in "granting Defendant's for-cause challenge to Juror Number 14 over Plaintiff's objection." *Id.* at 28. The Court disagrees. The Court finds no abuse of discretion in the Magistrate Judge's thoroughly reasoned decision to deny Ms. Tourangeau's challenge for cause to Juror Number 89 and to grant Nappi's challenge for cause to Juror Number 14. *See Jury Selection Tr.* at 60:3-61; 63:13-64:6. Although Ms. Tourangeau seeks to compare the situations of these two jurors, arguing that it was improper to dismiss Juror 14 while empaneling Juror 89, the Court agrees with the Magistrate Judge's explanation of why the Court could and should not compare Jurors 14 and 89. The Magistrate Judge explained:

> THE COURT: I'm not going to compare one juror to the next. The juror [89] that was sued that's seated has nothing to do with employment, nothing to do with disparate pay allegation, nothing to do with what is perceived to be unequal. So the fact that there is a lawsuit filed against somebody is a separate issue from whether there are experiences similar to the plaintiff in this case or a party in this case, that's really the distinction.
>
> I cut you off, so I'm sorry, so make sure -- make sure you get on the record, Ms. Quinlan, everything you want to say. I -- I get it, so feel free to share the --
>
> MS. QUINLAN: No, no worries, that's okay. That's all right.
>
> THE COURT: No, I -- I do understand, and, believe me, as I weigh these rulings I am aware of how one ruling may affect another ruling, or be

> perceived, and I think it's understandable that you point out the
> distinction that you point out.  I just see th[e situation with Juror 14] as
> too close to the plaintiff's actual claim, the substance of pay and
> differential disparate pay based on gender which unfortunately it
> sounds like the juror was -- the juror experienced herself, and for that
> very direct similar experience to what the plaintiff is claiming I would
> be surprised if it didn't impact how she saw the evidence, frankly.  I
> think it would be understandable; I think her hesitation reflects that.
> But I certainly acknowledge why you are pointing to the physician juror
> [89] having been a party to a lawsuit yet staying in the pool.  I
> understand, but I just see a distinction in terms of the substantive claim
> --

*Jury Selection Tr.* at 79:10-80:13.  The Court agrees with the Magistrate Judge's
assessment of Jurors 89 and 14 as well as his reasoning as to why the Court ought
not compare these two jurors to one other.

Moreover, the Magistrate Judge's assessment of both the information provided
by the jurors and the manner in which they responded to questions is entitled to
substantial deference, and the Court finds no clear abuse of discretion here.  *See
United States v. Encarnacion*, 26 F.4th 490, 502 (1st Cir. 2022) (stating that
"[b]ecause the district court has the benefit of observing and interacting with
potential jurors, we cede substantial deference to that court in assessing potential
juror bias" and holding that the district court's decision to strike a juror who
expressed doubt about her ability to be fair fell "comfortably within the encincture of
the district court's discretion") (citations omitted).

Ms. Tourangeau next contends that Juror Number 89's affiliation with his
employer Northern Lights militated in favor of his removal from the jury pool.
Although Ms. Tourangeau questioned Juror Number 89 about his knowledge—or lack
thereof—regarding current legal claims against his employer, she did not move to

strike him for cause based on his association with Northern Lights. *Tr. of Jury Selection* at 65:3-66:22. The Court finds no clear injustice here, and Ms. Tourangeau has therefore waived, as grounds for dismissal for cause, Juror 89's very limited knowledge of current legal claims against his employer. *See United States v. McNeill*, 728 F.2d 5, 10 (1st Cir. 1984) (holding that a party who fails to challenge a juror during voir dire waives that challenge, absent clear injustice).

Ms. Tourangeau further contends that a new trial is warranted because "Juror 89's bias was visibly evident at trial" and because "[h]e was chosen to serve as the jury foreman . . . his bias likely resulted in the adverse verdict against Plaintiff." *Pl.'s Mot.* at 28. Ms. Tourangeau has provided no record evidence of Juror 89's bias during trial. Ms. Tourangeau expresses an opinion that Juror 89 "looked so incensed by Plaintiff's arguments that he became completely red faced and appeared obviously angry." But Ms. Tourangeau never brought her current assertions about Juror 89's visible bias to the Court's attention during trial. If she had done so, the Court and counsel, including defense counsel, could have observed Juror 89 to assess whether these allegations were corroborated and the Court could have acted, if necessary.

But Ms. Tourangeau and her counsel kept these observations to themselves and in so doing, she waived any claim of juror misconduct as to Juror Number 89 by failing to bring her knowledge of such misconduct to the Court during trial. *See United States v. Desir*, 273 F.3d 39, 43 (1st Cir. 2001) (holding that a party "who has knowledge of juror misconduct or bias at the time of trial waives such a claim by failing to raise it until after trial" (citing *United States v. Costa*, 890 F.2d 480, 482

(1st Cir. 1989)).  The First Circuit adopted this rule, explaining how "any other rule would allow [parties] to sandbag the court by remaining silent and gambling on a favorable verdict, knowing that if the verdict went against them, they could always obtain a new trial by later raising the issue of juror misconduct." *Costa*, 890 F.2d at 482.

Finally, citing *Batson v. Kentucky*, 476 U.S. 79 (1986), Ms. Tourangeau suggests that "[t]he verdict must be set aside because the Court erred in dismissing Juror Number 14, a woman who was truthful . . . [and] Defendant struck mostly women from the pool of potential jurors . . . [and this] gender-based discrimination in the use of peremptory and for cause challenges during jury selection resulted in a jury that was neither impartial not appropriately inclusive of women." *Pl.'s Mot.* at 30.

Ms. Tourangeau, however, is now foreclosed from relying on a *Batson*-type argument because she did not object when Nappi exercised its challenges during jury selection nor did she object at any point before or during trial on the grounds that the jury violated her constitutional rights.  *See Sanchez v. Roden*, 753 F.3d 279, 295 n.10 (1st Cir. 2014) (holding that a party has waived a *Batson* objection to particular jurors by failing to object to the peremptory challenges at the time they were exercised). Alternatively, by failing to make a *Batson* claim at trial, Ms. Tourangeau's current *Batson* objection is what the First Circuit has termed an "unpreserved *Batson* claim." *United States v. Charlton*, 600 F.3d 43, 50 (1st Cir. 2010).   As the First Circuit has explained, "clear and timely preservation of alleged error . . . [is] especially pertinent

as to *Batson* claims, where innocent oversight can so readily be remedied and an accurate record of the [gender][5] composition of the jury is crucial. . .." *United States v. Pulgarin*, 925 F.2d 1, 2 (1st Cir. 1992).  On appeal, the First Circuit reviews an unpreserved *Batson* claim for "plain error." *Id.*    Furthermore, by failing to make a timely objection, Ms. Tourangeau deprived the Court and defense counsel the opportunity to comply with the procedure for determining whether a preemptory strike was discriminatory.   The United States Supreme Court has "refined the process" into three steps:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of [gender]; second, if that showing has been made, the prosecution must offer a [gender]-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Porter v. Coyne-Fague*, 35 F.4th 68, 76 (1st Cir. 2022) (quoting *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 2768 (2008))). By Ms. Tourangeau's failure to object, Nappi's defense counsel was not given the opportunity to present the Court with a contemporaneous explanation for the preemptory challenge nor was the Court was able to contemporaneously determine whether Ms. Tourangeau had made a showing of purposeful discrimination.

Based on the trial record, the Court concludes there is no basis to conclude that Nappi's preemptory strike of Juror 14 constituted a violation of the rule against

---

[5]     Here the Court substituted gender for race.  In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), the United States Supreme Court extended *Batson* to gender-based preemptory challenges. *Id.* at 142; *United States v Analetto*, 807 F.3d 423, 425 (1st Cir. 2015).

impermissible discrimination in jury selection announced in *Batson* and extended to gender discrimination.

### D.     Juror Number 161

Ms. Tourangeau argues that a new trial is warranted because Juror Number 161 "displayed such bias, hostility, and false responses to voir dire that his presence tainted the entire jury pool against plaintiff." *Pl.'s Mot.* at 31. She submits that the Court erred in not dismissing Juror 161 during trial when Ms. Tourangeau filed her motion to disqualify based on juror bias. The Court disagrees. The Court concludes that it properly denied Ms. Tourangeau's motion and that there is insufficient evidence to find that Juror Number 161 provided false responses during voir dire.

#### 1.     Factual Background

At the outset of jury selection, the Magistrate Judge asked two general questions:

> Have any of you, members of the jury, ever been a member of an organization that has advocated on topics relevant to women's rights or gender-related issues?

> Have you ever been a member of any organization who has advocated regarding - - that is lobbied, advocating, for any organization regarding women's rights or gender-related - - or gender-equity-related issues?

*Jury Selection Tr.* at 5:20-6:1. The Magistrate Judge asked members of the jury venire to stand if the answer to either question was affirmative. *Id.* 6:1. Juror Number 161 did not stand.

Also, during jury selection, Juror Number 161 responded in the negative to all questions on the printed juror questionnaire, including questions seven and eight:

7. The law protects against discrimination of individuals with certain medical conditions, including a woman's pregnancy. Do you have any strong feelings or philosophical beliefs about such laws that might interfere with your ability to be fair and impartial in a case in which the laws might apply?

8. Do you have any strong personal feelings or philosophical beliefs about an individual's ability to bring a lawsuit to recover money damages that might interfere with your ability to be a neutral impartial decision-maker in a case in which a person is seeking money damages?

*Id.* at 11:24-25.  None of the prospective jurors, including Juror Number 161, stood in response to the Magistrate Judge's question: "Do you believe that there are any circumstances under which a man and a woman, with the same experience, education, and seniority, should be paid a different wage for performing the same job?" *Id.* at 6:15-18.

Before the fourth day of trial, Ms. Tourangeau moved to disqualify Juror Number 161.  *Pl.'s Mot. for Misc. Relief to Disqualify Juror* (ECF No. 186).  In part, she argued that "it appears" Juror Number 161 lied in his responses to the written juror questionnaire based on his "Facebook interests."  *Id.* ¶ 5.  In support of that assertion, she represented that Juror Number 161 "is part of a secret Facebook group called #FEDUP."  *Id.* ¶ 9.  She represented to the Court that Juror Number 161 "liked" a Facebook page called "#FEDUP," which she submitted contains a statement about "how we can come together for change and resistance against the liberal/democratic/socialist agenda."  *Id.* ¶¶ 9-10.  She further submitted that the Facebook page "appears distinctly opposed to the rights of women and all other minority groups."  *Id.* ¶ 10.  Finally, she submitted that based on Juror Number 161's

liking of this Facebook group, it was clear that he lied in his responses to questions 7 and 8 during voir dire. *Id.* ¶ 11.

In her motion to disqualify, Ms. Tourangeau contended that her counsel observed Juror Number 161 rolling his eyes and exhibiting "obvious distain" for her testimony during trial. *Id.* ¶ 8. She further suggested that her counsel heard Juror Number 161 making "biased utterances" during her testimony and "scoffing" at and disregarding testimony about Frank Ma[io]rino. *Id.*

On March 3, 2023, the Court addressed Ms. Tourangeau's motion to disqualify with the parties. *Trial Tr.* at 1081:21-1097:24. While reviewing her motion orally with the Court, Ms. Tourangeau conceded that she did not know when Juror Number 161 liked the Facebook page. *Id.* at 1085:6-8. The Court then engaged in following discussion:

> THE COURT: Do we -- do we know from the fact he liked it what it was he liked about it?
>
> MS. QUINLAN: Your Honor, people who follow these types of accounts on Facebook, they do not like it if they do not wholeheartedly follow these ideas and philosophies. If you are not one of the people who agrees with these statements, you do not put that on your social media.
>
> THE COURT: So he -- so as opposed -- you're -- I don't know what I -- how to consider this. So you're making a representation that if someone likes this website that if he -- that someone else is going to track him down and make sure that he agrees with all the principles of the website?
>
> MS. QUINLAN: I'm not saying they're going to track him down and make sure, I'm saying that these opinions are inflammatory and people who don't agree with them are not going to represent to others that there is even a chance that they agree with these opinion because --

THE COURT: Well, I mean I hear you, but there is really no evidence of that.  I hear what you're telling me, but I don't -- I'm not so sure that there is evidence of that.  Do you have anything further on this?

MS. WHITE:  No, I think that's it.  Thank you, Your Honor.

*Jury Selection Tr.* at 1087:2-24.  Ms. Tourangeau acknowledged that she did not find anything on Juror Number 161's personal Facebook page to suggest that he liked or shared any posts from "#100percentFEDUP."  *Id.* at 1088:24-1089:5.

The Court denied Ms. Tourangeau's motion to disqualify. First, the Court indicated that Ms. Tourangeau had failed to demonstrate a colorable instance of potential juror bias because there was no evidence that Juror Number 161 lied in responding to questions 7 and 8 of the juror questionnaire.  The Court reasoned:

> To obtain a disqualification, the person seeking disqualification must present a, quote, colorable or plausible, unquote, claim that juror misconduct has occurred.
>
> . . .
>
> My view of this is first that questions seven and eight do not ask the juror to reveal facts.  They ask the juror to reveal his opinions and they ask his opinion about whether or not he could be fair and impartial in those two types of cases.
>
> So I don't -- he -- he said that -- he responded that in his view he would not be biased, effectively, and that's different than [*United States v.*] *French*, [904 F.3d 111 (1st Cir. 2018)]. . . . So I see this – it's hard to delve into an opinion about one's own ability to be fair and impartial and conclude, unlike in *French* that there -- that the juror has lied.
>
> Second, I mentioned that the first question was whether or not a juror could be fair about a case that involves a medical condition involving pregnancy.  I have looked at the website; I don't really see a connection between the website and that question.
>
> Secondly, question eight asks about a person bringing a lawsuit.  It's not specific about women.  It's not specific about discrimination.  It's not

specific about unequal pay.  So I don't think this is like *French* in that regard.

*Id.* at 1094:5-1095:4.  The Court indicated that to the extent Juror Number 161 liked a website for 100percentfedup.com, the most the Court could reasonably infer from the information provided is that Juror Number 161 is a politically conservative person.  *Id.* at 1095:5-18.  The Court noted that there was no evidence that Juror Number 161 liked any particular postings or of what was in his mind with regard to any particular posting.  *Id.*  Nor did the Court think it was fair to infer that a person who liked the page agreed with everything on the page.  *Id.* at 1095:24-1096:3.  The Court concluded that it would not be fair to infer that a person who liked the website could not be a fair and impartial juror.  *Id.* at 1095:5-18.

Finally, the Court noted that it had been observing Juror Number 161's demeanor since Ms. Tourangeau had filed her motion.  The Court stated that it could not hear Juror Number 161 and therefore did not know if he had ever "scoffed."  *Id.* at 1097:13-14.  The Court also stated that Juror Number 161 would "occasionally . . . look up as if he is sort of frustrated" and went on to provide:

> I haven't noticed that he has been doing that at any particular time.  In other words, he doesn't look up more when [the defendant] is asking questions as opposed to the plaintiff asking questions.  So I'm not convinced, from what I have seen here, that he has exhibited body language and an attitude that would render him disqualified.

*Id.* at 1097:16-22.

### 2.     Legal Standard

The First Circuit has held that "[a] party seeking a new trial because of non-disclosure by a juror during voir dire must do more than raise a speculative allegation

that the juror's possible bias may have influenced the outcome of the trial." *Dall v. Coffin*, 970 F.2d 964, 969 (1st Cir. 1992).   To the contrary, "'a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause.'"  *Id.* (quoting *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556 (1984)).   The First Circuit has also required a party seeking a new trial based on nondisclosure by a juror to "demonstrate actual prejudice or bias."  *Id.* (quoting *United States v. Aponte-Suarez,* 905 F.2d 483, 492 (1st Cir. 1990)).   The First Circuit has emphasized that this "burden of proof must be sustained not as a matter of speculation, but as a demonstrable reality."  *Id.* (citations and internal quotation marks omitted).

### 3.   Analysis

Ms. Tourangeau submits that a new trial is warranted because of the bias and hostility demonstrated by Juror 161 during trial.  She further submits that Juror 161 provided false answers to questions seven and eight on the juror questionnaire.[6]  She contends that because he "liked" the 100PercentFedUp page on Facebook, his

---

[6]   Questions seven and eight ask:

7. The law protects against discrimination of individuals with certain medical conditions, including a woman's pregnancy.  Do you have any strong feelings or philosophical beliefs about such laws that might interfere with your ability to be fair and impartial in a case in which the laws might apply?

8. Do you have any strong personal feelings or philosophical beliefs about an individual's ability to bring a lawsuit to recover money damages that might interfere with your ability to be a neutral impartial decision-maker in a case in which a person is seeking money damages?

*Jury Selection Tr.* at 11:24-25.

philosophical beliefs necessarily prevent him from being a neutral juror on a question pertaining to gender discrimination laws. Ms. Tourangeau further contends that Juror Number 161 provided false responses during voir dire because he did not stand in response to the Magistrate Judge asking "Have any of you . . . ever been a member of an organization that has advocated on topics relevant to women's rights or gender-related issues?" *Jury Selection Tr.* at 5:20-22. She relies on *French* and *Tucker* to support her argument.

The Court addressed both *French* and *Tucker* when responding to Ms. Tourangeau's motion to disqualify during trial. The Court explained at great length why it does not read *French* or *Tucker* as requiring the Court to bring in and question Juror 161 here. *See Trial Tr.* at 1090:17-1097:24. The Court provided in part:

> I spoke the other day about *United States versus Tucker*, which was recently decided by the First Circuit, saying that the overriding -- overarching principle is that an impartial jury is an integral component of a fair trial and must be jealously safeguarded; therefore, the trial court has a duty to investigate an allegation of jury taint promptly, and the judge must determine if a taint-producing event actually occurred and if so the extent or pervasiveness of the resulting prejudice.
>
> . . .
>
> I've had experience with this in a somewhat similar context but not during trial and not involving this type of question. It was *United States versus French*, 904 F.3d 111, a 2018 First Circuit case. And the question in that case, similar to the question here, was whether a juror had honestly answered a material question. And the standard is a party must first demonstrate that a juror failed to answer honestly a material question on voir dire and further show that a correct response would have provided a valid basis for a challenge for cause.
>
> . . .
>
> My view of this is first that questions seven and eight do not ask the juror to reveal facts. They ask the juror to reveal his opinions and they ask his opinion about whether or not he could be fair and impartial in those two types of cases. So I don't -- he -- he said that -- he responded

that in his view he would not be biased, effectively, and that's different than *French*. In *French* they asked the juror a specific factual question, she denied it, and it turned out that she had lied. So I see this – it's hard to delve into an opinion about one's own ability to be fair and impartial and conclude, unlike in French, that there -- that the juror has lied.

Second, I mentioned that the first question was whether or not a juror could be fair about a case that involves a medical condition involving pregnancy. I have looked at the website; I don't really see a connection between the website and that question.

Secondly, question eight asks about a person bringing a lawsuit. It's not specific about women. It's not specific about discrimination. It's not specific about unequal pay. So I don't think this is like *French* in that regard.

. . .

There are all sorts of different postings that have been made available to me and I'm not sure what he liked. I don't know what was in his mind.

So I don't think it's true that we can draw a conclusion that it would be a fair inference to conclude that because he likes a website with conservative political views that he could not be a fair and impartial juror here. I think that's a leap too far.

I also think that the fact that he liked 100percentfedup does not mean he necessarily adopts all the postings on the website any more than a member of the Democratic or Republican party necessarily agrees with all the positions of the party. I think that's true of any group.

*Trial Tr.* at 1090:17-1096:3.

The Court once again notes that question eight does not ask anything about gender, sex, or pregnancy. The Court is unsure why Ms. Tourangeau would suppose that Juror Number 161's "liking" of the 100PercentFedUp group would render him biased in all lawsuits brought to recover money damages.[7] Regarding question seven,

---

[7]      During trial, Ms. Tourangeau's counsel requested that the Court strike Juror Number 161. *Pl.'s Mot. for Miscellaneous Relief to Disqualify Juror* at 4 (ECF No. 186). The Court agreed that if it found that Juror Number 161 had engaged in misconduct, perhaps the safest thing would be to let him

the court concludes that the fact that Juror Number 161 "liked" the 100PercentFedUp page—absent other substantiated evidence—does not prove that the juror holds strong feelings or philosophical beliefs about pregnancy. *See, e.g., Cabrera v. Macomber*, No. 1:15-cv-01547-LJO-EPG-HC, 2018 U.S. Dist. LEXIS 132969, at *51 (E.D. Cal. Aug. 7, 2018) (denying a motion for new trial based on juror misconduct on the grounds that the moving party failed to support its request with competent evidence) (quoting *Anderson v. Calderon*, 232 F.3d 1053, 1098 (9th Cir. 2000)).

The Court likewise cannot conclude that Juror Number 161 should have stood up when asked whether he is a "member of an organization that has advocated on topics relevant to women's rights or gender-related issues" or a "member of any organization who has advocated regarding . . . women's rights or . . . gender-equity-related issues." Each question asked whether the person was a "member of" any such organization. Although Ms. Tourangeau blankly asserts that Juror 161 "should have"

---

go through trial and dismiss him as an alternate at the end of trial, even though alternatives are not typically used in civil cases. *Trial Tr.* at 642:22-643:4.

The Court is very conscious of its "'unflagging duty' . . . to investigate" a colorable or plausible claim of juror misconduct. *See French*, 904 F.3d at 117. After acknowledging its duty to investigate under *French* and *United States v. Tucker*, 61 F.4th 194 (1st Cir. 2023), the Court undertook an investigation by directing Ms. Tourangeau's counsel to produce any evidence that Juror 161 was a member of 100PercentFedUp or another similar group. *Trial Tr.* at 639:1-641:17. The Court noted that if Ms. Tourangeau could demonstrate that Juror Number 161 was a member of a group that advocated on women's issues, the Court could "draw the conclusion that he hasn't been truthful." *Id.* at 640:21-25. At the end of trial, Ms. Tourangeau's counsel expanded the record by including more about the website 100PercentFedUp but did not produce any evidence that Juror Number 161 was a member of that group or any other which had taken a stance on women's issues.

Given this development, the Court noted that the situation did not afford "very much flexibility." *Id.* at 1096:4-6. Unlike *French*, where the question was whether a juror had truthfully answered a specific factual question, here, the Court would have had to ask Juror Number 161 about his political views. *Id.* at 1096:6-11. The Court was concerned that once it asked Juror Number 161 about his Facebook postings and questioned him about his political views, it would have been difficult for Juror Number 161 to remain fair and impartial. *Id.* at 1096:11-20. The Court decided that it had properly investigated the allegation of juror misconduct and concluded no further investigation was warranted.

stood up in response to these questions, she has presented no evidence that by "liking" a Facebook page, an individual becomes a member of the organization that sponsored the page. Even if liking a Facebook page suggests some level of support for some or all of the contents of the page, Ms. Tourangeau has presented no evidence that Juror Number 161 actually joined any of the organizations that were the subject of the Magistrate Judge's questions.[8]

The Court simply cannot conclude from Juror Number 89's mere "like" of the 100PercentFedUp page that he is either a "member of an organization that has advocated for or lobbied on issues such as women's rights or gender equity" or that his "strong feelings or philosophical beliefs about laws that protect against discrimination of individuals with certain medical conditions, including pregnancy." Ms. Tourangeau has provided no other evidence that Juror Number 161 provided false answers during voir dire, and the Court thus concludes that a new trial is not warranted based on nondisclosure by Juror Number 161. *See Dall v. Coffin*, 970 F.2d at 969 (the "burden of proof" to demonstrate juror nondisclosure "must be sustained not as a matter of speculation, but as a demonstrable reality" (citations and internal quotation marks omitted).

Finally, the Court already addressed Juror 161's allegedly hostile conduct during trial, stating that the juror "occasionally will look up as if he is sort of frustrated, but [the Court hasn't] noticed that he has been doing that at any

---

[8]     Ms. Tourangeau presented no evidence about how Facebook works that would allow the Court to draw any conclusions about the significance of "liking" a page and no evidence at all that Juror 161 joined a Facebook group. The Court cannot take judicial notice about Facebook and its inner workings and if Ms. Tourangeau wished the Court to do so, she should have supplemented the record.

particular time . . . he doesn't look up more when [the defendant] is asking questions as opposed to the plaintiff asking questions." *Trial Tr.* at 1097:16-20.  The Court again agrees with its prior analysis and concludes that Juror 161 did not exhibit behavior sufficient to require disqualification or questioning.  *See United States v. Gibson*, 353 F.3d 21, 26 (D.C. Cir. 2003) (holding that defense counsel's "unsubstantiated suspicion" of juror bias based on the juror's facial expressions does not, on its own, require the district court to conduct jury questioning) (citing *United States v. Thornton*, 746 F.2d 39, 50 (D.C. Cir. 1984)).  As the record now stands, there is no evidence supporting counsels' assertions that this juror engaged in inappropriate facial expressions and verbal conduct.  In essence, the Court is left with argument without evidence.

The Court reaffirms its reasoning in denying the motion and concludes that whether Juror 161 still "likes" the 100PercentFedUp page today is irrelevant to the Court's reasoning.[9]

Although Ms. Tourangeau disavows seeking to disqualify Juror 161 because of his political views, parties are not entitled to jurors—whether progressive or conservative—who belong to a particular political party or who share their world view.  People come to jury service from all walks of life, with different levels of

---

[9]    Ms. Tourangeau suggests that the Court should bring in Juror Number 161 now to question him as to why he has since "unliked" the 100PercentFEDUP Facebook page, at some point after Ms. Tourangeau filed her motion for new trial.  Ms. Tourangeau, however, provides no legal support indicating that it would be proper for the Court to do so.  The Court does not know what may have prompted Juror Number 161 to "unlike" the page, but the Court concludes that regardless of the reason, Juror Number 161 did not "display[] such bias, hostility, and false responses to voir dire that his presence tainted the entire jury pool against plaintiff," as Ms. Tourangeau suggests.  *Pl.'s Mot.* at 31.

education, a variety of job skills, and a broad range of life experiences.  No one is a blank slate.  Jury duty requires that jurors be willing to impartially evaluate the evidence, find the facts, and apply the law as instructed whether they agree with it or not.  Ms. Tourangeau has made no showing that Juror 161's personal or political views made him less than a fair and impartial juror.

## V.    CONCLUSION

The Court DENIES Michele Tourangeau's Motion for New Trial Pursuant to Federal Rule of Civil Procedure 59(a)(1)(A) (ECF No. 219).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 18th day of July, 2023